# Unpublished Opinions

1995 WL 424906
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

John BODOR, Sr., Plaintiff,
v.
HORSHAM CLINIC, INC., et al., Defendants.

No. CIV. A. 94-7210.
|
July 19, 1995.

MEMORANDUM

REED, J.

***1** Plaintiff John Bodor, Sr. brought this action against defendants Horsham Clinic, First Hospital Corporation, David Barron, M.D. and Susan Gasteyer, M.D. (collectively "defendants").[1] Plaintiff claims that defendants deprived him of his constitutional rights and his rights under the laws of the United States in violation of 42 U.S.C.A. § 1983 (West 1994). Plaintiff also makes claims under Pennsylvania law for gross negligence and false imprisonment. This Court has jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1367 (West 1993).

Pending before the Court is the motion of defendants to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). (Document No. 11). For the following reasons, the motion will be granted in part and denied in part.

## I. FACTUAL BACKGROUND[2]

On December 1, 1993, plaintiff John Bodor, Sr. engaged in a drinking binge and allegedly threatened to commit suicide. Bodor's employer, William Yost, contacted the East Coventry police department. Officer Karl A. Jones, of the East Coventry Township police department, met Bodor at Bodor's home and transported him to the emergency room of the Phoenixville Hospital in Chester County, Pennsylvania.

Upon arrival at the Phoenixville Hospital, Officer Jones completed an application for the involuntary examination and treatment of plaintiff pursuant to sections 7301 and 7302 of the Pennsylvania Mental Health Procedures Act. Pa. Stat. Ann. tit. 50, §§ 7301-03 (1994).[3] Officer Jones received assistance with this application from Stacey L. Zang, a crisis counselor employed by the Chester County Mental Health Crisis Department. Officer Jones then filed the application with the Mental Health Delegate of the Office of the County Administrator for the Chester County Department of Mental Health and Mental Retardation Board pursuant to section 7302 of the Pennsylvania Mental Health Procedures Act.[4]

On December 1, 1993, following the completion of the involuntary commitment application at the Phoenixville Hospital, plaintiff was transported against his will in an ambulance from Phoenixville Hospital to the Horsham Clinic in Ambler, Pennsylvania. Plaintiff alleges that defendants did not notify plaintiff of his due process rights at the time of plaintiffs emergency examination or at the time of plaintiff's arrival at the Horsham Clinic, as required by section 7302(c) of the Pennsylvania Mental Health Procedures Act.[5] On December 2, 1993, defendants submitted an involuntary committal petition to the Chester County Court of Common Pleas, or to an authorized representative thereof, in accordance with the requirements for extended involuntary emergency treatment under section 7303(a).[6] Plaintiff did not receive a hearing within twenty-four hours of the application for extended committal. *See* Pa. Stat. Ann. tit. 50, § 7303(b).[7]

On December 6, 1993, a hearing was held before a hearing officer of the Chester County Court of Common Pleas at the Horsham Clinic as required by section 7303 of the Pennsylvania Mental Health Procedures Act. The Hearing Officer found that plaintiff's due process rights under the Pennsylvania Mental Health Procedures Act had been violated and plaintiff was released from the Horsham Clinic. As a result of these events, plaintiff claims that he has sustained various injuries including, *inter alia,* mental anguish, pain, humiliation and personal indignity. Additionally, plaintiff alleges that he has been unable to undertake his "normal duties" and believes that he will suffer "impairments" in the future which will result in a decrease in his earning capacity.

## II. DISCUSSION

***2** In determining whether or not to grant a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), this Court is required to "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them." *Markowitz,* 906 F.2d at 103. Dismissal is appropriate under Rule 12(b)(6) only when a plaintiff has alleged no set of facts which, if proved, would entitle the plaintiff to relief. *Id.*

Plaintiff brings three claims against defendants. The first two assert claims of gross negligence and false imprisonment arising under Pennsylvania law. Plaintiff's third claim alleges that defendants deprived him of his federal civil rights under 42 U.S.C.A. § 1983 (West 1994), as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. [8] Defendants essentially argue that plaintiff cannot satisfy the state action requirement under the Fourteenth Amendment and section 1983. Accordingly, defendants have moved to dismiss plaintiff's third claim. Defendants also request that this Court not exercise its supplemental jurisdiction over plaintiff's state law claims once the federal claim is dismissed. For the following reasons, defendants' motion to dismiss shall be granted. This Court, however, will retain supplemental jurisdiction over plaintiff's state law claims.

A. Federal Claims

Plaintiff brings a federal civil rights claim under 42 U.S.C.A. § 1983. To state a claim upon which relief can be granted under this statute, plaintiff must satisfy two elements. [9] *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155 (1978). First, plaintiff must demonstrate that defendants "deprived [him] of a right 'secured by the Constitution and the laws of the United States." *Id.* at 155; *see Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995). Second, plaintiff must show that defendants acted "under color of state law." *Groman,* 47 F.3d at 638; *see Flagg Bros.,* 436 U.S. at 155.

As to the first element, plaintiff must show that his federal statutory or constitutional rights were violated. In order to do so, plaintiff attempts to state a claim under the Due Process Clause of the Fourteenth Amendment. [10] To state a claim under that clause, plaintiff must prove that he was (1) deprived of his right to life, liberty or property without due process of law; (2) by a state actor. *See Flagg Bros.,* 436 U.S. at 155 n. 4. Plaintiff has failed to demonstrate that defendants were functioning as state actors at the time of the violation and, therefore, it is unnecessary to decide whether defendants conduct constituted a "deprivation" of plaintiff's due process right to liberty. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349 (1974); *Shelley v. Kraemer,* 334 U.S. 1, 13-14 (1948); *see, e.g., O'Connor v. Donaldson,* 422 U.S. 563, 580 (1975) ("There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law."). Because defendants were not state actors, plaintiff cannot state a claim because "the Fourteenth Amendment offers no shield" against private conduct, no matter how "discriminatory or wrongful." *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349 (1974) (citing *Shelley,* 334 U.S. at 13). [11]

***3** Moreover, in order to satisfy the second prong of a section 1983 claim, plaintiff must demonstrate that the actions of the defendants, all private doctors and hospitals, were conducted "under color of state law". *See Lugar,* 457 U.S. at 930. While courts have often treated the "under color of state law" inquiry of section 1983 identically to the "state action" requirement of the Fourteenth Amendment, the Supreme Court has noted that "[c]onduct satisfying the state action requirement under the Fourteenth Amendment will satisfy the § 1983 requirement as well, but the reverse is not necessarily true." *Lugar,* 457 U.S. at 935 n. 18; *United States v. Price,* 383 U.S. 787, 794 (1966); *Groman,* 47 F.3d at 639 n. 15. Because I do not find that defendants conduct constituted state action under the second prong of the Fourteenth Amendment, it is not necessary to determine whether defendants conduct was taken "under color of state law" pursuant to the section 1983 inquiry.

Therefore, the key inquiry here is whether defendants were "state actors," and not private parties. *Groman,* 437 F.3d at 638. "[T]he question whether particular conduct is 'private, on the one hand, or 'state action, on the other, frequently admits of no easy answer.'' *Jackson,* 419 U.S. at 349-50 (quoting *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 723 (1961)). In this case, plaintiff does not contest defendants assertion that defendants were not state officials or agencies. However, simply determining that the actors were not state employees does not end the analysis. *See Groman,* 47 F.3d at 638. Private conduct can still be classified as state action when a detailed factual inquiry into the relationship between the private actor and the State reveals that the defendants conduct is "fairly attributable to the State." *Rendell-Baker,* 457 U.S. at 838 (quoting *Lugar,* 457 U.S. at 937).

The Supreme Court has developed four tests to satisfy this state action inquiry, including the close nexus test, the government compulsion test, the traditional governmental function test, and the symbiotic relationship test.[12] *See Rendell-Baker,* 457 U.S. at 842; *Jackson,* 419 U.S. at 351-53. The Court of Appeals for the Third Circuit in *Groman* stated that whichever state action test is utilized by a court, the heart of the inquiry should be the same. *Groman,* 47 F.3d at 639. That is, the focus should be "to discern if the defendant 'exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'' *Id.* (quoting *West v. Atkins,* 487 U.S. 42, 49 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326 (1941)); *see also Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 620 (1991) (describing the state action inquiry as "whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority"). The following analysis addresses whether defendants conduct was "fairly attributable to the State" under each of the state action tests. *Lugar,* 457 U.S. at 937.

1. Close Nexus Test

***4** The Supreme Court has stated that the state action requirement can be satisfied through the close nexus test, which requires an inquiry into "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson,* 419 U.S. at 351. The Court expounded upon this test in *Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982). *Blum* involved a privately owned nursing home which was subsidized and heavily regulated by the State of New York. *Id.* at 1008. Despite this extensive regulation and funding by the State, the Court found that no "sufficiently close nexus" existed between the State and the nursing home. *Id.* The Court held that the conduct of the nursing home did not amount to state action, and stated that "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Id.* at 1004 (quoting *Jackson,* 419 U.S. at 350). Moreover, in *Rendell-Baker,* the Court examined the relationship between the State of Massachusetts and a private school that received 90% of its funding from the State, operated under a state contract, and was heavily-regulated by the State. *Rendell-Baker,* 457 U.S. at 840-42. The Court held that there was no "sufficiently close nexus" between the State and the school because the receipt of funding did not convert the decisions of the school into acts of the State, and the school's decisions were not compelled by state regulation. *Id.* at 841-42.

In a case similar to the one at bar, the Court of Appeals for the Eleventh Circuit used the rationale from *Blum* and *Rendell-Baker* in their application of the "close nexus" test to the conduct at issue there. *See Harvey v. Harvey,* 949 F.2d 1127, 1131 (11th Cir.1992). In *Harvey,* the plaintiff, who was involuntarily committed pursuant to a Georgia statute, brought a section 1983 claim against a private mental health facility for a violation of her due process right to liberty. *Harvey,* 949 F.2d at 1129-30. The Court of Appeals for the Eleventh Circuit held that the plaintiff failed to state a claim for relief under section 1983 because the private hospital was not a state actor.[13] The court reasoned that for a sufficiently close nexus to be created, the State must have "so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Id.* at 1131. In *Harvey,* the only connection between the defendants and the State of Georgia involved the defendants compliance with the Georgia involuntary commitment statute. *Id.* at 1129. The Court of Appeals for the Eleventh Circuit reasoned that no "close nexus" existed between the State and the private defendants, because the Supreme Court had rejected the presence of such a connection in cases with "much more compelling" circumstances, such as in *Blum* and *Rendell-Baker. See id.* The *Harvey* court concluded that if no joint action existed between the State and the heavily regulated and publicly-funded defendants in *Blum* and *Rendell-Baker,* then no close nexus existed between the State and a private hospital which simply followed the guidelines of a state commitment statute. See *id.*

***5** The Court of Appeals for the First Circuit followed the rationale of the Court of Appeals for the Eleventh Circuit in a recent decision involving the involuntary committal of a patient by a private hospital and physicians pursuant to a Massachusetts statute, Mass. Gen. L. ch. 123, § 12(a) (1993). *See Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 257-58 (1st Cir.1994). In *Rockwell,* the plaintiff argued that the hospital's receipt of government funding and the heavy state regulation of the hospital's activities mandated the classification of the private defendants as state actors. *Rockwell,* 26 F.3d at 258. The Court of Appeals for the First Circuit, relying upon the *Harvey* case, held that no close nexus existed between the State and the private hospital so as to convert private actions into state actions. *Id.* The *Rockwell* court found that the defendants receipt of government funding and compliance with a state statute were insufficient to create state action and,

therefore, the plaintiff could not state a claim under section 1983. *See id.* ("[G]overnment regulation, even extensive regulation, and the receipt of federal funds, such as Medicare, Medicaid and Hill-Burton funds, are insufficient to establish that a hospital or other entity acted under color of state law.").

Similarly, in this case, there were no actions taken by the doctors, the Horsham clinic, or its parent corporation, First Hospital, which created a "sufficiently close nexus" with the Commonwealth of Pennsylvania. The only conduct that plaintiff alleges connects the defendants with Pennsylvania is that defendants complied with the Pennsylvania Mental Health Procedures Act. Several courts, including the Supreme Court and the Court of Appeals for the First and the Eleventh Circuits, have analyzed cases with far greater connections between the State and the private actor and still have failed to find a "sufficiently close nexus" to establish state action. *See Blum,* 457 U.S. at 1008; *Rendell-Baker,* 457 U.S. at 841-42; *Rockwell* 26 F.3d at 258; *Harvey,* 949 F.2d at 1129. Similarly here, because plaintiff alleges even less connection between the defendants and Pennsylvania than in these other cases, I conclude that plaintiff has not demonstrated the existence of a relationship of interdependence between defendants and the State to support a claim under the "sufficiently close nexus" test.

2. Government/State Compulsion Test

The requirement of state action can also be satisfied through the government compulsion test, also known as the state compulsion test. *Blum,* 457 U.S. at 1004; *Jackson,* 419 U.S. at 357 n. 17; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 170-71 (1970). The government compulsion test is based upon the premise that private action can be attributed to the State when the State has coerced the conduct, through either overt or covert encouragement. *Blum,* 457 U.S. at 1004. In the instant case, I must determine whether the Commonwealth of Pennsylvania compels or coerces involuntary commitments by private citizens, thereby changing their status from private to state actors. Stated more simply, the issue is whether Pennsylvania has encouraged involuntary commitments, and in doing so, has transformed the private conduct of defendants into state action.

***6** While the Court of Appeals for the Third Circuit has not addressed the question of whether a state's involuntary commitment statute coerces private activity, three circuits have considered this issue. *Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 258 (1st Cir.1994); *Harvey v. Harvey,* 949 F.2d 1127, 1130-31 (11th Cir.1992); *Spencer v. Lee,* 864 F.2d 1376, 1379 (7th Cir.1989) (en banc), *cert. denied,* 494 U.S. 1016 (1990). In *Harvey,* the Court of Appeals for the Eleventh Circuit examined the Georgia involuntary commitment statute and held that Georgia did not compel or encourage commitments. *See Harvey,* 949 F.2d at 1130-31. The *Harvey* court relied upon a lower court decision which had analogized the Georgia involuntary commitment statute to a statute which permitted merchants to detain suspected shoplifters for questioning by police. *See Harvey* 949 F.2d at 1131 n. 8 (citing *Watkins v. Roche,* 529 F.Supp. 327, 331 (S.D.Ga.1981)). The shoplifter detention statute was not considered state compulsion of private activity because the detention was permitted but not required or directed by the statute. *Watkins,* 529 F.Supp. at 331 (quoting *White v. Scrivner,* 594 F.2d 140, 143 (5th Cir.1979) ("The ... provision does not compel merchants to detain shoplifters, but merely permits them to do so under certain circumstances. Absent some compulsion or overt state involvement, no state action can be found because of the mere existence of the statute."). Using this reasoning, the Court of Appeals for the Eleventh Circuit found that the Georgia statute at issue in *Harvey* did not compel involuntary commitments, but merely allowed for their use in certain limited circumstances. *See Harvey,* 949 F.2d at 1130-31; *Watkins,* 529 F.Supp. at 331. Therefore, because the court found that Georgia did not promote or encourage involuntary commitments, the court held that the state commitment statute did not convert private action into state action through coercion. *Harvey,* 949 F.2d at 1131.

Similarly, the Court of Appeals for the First Circuit in *Rockwell* found that the Massachusetts involuntary commitment statute did not compel private action and, therefore, did not convert private action into state action. *See Rockwell,* 26 F.3d at 258. The Massachusetts statute at issue in *Rockwell* provided that a licensed physician who examines a person and finds that "failure to hospitalize the person would create a likelihood of serious harm by reason of mental illness may restrain or authorize the restraint of such person." *Id.* The court concluded that the use of the word "may" in the statute gave discretion to private physicians in their decisions involving involuntary commitments. *See id.* The *Rockwell* court found that this statutory language made involuntary commitments "permissive, not mandatory." *See id.* Thus, the Court of Appeals for the First Circuit held that because Massachusetts did not compel involuntary commitments, the private conduct of the physicians and

hospital did not constitute state action under the government compulsion test.[14] *Id.*

***7** The critical issue then is whether the Pennsylvania Mental Health Procedures Act compels or encourages involuntary commitments.[15] Section 7302(a) outlines the procedure for applying for emergency examination of a person thought to be in need of treatment under the provisions of the statute. *See* Pa. Stat. Ann. tit. 50, § 7302(a). Section 7302(a) provides that "[e]mergency examination may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination; or upon a warrant issued by the county administrator authorizing such examination; or without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination." *Id.*

Furthermore, if an individual is examined without a warrant, as in the instant case, the statute gives the persons seeking examination and treatment discretion to determine if such conduct is necessary. *See* Pa. Stat. Ann. tit. 50, § 7302(a)(ii). Section 7302(a)(ii) states that "[u]pon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, and [sic] physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination." Pa. Stat. Ann. tit. 50, § 7302(a)(ii). The use of the word "may" in the statute is permissive and does not mandate emergency commitments. The mental health professionals involved in the commitment process are afforded discretion concerning the need for an emergency examination, and under the reasoning of the courts stated above, the Pennsylvania statute does not compel involuntary commitments. *See Rockwell,* 26 F.3d at 258; *Harvey,* 949 F.2d at 1130-31. Therefore, these provisions permit emergency examination of an individual, but they do not require such action. *See Rockwell,* 26 F.3d at 258.

A court in the Middle District of Pennsylvania has determined that the Pennsylvania Mental Health Procedures Act does not compel or encourage involuntary commitments. *See Janicsko v. Pellman,* 774 F.Supp. 331, 338-39 (M.D.Pa.1991), *aff'd without op.,* 970 F.2d 899 (3d Cir.1992).[16] In *Janicsko,* the court observed that the language of section 7302 is "very close to the statutory language essentially approved by the Seventh Circuit in *Spencer,* that one subject to involuntary commitment 'may be admitted to a mental health facility.'" *Id.* at 339 (quoting Ill.Rev.Stat. ch. 91 1/2 3600 (1989)). The *Janicsko* court determined that this language increased the discretionary power of the private actors and decreased the coercive power of the State. *Id.* According to the court, this provision supported the conclusion that Pennsylvania does not compel private actors to involuntarily commit persons under the Mental Health Procedures Act.

As the *Janicsko* court noted, however, not all of the provisions of the Pennsylvania statute allow for such discretion on the part of private actors. *See Janicsko,* 774 F.Supp. at 338. For example, section 7302(b) states that "[a] person taken to a facility shall be examined by a physician within two hours of arrival." Pa. Stat. Ann. tit. 50, § 7302(b). The statute further provides that "[i]f it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately. If the physician does not so find, or if at any time it appears there is no longer a need for immediate treatment, the person shall be discharged." *Id.* These provisions require that specific actions be taken by physicians, thereby decreasing the discretionary power of the private actors. However, as the *Janicsko* court observed, "the 'shalls of § 302(b) ... appear to be in place more for the protection of the person to be committed than to compel that persons commitment by private actors." *Janicsko,* 774 F.Supp. at 338. For example, the requirement of an examination "within two hours of the patients arrival at the facility appears to protect patients from being forced to wait an undue period of time in custody before being examined by a qualified professional." *Id.* In sum, these requirements relate to the procedures that a person must be afforded once that person has been committed. *See id.* This coercive language does not appear to have been enacted in order to compel the commitment of individuals, but rather, to protect the due process rights of those persons examined and treated under the statute. *See id.*

***8** In light of the rulings of the courts discussed above and the text of the Pennsylvania statute at issue here, I conclude that Pennsylvania's involuntary commitment statute does not encourage or coerce private actors to commit persons. Because the actual decision to commit and examine a person is permissive, the inclusion of mandatory language relating to the procedures that must be provided to patients is insufficient to transform this statute into one which compels involuntary commitments. Simply, plaintiff has not demonstrated that Pennsylvania has sought to coerce any conduct other than the procedures mandating the protection of the rights of patients

or potential patients. Thus, the defendants were not state actors under the government compulsion test.

3. Public/Government Function Test

Another test that has been used to demonstrate the existence of state action is the government or public function test. *See Rendell-Baker,* 457 U.S. at 842. Under this test, the "relevant question is not simply whether a private group is serving a public function, [but] whether the function performed has been traditionally the exclusive prerogative of the State." *Id.* at 842 (internal quotation marks omitted). The scope of this test, therefore, is limited to those traditional activities that were within the *exclusive* domain of the State. *See Flagg Bros.,* 436 U.S. at 158 ("While many functions have been traditionally performed by government, very few have been 'exclusively reserved to the State."); *Groman,* 47 F.3d at 640. Therefore, I must determine whether involuntary commitments have been a traditional and exclusive function of the Commonwealth of Pennsylvania, and whether Pennsylvania has merely delegated this function to private actors. [17] *Rockwell,* 26 F.3d at 258. If the answers to these questions are in the affirmative, then the conduct of the defendants can be considered state action. *Id.*

A brief review of history indicates that involuntary commitments were not within the exclusive and traditional domain of the State, but rather, have been accomplished by both public and private actors throughout English and American history. *See Spencer,* 864 F.2d at 1380-81 (holding that civil commitment in State of Illinois was not a traditional and exclusive public function); *see also Rockwell,* 26 F.3d at 259 (stating that involuntary commitments were "by no means the exclusive prerogative of the State [of Massachusetts]"). The involvement of private parties in commitments in England was described by Blackstone in 1765. *Spencer,* 864 F.2d at 1380-81. Blackstone wrote that: "On the first attack of lunacy, or other occasional insanity ... it is usual to confine the unhappy objects in private custody under the direction of their nearest friends and relations." *Id.* (quoting 1 William Blackstone, Commentaries 305). Similarly, throughout American history, "[f]rom the early 1800s until the Civil War, private citizens could freely admit mentally ill relatives to both public and private psychiatric facilities." *Rockwell,* 26 F.3d at 259 (footnote omitted).

***9** Furthermore, the predecessor to the current Pennsylvania commitment statute provides additional support for the conclusion that the commitment of individuals has been a function of both public and private actors in Pennsylvania. The Mental Health and Retardation Act of 1966, which was essentially repealed by the current involuntary commitment statute at issue here, permitted "a relative, guardian, friend, individual standing in loco parentis to the person to be committed, or ... the executive officer or an authorized agent of a governmental ... agency" to apply for a persons commitment. Pa. Stat. Ann. tit. 50, § 4404 (1969). Under this statute, both public and private individuals were responsible for committing the mentally ill for the purposes of examination. *See* Pa. Stat. Ann. tit. 50, § 4404-05 (1969). Therefore, this statute demonstrates that during the most recent point in Pennsylvania legal history, the commitment process had not been within the exclusive domain of the State.

My conclusion is further supported by the *Janicsko* decision in which the court found that involuntary commitments were not a traditional public function of the Commonwealth of Pennsylvania. *Janicsko,* 774 F.Supp. at 338. The court stated that although the plaintiff did not argue that commitments were a traditional public function, the court was "convinced by the *Spencer* courts elaborate history of private commitment of mental patients and its holding that commitment is not necessarily a traditional public function." *Id.* The court, therefore, found that civil commitments were not a traditional and exclusive public function of the Commonwealth of Pennsylvania. *Id.*

Similarly, in the instant case, plaintiff has not presented any evidence to support his contention that commitments of the mentally ill have been a traditional and exclusive state function in Pennsylvania. Thus, based upon the history of private and public commitments in the United States and Pennsylvania, I conclude that the commitment of the mentally ill has not been a traditional and exclusive function of the Commonwealth of Pennsylvania and, therefore, defendants conduct does not satisfy the public function test for state action. [18]

In conclusion, plaintiff has not established that defendants' conduct is "fairly attributable to the state" to convert it into state action. The nexus between defendants and the Commonwealth of Pennsylvania is insufficient to establish state action under the "close nexus" test and the symbiotic relationship test. Moreover, Pennsylvania does not compel or coerce private actors to involuntarily commit persons and, thus, defendants are not state actors under the government/ state compulsion test. Finally, because the involuntary

committal of the mentally ill has not been within the traditional and exclusive domain of the Commonwealth of Pennsylvania, defendants' conduct does not satisfy the public function test for state action. Therefore, defendants were not state actors and, thus, plaintiff has not stated a claim for a Due Process violation under the Fourteenth Amendment.

B. State Law Claims

***10** Defendants motion seeks dismissal of plaintiffs claims against them, including the state law claims of gross negligence and false imprisonment. Defendants contend that this Court should decline to exercise supplemental jurisdiction over these claims if the federal claim is dismissed. However, while the federal claims against these defendants have been eliminated, there still are federal claims pending in this Court against other defendants arising out of the same conduct. As a result, the exercise of supplemental jurisdiction over the state law claims against these defendants will further the interests of judicial economy and fairness by preventing piecemeal litigation and inconsistent verdicts. Therefore, this Court will exercise its supplemental jurisdiction over the remaining claims against the defendants, and the motion to dismiss plaintiffs state law claims shall be denied. Should the federal claims against the remaining defendants later be dismissed, this Court will reconsider its exercise of supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C.A. § 1367.

III. CONCLUSION

For the foregoing reasons, and because the complaint does not demonstrate that defendants' conduct amounted to state action, the motion of defendants Horsham Clinic, First Hospital, David Barron, M.D., and Susan Gasteyer, M.D. to dismiss plaintiffs section 1983 claim will be granted. The motion will be denied as to "cause [s] of action" one and two, as this Court will retain supplemental jurisdiction over these claims.

An appropriate Order follows.

**All Citations**

Not Reported in F.Supp., 1995 WL 424906

## Footnotes

1 Plaintiff originally named eleven defendants in his complaint. This Court granted summary judgment in favor of defendants Chester County Mental Health Crisis Intervention Department and Stacey L. Zang on June 8, 1995. Defendants Chester County Department of Mental Health/Mental Retardation Board, Edward McConnell and Donna Gonzales filed a motion to dismiss plaintiff's complaint which is pending before this Court.

2 The following operative facts from the complaint are construed in the light most favorable to plaintiff. *See Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990).

3 Sections 7301 and 7302 of the Mental Health Procedures Act dictate who may be subject to, and the procedures for, involuntary commitments in Pennsylvania. Determination of "[p]ersons who may be subject to involuntary emergency examination and treatment" is made according to section 7301(a). Pa. Stat. Ann. tit. 50, § 7301(a). Section 7301(a) states that "[w]henever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness ... he poses a clear and present danger of harm to others or to himself." *Id.* Section 7301(b) defines "clear and present danger to himself" as when the "person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide." *Id.* at § 7301(b)(2)(ii).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Once a person is found to fit the definition of “severely mentally disabled” under section 7301, an application for “[i]nvoluntary emergency examination and treatment authorized by a physician—not to exceed one hundred twenty hours” may be completed under section 7302. Pa. Stat. Ann. tit. 50, § 7302. The relevant section of 7302 states that “[e]mergency examination may be undertaken at a treatment facility ... without a warrant upon application by a physician or other authorized person who has personally observed conduct showing the need for such examination.” Pa. Stat. Ann. tit. 50, § 7302(a).

4 Section 7302(a)(2) states that “[u]pon personal observation of the conduct of a person constituting reasonable grounds to believe that he is severely mentally disabled and in need of immediate treatment, and [sic] physician or peace officer, or anyone authorized by the county administrator may take such person to an approved facility for an emergency examination.” Pa. Stat. Ann. tit. 50, § 7302(a)(2).

5 Section 7302(c) states that “[u]pon arrival at the facility, the person shall be informed of the reasons for emergency examination and of his right to communicate immediately with others. He shall be given reasonable use of the telephone. He shall be requested to furnish the names of parties whom he may want notified of his custody and kept informed of his status.” Pa. Stat. Ann. tit. 50, § 7302(c).

6 Section 7303 states that “[a]pplication for extended involuntary emergency treatment may be made for any person being treated pursuant to section 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours. The application shall be filed forthwithin the court of common pleas, and shall state the grounds on which extended emergency treatment is believed to be necessary.” Pa. Stat. Ann. tit. 50, § 7303(a) (footnote omitted).

7 Section 7303(b) states that “[w]ithin 24 hours after the application is filed, an informal hearing shall be conducted by a judge or by a mental health review officer and, if practicable, shall be held at the facility.” Pa. Stat. Ann. tit. 50, § 7303(b).

8 Plaintiff's claim under the Fifth Amendment fails because such a claim requires deprivation of a constitutional right by a federal actor. *See San Francisco Arts and Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 542 n. 21 (1987). Plaintiff has not alleged the presence of any federal action and, therefore, his claim will be dismissed to the extent that it alleges a claim under the Fifth Amendment.

Plaintiff's complaint also makes an amorphous claim under the Americans with Disabilities Act (“ADA”). 42 U.S.C.A. §§ 12101-213 (1994). However, plaintiff has failed to explain what provisions of the statute have been violated in his opposition to defendants motion to dismiss. As a result, this Court is unable to determine the substance of plaintiff's claim and therefore, plaintiff's claim, under the ADA, if any, will be dismissed.

9 Section 1983 states that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C.A. § 1983.

10 The pertinent section of the Fourteenth Amendment provides that “[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law.” U.S. Const. amend. XIV, § 1.

11 The Supreme Court has explained the rationale for the state action requirement as two-fold. *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936 (1982); *Community Medical Ctr. v. Emergency Medical Serv. of Northeastern Pa.,* 712 F.2d 878, 879 (3d Cir.1983). First, the state action requirement protects “individual freedom by limiting the reach of federal law and federal judicial power.” *Lugar,* 457 U.S. at 936; *Community Medical Ctr.,* 712 F.2d at 879. At the same time, the state action requirement prevents the imposition of responsibility” on the State, its agencies or officials ... for conduct for which they cannot fairly be blamed.” *Lugar,* 457 U.S. at 936; *Community Medical Ctr.,* 712 F.2d at 879.

12 “Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in such a situation” has not been resolved to date. *Lugar,* 457 U.S. at 939.

13 Before reaching this issue, the court first stated that the defendant hospital could not be held vicariously liable for the actions of its employees under section 1983. *Harvey,* 949 F.2d at 1129. The court stated that because there is no respondeat superior liability under section 1983, the “hospital cannot be faulted for the conduct of its employees.” *Id.* This defense would serve as an additional barrier to plaintiffs claims against defendants Horsham Clinic and First Hospital for the conduct of its physicians in this action.

14 Similarly, the Court of Appeals for the Seventh Circuit examined the involuntary commitment statute of Illinois to determine whether the state statute encouraged or compelled commitments. *See Spencer,* 864 F.2d at 1378-79. The Illinois statute at issue in *Spencer* stated that a person “in need of immediate hospitalization may be admitted to a mental health facility pursuant to this article.” Ill.Rev.Stat. ch. 91 1/2 3-600 (1989). After consideration of this language, Judge Posner, writing for the Seventh Circuit sitting en banc, concluded without any further explanation, that Illinois did not enact this statute because the State sought to encourage commitments, “any more than state repossession laws are passed because states want to encourage creditors to repossess their debtors goods.” *Spencer,* 864 F.2d at 1379.

15 For relevant text of the Pennsylvania Mental Health Procedures Act, Pa. Stat. Ann. tit. 50, §§ 7301-03, *see supra* notes 3-7.

16 In *Janicsko,* the plaintiff was involuntarily committed pursuant to the Mental Health Procedures Act, Pa. Stat. Ann. tit. 50, §§ 7301-03. *Janicsko,* 774 F.Supp. at 334. Following her release, plaintiff brought a section 1983 claim against two private physicians and the private hospital involved in her commitment. *Id.* at 335. The court held that the statute did not rise to the level of coercion and, therefore, the plaintiff did not satisfy the government compulsion test for state action. *See id.* at 339. For this reason, the court dismissed the complaint for failure to state a claim under section 1983. *See id.*

17 The Supreme Court has recently described this state action test as the “traditional government function” test, rather than the “exclusive government function” test. *See Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 621 (1991). The Court of Appeals for the Third Circuit examined this change and concluded that the Supreme Court would not have attempted to radically alter the substance of this test without any discussion. *Groman,* 47 F.3d at 640 n. 18. Therefore, despite this difference in terminology, the Third Circuit has stated that the “exclusivity” requirement still must be satisfied under this test. *See id.*

18 A fourth test, the symbiotic relationship test, also has been used to determine whether private conduct satisfies the state action requirement. *See Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725 (1961). The “symbiotic relationship” test examines the overall relationship between the state and a private party to determine “if there is a great degree of interdependence between the two.” *Janicsko,* 774 F.Supp. at 335 n. 3 (citing *Burton,* 365 U.S. at 725). I find that defendants are not state actors under this test. First, plaintiff does not argue that defendants' conduct constituted state action under this test. Second, for the reasons stated in part II.A.1. of this memorandum, relating to the “close nexus” inquiry, I find that there was no interdependence

between the private defendants and the Commonwealth of Pennsylvania to convert defendants into state actors. *See supra* part II.A.1.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

1996 WL 510095
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Rebecca S. DOBY and Herbert K. Doby
v.
James DECRESCENZO, et al.

No. CIV. A. 94–3991.
|
Sept. 9, 1996.

*MEMORANDUM*

RENDELL, Judge.

***1** Plaintiffs, husband and wife, filed this § 1983 action against the defendants arising out of the involuntary commitment of Rebecca Doby at Doylestown Hospital on December 30, 1993. Plaintiffs also allege various state law claims against defendants. Defendants include: James DeCrescenzo (hereinafter "DeCrescenzo"), who was Mrs. Doby's employer and the person who applied for the warrant to have her involuntarily examined on an emergency basis; the Lenape Valley Foundation (hereinafter "LVF"), and Amy Bryant (hereinafter "Bryant") (collectively "the Foundation defendants"), who took information from DeCrescenzo and processed the warrant application; the Bucks County Department of Mental Health and Mental Retardation (hereinafter "Bucks County"), Philip M. Fenster (hereinafter "Fenster"), and Debbie Neidhardt (hereinafter "Neidhardt") (collectively "the County defendants"), under whose auspices the warrant was authorized and issued; the Township of Warrington, the Warrington Township Police Department (hereinafter "the Police Department"), Chief John Bonargo (hereinafter "Chief Bonargo"), Sergeant Joseph Knox (hereinafter "Knox"), Officer Michael Neipp (hereinafter "Neipp"), and Officer Kenneth Hawthorn (hereinafter "Hawthorn") (collectively "the Police defendants"), who were responsible for serving the warrant upon Mrs. Doby and taking her to Doylestown Hospital for the examination; and Dr. John C. Richards (hereinafter "Dr. Richards") and Doylestown Hospital (hereinafter "the Hospital"), who examined and involuntarily committed Mrs. Doby.Plaintiff and each of the defendants have moved for summary judgment.

*DISCUSSION*

I.STATEMENT OF FACTS AND THE PENNSYLVANIA MENTAL HEALTH PROCEDURES ACT

The facts of this case are extensive, as evidenced by the hundreds of pages of documents and deposition testimony submitted by the parties in support of their motions. I will briefly summarize the facts here, then add further facts as may be relevant to the discussion of plaintiffs' specific claims against each defendant.

Rebecca Doby began working as a court reporter for DeCrescenzo's court reporting agency in 1991 when she, her husband, and their child moved to Philadelphia to be closer to Herbert Doby's daughter from a prior marriage. Plaintiffs allege that Rebecca Doby and DeCrescenzo formed a personal relationship beyond that of an employer and an employee which involved personal letters from Rebecca Doby to DeCrescenzo (and one from DeCrescenzo) and several instances of personal intimacy. In early 1993, April 1993, and approximately June 1993, Rebecca Doby wrote three letters to DeCrescenzo, each in a flowery, melodramatic style, filled with very personal reflections. Rebecca Doby further alleges that several instances of physical, sexual contact between herself and DeCrescenzo occurred during this time period. DeCrescenzo has denied many of the events alleged, or characterizes them differently, but has not denied having received the three letters from Rebecca Doby.

***2** In September 1993, Rebecca Doby and Herbert Doby had been arguing, and Rebecca Doby "felt a great need to get out of our small apartment and have a break from him." She asked DeCrescenzo whether she and her daughter Amanda could stay with his family (DeCrescenzo and his wife and three children), and he acquiesced. They stayed with the DeCrescenzos for approximately three nights.

On December 22, 1993, Rebecca Doby gave DeCrescenzo an eleven-page letter which was flowery and melodramatic, and which has been characterized in many different ways by the different parties. In the letter, Rebecca Doby indicates she wants to end her relationship with DeCrescenzo. The letter discusses painful experiences from Rebecca Doby's childhood, contains statements referring to the shortness of time and how life is fleeting, and is rather graphic in describing sexual conduct she would like to engage in with DeCrescenzo. After receiving the letter, DeCrescenzo consulted with his wife, his marriage counselor, and an

attorney about the letter. He spoke with personnel of the Philadelphia mental health office who told DeCrescenzo that they could send a mobile emergency crisis team to meet with Rebecca Doby. Without consulting her, DeCrescenzo arranged for the crisis team to come to the office and speak with Rebecca Doby on December 30, 1993. DeCrescenzo states that this was the earliest possible time this could be arranged because he was involved in an audit and he wanted to meet with his marriage counselor to discuss the eleven-page letter. DeCrescenzo had no contact with Rebecca Doby or her husband between December 22, 1993 and December 30, 1993.

On December 30, 1993, Rebecca Doby left the office of DeCrescenzo's court reporting agency before the mobile emergency crisis team arrived. She placed a call by car phone to a co-worker, Kathy McHugh, to advise her that she would not be at her New Year's Eve party. Rebecca Doby was upset and crying, and she indicated that she was driving in the rain and would not tell McHugh where she was going. McHugh told DeCrescenzo that she had just spoken with Rebecca Doby on the latter's car phone and that Rebecca Doby had been crying during their conversation. After her conversation with McHugh, Rebecca Doby called her husband to tell him that she was going for a drive and would be home after wards. DeCrescenzo then called Rebecca Doby on her car phone and asked her to return to the office; she refused and said she did not want to talk to him that day but that they would talk later.

DeCrescenzo then called the Philadelphia mental health office and the Warrington Township police. He then contacted Herbert Doby at the suggestion of the Philadelphia mental health office. DeCrescenzo spoke with Herbert Doby briefly and related a few phrases from Rebecca Doby's letter. Herbert Doby then contacted Rebecca Doby on her car phone; the conversation convinced Herbert Doby that nothing was wrong. Rebecca Doby called DeCrescenzo to assure him that she was fine.

***3** As a result of DeCrescenzo's call to the Warrington Township police department, Sergeant Miller visited the Dobys' home and spoke with Herbert Doby who assured him that Rebecca Doby was fine. Sergeant Miller, upon arriving at the police station, telephoned DeCrescenzo and told him that Herbert Doby had spoken with Rebecca Doby, that Doby felt the letter was being blown out of proportion, and that the guns kept in their apartment were secured. The parties dispute whether Herbert Doby then telephoned DeCrescenzo to advise him that Doby's guns were secured; the plaintiffs deny the second conversation.

The next series of events is disputed. DeCrescenzo contends that he faxed the eleven-page letter to Sergeant Miller and that Sergeant Miller, upon receipt of the letter, telephoned DeCrescenzo and advised him that the letter would not be sufficient to commit Rebecca Doby and that he should search Rebecca Doby's desk to see whether any other materials could be found. Sergeant Miller stated that he did not really want the eleven-page letter to be faxed and only had allowed DeCrescenzo to fax it because DeCrescenzo seemed to need to take some action, and that he was not sure whether he saw the letter on December 30, 1993 or afterward.

In any event, the parties do not dispute the fact that DeCrescenzo asked his wife, Sheila DeCrescenzo, who was a part-time employee of his court reporting agency and Kathy McHugh, another employee, to search Rebecca Doby's work area. They did so and located a two-page note which appeared to be a suicide note, making reference to organ donation and custody of Rebecca Doby's daughter and step-daughter, among other things. The parties, though, do dispute whether DeCrescenzo had this two-page note when he completed the 302 petition to have Rebecca Doby involuntarily examined with Bryant at Doylestown Hospital that afternoon. Plaintiffs argue that he could not have had the two-page note because of the sequence of various events and the fact that the handwritten notes were attached to the 302 petition when Dr. Kieve examined Rebecca Doby; however, Neidhardt testified that she remembered Bryant reading particular parts of the two-page note to her before she issued the warrant for an emergency involuntary examination of Rebecca Doby.

Thereafter, DeCrescenzo proceeded to Doylestown Hospital to complete the paperwork necessary to begin the involuntary commitment process under the Pennsylvania Mental Health Procedures Act (hereinafter “MHPA”). During his drive to Doylestown Hospital, he received a telephone call on his car phone relaying a message from Herbert Doby that Rebecca Doby was fine.

At the Hospital, DeCrescenzo met with Bryant, the crisis worker employed by LVF to process the filing of 302 petitions. The parties dispute whether Bryant wrote down what DeCrescenzo said verbatim on the 302 application, which DeCrescenzo then reviewed for accuracy, as the Foundation defendants contend, or whether DeCrescenzo explained the situation to Bryant and gave her a file of

material from which Bryant composed the 302 application, as DeCrescenzo contends.

***4** Section 302 of the MHPA, entitled "Involuntary emergency examination and treatment authorized by a physician—not to exceed one hundred twenty hours," provides for the issuance of a warrant for an involuntary emergency examination:

> Upon written application by a physician or other responsible party setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment, the county administrator may issue a warrant requiring a person authorized by him, or any peace officer, to take such a person to the facility specified in the warrant.

Pa. Stat. Ann. tit. 50, § 7302(a)(1) (Supp.1996).

If the physician performing the examination determines that the person is severely mentally disabled and in need of immediate treatment, then the person may be involuntarily committed to begin treatment for a period not to exceed 120 hours, unless a procedure is followed to extend the involuntary treatment or the person signs a voluntary commitment form. *See id.* at § 7302(b), (d).

DeCrescenzo presented an undated copy of the eleven-page letter to Bryant and indicated that he had found a suicide note that day on Rebecca Doby's desk. Bryant wrote the information given to her by DeCrescenzo on the 302 application:

> I believe that Rebecca Doby is in need of emergency psychiatric care. Today I found an extensive suicide note on her desk, as well as lists of chores including transference of information to her husband about access to bank accounts, insurance policy bills, a shared storage shed, and her current status with my company. She also has written a reminder to call about organ donations. Rebecca asked me as well to lock away a file for her with a note attached instructing me to destroy it if anything should happen to her. She also has begun letters to friends and relatives, with envelopes already addressed, asking either for forgiveness for pain she caused or including pleas for their help with the raising of her children. The return address is to a P.O. Box which only lists the names of her husband and children. In the past few weeks. Rebecca has been drastically less efficient at work and often retires to a cot to sleep during working hours. She has access to guns and has a licensed to carry one herself; she also talks a great deal about guns. I truly fear for her safety.

DeCrescenzo did not recount the events of the day specifically, nor did he relate his discussions with Rebecca Doby, Herbert Doby, or Sergeant Miller. When the 302 application asked for employment information concerning the subject of the application, DeCrescenzo identified himself as Rebecca Doby's employer and listed her termination date as that day, December 30, 1993.

Plaintiffs argue that neither Bryant nor Neidhardt could have seen the two-page letter located by Sheila DeCrescenzo and McHugh on Rebecca Doby's desk because of the fact that it was not found in the hospital's files concerning Rebecca Doby since LVF's and Doylestown Hospital's procedures required that any supporting documentation be kept in the patient's file. I note that Neidhardt's deposition testimony supports the defendants' contention that DeCrescenzo presented both Rebecca Doby's eleven-page letter and two-page handwritten note to Bryant, who related their contents to Neidhardt. Neidhardt testified as to particular provisions of the two-page note which she remembered hearing when she was deciding whether a 302 warrant should be issued for Rebecca Doby.

***5** The nature of the relationship between Rebecca Doby and DeCrescenzo is disputed. Rebecca Doby claims that they had a romantic affair which was never completely consummated, while DeCrescenzo contends that they were

simply employer and employee who did socialize outside of work but with their spouses. Plaintiffs suggest that DeCrescenzo's actions in committing Rebecca Doby were motivated by a desire to discredit and embarrass her and to prevent DeCrescenzo's wife from learning about his relationship with Doby; DeCrescenzo denies anything but a genuine concern for Mrs. Doby's welfare.

Bryant inquired whether involuntary emergency treatment was the least restrictive alternative available, and then read the 302 application over the telephone to Neidhardt. Neidhardt spoke with Bryant for approximately fourteen minutes and made notes of the information being relayed by Bryant. At the end of their conversation, Neidhardt authorized the issuance of a 302 warrant to perform an involuntary emergency examination of Rebecca Doby. Bryant then signed the 302 warrant on behalf of Neidhardt. DeCrescenzo delivered the warrant to the Warrington Township police department. The Police Department executed the warrant at approximately 7:00 p.m. at the Dobys' apartment.

Three police officers, Knox, Neipp, and Hawthorn, arrived at the apartment and knocked on the door. Rebecca Doby answered the door; at that time, her children were in the bathtub, and her husband was in their bedroom, with the door closed, on the telephone. The police officers asked Rebecca Doby to step outside, so the children would not see. She did so. She states that the officers never told her, although she asked repeatedly, why they were taking her into custody or where she was being taken; the officers state that she was told why she was being taken into custody. The officers have admitted that they knew that, while guns may have been in the apartment, Rebecca Doby did not have a gun when she was in the hallway.

Rebecca Doby attempted to return to the apartment to tell her husband what was happening, at which point the officers handcuffed her. She tried to kick the door to get her husband's attention. Thereafter, the officers put her in leg shackles, carried her to a police car, placed her in it, and drove her to Doylestown Hospital. At some point before she was examined by Dr. Richards, a female police officer performed a pat-down body search of Rebecca Doby over her clothes. Mrs. Doby remained in the restraints for some period of time at the hospital until the crisis worker who was on duty at that time authorized their removal.

While Rebecca Doby was being removed from her apartment building and being placed in the police car, Hawthorn stayed behind in the Dobys' apartment and spoke briefly with Herbert Doby about what had happened to Rebecca Doby (the plaintiffs allege that Hawthorn was silent most of the time, but they acknowledge that he did attempt to provide Herbert Doby with some information). Hawthorn then left the apartment and drove Rebecca Doby to Doylestown Hospital.

***6** Dr. Richards then met with Rebecca Doby to perform a mental examination; his examination lasted between fifteen and forty-five minutes. They discussed the eleven-page letter and Rebecca Doby's feelings towards DeCrescenzo. Rebecca Doby admitted to Dr. Richards that she had been depressed most of her life but had functioned very well. She informed him that she had been seeing a psychiatrist, Dr. London, that her last visit with Dr. London had been on December 7, 1993, and that she had been taking Prozac, prescribed by Dr. London but had run out on the previous day. Immediately before their session ended, Dr. Richards asked Rebecca Doby whether she thought she needed some help, and she admitted that she did. They then discussed the options available with the end result being that Rebecca would be either involuntarily or voluntarily committed that day. Rebecca Doby then asked if she could call Dr. London and her husband. Dr. Richards agreed, and Rebecca Doby left the room, concluding the examination. Dr. Richards committed Rebecca Doby involuntarily for a period not to exceed 120 hours and prescribed Ativan, a psychotropic drug, on an as-needed basis.

Rebecca Doby was reexamined on December 31, 1993 by Dr. Kieve, not a defendant in this suit, who concluded Rebecca Doby was not suicidal but should not be released at that point because of the situation with DeCrescenzo and Herbert Doby. On January 3, 1994, Rebecca Doby signed voluntary commitment papers (she has stated that she signed them because she was told that signing the papers would lead to her release the next day). On January 4, 1994, she was released.

The Dobys have alleged numerous claims against the defendants. They have brought claims under § 1983 for violation of her civil rights (Counts I, II, III, IV, V, VI, VII and VIII of the Complaint),[1] false arrest and imprisonment (Count XI), assault and battery (Count XII), conspiracy (Count XII),[2] gross negligence (willful misconduct) (Count XIV), intentional infliction of emotional distress (Count XVI), declaratory judgment (Count XVII), and loss of consortium (Count XVIII) against all defendants. In addition, plaintiffs have alleged an invasion of privacy claim (Count X) against DeCrescenzo, the County defendants, the Foundation

defendants, and the Police defendants. Finally, plaintiffs have alleged defamation (Count IX) and wrongful use of civil proceedings (Count XV) against DeCrescenzo.

I will address the defendants' motions first, in the order in which the events of December 30 unfolded, and then the plaintiffs' motion.

II. DECRESCENZO'S MOTION

DeCrescenzo raises a number of arguments in support of his motion for summary judgment. First, he argues that plaintiffs' § 1983 civil rights claim against him must be dismissed because he was not acting under color of state law; if he was not a state actor, he cannot be held liable for plaintiffs' alleged federal constitutional violations. Second, he contends that even if he were a state actor, he could not be held liable for plaintiffs' § 1983 claim because he is entitled to "good faith" immunity which protects private citizens found to be state actors. Third, DeCrescenzo asserts that even if he were a state actor and not protected by "good faith" immunity, plaintiffs cannot state a federal claim against him arising out of actions of non-state actors, including Dr. Richards and, possibly, Bryant and Neidhardt. Fourth, DeCrescenzo challenges the sufficiency of plaintiffs' evidence supporting their federal constitutional claims. Fifth, he argues that he is entitled to immunity from plaintiffs' state law claims under § 7114(a) of the MHPA. Finally, he argues that plaintiffs have not raised a genuine issue of material fact and that he is entitled to judgment as a matter of law on their defamation, invasion of privacy, false arrest/false imprisonment, assault and battery, gross negligence, malicious prosecution, and intentional infliction of emotional distress claims. I will discuss each argument in turn.

A. Whether DeCrescenzo Is A State Actor

***7** DeCrescenzo first argues that he was not a state actor for purposes of plaintiffs' claim under 42 U.S.C. § 1983 and, accordingly, that plaintiffs' § 1983 claim against him must be dismissed. Plaintiffs respond by stating that the Bucks County Department of Mental Health issued the 302 warrant for Rebecca Doby based solely upon DeCrescenzo's information, made no independent review of that information, and substituted DeCrescenzo's judgment for its own. Plaintiffs contend that this set of facts demonstrates "improper delegation," which constitutes state action for purposes of § 1983. [3]

The improper delegation theory is rooted in the Supreme Court's decision in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922 (1982), in which the Court decided that one acting pursuant to a state's procedure which allowed the attachment of a party's property upon the ex parte application of another was a state actor for purposes of § 1983. *See id.* at 941–42.

The Court in *Lugar* outlined four tests which are applied to determine whether a private actor has become a state actor for purposes of § 1983: the public function test, the state compulsion test, the nexus test, and the joint action test. *See id.* at 939. I discuss here only the joint action test actually applied in *Lugar* because no party has argued that the other tests apply here and because I do not believe that they would govern the instant facts. The improper delegation theory is actually one method of analysis under the joint action test. *See Cruz v. Donnelly,* 727 F.2d 79, 82 (3d Cir.1984).

In finding that the statute improperly delegated the state's attachment power to an otherwise private actor, the Court noted that two principles guide the state action inquiry:

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.

*Id.* at 937. In *Lugar,* the person effecting the attachment was viewed as one who "has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.* Simply acting pursuant to a statute did not make one a state actor. *Id.* at 939. However, the use of a statutory scheme under which state officials attached one's property based upon an ex parte application, without notice or opportunity for a hearing to the party whose property was being seized, constituted state action such that the private party was a state actor. *See id.* at 941–42.

In *Cruz v. Donnelly,* the Third Circuit found that a store manager and his employer were not state actors simply because the manager had asked two police officers to detain and search the plaintiff because the manager suspected the

plaintiff was shoplifting. *See id.* at 79. Relying upon *Lugar,* the court held that unless plaintiff could demonstrate that the officers' judgment had been subordinated to the judgment of the manager and the store, they would not be state actors under § 1983. *See id.* at 82.

***8** The Third Circuit more recently applied the principles enunciated by the *Lugar* Court in the context of a confession of judgment proceeding. *See Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1265–67 (3d Cir.1994). There, it concluded that one who executes on a confessed judgment without notice and with the aid of state officials was a state actor. *See id.* at 1266–67. The *Jordan* court stated:

> We agree again with the district court that a private individual who enlists the compulsive powers of the state to seize property by executing on a judgment without predeprivation notice or hearing acts under color of law and so may be held liable under section 1983 if his acts cause a state official to use the state's power of legal compulsion to deprive another of property.

*Id.* at 1267.

With this authority as a guide, I find *Lugar* and *Jordan* distinguishable from the case at hand because here, as in *Cruz,* the "state" processed information and acted based upon its own judgment and assessment of the situation. The defendants have produced evidence that Bryant took information from DeCrescenzo and engaged in a fourteen minute telephone conversation with Neidhardt during which Neidhardt was presented with and evaluated all of DeCrescenzo's information. They have also shown that Neidhardt determined that the information demonstrated reasonable grounds to conclude that Rebecca Doby was severely mentally disabled and in need of immediate treatment. DeCrescenzo's judgment was not substituted for that of the county delegate, because Neidhardt evaluated the information he provided and made an independent determination that Rebecca Doby should be involuntarily examined on an emergency basis.

Plaintiffs contend that the failure of Bryant, the crisis worker, and Neidhardt, the county delegate, to make any independent review of the facts presented by DeCrescenzo, attempt to corroborate the facts presented, or more fully explore alternatives less restrictive than an involuntary emergency examination equates with the state's having substituted DeCrescenzo's judgment for its own. I do not agree. The existence of state action does not turn on whether more information could have been obtained or should have been obtained in order to satisfy a probable cause standard, but rather, on whether the state actor exercised independent judgment. I conclude as a matter of law that Neidhardt did exercise independent judgment as to the information presented by DeCrescenzo to Bryant and that actions were taken based upon her assessment of reasonable cause, not on DeCrescenzo's. Accordingly, DeCrescenzo is not a state actor for purposes of § 1983, and plaintiffs' § 1983 claim against him must be dismissed.[4]

B. Whether DeCrescenzo May Be Liable For Plaintiffs' State Law Claims

Plaintiffs have alleged a number of state law claims against DeCrescenzo, namely defamation, invasion of privacy, false arrest/false imprisonment, assault and battery, gross negligence, malicious prosecution, and intentional infliction of emotional distress. DeCrescenzo seeks summary judgment on all such claims and on each claim, on several grounds. I will address each argument separately.

1. Whether DeCrescenzo Is Entitled To Immunity From Plaintiffs' State Law Claims Under § 7114 Of The MHPA

***9** DeCrescenzo argues that he is entitled to immunity from all of plaintiffs' state law claims under § 7114 of the MHPA. Section 7114(a) of the MHPA provides:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act ... shall not be civilly or criminally liable for such decision or for any of its consequences.

Pa. Stat. Ann. tit. 50, § 7114(a) (Supp.1996).

Plaintiffs argue that DeCrescenzo does not fall within the class of persons entitled to immunity and, further, that even if he did, they have shown that he acted maliciously and that his actions therefore fall outside of the grant of immunity of the statute. I agree with plaintiffs' first argument and so do not reach their second.

DeCrescenzo argues he is immune because he is an “authorized person” within the meaning of the statute. However, I find he does not fit within the immunity provision, not based upon whether he was an “authorized person,” but rather, because the statute provides immunity only to persons who “participate” in an examination or treatment decision. In *McNamara v. Schleifer Ambulance Serv., Inc.,* 556 A.2d 448 (Pa.Super.Ct.1989), the court held that ambulance attendants responsible only for transporting a mental patient between hospitals were not immune under § 7114(a):

> It is clear from these sections that the legislature contemplated the decision-making process under § 7114 as one which would take place within the context of treatment, care, diagnosis or rehabilitation. It is equally clear that the individuals who would participate in those decisions would be trained in the field of mental health.... To read the MHPA as extending immunity to untrained individuals would be an unreasonable result.

*Id.* at 449–50. The *McNamara* court emphasized the importance of participation in the examination or treatment decision in determining whether immunity under § 7114(a) would apply: “[f]urther, and more critical for purposes of determining the applicability of § 7114 immunity, neither [of the ambulance drivers] was participating in the patient's treatment.” *Id.* at 450.

Clearly, Pennsylvania courts, as well as the plain language of § 7114(a), require some level of participation in the decision to examine or treat someone under the MHPA before immunity will apply. Here, DeCrescenzo did nothing more than provide information; I see no evidence that he performed any role in Bucks County's decision-making process as to whether a warrant should issue for an examination of Rebecca Doby. I find that he is not entitled to immunity from plaintiffs' state law claims under § 7114(a) and will deny his motion on this ground.

2. Whether DeCrescenzo Is Entitled To Judgment As A Matter Of Law On Plaintiffs' State Law Claims

DeCrescenzo also argues that the plaintiffs have failed to allege conduct actionable under state law and have failed to adduce sufficient evidence in support of their state law claims against him. Plaintiffs contend that they have provided sufficient facts, or shown genuine issues of material fact, precluding entry of summary judgment in DeCrescenzo's favor.

a. Defamation

***10** In Count IX of the complaint, plaintiffs describe the nature of DeCrescenzo's conduct giving rise to their defamation claim against DeCrescenzo as: 1) providing false written and oral statements to the other defendants stating that Rebecca Doby was suicidal, a danger to herself, and suffered a mental impairment; 2) stigmatizing Rebecca Doby by having her committed; 3) causing false statements to be circulated throughout the community; 4) causing Rebecca Doby to be detained in handcuffs and leg shackles in public view; and 5) spreading false statements to coworkers. As to items 2) and 4), DeCrescenzo contends that summary judgment should be granted because the plaintiffs have not alleged the publication of an allegedly defamatory statement. As to items 1), 3) and 5), DeCrescenzo argues that because the statements he made were true, he has a complete defense to these aspects of plaintiffs' defamation claim.

In order to sustain a claim for defamation under Pennsylvania law, the plaintiffs must prove: “(1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff.” *Weinstein v. Bullick,* 827 F.Supp. 1193, 1196 (E.D.Pa.1993). However, the truth is a complete defense to a defamation claim.[5] *See Schonek v. WJAC, Inc.,* 258 A.2d 504, 507 (Pa.1969).

I agree with DeCrescenzo that he is entitled to judgment as a matter of law with respect to items 2 and 4) of plaintiffs'

defamation claim because plaintiffs have not alleged a defamatory statement and publication in those allegations.

With respect to the truth of his statements in defense of items 1), 3), and 5) of the defamation allegations, I find that a genuine issue of material fact exists for a jury to decide. DeCrescenzo contends that statements 1), 3) and 5)—that is, that Rebecca Doby was suicidal, was a danger to herself, and had a mental impairment—were true. While various doctors had diagnosed Rebecca Doby as suffering from major depression and as severely mentally disabled and in need of immediate treatment at various times in December 1993, I do not view these diagnoses as necessarily confirming that she was suicidal, a danger to herself, or mentally impaired.

DeCrescenzo points to the fact that Rebecca Doby has admitted in her deposition both that she drafted the two-page suicide note found on her desk on December 30, 1993 and that it could be characterized as a suicide note. Finally, DeCrescenzo points to the fact that Rebecca Doby signed voluntary commitment papers on January 3, 1994 which extended her treatment at Doylestown Hospital for one day.

However, I cannot conclude that this evidence proves that no genuine issue of material fact exists as to the truth of the alleged statements. Dr. Kieve specifically testified that she did not know whether Rebecca Doby was suicidal on December 31, 1993 and that Rebecca Doby was not suicidal as of January 3, 1994. While Dr. Richards believed that Rebecca Doby was suicidal, I note that the plaintiffs have produced two expert reports which challenge Dr. Richards' examination and diagnosis. Accordingly, I cannot conclude that DeCrescenzo's statements to the County defendants, the Police defendants, Bryant, Dr. Richards, the community, and coworkers were true as a matter of law.

***11** Accordingly, I will deny DeCrescenzo's motion for summary judgment with respect to plaintiffs' defamation count (Count IX), except that I will dismiss plaintiffs' allegations that DeCrescenzo defamed her "[b]y causing social stigma to attach to Plaintiff due to the involuntary commitment of Mrs. Doby to a mental institution" and "[b]y causing Mrs. Doby to be detained at Plaintiffs' apartment in handcuffs and leg shackles in full public view which implied that Mrs. Doby and/or her family was involved in criminal conduct."

b. Invasion of Privacy

In Count X of the complaint, Rebecca Doby alleges that DeCrescenzo invaded her privacy by rummaging "through Mrs. Doby's personal effects and made public her very most private writings and papers, and set in motion a devastating and intentional invasion in the Dobys' personal life and family." The search complained of is the search performed by Sheila DeCrescenzo and Kathy McHugh (hereinafter "McHugh"), at the request of DeCrescenzo, of Rebecca Doby's desk at DeCrescenzo's reporting agency's office. [6] The search revealed a two-page "suicide note."

DeCrescenzo argues that this claim must be dismissed because plaintiffs have not established that he intended an invasion of privacy; instead, he acted only to obtain assistance for Rebecca Doby who he believed, in good faith, was suicidal. Plaintiffs respond that they have set forth facts controverting DeCrescenzo's claim of good faith and demonstrating that he intended to intrude into her private affairs and intended to subject her to involuntary medical treatment.

Pennsylvania law recognizes four distinct kinds of invasion of privacy: intrusion upon seclusion, public disclosure of private facts, false light, and appropriation for commercial purpose. *See Marks v. Bell Tel. Co.,* 331 A.2d 424, 430 (Pa.1975). Here, DeCrescenzo states, and plaintiffs do not dispute, that plaintiffs are stating a claim for intrusion upon seclusion. Pennsylvania courts have adopted the Restatement (Second) of Torts' definition of intrusion upon seclusion which provides:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person.

*Doe v. Kohn Nast & Graf, P.C.,* 862 F.Supp. 1310, 1326 (E.D.Pa.1994) (quoting Restatement (Second) of Torts § 652B).

According to the Restatement (Second) of Torts, the intent required is: "the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially

certain to result from it." *O'Donnell v. United States,* 891 F.2d 1079, 1083 (3d Cir.1989) (quoting Restatement (Second) of Torts § 8). The Third Circuit has described the intentional intrusion required to support an invasion of privacy claim under Pennsylvania laws as follows:

> We conclude that an actor commits an intentional intrusion only if he believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act.

***12** *Id.; see also Kohn Nast & Graf, P.C.,* 862 F.Supp. at 1326.

Here, DeCrescenzo does not contend that Rebecca Doby had given him permission to search her desk. At least one court has concluded that "[a] search of an employee's workplace which is done in such a way as to reveal matters unrelated to the workplace, may constitute tortious invasion of the employee's privacy." *Id.* Given the different characterizations by the parties as to DeCrescenzo's motives based upon the disputed facts of the relationship between DeCrescenzo and Rebecca Doby, plaintiffs have raised an issue as to whether DeCrescenzo was searching for matters relating to his employee's welfare or in order to locate material to have Rebecca Doby committed for personal reasons. Accordingly, I find that genuine issues of material fact exist, which must be resolved by a jury, in order to determine whether DeCrescenzo intentionally intruded into Rebecca Doby's privacy by ordering the search of her desk. Accordingly, I will deny DeCrescenzo's motion for summary judgment with respect to Count X of the complaint, plaintiffs' claim for invasion of privacy.

c. False Arrest/False Imprisonment

DeCrescenzo next argues that he is entitled to summary judgment as to count XI of the complaint, which charges DeCrescenzo with false arrest and false imprisonment. Plaintiffs allege that DeCrescenzo caused Rebecca Doby to be falsely arrested and imprisoned by the Warrington police, when they served the warrant and took her to Doylestown Hospital, and by Doylestown Hospital, when it confined her for several days and administered psychotropic drugs. DeCrescenzo asks that I grant summary judgment on this claim against him because: first, Rebecca Doby was not arrested; second, DeCrescenzo was not involved in the decision to commit her; third, the warrant was valid such that any arrest was not false; and finally, taking Rebecca Doby into custody to have her examined was supported by probable cause. Plaintiffs respond that Rebecca Doby was subject to arrest under Pennsylvania law because she was confined and detained and that the warrant was not supported by probable cause.

False arrest or imprisonment occurs under Pennsylvania law where a person has been (1) arrested or restrained (2) without adequate legal justification. *See Gilbert v. Feld,* 788 F.Supp. 854, 862 (E.D.Pa.1992). An "arrest" occurs under Pennsylvania law by "any act that indicates an intention to take the individual into custody and subjects him to the actual control and will of the person making the arrest. When a person is actually restrained of his freedom by the police and taken into custody, an arrest has occurred." *Commonwealth v. Carter,* 643 A.2d 61, 67 (Pa.1994), *cert. denied,* 115 S.Ct. 1317 (1995). While DeCrescenzo contends that no arrest occurred, I find that the undisputed facts here demonstrate that Rebecca Doby was restrained and arrested.

The issue, however, is whether DeCrescenzo, as a private party who did nothing more than provide information to the county and its agent, LVF, can be held liable for Rebecca Doby's detention. In *Gilbert v. Feld,* 788 F.Supp. 854 (E.D.Pa.1992), the court held that a private individual who provided false information to law enforcement officials could be held liable for a false arrest or imprisonment resulting from that false information. *See Gilbert,* 788 F.Supp. at 862. The court relied upon *Hess v. County of Lancaster,* 514 A.2d 681 (Pa.Commw.Ct.1986), which had allowed a claim for malicious prosecution to proceed against a private person who provided false information to law enforcement officials who instituted criminal charges against the plaintiff in that suit. *See id.*

***13** Here, I am faced with a situation where DeCrescenzo appears to have provided incomplete information to LVF, Bryant, and the county delegate, Neidhardt, but the information he did provide appears to be true. For instance, while Rebecca had left the office crying, and while DeCrescenzo did find the two-page handwritten note on her desk that day, he did not indicate that Rebecca Doby had given him the eleven-page letter some eight days before. Also, he had written the date of December 22, 1993 on the

original letter, yet he provided Bryant with an undated copy of the letter. DeCrescenzo also did not tell Bryant of his several conversations with Rebecca Doby and Herbert Doby and Sergeant Miller, all of whom told DeCrescenzo that the situation was under control.

I must determine whether a false arrest or imprisonment claim can lie against one who does not provide all of the relevant facts to the authorities. While Pennsylvania courts have not addressed this precise issue, the concern expressed by the Pennsylvania Commonwealth Court in *Hess* may apply to this situation as well. In *Hess,* the court concluded that one who provided false information to authorities could be liable for malicious prosecution because he prevented the police officer from adequately exercising independent judgment as to whether criminal charges should be instituted. *See id.* at 683.

Incomplete information would result in the same deficiency, and a Missouri court has so stated. In *Wehrman v. Liberty Petroleum Co.,* 382 S.W.2d 56, 61–62 (Mo.Ct.App.1964), the court stated that if the defendant had reported all of the facts known to him, it would not hesitate to find that he could not be held liable for false arrest or imprisonment but that:

> We are of the opinion, however, that a different rule should prevail where the informant knowingly and deliberately gives the police an incomplete and biased version of the occurrence which induces them to believe that another is a thief, and results in the latter's unwarranted arrest.

*Id.* at 61.

Following the rationale espoused by the court in *Hess,* and consistent with the *Wehrman* court's conclusion, I find that a private citizen can be held liable for false arrest or imprisonment if he has either knowingly provided false information to authorities or knowingly provided incomplete, misleading information to the authorities which resulted in the detention of another. In the instant case, I conclude that, at a minimum, a genuine issue of material fact exists as to whether DeCrescenzo knowingly provided incomplete and misleading information to LVF, Bryant, and Neidhardt.

DeCrescenzo contends that the warrant was issued with probable cause, and therefore there can be no claim of false arrest. While this would be true if a false arrest charge were levelled against a police officer who acted based on information in a warrant, it will not shield Decrescenzo if a jury finds that had he provided incomplete information, and, had he given complete information, the warrant would not have been issued, i.e., probable cause would have been found not to exist and no arrest would have occurred. The *Hess* case, discussed above, only has meaning if the defendant is liable for giving information that led to an arrest that would not have occurred if he had been forthright. Whether probable cause for the arrest existed without the information he concealed is not relevant to this issue. The resolution of this aspect of DeCrescenzo's defense involves genuine issues of material fact as to the information he possessed and the completeness of the information provided to Bryant at the time he acted. The issue of whether probable cause existed is inexorably tied to the issue of the significance of what was, and was not, included by DeCrescenzo in the grounds he gave for an emergency warrant. This will turn on credibility of witnesses and inferences to be drawn from facts difficult if not impossible to resolve on a motion for summary judgment.

***14** Accordingly, I will deny DeCrescenzo's motion for summary judgment with respect to plaintiffs' false arrest and imprisonment claim.

d. Assault and Battery

DeCrescenzo next seeks summary judgment with respect to plaintiffs' assault and battery claim in Count XII of the complaint, asserting that no evidence has been produced showing that he ever attempted to make, or made, physical contact with Rebecca Doby or that she was in apprehension of such physical contact by DeCrescenzo. Plaintiffs do not respond to DeCrescenzo's claim specifically but state that all defendants threatened Rebecca Doby with being placed in hand cuffs and leg shackles or with a "padded room" and solitary confinement, both of which constitute an assault. I find that plaintiffs have not supported a claim for battery against DeCrescenzo, and I will grant summary judgment as to this claim. However, they have argued that a genuine issue of material fact exists as to their assault claim against DeCrescenzo.

In Pennsylvania, "an assault occurs when one acts with the unprivileged intent to put another in reasonable and immediate apprehension of a harmful or offensive contact and which does cause such apprehension." *Proudfoot v. Williams,*

803 F.Supp. 1048, 1054 (E.D.Pa.1992). Pennsylvania courts do allow liability for an assault when the alleged tortfeasor was not the one who put the plaintiff in apprehension of an offensive contact "through a showing of common design or mutual aid in bringing about harm." *Keich v. Frost,* 63 Pa. D. & C.2d 499, 501 (Dauphin Ct. C.P.1973). The Middle District of Pennsylvania has noted that Pennsylvania allows vicarious liability for assault and battery based upon concert of action. *See Shoop v. Dauphin County,* 766 F.Supp. 1323, 1326 (M.D.Pa.1990). Plaintiffs base their assault claim against DeCrescenzo on the fact that he set the 302 petition process in motion, which resulted in the police officers taking Rebecca Doby into custody and Doylestown Hospital confining her. DeCrescenzo contends that he did not commit an assault and cannot be held liable for an assault committed by someone else. I agree. DeCrescenzo provided information to LVF and Bryant, but plaintiffs have not shown that he was present at the time of any assault such that he committed the assault or that he engaged in a concerted action with the police or the hospital such that he could be held liable even if they committed an assault. Accordingly, I will grant DeCrescenzo's motion for summary judgment with respect to plaintiffs' assault claim.

e. Gross Negligence And Willful Misconduct

DeCrescenzo next contends that he is entitled to judgment as a matter of law on Count XIV of the complaint, which states a claim for gross negligence and willful misconduct, because no genuine issues of material fact exist. Plaintiffs argue that a genuine issue of material fact exists as to whether he acted maliciously toward Rebecca Doby, such that his conduct violated the standard for gross negligence and willful misconduct.

***15** DeCrescenzo urges that his actions could, at most, constitute negligence, not gross negligence or willful misconduct, since he was acting on information sufficient to cause the issuance of a 302 warrant. As a result, he concludes that he is entitled to summary judgment on plaintiffs' gross negligence and willful misconduct claim. I disagree. Pennsylvania courts have defined gross negligence as "a want of even scant care, but something less than intentional indifference to consequences of acts" or "a failure to perform a duty in reckless disregard of the consequences or with such want of care and regard for the consequences as to justify a presumption of willfulness or wantonness." Jack K. Levin, *Negligence,* 2 Summary of Pennsylvania Jurisprudence 2d 1, 13 (Lonnie E. Griffith, Jr. et al. eds., 1991). Pennsylvania courts have defined willful misconduct as occurring when:

> [A]n actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or her or so obvious that he or she must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

Brian H. Redmond, *Kinds & Classifications of Tortious Acts,* 1 Summary of Pennsylvania Jurisprudence 2d 47, 53 (Lonnie E. Griffith, Jr. et al. eds., 1991).

In addition, Pennsylvania has adopted section 323 of the Restatement (Second) of Torts which defines a certain circumstance under which an actor can owe a duty to another. Section 323, otherwise known as a Good Samaritan Rule, imposes a duty on:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965).

Was DeCrescenzo acting with reasonable care and concern of an employer, genuinely fearful for Rebecca Doby's safety, as he contends? Or was he acting unreasonably, seeking to confine her to keep their romantic involvement from his wife or to embarrass or humiliate Rebecca Doby? A jury could conclude that although DeCrescenzo possessed information which supported the issuance of a 302 warrant, he may have believed that Rebecca Doby was, in fact, not in need of immediate care or severely mentally disabled and, therefore, was not acting with reasonable care, or was acting in reckless disregard of a risk of which he knew or should have been aware.

Even if Decrescenzo was acting on behalf of Rebecca Doby when he sought out involuntary mental health treatment for her, once he undertook this responsibility, he had a duty to exercise reasonable care in performing it. Given the facts before me, I find that a genuine issue of material fact exists as to whether DeCrescenzo acted with gross negligence or with willful misconduct, or whether he acted in reckless disregard of his duty to exercise reasonable care once he determined to seek out involuntary treatment for Rebecca Doby. Accordingly, I will deny DeCrescenzo's motion for summary judgment on plaintiffs' gross negligence or willful misconduct claim.

f. Malicious Prosecution

***16** DeCrescenzo asks that I grant summary judgment in his favor on plaintiffs' claim for malicious prosecution, Count XV of the complaint, for two reasons. First, he states that a claim of malicious prosecution applies only to criminal proceedings and that plaintiffs have not pled the equivalent claim for civil proceedings. Second, he argues that since Rebecca Doby was committed, the proceeding has terminated favorably to the plaintiff, so that a malicious prosecution claim cannot be proven. Plaintiffs respond that an abuse of process claim [7] and claim for malicious prosecution can be asserted in a civil proceeding.

I find that Pennsylvania does recognize a cause of action for malicious prosecution in a civil context. Count XV of the complaint clearly is titled "Malicious Prosecution, 42 PA.C.S.A. § 8351 Wrongful Use of Civil Proceeding." The statutory citation and the phrase "wrongful use of civil proceeding" clearly refers to the Pennsylvania cause of action for the civil equivalent of a malicious prosecution claim.

However, I agree with DeCrescenzo's argument that plaintiffs have provided no evidence demonstrating that the proceeding, here the involuntary commitment process, terminated favorably to Rebecca Doby. In Pennsylvania, the Dragonetti Act sets out the elements needed to prove a wrongful use of civil proceedings claim:

> (a) Elements of action.—A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:
>
> (1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based; and
>
> (2) The proceedings have terminated in favor of the person against whom they are brought.

Pa. Stat. Ann. tit. 42, § 8351 (1982).

Favorable termination within the meaning of the wrongful use of civil proceeding statute need not be an adjudication on the merits; favorable termination can occur as the result of a voluntary dismissal of the underlying proceeding or an abandonment of the proceeding. *See Shaffer v. Stewart,* 473 A.2d 1017, 1020–21 (Pa.Super.Ct.1984); *Woodyatt v. Bank of Old York Road,* 182 A.2d 500, 501 (Pa.1962).

While plaintiffs might be able to prove the first two elements, initiation of a proceeding and gross negligence or lack of probable cause, I conclude that they cannot prove the third—that the proceedings terminated in favor of Rebecca Doby. DeCrescenzo applied for a 302 petition, which would allow Rebecca Doby to be examined for two hours on an involuntary, emergency basis. *See* Pa. Stat. Ann. tit. 50, § 7302(b) (Supp.1995). During the examination, the physician then was to determine whether involuntary emergency treatment was necessary. *See id.* at § 7302(b). If the person examined was committed for involuntary emergency treatment, the person could only be kept for treatment for 120 hours, unless the person agreed to remain in treatment longer voluntarily or a certification for extended involuntary emergency treatment was filed with the court of common pleas. *See id.* at § 7302(d).

***17** I view the process initiated by DeCrescenzo as that for an emergency examination to last no longer than two hours. Therefore, the result of the emergency examination determines whether it was terminated favorably to Rebecca Doby. As a result of his examination of Rebecca Doby pursuant to the 302 warrant, Dr. Richards did involuntarily commit her for the 120 hour statutory period. This result can in no way be viewed as a termination of the proceedings in favor of Rebecca Doby. I must conclude that no genuine issue of material fact exists as to whether the proceeding terminated favorably to Rebecca Doby because she does not dispute the fact that Dr. Richards did order her committed. Accordingly, DeCrescenzo's motion for summary judgment will be granted as to plaintiffs' wrongful use of civil proceedings claim.

g. Intentional Infliction Of Emotional Distress

DeCrescenzo finally seeks summary judgment on Count XVI of the complaint which states a claim for intentional infliction of emotional distress. He argues both that his conduct was not outrageous enough to support such a claim because he was acting in good faith, and that Rebecca Doby must show an actual injury in order to sustain this claim and has failed to do so. Plaintiffs respond that Rebecca Doby's involuntary commitment was outrageous and that she suffered physical contact throughout the events in question and emotional injury as testified to by an expert.

While the Pennsylvania Supreme Court has not definitively accepted the tort of intentional infliction of emotional distress, the Third Circuit and other courts within this district have construed the Pennsylvania Supreme Court's decision in *Kazatsky v. King David Memorial Park, Inc.,* 527 A.2d 988 (Pa.1987), as being consistent with allowing such a cause of action. *See Silver v. Mendel,* 894 F.2d 598, 606 (3d Cir.), *cert. denied,* 496 U.S. 926 (1990); *Corbett v. Morganstern,* No. 95–4776, 1996 WL 273676, at *3 (E.D.Pa. May 17, 1996). I agree that Pennsylvania does recognize a cause of action for intentional infliction of emotional distress.

The Third Circuit has set out the elements of the tort: "1) the conduct must be extreme and outrageous; 2) the conduct must be intended; 3) the conduct must cause emotional distress; and 4) the distress must be severe." *Silver,* 894 F.2d at 606. Outrageous conduct is that conduct which is:

> [S]o outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Corbett,* 1996 WL 273676, at *3 (internal quotation and citation omitted). As a preliminary matter, I must determine whether a jury could reasonably find that the complained of conduct was sufficiently extreme and outrageous so as to warrant recovery. *See id.*

***18** As indicated above in connection with my discussion of plaintiffs' gross negligence and willful misconduct claim, the jury's view of the facts will be key in deciding this issue. Plaintiffs argue that the inference to be drawn from these facts is that Rebecca Doby and DeCrescenzo had engaged in some sort of romantic relationship, that she sought to terminate both that relationship and her employment with DeCrescenzo, and that he decided to seek to have her committed as either a way to prevent her from discussing their relationship or to seek revenge by embarrassing and humiliating her. A jury could agree with the motivations proposed by plaintiffs, especially when it considers certain information DeCrescenzo possessed, but did not share with Bryant, tending to negate the emergency nature of the situation, and his seemingly inconsistent persistence in pursuing this extreme step. If a jury concludes that DeCrescenzo acted with malice towards Rebecca Doby, and not in good faith, then I cannot hold as a matter of law that DeCrescenzo's actions in having Rebecca Doby physically removed from her family and home to be subjected to a psychological examination and confined are not outrageous within the meaning of the tort. If the jury believes plaintiff's version of the facts, I conclude that the conduct alleged could be considered so outrageous by a jury that it could find DeCrescenzo intended to inflict emotional distress on Rebecca Doby. Accordingly, I will not dismiss plaintiffs' claim against DeCrescenzo on that ground.

DeCrescenzo next argues that plaintiffs have failed to show by some competent medical evidence that Rebecca Doby suffered some actual injury. While I agree that Pennsylvania does require medical evidence showing some injury, *see Kazatsky,* 527 A.2d at 995, I believe that plaintiffs have met their burden at least for purposes of summary judgment. Plaintiffs have produced the expert report of Susan B. Bierker, a licensed social worker, which diagnoses Rebecca Doby with Post-traumatic Stress Disorder as a result of her involuntary commitment and attending events. This report is sufficient to demonstrate a medical injury for purposes of summary judgment. I will deny DeCrescenzo's motion for summary judgment with respect to plaintiffs' intentional infliction of emotional distress claim.

## III. LENAPE VALLEY FOUNDATION'S AND AMY BRYANT'S MOTION

LVF is a private, not for profit crisis intervention unit, functioning under contract with Bucks County for purposes of, among other things, conducting intake interviews for 302 warrant applications. As indicated above, on December 30, 1993, Bryant was a crisis worker for LVF and was

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

responsible for taking information from petitioners making a 302 application and presenting it to the County delegate, Neidhardt.

The Foundation defendants raise numerous arguments in support of their motion for summary judgment. Their primary argument is that they are not state actors for purposes of § 1983 and that plaintiffs' § 1983 claim against them must be dismissed. They then argue that even if LVF is considered a state actor for purposes of § 1983, I should dismiss the § 1983 claims against LVF because plaintiffs have not shown a custom or policy of LVF that caused a constitutional violation. Further, even if deemed state actors, they are entitled to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800 (1982). As to plaintiffs' state law claims, they contend that they are entitled to immunity under § 7114 of the MHPA.

A. Whether The Foundation Defendants Are State Actors For Purposes Of § 1983

***19** The Foundation defendants first argue that they are not state actors for purposes of § 1983, so plaintiffs' federal constitutional claims should be dismissed.

My state action analysis of the Foundation defendants differs from my analysis of DeCrescenzo's status because while DeCrescenzo acted as a private citizen presenting information to a governmental body, the Foundation defendants had entered into a contract with Bucks County to provide a "*continuum* of mental health services ranging from emergency psychiatric hospitalization (most intensive) to information and referral regarding a temporary situational problem (least intensive)." Therefore, they were contractually bound to provide the services that the County was to provide under the MHPA.

In *West v. Atkins,* 487 U.S. 42 (1988), the Supreme Court was faced with a prisoner's suit against a private physician who was under contract with the prison hospital to provide orthopedic services to inmates. *See West,* 487 U.S. at 44. The Court concluded that the physician was a state actor for purposes of § 1983 because the state had created a contractual relationship with the physician who was the only doctor to whom the inmates could turn for his specialty of medical care. *See id.* at 54–55. The Court noted that the contractual relationship between the state and the physician and the obligation of the state to provide medical care to inmates dictated the state action finding; the fact that the physician was an independent contractor and not a state employee did not affect the state action analysis. *See id.* at 55–56. The Court stated:

> It is the physician's function while working for the State, not the amount of time he spends in performance of those duties or the fact that he may be employed by others to perform similar duties, that determines whether he is acting under color of state law. In the State's employ, respondent worked as a physician at the prison hospital fully vested with state authority to fulfill essential aspects of the duty, placed on the State by the Eighth Amendment and state law, to provide essential medical care to those the State had incarcerated. Doctor Atkins must be considered to be a state actor.

*Id.* at 56–57.

Here, the Foundation defendants are in the same position as the physician in *West;* LVF entered into a contract with Bucks County to provide the mental health services that Bucks County was obligated to provide under the MHPA. LVF employed Bryant to effectuate its duties under the contract. Accordingly, I conclude that Bucks County delegated its authority to provide mental health services under the MHPA to the Foundation defendants such that the Foundation defendants are state actors for purposes of § 1983. [8]

B. Liability of LVF for Constitutional Violations

(i) On What Basis Can LVF Be Held Liable For Violation of Plaintiff's Constitutional Rights

LVF was a private entity acting as a state actor. LVF argues that it should not be held liable under principles of respondeat superior, just as a municipality is not. At the same time, however, it argues that theories permitting liability against municipalities should not apply. It does not support this argument with authority in the case law. Plaintiffs contend that the same standards applicable to municipalities apply, that is, that LVF will be liable if it had a custom and policy which violated constitutional rights. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691–92 (1978). I believe that the

Supreme Court's holding in *Monell* applies with equal force to both municipalities and private entities which are state actors. In rejecting *respondeat superior* liability and defining the “custom and policy” requirement, the Supreme Court did not rest upon factors unique to municipalities but, instead, relied upon more general legislative history. It stated:

> ***20** We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* I find that in order to be held liable under § 1983 for any constitutional violation which may have occurred, LVF must have a custom or policy which caused the violation The question before me is whether LVF is entitled to judgment as a matter of law that it did not have a custom and policy that caused any violation of Rebecca Doby's constitutional rights.

(ii) Did LVF Have A Custom And Policy That Caused A Violation Of Plaintiff's Constitutional Rights

The practice of LVF, as related by Bryant and a supervisor, Mr. Eusebi, was to have a crisis worker take information from the petitioner, then consult with and take instructions from the County Administrator or delegate by telephone. Plaintiffs contend that LVF should have investigated the facts independently, rather than acting solely as a facilitator. Plaintiffs also contend that LVF should have contacted Rebecca Doby's doctor, Dr. London, and her husband; this complaint is related to LVF's challenged custom of performing no independent investigation of information presented in a 302 petition. In addition, plaintiffs argue that LVF should have investigated further into what the least restrictive alternative actually available was, rather than relying upon the representation of the 302 petition. The plaintiffs' argument stems from their belief that, had LVF done this, perhaps the investigation would have revealed information that would have caused Neidhardt not to issue the warrant. However, custom and policy for purposes of § 1983 municipal liability is not proven by demonstrating that a municipality has a practice which in *one* instance caused a constitutional violation. Rather, the essence of *Monell* and its progeny is that custom and policy means habitual neglect or indifference to rights, such as a pattern of behavior or conduct which reflects that the entity has adopted a practice that *causes* constitutional violations.[9] *See Monell,* 436 U.S. at 694–95; *Beck v. City of Pittsburgh,* No. 95–3328, slip op. at 10–12 (3d Cir. July 22, 1996); *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990). Plaintiffs have made no showing that LVF has engaged in a custom of processing warrant applications in a way that violates constitutional rights of those sought to be brought in for treatment, or that their practices in this regard were suspect in any way.

Plaintiffs also attack LVF's practice of accepting information for warrants from responsible adults, arguing that “physician or other responsible person” limits those who should be allowed to petition to persons with physician-like training. I find no constitutional implications in this practice, first, because I disagree with plaintiffs' interpretation of the statute, but also because, again, I find no showing that the practice of permitting non-physicians to report facts to support the issuance of warrants is a custom and policy that cause constitutional violations.[10]

***21** I find, therefore, that plaintiffs have failed to show that a genuine issue of material fact exists that LVF has a custom or policy which has deprived plaintiffs of their constitutional rights, and I will grant the Foundation defendants' motion for summary judgment as to plaintiffs' § 1983 claim against LVF.

C. Whether Bryant Is Entitled To Good Faith Immunity

Bryant[11] argues that she is entitled to good faith immunity from plaintiffs' § 1983 claims because her conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Plaintiffs reply that Bryant is not entitled to good faith or qualified immunity because she deliberately and recklessly disregarded plaintiffs' rights by not holding a hearing, not balancing Rebecca Doby's individual rights versus medical necessity, making no attempt to verify the veracity of DeCrescenzo, and making no attempt to ensure that the warrant was necessary.

In *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250 (3d Cir.1994), the Third Circuit adopted a modified form of the good faith defense available to individual private actors in § 1983 claims in the Fifth Circuit:

> [The Fifth Circuit] said: "Private defendants should not be held liable under § 1983 absent a showing of malice and evidence that they either knew or should have known of the statute's constitutional infirmity." We are in basic agreement, but we believe "malice" in this context means a creditor's subjective appreciation that its act deprives the debtor of his constitutional right to due process.

*Id.* at 1276 (citation omitted). I see no evidence which would indicate that Bryant was aware or knew that any of her actions might violate Rebecca Doby's rights. While plaintiffs allege deliberate and reckless behavior on the part of Bryant, they have not provided support for their allegations, nor have they provided evidence that Bryant knew her actions would cause a constitutional deprivation. Instead, I conclude that Bryant simply followed the policies of LVF whereby she did not make substantive decisions regarding the merits of 302 applications; her role was to facilitate the processing of 302 petitions. There is no evidence that she was aware of any constitutional infirmity in this process. Accordingly, the Foundation defendants' motion for summary judgment as to plaintiffs' § 1983 claim against Bryant will be granted. [12]

D. Whether The Foundation Defendants Are Immune From Plaintiffs' State Law Claims Under § 7114 Of The MHPA

The Foundation defendants next argue that they are entitled to immunity under § 7114 of the MHPA from plaintiffs' state law claims. As discussed above in conjunction with DeCrescenzo's claim for immunity under § 7114, the MHPA provides immunity to various officials, including a county administrator, and any other authorized person who participates in a decision that someone be examined or treated under the MHPA. *See* Pa. Stat. Ann. tit. 50, § 7114(a) (Supp.1996). Plaintiffs argue that the Foundation defendants are not entitled to immunity because they acted with gross negligence or willful misconduct.

***22** First, I note that if Bryant is entitled to immunity, then LVF will also be immune under § 7114. *See Farago v. Sacred Heart General Hosp.,* 562 A.2d 300, 303 (Pa.1989). The *Farago* court stated:

> Unquestionably, the clear intent of the General Assembly in enacting Section 114 of the MHPA was to provide limited civil and criminal immunity to those individuals and institutions charged with providing treatment to the mentally ill. Treatment in these facilities, in practical terms, must be administered by individuals. Therefore, these facilities do not act independent of their personnel. To allow an individual to claim immunity under this provision but in turn preclude its employer the same benefit of the immunity would indeed undermine the stated purpose of the limited immunity conferred under the Act. This result would only encourage a plaintiff to circumvent the immunity clause by naming a hospital or facility and not its employees in a lawsuit: a result which would be both absurd and unreasonable.

*Id.* at 303 (citations omitted). Accordingly, I need only decide whether Bryant is entitled to immunity under § 7114(a).

Section 7114(a) first requires that a person be "authorized" in order to receive immunity under that section if she is not "a county administrator, a director of a facility, a physician, [or] a peace officer." *See id.* I conclude that Bryant was an authorized person because she was LVF's employee, such that she was cloaked with the authority of Bucks County by virtue of LVF's contract with Bucks County under which LVF performed many of Bucks County's duties under the MHPA. The statute further requires that one must "participate [ ] in a decision that a person be examined or treated" to be immune under § 7114(a). Pa. Stat. Ann. tit. 50, § 7114(a) (Supp.1996). The Pennsylvania courts have construed this language as requiring that immunity will be given only to those who are involved in the mental health field by virtue of their training or experience. *See McNamara v. Schleifer Ambulance Serv., Inc.,* 556 A.2d 448, 449–50 (Pa.Super.Ct.1989).

Bryant was an employee of LVF which was under contract with Bucks County to provide mental health services required

under the MHPA, not only in the emergency 302 warrant situation, but also in non-emergency situations. Bryant did play a role in the decision to issue a 302 warrant for Rebecca Doby. She inquired of DeCrescenzo as to the least restrictive treatment option which would meet Rebecca Doby's needs. She gathered information and asked questions to clarify the information presented by the petitioner and determine the behavior DeCrescenzo had witnessed in the past 30 days. Bryant also advised DeCrescenzo of the different alternatives available. She presented information to the county delegate, here Neidhardt, and would ask any follow-up questions which the delegate thought were necessary. While I recognize that Bryant's view of her role as a facilitator and scrivener means that she herself did not make the decision to issue a 302 warrant for Rebecca Doby, I nevertheless conclude that Bryant participated in the decision to examine and treat Rebecca Doby such that she is entitled to immunity under § 7114(a) as long as she did not act with gross negligence or willful misconduct. Section 7114(a) does not limit the immunity granted to decision makers; instead, it provides immunity to all who participate in a decision. Participation includes those who compile and present information to, and discuss it with, the county delegate. In addition, Bryant's training for her role as a crisis worker, albeit limited, is sufficient to bring the Foundation defendants within the scope of § 7114(a) immunity. Accordingly, both LVF and Bryant are entitled immunity under § 7114(a) if Bryant did not act with gross negligence or willful misconduct.

***23** The Superior Court of Pennsylvania has discussed the level of culpability necessary to constitute gross negligence or willful misconduct under § 7114(a). *See Bloom v. Dubois Regional Medical Ctr.,* 597 A.2d 671, 677 n. 6, 679 (Pa.Super.Ct.1991). In *Bloom,* the court defined willful misconduct "for immunity purposes as 'conduct whereby the actor desired to being about the result that followed or at least was aware that it was certain to follow, so that such desire can be implied.' " *Id.* at 677 n. 6. Gross negligence, for purposes of § 7114(a), is "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." *Id.* at 679.

I see no such conduct on the part of the Foundation defendants. The plaintiffs have portrayed the Foundation defendants as adopting a passive approach to their role in assisting in the preparation of 302 petitions. This approach, and the purported lack of diligent inquiry plaintiffs rely upon, could not constitute anything more than, at most, ordinary negligence. Accordingly, I conclude that the Foundation defendants are entitled to immunity under § 7114(a) of the MHPA from plaintiffs' state law claims for invasion of privacy (Count X), false arrest and false imprisonment (Count XI), assault and battery (Count XII), gross negligence/willful misconduct (Count XIV), intentional infliction of emotional distress (Count XVI), and loss of consortium (Count XVIII).[13] I will grant the Foundation defendants' motion for summary judgment on this ground.

## IV. THE COUNTY DEFENDANTS' MOTION

Plaintiffs have sued Bucks County, Fenster, and Neidhardt for their actions in implementing the involuntary emergency examination provisions of the MHPA and their actions in the particular circumstances surrounding Rebecca Doby's involuntary emergency examination and commitment. Bucks County was responsible for implementing the provisions of the MHPA and contracted with LVF to perform many of its duties under the Act. Fenster is the county administrator for Bucks County and was responsible for issuing 302 warrants under the MHPA. Fenster has been sued only in his official capacity as county administrator; the Supreme Court has held that official capacity suits are simply "another way of pleading an action against an entity of which an officer is an agent." *Brandon v. Holt,* 469 U.S. 464, 472 n. 21 (1985) (internal quotation omitted). Accordingly, plaintiffs have essentially named Bucks County twice as a defendant, and I will, therefore, only discuss the claims against Bucks County and Neidhardt, not Fenster. Neidhardt was the county mental health delegate for Bucks County who, at the time that DeCrescenzo submitted the 302 application, was responsible for reviewing and approving 302 petitions.

The County defendants raise several arguments in support of their motion for summary judgment. I need address only three of them. First, they assert that they are entitled to qualified immunity for plaintiffs' § 1983 claims because plaintiffs have not shown that the County defendants knew or should have known that they were violating plaintiffs' clearly established constitutional rights. Next, they argue that plaintiffs have failed to demonstrate that Bucks County adopted a custom or policy which violated plaintiffs' constitutional rights sufficient to impose liability on Bucks County under § 1983. Last, the County defendants argue that they are entitled to immunity from plaintiffs' state law claims pursuant to § 7114(a) of the MHPA.

***24** A. Whether The County Defendants Are Entitled To Qualified Immunity From Plaintiffs' § 1983 Claims

The County defendants argue that they are entitled to qualified immunity from plaintiffs' § 1983 claims because they did not violate clearly established constitutional rights of which they knew or should have known. Plaintiffs respond that they have shown that the County defendants violated clearly established constitutional rights such that they may not claim qualified immunity.

As an initial matter, I note that qualified immunity is a defense available to officials for individual-capacity suits against them; it is not available to governmental agencies or officials sued in their official capacity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 817–19 (1982). Thus, the County defendants' qualified immunity defense is available only to Neidhardt, not to Bucks County or Fenster, who is sued only in his official capacity.

In *Harlow,* the Supreme Court defined the contours of qualified immunity: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. In the context of a motion for summary judgment, I may determine the currently applicable law and whether it was clearly established at the time the events alleged occurred. *See id.* In making these decisions, I rely upon objective factors, not the subjective knowledge of the particular defendant. *See id.* at 819.

Here, plaintiffs have alleged that Neidhardt violated the Fourth Amendment by issuing a 302 warrant for Rebecca Doby without probable cause and also violated due process requirements by not following certain procedural protections required before depriving Rebecca Doby of her liberty. I will discuss each claim in turn to determine whether Neidhardt violated clearly established constitutional rights in her handling of the 302 application filed with respect to Rebecca Doby.

The probable cause to seize and detain an individual for an involuntary commitment will depend upon, in part, the length of the detention:

> The shorter the detention, the less compelling is the evidence of the necessity for it that the authorities need to produce. This is the theory of the "Terry stop" and of much else in Fourth Amendment law. In mathematical terms, the test of a reasonable commitment can be expressed by the inequality C<PH, where C is the cost of confinement to the person confined, H is the harm he might do if released, and P is the probability of his doing that harm if released.... The test of negligence at common law and of an unlawful search or seizure challenged under the Fourth Amendment is the same: unreasonableness in the circumstances.

*Villanova v. Abrams,* 972 F.2d 792, 795 (7th Cir.1992) (citations omitted).

Here, Neidhardt issued a 302 warrant which allowed Rebecca Doby to be taken into custody by the police and kept in custody for a maximum of two hours for purposes of performing an emergency examination. In light of the extremely brief duration of detention authorized by the warrant, the probable cause needed to sustain Neidhardt's decision to issue the warrant is low as compared to the probable cause required in an arrest situation. *See id.; Cf. McCabe v. Life–Line Ambulance Serv., Inc.,* 77 F.3d 540, 547–50 (1st Cir.), *petition for cert. filed,* 64 U.S.L.W. 3808 (May 29, 1996).

***25** The information and documents received from DeCrescenzo clearly reflected a suicidal person in imminent danger, giving "reasonable grounds" to believe she was severely mentally disabled and in need of immediate treatment. Even if the evidence relied upon was not sufficient to constitute probable cause in this particular case, I cannot conclude that Neidhardt violated a clearly established Fourth Amendment right of which a reasonable person in her

situation would have been aware. [14] Rather, in light of the emergency nature of the proceeding, the short duration of the 302 warrant, and the facts presented, a reasonable person deciding whether to issue a 302 warrant under these circumstances would have concluded that probable cause existed for an involuntary emergency examination to last no longer than two hours and that the issuance of the warrant did not violate Doby's clearly established constitutional rights. Similarly, I have no basis for concluding that Neidhardt violated a clearly established right to due process of which a reasonable person in her situation would have been aware [15] by following the MHPA procedures as she did and reaching her decision based on all the facts. Issuing a 302 warrant based upon this information could not be deemed a violation of clearly established constitutional rights of which she should have been aware. Neidhardt is entitled to qualified immunity from plaintiffs' Fourth Amendment and due process claims for her decision to issue a 302 warrant for Rebecca Doby.

B. Whether Bucks County Had A Custom Or Policy Which Violated Plaintiffs' Fourth Amendment Or Due Process Rights

The County defendants next argue that plaintiffs' § 1983 claim against Bucks County must be dismissed because plaintiffs have failed to show that Bucks County had a custom or policy which violated plaintiffs' rights. Plaintiffs respond that Bucks County's custom of not investigating the information presented, not placing the affiant under oath, not reviewing documents presented before issuing a warrant, and issuing warrants over the telephone all violated the notions of due process and probable cause required under the Fourth and Fourteenth Amendments.

As discussed in connection with LVF's motion for summary judgment, plaintiffs must demonstrate a custom or policy of Bucks County which caused constitutional violations. My discussion with respect to LVF has application here. Again, I need not reach the issue of constitutional violation, because I find the type of custom and policy that will subject Bucks County to liability to be lacking. As with LVF, plaintiffs complain of an instance in which, had Bucks County conducted itself differently, an alleged wrong might not have occurred. However, no indifference or clearly inadequate practice, or tolerance of a flawed procedure, has been shown.

The First Circuit in *McCabe* allowed the police to conduct warrantless seizures of individuals who were to be involuntarily committed based upon a "pink paper" signed by a physician; on the facts of *McCabe,* the physician had signed the pink paper based solely upon the reports of family members and neighbors. *See id.* at 542, 546–47. The court did not indicate that the reports had been made under oath or that the physician had made any attempt to verify the information presented. It held that the pink paper provided evidence of a "special need" such that:

> ***26** [A] residential search pursuant to an established warrantless search procedure may be reasonable if conducted in furtherance of an important administrative or regulatory purpose, or "special need," which would be undermined systemically by an impracticable warrant or probable-cause requirement.

*Id.* at 545. I concur with the court's conclusion in *McCabe* and conclude that Bucks County's procedure of receiving information and issuing a warrant via telephone, without placing the affiant under oath, does not constitute a custom or policy which violates the Fourth Amendment or due process requirements. Accordingly, I will dismiss plaintiffs' § 1983 claim against Bucks County and Fenster, who was sues in his official capacity.

C. Whether The County Defendants Are Entitled To Immunity Under § 7114(a) Of The MHPA

The County defendants next argue that they are entitled to immunity from plaintiffs' state law claims pursuant to § 7114(a) of the MHPA. Plaintiffs respond that the County defendants acted with gross negligence or willful misconduct such that they fall outside of the grant of immunity contained in § 7114(a). I have discussed the scope of immunity granted by § 7114(a) above in connection with the same arguments raised by DeCrescenzo and the Foundation defendants, and I will not repeat that discussion here. I find that the County defendants fall within the grant of immunity because § 7114(a) grants immunity to "a county administrator ... or any other authorized person." Pa. Stat. Ann. tit. 50, § 7114(a) (Supp.1996). Further, as may be clear from my

analysis in the preceding two sections, I conclude that neither Bucks County nor Neidhardt acted with gross negligence or willful misconduct. Accordingly, the County defendants are immune from plaintiffs' state law claims under § 7114(a), and plaintiffs' state law claims against the County defendants will be dismissed. All of plaintiffs' federal and state claims against the County will be dismissed.

V. THE POLICE DEFENDANTS' MOTION

Warrington Township, the Police Department, Chief Bonargo, Knox, Neipp, and Hawthorn have collectively sought summary judgment absolving them of liability for their role in Rebecca Doby's involuntary commitment in December of 1993. Plaintiffs have sued the Police defendants for Fourth, Eighth, and Fourteenth Amendment violations via § 1983 and state law claims of invasion of privacy, false arrest and false imprisonment, assault and battery, gross negligence/willful misconduct, intentional infliction of emotional distress, and loss of consortium.

First, the Police defendants ask that I dismiss plaintiffs' official capacity claim under § 1983 against Chief Bonargo, Knox, Neipp, and Hawthorn because those claims merge into the claim against their employer, either Warrington Township or the Police Department.

Second, the Police defendants next argue that plaintiffs' § 1983 claim must be dismissed because plaintiffs have not shown any constitutional violation, either on the part of the individual police officers or on the part of the Police Department via showing of a custom or policy which caused the alleged constitutional deprivation.

***27** Third, they contend that Sergeant Knox, Officer Neipp, and Officer Hawthorn are entitled to qualified immunity from plaintiffs' § 1983 claim because they did not violate any clearly established constitutional rights in dealing with Rebecca Doby.

Fourth, they ask that I dismiss plaintiffs' punitive damages claim under § 1983 against Warrington Township and the Police Department because punitive damages cannot be awarded against a public entity under § 1983.

Fifth, the Police defendants seek to dismiss plaintiffs' state law claims based upon the immunity granted in the Pennsylvania Political Subdivision Tort Claims Act.

Sixth, they believe they also are entitled to immunity under § 7114(a) of the MHPA.

Seventh, they ask that I grant summary judgment as to plaintiffs' invasion of privacy claim because plaintiffs have provided no evidence to support that claim.

Eighth, the Police defendants argue that plaintiffs' false arrest and imprisonment claim should be dismissed as a matter of law because the police had probable cause and had no discretion as to whether to serve the warrant.

Ninth, they contend that the assault and battery claim must be dismissed because they were entitled to use force once she resisted arrest.

Tenth, they seek summary judgment as to the gross negligence/willful misconduct claim because the Police defendants followed appropriate procedures and because Rebecca Doby's embarrassment resulted from her own actions, not theirs.

Finally, they argue that they are entitled to summary judgment on plaintiffs' intentional infliction of emotional distress and loss of consortium claims pursuant to the Tort Claims Act.

A. Whether Plaintiffs Have Demonstrated The Police Defendants Violated Their Constitutional Rights

The Police defendants make several arguments in support of their contention that plaintiffs have not proven a constitutional violation. I address three as a preliminary matter. First, the Police defendants argue that plaintiffs' official capacity claims against Knox, Neipp, and Hawthorn should be dismissed because they have already sued the entity; they make the same argument elsewhere in their brief with respect to the official capacity claim against Chief Bonargo. As discussed above, official capacity suits are simply another method of pleading an action against the entity which employs the official. *See Brandon v. Holt,* 469 U.S. 464, 472 n. 21 (1985). Plaintiffs have sued Warrington Township and the Police Department, a department of the Township, so their official capacity claims against Knox, Neipp, Hawthorn, and Chief Bonargo are redundant. I will dismiss the official capacity

claims against the aforementioned individuals. [16] Next, the Police defendants argue that plaintiffs' § 1983 claim must be dismissed to the extent it rests upon state law violations; I agree. *See Baker v. McCollan,* 443 U.S. 137 (1979). I will dismiss plaintiffs' § 1983 claim to the extent that it rests upon violations of the MHPA.

***28** Last, defendants contend that plaintiffs have not shown any constitutional violation committed by the Police defendants. Plaintiffs' complaint alleges Fourth Amendment violations based upon the Police defendants' actions in taking Rebecca Doby into custody pursuant to the 302 warrant and transporting her to Doylestown Hospital where she was examined by Dr. Richards. Plaintiffs also appear to seek liability for actions taken by the hospital thereafter in giving Rebecca Doby psychotropic medications and keeping her confined for several days. [17]

Plaintiffs' first constitutional claim against the Police defendants is that they arrested her without probable cause in violation of the Fourth Amendment because they relied upon a facially invalid warrant. The Police defendants argue that they had no discretion to question the warrant but were required under the MHPA to transport the person listed, Rebecca Doby. They have produced an expert report which notes that "[t]hey must accept the warrant of [sic] face value."

As to plaintiffs' complaint that the 302 warrant was facially invalid because it was approved over the telephone and signed by Bryant on behalf of Neidhardt, I disagree. The Pennsylvania Commonwealth Court in *Uram v. County of Allegheny,* 567 A.2d 753 (Pa.Commw.Ct.1989), specifically held that receiving information over and approving a 302 warrant via the telephone did not violate either the MHPA or the Due Process Clause. *See id.* at 757. I find that this procedure similarly does not create a facially invalid warrant simply because the warrant is signed by Bryant for Neidhardt.

Police officers executing a facially valid warrant, as was the case here, cannot be held liable for executing it. *See Malley v. Briggs,* 475 U.S. 335, 345–46, 346 n. 9 (1986); *Baker v. McCollan,* 443 U.S. 137, 145–46 (1979); *Stigall v. Madeen,* 26 F.3d 867, 869 (8th Cir.1994). The Supreme Court in *Malley* stated that:

> It goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable.

*Malley,* 475 U.S. at 346 n. 9. This rationale would also apply to the execution of a facially valid warrant. The *Baker* court absolved police officers executing a facially valid warrant of the duty to investigate claims that the warrant was improper. *See Baker,* 443 U.S. at 145–56. Finally, the Eighth Circuit has recently held that "[t]he warrant itself, however, shields [the officer] from liability for executing it, unless a reasonably well-trained officer would have known that the arrest was illegal despite the magistrate's authorization." *Stigall,* 27 F.3d at 869 (citation omitted). I conclude that the police officers here were serving a facially valid warrant on Rebecca Doby such that they cannot be held liable for a false arrest claim based on the Fourth Amendment. [18] Accordingly, I will grant the Police defendants' motion for summary judgment as to plaintiffs' Fourth Amendment claim based on lack of probable cause.

***29** Plaintiffs' second constitutional claim against the Police defendants is that they used excessive force against her in violation of the Fourth Amendment while arresting her. The Police defendants contend that this claim must be dismissed because they acted reasonably under the circumstances: the police knew the Dobys had guns, Rebecca Doby resisted arrest, and the police expert stated that handcuffs were routinely used on everyone, even mental patients. Plaintiffs respond by stating that Pennsylvania's mental health regulations prohibit the use of metal restraints when transporting mental health patients. In addition, they argue that the use of handcuffs and leg shackles and the fact that the police would not advise Rebecca Doby where they were taking her constitutes excessive force under these circumstances. Plaintiffs contend that the relevant circumstances are: three police officers were present, Rebecca Doby clearly did not have a gun with her while she was speaking with the police in the hall, and she was not being arrested on a criminal charge.

The Supreme Court in *Graham v. Connor,* 490 U.S. 386 (1989), has held that excessive force claims resulting from an investigatory stop or other seizure, such as an arrest, are governed by the Fourth Amendment's reasonableness standard which "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests

at stake." *Id.* at 395–96 (internal quotation and citation omitted). This balancing focuses on objective factors and answers the question "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." [19] *Id.* at 397.

In *Baker v. Monroe Township,* 50 F.3d 1186 (3d Cir.1995), the Third Circuit reviewed the district court's grant of summary judgment to the police officers on the plaintiffs' excessive force claim. The *Baker* plaintiffs, a mother and her three children, had been walking up to a relative's house for dinner when police officers, who were beginning a raid upon the house, ordered them to get down on the ground. *See id.* at 1188–89. While a number of officers were performing the raid, several officers stayed with the plaintiffs, handcuffed them, and pointed guns at them. *See id.* at 1189. After the plaintiffs were identified as relatives of the person living in the home, they were released; some of the plaintiffs were kept in handcuffs for as long as twenty-five minutes. *See id.* The court found that if the jury believed the plaintiffs' evidence, it could conclude that the circumstances present did not warrant the use of handcuffs and guns against the plaintiffs, who appeared to be paying a social call. *See id.* at 1193. Thus, the grant of summary judgment on this issue was improper.

I reach the same conclusion on the instant facts. Rebecca Doby was not being arrested; she was being transported for mental health purposes. While the police knew the Dobys had guns in their apartment, they also admitted that she did not have a firearm when they were speaking with her in the hallway outside of her apartment. The police knew that her husband thought the entire situation was being blown out of proportion. Three police officers were present when Rebecca Doby was taken into custody, and both Herbert Doby and their children were otherwise occupied in the Dobys' apartment. The apartment door was closed.

***30** While certain facts relevant to this issue are disputed, I construe the facts in the plaintiffs' favor for purposes of summary judgment. Rebecca Doby states that the police did not provide her with any information as to why she was being arrested; they simply told her that she had to go with them. They talked her into stepping outside of the apartment so that her children would not see her talking with the police. She asked for information several times. They apparently began making insulting and degrading remarks and handcuffed her. When she tried to get the attention of her husband to let him know what was happening (because the police officers refused to allow her to return to the apartment to speak with her husband), the police placed her in leg shackles, dragged her out to the police car, and, at some point, performed a pat-down, over-the-clothes body search. A jury might easily conclude that the officers' use of force, in light of the circumstances, was unreasonable, especially when considering the fact that Rebecca Doby was not being arrested on a criminal charge but was being taken to a hospital for a mental examination.

I must also determine whether plaintiffs have stated an excessive force claim against the Police Department based upon a custom or policy of the Police Department. The police officers have testified that the Police Department had a policy of handcuffing everyone who was taken into custody, regardless of the purpose of custody or crime committed. In addition, they testified that they were given no special instructions for transporting people pursuant to a 302 warrant. The Police Department's policies regarding arrests contain no provision for transporting people pursuant to a 302 warrant.

Further, plaintiffs have produced, and the defendants have not contradicted, a Mental Health Bulletin published by the Pennsylvania Department of Public Welfare which states that the policy of that department is "[a]ny restraint(s) made wholly or largely of metal shall not be purchased, maintained, or used for any purpose by employees or agents of state mental hospitals in the transport or behavior management of non-forensic patients." In light of this policy, I conclude that the Police Department's lack of any special procedures dealing with the custody and transport of 302 patients being taken for an examination might well be a custom or policy of the Police Department which violates the rights of those patients. *See Bielevicz v. Dubinon,* 915 F.2d 845, 850–51 (3d Cir.1990). I view this situation as very different from LVF's actions. LVF was not acting with knowledge or notice that its conduct caused or could cause constitutional violations, even if one did occur. Here, the Police Department had specifically drafted regulations on how to accomplish an arrest and the use of force and had made no provisions for people being transported by the police for a noncriminal reason. In addition, the Pennsylvania state agency responsible for mental health issues had specifically prohibited exactly what the Police Department allowed here, which clearly would constitute notice to the Police Department of potentially suspect procedures. The Police Department's lack of guidance in effect advises the police officers that they are to treat 302 patients just as any other person being arrested; however, the Fourth Amendment requires that police use force only

as is reasonable under the circumstances. The force which would be reasonable when arresting a drug or murder suspect would not be reasonable when transporting someone who is in need of treatment for a mental condition. Accordingly, I will deny the Police defendants' motion for summary judgment on plaintiffs' claim for excessive force under the Fourth Amendment.

B. Whether Knox, Hawthorn, And Neipp Are Entitled To Qualified Immunity

***31** The individual police officers next ask that I dismiss plaintiffs' excessive force claims against them because they are entitled to qualified immunity. As discussed above in my resolution of the County defendants' motion, the police officers are entitled to qualified immunity unless they violated clearly established constitutional rights of which a reasonable officer would have been aware. Further, the constitutional rights must have been clearly established at the time of the alleged events. I first examine whether plaintiffs' alleged excessive force claim states facts which would have violated clearly established law at the time the events occurred. The individual police officers do not dispute that the reasonableness standard established by the Supreme Court for excessive force claims in *Graham v. Connor* was clearly established as of December 1993 when the events in question occurred. *See Graham v. Connor,* 490 U.S. 386 (1989).

Prior to December 1993, I note that the Third Circuit in *Black v. Stephens,* 662 F.2d 181 (3d Cir.1981), *cert. denied,* 455 U.S. 1008 (1982), held that the conduct of an unidentified police officer who pointed his revolver at a citizen's head, with another citizen's head directly in the line of fire, and threatened to shoot, shocked the conscience such that it could support liability for a Fourth Amendment excessive force claim.[20] In addition, the Seventh Circuit concluded that a police officer who pointed a gun at a child's head during a search of the child's home violated the excessive force prohibition of the Fourth Amendment when the child posed no threat to the safety of the officer, was not actively resisting arrest, was not under arrest or suspected of committing a crime, was not armed, and was not interfering with the performance of the officer's duties. *See McDonald v. Haskins,* 966 F.2d 292, 292–93, 294–95 (7th Cir.1992). Construing the facts in the light most favorable to plaintiffs, I conclude that a reasonable officer would have known that using leg shackles and handcuffs and performing a pat-down body search on a mental patient who was unarmed and who was not suspected of any crime was an unreasonable use of force in that context, especially in light of the directive from the Pennsylvania Department of Public Health prohibiting the use of metal restraints on those being transported under the MHPA. Accordingly, the police officers are not entitled to summary judgment on the issue of qualified immunity from plaintiffs' Fourth Amendment excessive force claim.

C. Whether Punitive Damages Are Available Against The Police Department

The Police defendants next ask that I dismiss the punitive damages claim against Chief Bonargo in his official capacity, Warrington Township, and the Police Department because punitive damages may not be awarded against a public entity.[21] As discussed above, plaintiffs' claims against these parties amount to one claim against the municipal entity, referred to herein as the Police Department. I agree with the Police defendants. The Supreme Court has held that municipalities are not liable for punitive damages under § 1983. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981). The Third Circuit has held that the rationale adopted by the Court in *City of Newport* prevented punitive damages from being assessed against a hybrid entity which could be analogized to a government entity, namely the regional transportation authority—Southeastern Pennsylvania Transportation Authority. *See Bolden v. Southeastern Pa. Transp. Auth.,* 953 F.2d 807, 830 (3d Cir.1991), *cert. denied,* 504 U.S. 943 (1992). The parties agree that the Police Department is a local entity, and so I find that punitive damages may not be awarded against them. Accordingly, I will dismiss plaintiffs' punitive damages claim against Warrington Township, the Police Department, and Chief Bonargo in his official capacity.

D. Whether The Police Defendants Are Entitled To Immunity From Plaintiffs' State Law Claims Under The Pennsylvania Political Subdivision Tort Claims Act

***32** The Police defendants next ask that I dismiss plaintiffs' state law claims against them because both the Police Department and the individual officers are immune from suit pursuant to the Pennsylvania Political Subdivision Tort Claims Act (hereinafter "Tort Claims Act"). Plaintiffs argue that the grant of immunity under the Tort Claims Act applies only to claims which are not brought under the MHPA and that the individual police officers are not immune from plaintiffs' alleged intentional torts.

The Tort Claims Act grants local agencies, municipalities, and local officials immunity from liability for certain claims. It provides: "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." Pa. Stat. Ann. tit. 42, § 8541 (1982). The Pennsylvania legislature has created eight exceptions to the grant of immunity under the Tort Claims Act; the exceptions encompass negligent acts involving vehicle liability, personal property, real property, trees, traffic controls, street lighting, utility service facilities, streets, sidewalks, and animals. *See id.* at § 8542. In addition, the Tort Claims Act bars claims against a local agency for intentional, as well as negligent torts. *See Parsons v. City of Philadelphia,* 833 F.Supp. 1108, 1118–19 (E.D.Pa.1993); *Cooper v. City of Chester,* 810 F.Supp. 618, 626 n. 8 (E.D.Pa.1992). Here, no one disputes that Warrington Township and the Police Department are local agencies within the meaning of the Tort Claims Act. Accordingly, I will dismiss all of plaintiffs' state law claims against Warrington Township, Warrington Township Police Department, and Chief Bonargo in his official capacity.

I reach a different result, however, with respect to plaintiffs' state law claims against the individual police officers sued in their individual capacity.[22] Unlike municipal entities, municipal employees or officials are not granted immunity under the Tort Claims Act for intentional torts:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

Pa. Stat. Ann. tit. 42, § 8550 (1982). Plaintiffs have alleged that the police officers committed the torts of invasion of privacy, false arrest and false imprisonment, assault and battery, gross negligence/willful misconduct, and intentional infliction of emotional distress. These torts all fall outside of the grant of immunity as outlined in § 8550 above, so I will deny the Police defendants' motion on this ground as to the individual police officers.

### E. Whether The Individual Police Officers Are Immune Under § 7114(a) Of The MHPA

***33** The Police defendants contend that the individual police officers are immune from plaintiffs' state law claims under § 7114(a) of the MHPA.[23] Plaintiffs respond that the police officers are not entitled to immunity under § 7114(a) because the officers violated the MHPA by using handcuffs and leg shackles and performing a body search.

To resolve this issue, I rely upon my discussion of § 7114(a) immunity in connection with DeCrescenzo's motion. If ambulance drivers transporting a person under the MHPA do not "participate" in a treatment or examination decision, then neither do police officers who are transporting someone under the MHPA. *See McNamara v. Schleifer Ambulance Serv., Inc.,* 556 A.2d 448, 450 (Pa.Super.Ct.1989). Accordingly, the police officers are not entitled to immunity under § 7114(a), and I will deny their motion upon this ground.

### F. Whether Plaintiffs Have Adequately Alleged Their State Law Claims Against The Individual Police Officers

The Police defendants next make a series of arguments which attack plaintiffs' ability to maintain each state law claim against the individual police officers.[24] I address each state law claim separately.

#### 1. Invasion Of Privacy

The police officers argue that plaintiffs have not provided any evidence to support their allegation of invasion of privacy (Count X) and that the officers complied with the terms of the 302 warrant and the MHPA.

As discussed above when resolving DeCrescenzo's motion, Pennsylvania law recognizes four distinct kinds of invasion of privacy: intrusion upon seclusion, public disclosure of private facts, false light, and appropriation for commercial purpose. *See Marks v. Bell Tel. Co.,* 331 A.2d 424, 430 (Pa.1975). Here, plaintiffs have alleged intrusion upon seclusion against the Police defendants by "intentionally, unlawfully and with deliberate indifference to the bounds of decency, dragged Mrs. Doby from her home in front of her neighbors and when Police Officer # 3 attended to the Dobys' children without the knowledge or consent of Mr. or Mrs. Doby."

Pennsylvania courts have adopted the Restatement (Second) of Torts' definition of intrusion upon seclusion which provides:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person.

*Doe v. Kohn Nast & Graf, P.C.,* 862 F.Supp. 1310, 1326 (E.D.Pa.1994). While the police officers did intrude upon the privacy of the Dobys when they arrested Rebecca Doby and when one officer remained in the Dobys' apartment to advise Herbert Doby about what had transpired, I believe that such actions are justified when performed under a valid warrant. *See Fisher v. Volz,* 496 F.2d 333, 340–41 (3d Cir.1974); *United States v. Jones,* 475 F.2d 723, 729 (5th Cir.), *cert. denied,* 414 U.S. 841 (1973); *Commonwealth v. Terebieniec,* 408 A.2d 1120, 1126 (Pa.Super.Ct.1979). Police officers acting under a valid arrest warrant are permitted to enter that person's residence if they have probable cause to believe that the person is there. *See Terebieniec,* 408 A.2d at 1126. They are also permitted to search the residence to the extent necessary to locate the person identified in the warrant, as long as they do not use the search simply to uncover incriminating evidence or extend it beyond what is necessary. *See id.* at 1127 n. 4.

***34** On the facts before me, the police officers clearly had probable cause to believe that Rebecca Doby was there because the apartment was hers, so they could enter the premises. In addition, while one police officer did remain in the Dobys' apartment after Rebecca Doby had been arrested, plaintiffs have not produced evidence that he performed any search of the apartment or gathered any evidence. Instead, he simply remained to inform Herbert Doby of what had happened and then left. I must, therefore, conclude that the police officers did not commit a highly offensive intrusion into the Dobys' privacy because they possessed a 302 warrant for Rebecca Doby and did not go beyond the authority therein. The action of one officer in waiting inside the apartment to tell Herbert Doby what had happened does not transform the intrusion into a highly offensive one. Accordingly, I will grant the Police defendants' motion on this ground and will dismiss plaintiffs' invasion of privacy claim against the individual police officers.

2. False Arrest And False Imprisonment

The individual police officers argue that plaintiffs' false arrest and false imprisonment claim (Count XI) against them should be dismissed because they complied with law enforcement procedures and were executing a valid 302 warrant. Plaintiffs state that the 302 warrant was not supported by probable cause.

False arrest or imprisonment occurs under Pennsylvania law where a person has been (1) arrested or restrained (2) without adequate legal justification. *See Gilbert v. Feld,* 788 F.Supp. 854, 862 (E.D.Pa.1992). However, plaintiffs may maintain an action for false arrest against a police officer only when the process used for the arrest appears to be void on its face. *See Cassidy v. Abington Township,* 571 A.2d 543, 545 n. 1 (Pa.Commw.Ct.), *appeal denied,* 593 A.2d 424 (Pa.1990); *see also Schneider v. Kessler,* 97 F.2d 542, 544 (3d Cir.1938). I have found above that the 302 warrant for Rebecca Doby was facially valid, so I conclude that plaintiffs' false arrest and false imprisonment claim against the individual police officers must be dismissed and will grant the police officers' motion in that regard. [25]

3. Assault And Battery

The individual police officers urge that I dismiss plaintiffs' assault and battery claim (Count XII) against them because the police officers acted reasonably under the circumstances and because Rebecca Doby was not entitled to resist even an unlawful arrest. Plaintiffs simply respond that the police officers committed both an assault and a battery because they intended both to put Rebecca Doby in an immediate apprehension of a harmful or offensive contact and to cause an offensive contact.

The rule in Pennsylvania is that "[a] police officer may be held liable for assault and battery when a jury determines that the force used in making an arrest in unnecessary or excessive." *Renk v. City of Pittsburgh,* 641 A.2d 289, 293 (Pa.1994). In light of my decision above that the individual police officers are not entitled to qualified immunity on plaintiffs' excessive force claim, a jury could find that the police officers here did use excessive force when arresting Rebecca Doby such that they committed an assault and battery. Accordingly, I

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

will deny the individual police officers' motion on plaintiffs' assault and battery claim.

4. Gross Negligence And Willful Misconduct

***35** The police officers seek summary judgment on plaintiffs' gross negligence/willful misconduct claim (Count XIV) because they complied with the MHPA, because they did not have to make an independent determination of probable cause, and because Rebecca Doby has only alleged that she was embarrassed which, according to the Police defendants, is insufficient to support a gross negligence claim. Plaintiffs, apparently, do not address this argument.

As discussed above in connection with DeCrescenzo's motion for summary judgment, Pennsylvania courts have tended to define gross negligence as "a want of even scant care, but something less than intentional indifference to consequences of acts" or "a failure to perform a duty in reckless disregard of the consequences or with such want of care and regard for the consequences as to justify a presumption of willfulness or wantonness." Jack K. Levin, *Negligence,* 2 Summary of Pennsylvania Jurisprudence 2d 1, 13 (Lonnie E. Griffith, Jr. et al. eds., 1991). Pennsylvania courts have defined willful misconduct as when:

> [A]n actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or her or so obvious that he or she must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

Brian H. Redmond, *Kinds & Classifications of Tortious Acts,* 1 Summary of Pennsylvania Jurisprudence 2d 47, 53 (Lonnie E. Griffith, Jr. et al. eds., 1991).

Under plaintiff's version of the facts, a jury could find that because they violated clearly established law regarding excessive force, so plaintiffs may maintain their claim for gross negligence or willful misconduct. If a jury finds that the police officers did use excessive force upon Rebecca Doby, then it could similarly find that the police officers acted with gross negligence or willful misconduct throughout their detention of Rebecca Doby by performing their duties with a reckless disregard for the consequences. Accordingly, I will deny the police officers' motion on plaintiffs' gross negligence and willful misconduct claim.

5. Intentional Infliction Of Emotional Distress

The individual police officers finally ask that I dismiss plaintiffs' intentional infliction of emotional distress claim (Count XVI) against them. Plaintiffs contend that the officers' actions were sufficiently outrageous to warrant a claim for intentional infliction of emotional distress.

In my discussion of DeCrescenzo's similar argument, I agreed with other federal courts that Pennsylvania does recognize a cause of action for intentional infliction of emotional distress. The Third Circuit has set out the elements of the tort: "1) the conduct must be extreme and outrageous; 2) the conduct must be intended; 3) the conduct must cause emotional distress; and 4) the distress must be severe." *Silver v. Mendel,* 894 F.2d 598, 606 (3d Cir.), *cert. denied,* 496 U.S. 926 (1990). Outrageous conduct is that conduct which is:

> ***36** [S]o outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Corbett v. Morganstern,* No. 95–4776, 1996 WL 273676, at *3 (E.D.Pa. May 17, 1996) (internal quotation and citation omitted). As a preliminary matter, I must determine whether a jury could reasonably find that the complained of conduct was sufficiently extreme and outrageous so as to warrant recovery. *See id.*

If I view the facts in the light most favorable to the plaintiffs, as I must, I believe that a jury could find that the police officers' actions in refusing to inform, handcuffing, leg shackling, dragging, verbally insulting, and performing a pat-down body search of a woman who, they admit, did

not have a gun on her person and who was being taken for a psychiatric evaluation, were sufficiently outrageous to constitute intentional infliction of emotional distress. Accordingly, I will deny the Police defendants' motion on plaintiffs' intentional infliction of emotional distress as to the individual police officers.

5. Loss of Consortium

I also will not dismiss Herbert Doby's loss of consortium claim (Count XVIII). A loss of consortium claim is derivative, and as I have allowed Rebecca Doby to maintain several state law claims against the Police defendants, Herbert Doby could recover for loss of consortium upon those claims if a jury were to find in favor of Rebecca Doby. *See Tiernan v. Devoe,* 923 F.2d 1024, 1036 (3d Cir.1991); *Scottargeia v. Shin Shen Wu,* 495 A.2d 552, 553–54 (Pa.Super.Ct.1985).

V. DR. RICHARDS' MOTION

Plaintiffs have sued Dr. John C. Richards for his role in both examining Rebecca Doby after she was brought to Doylestown Hospital by the Warrington Township police under the 302 warrant and deciding that she should be involuntarily committed pursuant to § 302 of the MHPA for a period not to exceed 120 hours. They also complain that Dr. Richards prescribed psychotropic drugs for Rebecca Doby while she was involuntarily committed at Doylestown Hospital. Plaintiffs have alleged a host of state law claims against Dr. Richards such as false arrest and imprisonment, assault and battery, gross negligence and willful misconduct, intentional infliction of emotional distress, and loss of consortium. [26]

Dr. Richards raises a number of arguments in support of his motion for summary judgment. I will only address one, namely that Dr. Richards is entitled to immunity from plaintiffs' state law claims under § 7114(a) of the MHPA, because I find that it is dispositive. As discussed above, § 7114(a) provides immunity to a physician who participates in a decision that a person be examined or treated under the MHPA, unless the physician acted with gross negligence and willful misconduct. *See* Pa. Stat. Ann. tit. 50, § 7114(a) (Supp.1996). As Dr. Richards is clearly a physician who decided that Rebecca Doby should be involuntarily committed for a period of time, he falls within the grant of immunity. Thus, the only issue before me is whether he acted with gross negligence or willful misconduct.

***37** In discussing the scope of immunity granted under § 7114(a), Pennsylvania courts have defined gross negligence and willful misconduct by reference to common law rules. In *Bloom v. Dubois Regional Medical Ctr.,* 597 A.2d 671 (Pa.Super.Ct.1991), the court concluded:

> It appears that the legislature intended to require that liability [under the MHPA] be premised on facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference. We hold that the legislature intended the term gross negligence to mean a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.

*Id.* at 679. Similarly, Judge James McGirr Kelly of the Eastern District of Pennsylvania found that "[g]ross negligence is the want of even a scant degree of care or a failure to perform a duty in reckless disregard of the consequences or with such want of care and regard for the consequences to justify a presumption of willfulness or wantonness." *Kelly v. United States,* No. 86–2864, 1987 WL 8544, at *8 (E.D.Pa. Mar. 24, 1987).

Dr. Richards met and evaluated Rebecca Doby at Doylestown Hospital during the evening of December 30, 1993. Dr. Richards first elicited information concerning Rebecca Doby's background, medical history, marital status, and childhood. Rebecca Doby related her past psychiatric history, including the fact that she had been seeing Dr. Debra London from the summer of 1992 until late 1993 and had been taking Prozac. Rebecca Doby admitted to Dr. Richard that she had written the eleven-page letter, which Dr. Richards characterized as a suicide letter, and she also admitted that she needed help. She left the examination room early to talk to her lawyer and Dr. London, upon Dr. Richards' indication that she could telephone them. Dr. London spoke with Dr. Richards who informed her that he intended to involuntarily commit Rebecca Doby because of her suicidal thoughts as expressed

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

in the letters she had written. He decided that involuntary treatment was the least restrictive alternative because she was very depressed, had access to guns, and should not be released to her husband or any other uncontrolled environment. He further prescribed Ativan for Rebecca Doby without first getting her consent; the medication was ordered on an "as needed" basis, and Dr. Richards believed she was free to refuse the medication.

Plaintiffs have produced two expert reports, one from Dr. Paul S. Applebaum and the other from Dr. Eileen A. Bazelon, to support their contention that Dr. Richards acted in a grossly negligent manner such that he is not entitled to immunity under § 7114(a). Dr. Applebaum details five deficiencies with Dr. Richards' examination and resulting diagnosis of Rebecca Doby's depression, including failure to inquire about the most common symptoms of depression, failure to adequately evaluate Rebecca Doby's suicidality, failure to access collateral sources of data such as Dr. London and Herbert Doby, a grossly inadequate mental status evaluation, and failure to explore other less restrictive alternatives to involuntary commitment. Dr. Bazelon faults Dr. Richards for relying solely upon DeCrescenzo's information, even though Dr. Bazelon concedes that the letters produced were "frightening." She also criticizes his failure to contact Dr. London and Herbert Doby for information before deciding to commit Rebecca Doby.

***38** I note that simply providing expert reports does not necessarily create a genuine issue of material fact; the expert reports must be evidence tending to demonstrate gross negligence under Pennsylvania law. *See Callahan v. Walzer,* No. 90–5622, 1992 WL 70408, at *1 (E.D.Pa. Mar. 31, 1992). In addition, the Third Circuit has emphasized that:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Williams v. Borough of West Chester,* 891 F.2d 458, 466 n. 13 (3d Cir.1989) (citation omitted).

I find as a matter of law that plaintiffs have not provided evidence sufficient to establish flagrant behavior which grossly deviates from the standard of care required. Dr. Richards had an extensive eleven-page note which even plaintiffs' expert Dr. Bazelon concedes was "frightening." Rebecca Doby had admitted she had contemplated suicide, had been depressed and taking Prozac, and had a history of depression. She admitted she needed help. In light of her own statements, I conclude that the deficiencies noted by Drs. Applebaum and Bazelon could not amount to anything more than simple negligence by Dr. Richards. Further, Dr. Richards is entitled to immunity under § 7114(a) of the MHPA unless he acted with gross negligence or willful misconduct if he "participate[d] in a decision that a person be examined or treated under this act." Pa. Stat. Ann. tit. 50, § 7114(a) (Supp.1996); the statute does not focus on the precision of the diagnosis as such, which is the focus of Dr. Applebaum's report. Immunity is intended to safeguard those who must make such decisions *without* the luxury of time to do further investigation and inquiry. With respect to Richards' prescribing Ativan, I note that Rebecca Doby admits that she agreed to take the medication and that it was not forced upon her without her knowledge or consent. Prescribing medication in this manner could not amount to gross negligence.

Accordingly, Dr. Richards did not commit gross negligence or willful misconduct. He is immune under § 7114(a) from plaintiffs' state law claims because all of their claims against Dr. Richards arise out of Dr. Richards' examination and treatment decision with respect to Rebecca Doby. I will grant Dr. Richards' motion for summary judgment and will dismiss all of plaintiffs' claims against him.

## VII. DOYLESTOWN HOSPITAL'S MOTION

Plaintiffs have sued Doylestown Hospital for its role in providing involuntary treatment for Rebecca Doby for several days beginning on December 30, 1993. Throughout the relevant time period, the Hospital was under contract with LVF, which in turn was under contract with Bucks County; the Hospital contract required LVF to provide psychiatric crisis intervention, or emergency, services for the Hospital. However, plaintiffs cite no employee or agent of the Hospital whose conduct forms the basis for a claim, nor do plaintiffs make specific allegations as to the hospital's role in the alleged federal and state violations. Plaintiffs' only allegations

with respect to Doylestown Hospital are that it was the designated facility that confined Rebecca Doby and that it administered psychotropic medication without consent. Dr. Richards was employed by LVF, as was Dr. Carola Kieve, who oversaw Rebecca Doby from December 31, 1993 until she was released and is not a defendant in this lawsuit.

***39** Plaintiffs have brought claims for a § 1983 violation, false arrest and imprisonment, assault and battery, gross negligence/willful misconduct, intentional infliction of emotional distress, and loss of consortium against the Hospital. As I understand plaintiffs' contentions, they complain that the Hospital housed Rebecca Doby during her involuntary commitment; in addition, they may be complaining about the medication taken by Rebecca Doby during her stay.

The Hospital argues that it is not a state actor for purposes of § 1983, that it is immune from plaintiffs' state law claims under § 7114(a), and that it cannot be held vicariously liable for the actions of LVF and Dr. Richards. I do not need to address the Hospital's state actor argument because I find that the Hospital's role in Rebecca Doby's involuntary treatment is so minor that it could not rise to the level of a constitutional violation. Even if it were deemed a state actor, it would clearly be entitled to good faith immunity. Further, I have no factual basis for finding that the Hospital is or should be liable for the actions of LVF or Dr. Richards. As discussed above, plaintiffs have not indicated the role of the hospital in relation to Rebecca Doby, or in relation to other actors. Respondeat superior arises only due to the agency or other contractual relationship whereby one is responsible for another's acts. Here, there is no such nexus shown. In addition, plaintiffs have failed to indicate how administering medication, which Rebecca Doby admits she took voluntarily, constitutes a violation of any of plaintiffs' constitutional rights.

With respect to plaintiffs' state law claims, I must conclude that the Hospital is entitled to immunity under § 7114(a) of the MHPA. The Hospital clearly "participated" in the treatment decisions with respect to Rebecca Doby because it provided the facilities and hired LVF to provide mental health services. *See Farago v. Sacred Heart General Hosp.,* 562 A.2d 300, 303 (Pa.1989). *Farago* held that an entity receives the same immunity as its employees because treatment must be administered by individuals, so:

> To allow an individual to claim immunity under this provision but in turn preclude its employer the same benefit of the immunity would indeed undermine the stated purpose of the limited immunity conferred under the Act.

*Id.* An entity should not be treated differently simply because it hires contractors to perform certain functions, rather than hire employees and oversee the work itself. Further, plaintiffs have not shown any conduct of the Hospital that constitutes gross negligence or willful misconduct. Again, I have no basis for holding Doylestown Hospital responsible for the actions of third parties employed by others or for whose acts they are not liable as a matter of law. Accordingly, plaintiffs have pointed to no evidence demonstrating how such third parties' actions might possibly be attributable to Doylestown Hospital. I will therefore grant the Hospital's motion and find that it is entitled to immunity under § 7114(a) from plaintiffs' state law claims.

## VII. PLAINTIFFS' MOTION

***40** In addition to the various motions for summary judgment filed by the defendants in this case, plaintiffs also have filed a motion for summary judgment, seeking several legal declarations. First, plaintiffs ask that I find, as a matter of law, that LVF, Bucks County, and Warrington Township had an unconstitutional custom or policy which violated Rebecca Doby's constitutional rights. Second, they contend that the 302 warrant was invalid under the Fourth and Fourteenth Amendments as a matter of law because it was not based upon the application of a physician or physician-like person, because it was approved over the telephone, and because Neidhardt was not neutral or detached and performed no independent review of the information presented. Third, they argue that the MHPA must be read so as to allow a 302 petition for an involuntary emergency examination to be issued only upon the application of a physician or physician-like person, not a person such as DeCrescenzo who has had no mental health training.

Plaintiffs' first two arguments essentially ask for a declaration that the municipal defendants, including LVF, Bucks County, Warrington Township, and those individuals sued in their

official capacity, are liable under § 1983 because plaintiffs have shown a custom or policy of accepting 302 petitions from people not qualified to file a 302 petition, of issuing warrants on those petitions via telephone and without investigation, and of executing the improper warrants and a declaration that Bucks County's process for issuing a 302 warrant is unconstitutional. In the discussion above, I have concluded that the only defendants potentially liable for a constitutional violation are the Police defendants, and they could be liable only for plaintiffs' excessive force claim.

Therefore, as none of the defendants involved in the issuance of the warrant can be liable for plaintiffs' Fourth Amendment probable cause claim, I need not decide whether the process they employed violated the Fourth Amendment. I will deny plaintiffs' motion for summary judgment to the extent it seeks a declaration that the defendants violated Rebecca Doby's constitutional rights.

Plaintiffs next argue that I must construe the language in § 7302(a)(1) so as to allow only physician or physician-like persons to petition for a 302 warrant. I disposed of this argument above in footnote 10 and will deny plaintiffs' motion to the extent it seeks such a statutory construction. Plaintiffs' motion for summary judgment will be denied.

VII. CONCLUSION

As detailed above, I will grant DeCrescenzo's motion for summary judgment in part and dismiss all of plaintiffs' federal claims and their state law claims for assault and battery and wrongful use of civil proceedings against him; I will deny DeCrescenzo's motion for summary judgment in part and will allow plaintiffs to proceed with their defamation, invasion of privacy, false arrest or imprisonment, gross negligence and willful misconduct, and intentional infliction of emotional distress claims against DeCrescenzo. I will grant the Foundation defendants' motion for summary judgment and will dismiss all of plaintiffs' claims against them. I will grant the County defendants' motion for summary judgment and will dismiss all of plaintiffs' claims against them. I will grant the Police defendants' motion for summary judgment in part; I will dismiss plaintiffs' Fourth Amendment claim that Rebecca Doby was arrested on a facially invalid warrant, all of plaintiffs' state law claims against Warrington Township, the Police Department, and Chief Bonargo in his official capacity, and plaintiffs' invasion of privacy, false arrest or imprisonment state law claims against the individual officers. I will deny the Police defendants' motion in part and will allow plaintiffs to maintain their excessive force claim against all of the Police defendants and their state law claims of assault and battery, gross negligence and willful misconduct, and intentional infliction of emotional distress against the individual police officers. I will grant Dr. Richards' motion for summary judgment and will dismiss all of plaintiffs' claims against him. I will grant Doylestown Hospital's motion for summary judgment and will dismiss all of plaintiffs' claims against it. I will deny plaintiffs' motion for summary judgment.

***41** An appropriate order follows.

*ORDER*

AND NOW, this day of September, 1996, it is hereby ORDERED that:

1. DeCrescenzo's motion for summary judgment is GRANTED IN PART and DENIED IN PART such that plaintiffs' § 1983 claim (Count VII), assault and battery claim (Count XII), wrongful use of civil proceedings (Count XV) against DeCrescenzo are hereby DISMISSED but plaintiffs' defamation (Count IX), invasion of privacy (Count X), false arrest or imprisonment (Count XI), gross negligence/ willful misconduct (Count XIV), and intentional infliction of emotional distress (Count XVI) claims against DeCrescenzo may proceed;

2. The Foundation defendants' (Lenape Valley Foundation and Amy Bryant) motion for summary judgment is GRANTED, and all of plaintiffs' claims against Lenape Valley Foundation and Amy Bryant are hereby DISMISSED;

3. The County defendants' (Bucks County Department of Mental Health and Mental Retardation, Philip M. Fenster, and Debbie Neidhardt) motion for summary judgment is GRANTED, and all of plaintiffs' claims against them are hereby DISMISSED;

4. The Police defendants' (the Township of Warrington, the Warrington Township Police Department, Chief John Bonargo in his official capacity, Sergeant Joseph Knox, Officer Michael Neipp, and Officer Kenneth Hawthorn) motion for summary judgment is GRANTED IN PART and DENIED IN PART such that plaintiffs' § 1983 claim based upon the Fourth Amendment and a claimed facially invalid warrant (Counts III and IV in part), all of plaintiffs' state law claims against the Township of Warrington, the Warrington

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Township Police Department, Chief John Bonargo in his official capacity (Counts X, XI, XII, XIV, and XVI), and plaintiffs' invasion of privacy (Count X) and false arrest or imprisonment (Count XI) against the individual officers are hereby DISMISSED. Plaintiffs may maintain their § 1983 claim (Counts III and IV in part) against all of the Police defendants for excessive force and their assault and battery (Count XII), gross negligence/willful misconduct (Count XIV), and intentional infliction of emotional distress (Count XVI) claims against the individual police officers Knox, Neipp, and Hawthorn;

5. Dr. John Richards' motion for summary judgment is GRANTED, and all of plaintiffs' claims against him are hereby DISMISSED;

6. Doylestown Hospital's motion for summary judgment is GRANTED, and all of plaintiffs' claims against it are hereby DISMISSED;

7. Plaintiffs' motion for summary judgment is DENIED.

**All Citations**

Not Reported in F.Supp., 1996 WL 510095

## Footnotes

1 The § 1983 claim against Dr. Richards was dismissed in a prior Opinion, as were plaintiffs' conspiracy claims.

2 As mentioned above, I dismissed this claim in a prior Opinion.

3 Plaintiffs also rely upon an earlier opinion in this case in which I denied DeCrescenzo's motion to dismiss on the basis that he was not a state actor. *See Doby v. DeCrescenzo,* No. 94–3991, 1995 WL 141483, at *4 (E.D.Pa. Mar. 30, 1995). However, that opinion clearly examined only the sufficiency of the pleading, not the sufficiency of the evidence which is now before me, as to whether the "improper delegation" of authority of the state has been demonstrated. *See generally Gilbert v. Feld,* 788 F.Supp. 854, 859–60 (E.D.Pa.1992).

4 My finding that DeCrescenzo is not a state actor obviates the need for me to discuss the sufficiency of plaintiffs' evidence of constitutional violations or DeCrescenzo's other arguments relating to plaintiffs' § 1983 claim.

5 I note that DeCrescenzo cited the case of *Marcone v. Penthouse Int'l, Ltd.,* 533 F.Supp. 353, 361 (E.D.Pa.1982), among others, as support for this proposition. DeCrescenzo, however, failed to advise the Court that the Third Circuit had overruled that case in *Marcone v. Penthouse Int'l, Ltd.,* 754 F.2d 1072 (3d Cir.1985), although the Third Circuit did not overrule on the proposition for which the case was cited. I remind the parties of their obligation to provide the Court with an *accurate* statement of the law.

6 While plaintiffs make some reference in their response to the defendants' intentional invasion into Rebecca Doby's life by removing her from her home and providing her with involuntary medical care, they do not discuss, or demonstrate, how DeCrescenzo could be held liable under a state law invasion of privacy claim for these actions. Accordingly, I will confine my discussion to the search performed of Rebecca Doby's desk and will assume that plaintiffs have no other invasion of privacy claim against DeCrescenzo.

7 While plaintiffs argue in their response that they have stated a claim in their complaint against DeCrescenzo for abuse of process, there is no such claim. Accordingly, I do not address the merits of an abuse of process claim.

8 In their reply brief, the Foundation defendants argue that they could not be state actors because Bucks County did not delegate to LVF the authority to issue a 302 warrant; that authority remained with the County. While this may be true as to the actual issuance of the 302 warrant, Bucks County did delegate substantial

responsibilities under the MHPA to LVF. I must conclude LVF was a state actor with respect to its duties under the contract with Bucks County.

9 The cases applying *Monell* discuss custom and policy in terms that imply, if not require, that the municipality must have known, or reasonably should have realized, from the nature of its conduct or from actual past violation, that its practices were causing or likely to cause violations of constitutional rights, and permitted these practices to continue. The Third Circuit in *Bielevicz v. Dubinon,* 915 F.2d 845 (3d Cir.1990), defines “custom or policy” as “tolerated known misconduct,” *id.* at 851, “known but uncorrected custom or usage,” *id.,* “failure to act, once [the municipality] was on notice that its procedures were constitutionally deficient,” *id.,* “the township was on notice of the inadequacy of its detention procedures,” *id.,* “continued official tolerance of repeated misconduct,” *id.,* “acquiesced in the continuation of this custom,” *id.*

10 Plaintiffs have argued in their motion for summary judgment that the MHPA must be construed so as to allow only physician or physician-like persons to petition for a 302 warrant. Under their proffered construction of the MHPA, DeCrescenzo would be an improper petitioner under the MHPA which, according to plaintiffs, would render the 302 warrant issued for Rebecca Doby invalid under the Fourth Amendment. However, I have very little basis for construing this language narrowly so as to find that only a limited class of people, physicians or physician-like people, could supply facts constituting “reasonable grounds” under the MHPA. The reporter of facts does not opine, diagnose, or decide whether someone should be committed § 7302(a)(1). While plaintiffs argue that legislative intent and statutory construction principles require that the meaning of “other responsible party” be limited, I find that the context of this statutory language undercuts this.

The statute focuses not so much on the type of person completing a 302 petition but, rather, on the quality of the information they convey. A county administrator may issue a warrant “[u]pon written application by a physician or other responsible party *setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled and in need of immediate treatment.*” Pa. Stat. Ann. tit. 50, § 7302(a)(1) (Supp.1996). I will decline to construe the concept of “other responsible party” in a vacuum. Whether a party was or was not responsible, as a 302 petition applicant, in a given setting must be determined on a case by case basis. In reaching this conclusion, I employ two principles of statutory construction under Pennsylvania law. First, “[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.” Pa. Stat. Ann. tit. 1, § 1921(b) (1995). Second, “[w]ords and phrases shall be construed according to ... their common and approved usage.” Pa. Stat. Ann. tit. 1, § 1903(a) (1995). “Responsible” is defined, in this context, as:

> 1. Being legally or ethically accountable for the welfare or care of another. 2. Involving personal accountability or ability to act free from guidance or higher authority.... 4. Capable of making moral or rational decisions on one's own, thereby being answerable for one's behavior. 5. Capable of being trusted or depended on: reliable. 6. Based on or marked by good judgment.

I believe that the term “other responsible party” is free from ambiguity such that I need not engage in the more complicated statutory construction analysis plaintiffs advocate. Given his apparently close relationship to Rebecca Doby and the facts related by him, I cannot say that DeCrescenzo should have been viewed by Bryant or Neidhardt as anything other than a responsible party.

11 The Foundation defendants actually argue that both LVF and Bryant are entitled to a “good faith” defense such that plaintiffs' § 1983 claims against them must be dismissed; however, their legal discussion seems to argue for qualified immunity. The Supreme Court has explicitly rejected the notion that private actors who are found to be state actors for purposes of § 1983 can avail themselves of qualified immunity. *See Wyatt v. Cole,* 504 U.S. 158, 168–69 (1992). The Third Circuit has adopted a form of a good faith defense to §

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

1983 actions applicable to private persons, and so for purposes of my discussion here, I will analyze whether Bryant may escape liability under the Third Circuit's good faith defense.

As for the Foundation defendants' claim that LVF is entitled to a good faith defense, I need not resolve this issue here because I have decided above that LVF had no custom or policy which violated plaintiffs' federal constitutional rights.

12 The Foundation defendants make an additional argument that plaintiffs cannot maintain direct causes of action for constitutional violations but must proceed via a § 1983 action. They cite to two paragraphs of plaintiffs' complaint as evidence that plaintiffs are attempting to bring claims directly under those constitutional provisions. I read the complaint as raising several different constitutional violations, all within the context of their § 1983 claim. The paragraphs cited both allege that Rebecca Doby's Fourth, Eighth, and Fourteenth Amendment rights "actionable under 42 U.S.C.A. § 1983." As plaintiffs have only stated a § 1983 claim with several elements, I will not address the Foundation defendants' argument here.

In addition, as I have dismissed plaintiffs' § 1983 claims against both LVF and Bryant, I need not address whether plaintiffs stated valid constitutional claims against LVF and Bryant.

13 The grant of immunity under § 7114(a) only extends to a decision that a person be examined or treated under the MHPA and its consequences, but plaintiffs have not argued or produced any evidence to support the notion that their claims against the Foundation defendants are based upon facts distinct from the decision to examine or treat Rebecca Doby under the MHPA.

14 In *McCabe,* the court allowed a person to be seized for an involuntary commitment via a "pink paper," a slip signed by a physician, noting:

> Although the Fourth Amendment is implicated in a variety of civil proceedings, the Supreme Court has made it clear that the civil nature of certain search procedures may call for a narrowed application of the warrant and probable cause requirements.

*Id.* (citation omitted). The court eventually held that a seizure for purposes of an involuntary commitment fell within an exception to the probable cause and warrant requirements of the Fourth Amendment. *See id.* at 545. The warrantless search and seizure was permitted when conducted for an important administrative or regulatory purpose. *See id.* The lower probable cause burden in a circumstance such as an involuntary commitment, and possibly the lack of probable cause requirement as noted by the *McCabe* court, dictates my finding that Neidhardt did not violate any clearly established due process or Fourth Amendment rights of Rebecca Doby of which a reasonable person should have known. If the law, in fact, today holds that the process used here, which is very similar to that approved by the *McCabe* court, did not violate Rebecca Doby's constitutional rights, then I would be hard pressed to conclude that the law was clearly established to the contrary three years ago.

15 The fact that Neidhardt received information and approved the warrant via telephone does not affect my decision. The emergency nature of the 302 petition, the potentially disastrous consequences of a delay in issuing the 302 warrant, and the short duration of the warrant all militate in favor of a finding that the county delegate is not constitutionally required to be present to meet the petitioner and need not personally sign the warrant. *See generally McCabe v. Life–Line Ambulance Serv., Inc.,* 77 F.3d 540, 552 (1st Cir.), *petition for cert. filed,* 64 U.S.L.W. 3808 (May 29, 1996).

16 In addition, I note that naming both Warrington Township and the Police Department also appears to be naming the same defendant twice. However, the Police defendants have not asked that I dismiss the claims

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

against one or the other of these two defendants, so I will leave the claims against both intact but, for purposes of this Memorandum opinion, will refer to both defendants as the Police Department.

Later in their brief, the Police defendants argue that the claims against Chief Bonargo should be dismissed because plaintiffs had not shown that supervisory liability should be imposed upon him. I need not reach this issue because Chief Bonargo was sued only in his official capacity which, as discussed above, is a suit against the entity employing him, here the Police Department.

17 In their opposition to all of the defendants' summary judgment motions, plaintiffs do not appear to maintain their claim that the Police defendants violated their rights by Doylestown Hospital's forced medication and confinement of Rebecca Doby after the police officers transported her to Doylestown Hospital. In addition, they have not provided any legal support for such an argument. Accordingly, I will assume that plaintiffs no longer seek to impose liability on the Police defendants for actions taken by Doylestown Hospital after the officers left Rebecca Doby there.

18 My conclusion that the police officers had properly served the warrant and are not liable if probable cause was lacking to serve the 302 warrant upon Rebecca Doby and take her into custody also resolves plaintiffs' invasion of privacy claim. If they were entitled to serve the warrant, they were entitled to enter her home to do so. *See Fisher v. Volz,* 496 F.2d 333, 340–41 (3d Cir.1974); *United States v. Jones,* 475 F.2d 723, 729 (5th Cir.), *cert. denied,* 414 U.S. 841 (1973). Accordingly, I will grant the Police defendants' motion for summary judgment as to this claim.

19 The Police defendants argue that an excessive force claim under the Fourth Amendment must prove three elements: "1) a significant injury, which 2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was 3) objectively unreasonable." They rely upon the Fifth Circuit case of *Johnson v. Morel,* 876 F.2d 477 (5th Cir.1989), as support. However, the Police defendants have failed to mention the fact that the Fifth Circuit and legal commentators view the Supreme Court case of *Hudson v. McMillian,* 503 U.S. 1 (1992), as overruling the requirement in *Johnson* that a significant injury is required to state an excessive force claim. *See Dunn v. Denk,* 79 F.3d 401, 402–03 (5th Cir.), *petition for cert. filed,* 64 U.S.L.W. 3795 (May 20, 1996); *Stroik v. Ponseti,* 35 F.3d 155, 157 n. 3 (5th Cir.1994), *cert. denied,* 115 S.Ct. 1692 (1995); *Rankin v. Klevenhagen,* 5 F.3d 103, 105 n. 2 (5th Cir.1993); *King v. Chide,* 974 F.2d 653, 657 (5th Cir.1992); *Knight v. Caldwell,* 970 F.2d 1430, 1432–33 (5th Cir.1992), *cert. denied,* 507 U.S. 926 (1993); *see also* Martin A. Schwartz & John K. Kirklin, 1 *Section 1983 Litigation: Claims, Defenses, and Fees* 159 (2d ed. 1991 & Supp.1994). Further, in a recent Third Circuit case, the court did not refer to an injury requirement at all and allowed an excessive force claim to proceed to trial which apparently involved no injuries at all. *See Baker v. Monroe Township,* 50 F.3d 1186, 1189, 1193–94 (3d Cir.1995). I am troubled by the Police defendants' citation, reliance, and discussion of *Johnson v. Morel.* Whether done with knowledge of the case's lack of precedential value or not, counsel misled the Court as to the state of the law. I rely upon the parties to provide an accurate indication of the state of the law I should apply. Counsel's brief was clearly lacking in this regard.

20 The "shocks the conscience" standard which had been employed by different circuit courts prior to the Supreme Court's adoption of the reasonableness inquiry for all Fourth Amendment claims is even higher than the reasonableness standard I must apply. *See McDonald v. Haskins,* 966 F.2d 292, 293, 295 (7th Cir.1992).

21 They do not ask for the dismissal of punitive damages claims against the individual police officers.

22 As stated above, a suit against both an entity and an official in his or her official capacity is essentially a suit against the entity twice. This applies in analyzing state law claims as well.

Doby v. Decrescenzo, Not Reported in F.Supp. (1996)

23 Actually, the Police defendants argue that all of them, including the Police Department, Warrington Township, and Chief Bonargo's official-capacity claim, are entitled to immunity under § 7114(a); however, as I have already found that the local agencies are immune under the Tort Claims Act, I need not address whether the agencies would also be entitled to immunity under § 7114(a).

24 Again, I discuss only the individual police officers because I have already concluded that Warrington Township, the Police Department, and Chief Bonargo in his official capacity are immune from suit under the Tort Claims Act.

25 Above, I concluded that DeCrescenzo could be held liable for false arrest or imprisonment if he knowingly supplied misleading information to the authorities upon which a warrant was issued. I do not view my decision with respect to the police officers as being inconsistent with that conclusion. One who knowingly causes a warrant to issue on improper grounds should be liable for false arrest or imprisonment, while a police officer who serves a facially valid warrant should not be penalized because of a defect in the underlying evidence supporting the warrant. The police officer's role is to execute the warrant, not determine probable cause or the veracity of the information presented in the warrant. *See Baker v. McCollan,* 443 U.S. 137, 145–46 (1979).

26 In an earlier Memorandum opinion resolving Dr. Richards' motion to dismiss, I dismissed plaintiffs' § 1983 and § 1985(3) claims against Dr. Richards. *See Doby v. DeCrescenzo,* No. 94–3991, 1995 WL 385100, at *6 (E.D. Pa. June 27, 1995).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3568841
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey,
Camden Vicinage.

Charles W. FOULKE, Jr., et al., Plaintiffs,
v.
TOWNSHIP OF CHERRY HILL, et al., Defendants.

Case No. 23-cv-2543 (RMB/SAK)
|
Signed July 29, 2024

**Attorneys and Law Firms**

Laura D. Ruccolo, Capehart & Scatchard, PA, Mt. Laurel, NJ, for Plaintiffs.

Eric J. Riso, Zeller & Wieliczko, LLP, Cherry Hill, NJ, for Defendants.

[Docket No. 26]

**MEMORANDUM OPINION & ORDER**

RENÉE MARIE BUMB, Chief United States District Judge:

***1** In this land-use dispute, Plaintiffs Charles W. Foulke, Jr. ("**Mr. Foulke**"), Lenny Reality, LLC, and Foulke Management Corp. (collectively, "**Plaintiffs**") sue the Township of Cherry Hill ("**Township**"), the Cherry Hill Zoning Board of Adjustment ("**Zoning Board**"), and Cherry Hill Zoning Officer Kathleen Gaeta ("**Officer Gaeta**") (collectively, "**Defendants**") under 42 U.S.C. § 1983. Plaintiffs, who operate Cherry Hill Chrysler Dodge Jeep Ram ("**Cherry Hill Dodge**"), allege that, after crediting neighbors' noise complaints, the Township improperly rescinded permits that allowed Plaintiffs to expand their parking lot. The Zoning Board denied their appeal. Having sought reissuance of the permits by filing an action in lieu of prerogative writs in state court under N.J. Ct. R. 4:69-1, Plaintiffs seek to recover damages here for violations of the Takings Clause of the Fifth Amendment and the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

Pending before the Court is Defendants' Motion to Dismiss the First Amended Complaint. Plaintiffs have opposed the Motion, and the Court has considered the parties' submissions without oral argument pursuant to Local Civil Rule 78.1(b). Because the First Amended Complaint is an improper "shotgun" pleading, the Court must dismiss it without prejudice. Plaintiffs have inappropriately asserted their claims against "Defendants" as a collective unit, without specifying the conduct establishing each Defendant's liability for every claim asserted. For this reason, as more fully expressed below, the Motion will be **GRANTED**, and Plaintiffs will be given leave to file a second amended complaint.

**I. FACTUAL BACKGROUND**

Mr. Foulke owns a car dealership along Route 70 in Cherry Hill, New Jersey. [First Am. Compl. ¶¶ 3–4, 17.] For over 50 years, Mr. Foulke has operated Cherry Hill Dodge (through Foulke Management Corp.) on property referred to as "Block 137.01, Lot 1" on the Township's official tax maps (the "**Dealership Property**"). [*Id.* ¶¶ 3–4.] Lenny Reality LLC, the owner of record, leases the Dealership Property to Foulke Management Corp. [*Id.* ¶ 4.] Several other car dealerships neighbor Cherry Hill Dodge, including Subaru, Volvo, Mitsubishi, and Kia. [*Id.* ¶ 5.] All of this property is zoned "B2," referring to highway business. [*Id.* ¶ 16.]

There are additional parcels adjoining the Dealership Property on the same block. [*See* First Am. Compl. Ex. A, Docket No. 22-1 (satellite image of property).] They include Block 137.01, Lots 2, 3, and 4 (the "**Additional Property**"). [*Id.* ¶ 6.] Lenny Reality LLC purchased Lot 3 on February 1, 2018, and Lots 2 and 4 on October 7, 2021. [*Id.*] The only other parcel on Block 137.01 is Lot 5, which is owned by Frank Maloney and his wife (the "**Maloney Property**"). [*Id.* ¶ 8.] There, at 1207 Chambers Avenue, Mr. Maloney operates a tailoring business. [*Id.* ¶ 9.] Mr. Maloney is apparently the uncle of Michelle Samalonis, the Chief Financial Officer / Controller / Treasurer of the Township. [*Id.* ¶ 25.]

***2** At some point in 2020, Mr. Foulke decided to expand the Dealership Property. [First Am. Compl. ¶ 17.] He sought to construct a parking lot on the Additional Property for 75 new employee parking spaces and to lease the parking lot to Foulke Management Corp. [*Id.*] Accordingly, he applied to the Township Planning Board (the "**Planning Board**") to consolidate the Additional Property with the Dealership Property and to demolish the existing residential structures on the Additional Property. [*Id.*]

On August 3, September 8, and October 5, 2020, the Planning Board held public hearings to consider Mr. Foulke's application. [First Am. Compl. Ex. B at 1, Docket No. 22-2.]

During those hearings, Mr. Maloney and residents of the nearby Locustwood neighborhood objected to the parking lot expansion project. [First Am. Compl. ¶¶ 21–22.] Among several concerns, they testified regarding the constant use of vehicle alarms and horns on the Dealership Property, which they believed to be causing a nuisance. [*See* Twp. of Cherry Hill Planning Bd. Resol. Re: Appl. No. 18-P-0020, at 9–11, First Am. Compl. Ex. B. (hereinafter, "**Resolution No. 18-P-0020**") (summarizing neighbors' public testimony).] They identified other concerns too, including the orientation of lights on the property, and several testified that Mr. Foulke has not been a good neighbor. [*Id.* at 13–15.] Mr. Foulke, in turn, acknowledged his neighbors' frustrations and advised that while he was not aware of all their concerns, he wanted to address them. [*Id.* at 16.] But he also testified that additional employee parking spaces were necessary to avoid "parking and circulation conflicts" and that the proposed improvements would correct these problems. [*Id.* at 6–7.] He further explained that designated parking for employees would free up space for service and customer vehicles. [*Id.* at 18.]

Ultimately, on January 19, 2021, the Planning Board approved Mr. Foulke's application. [First Am. Comp. ¶ 29; *see also* Resolution No. 18-P-0020.] But the approval was subject to several conditions of use, including:

(g) No parking shall be permitted in any drive aisles on site.

(h) No off-site deliveries will be permitted and there shall be no delivery parking on Fulton Avenue and no employee or delivery parking on Wynnwood Avenue or Chambers Avenue.

(i) The drive aisle off of Fulton Street is to remain clear.

(j) There shall be no test drives, car repairs tests or employee parking in surrounding neighborhood streets.

...

(u) [Mr. Foulke] shall put in place a car location procedure in place of car horns or car alarms to locate vehicles, the utilization of which on site shall be strictly prohibited.

...

(z) [Mr. Foulke] shall comply with all applicable County and Township Noise Ordinances.

[Resolution No. 18-P-0020, at 24–26; First Am. Compl. ¶ 33.] Mr. Foulke did not challenge the conditional approval of his application. Rather, he accepted the conditions of use with the understanding that they would be enforced after the demolition and construction projects had been completed. [First Am. Compl. ¶ 39.] Still, he alleges that no other car dealerships in the Township are required to comply with similar conditions to operate their business. [*Id.* ¶ 34.]

In December 2022, after delays caused by the COVID-19 pandemic, Mr. Foulke applied for zoning and demolition permits to begin the parking lot expansion project. [*Id.* ¶ 42.] On December 21, 2022, the Township issued to Mr. Foulke a zoning permit for the construction aspects of the project. [*Id.* ¶ 43.] The permit advised that "[f]ailure to comply with any and all conditions of the Planning Board approval (#18-P-0020), particularly those enumerated under #6 on pages 24 through 26 of the approving Resolution, may result in the rescinding of this permit." [*Id.* ¶ 44; *see also* Cherry Hill Twp. Zoning Permit No. ZP-22-1649, First Am. Compl. Ex. C, Docket No. 22-3.] On December 22, 2022, the Township issued Lenny Reality LLC two zoning permits for the demolition aspects of the project, i.e., to remove the residential structures located at 1313 and 1315 Wynnwood Avenue. [First Am. Compl. ¶ 45; *see also* Cherry Hill Twp. Zoning Permit Nos. ZP-22-1668 & ZP-22-1669, First Am. Compl. Ex. D, Docket No. 22-4.] The demolition permits were approved by Officer Gaeta. [First Am. Compl. ¶ 45.]

***3** Having received the requisite approvals, Mr. Foulke engaged a firm to prepare the two residential structures for demolition. [*See id.* ¶ 47.] But on January 27, 2023, the Township received a noise complaint about the Dealership Property. [*Id.* ¶ 49.] Keath Mahan, a Zoning Enforcement Officer for the Township, investigated and determined that horn sounds were emanating from the Dealership Property and the Additional Property. [*Id.* ¶ 51.] He documented 28 incidents over a two-week period, noting that "several unoccupied vehicles were observed with activated alarm systems on the main lot and mechanics areas" and that "lot attendants were observed activing [sic] alarms via remote before exiting or relocating on the lot." [Feb. 22, 2023, Ltr. from Keath Mahan to Charles W. Foulke, Jr. & Lenny Reality LLC at 1, First Am. Compl. Ex. G, Docket No. 22-7 (hereinafter, "**Notice of Violation**"); First Am. Compl. ¶ 52.] In the letter, Mr. Mahan referred to § 5-1.6 of the Cherry Hill Code, directed Mr. Foulke to eliminate car alarm activations on the Dealership Property, and noted that "[f]ailure to correct and resolve this violation will leave us with no other option than taking immediate action through the Cherry Hill Municipal Court in accordance with Section 5-1.6

of the Cherry Hill Township General Ordinance for violations that extend beyond the abatement date of Friday, March 3, 2023." [Notice of Violation at 1 (emphasis omitted).] As alleged, neither Mr. Foulke nor Lenny Realty LLC ever received the Notice of Violation. [First Am. Compl. ¶ 58.]

At a Township council meeting on February 27, 2023, Mr. Maloney and other neighbors submitted additional complaints about the operation of Cherry Hill Dodge. [*Id.* ¶ 60.] Mr. Foulke did not participate in this meeting, but he was contacted by Planning Board Secretary Cosmas Diamantis thereafter and advised of the complaints. [*Id.* ¶ 61.] Mr. Foulke denied them. [*Id.* ¶ 62.] These complaints are not described in the pleading, but Plaintiffs indicate that they were "vague" and "unsubstantiated." [*Id.* ¶ 63.] During this exchange, Mr. Diamantis suggested to Mr. Foulke that he abandon his plans to build a parking lot and sell the Additional Property to the Township so it could develop a park or green space for the Locustwood neighborhood. [*Id.* ¶ 65.] Mr. Foulke refused this request. [*Id.*]

On April 17, 2023, the Township held a meeting and considered a request from Mr. Maloney to rescind Mr. Foulke's construction and demolition permits. [*Id.* ¶¶ 66–70.] Plaintiffs were not provided with notice of this meeting, [*id.* ¶ 69], and did not learn of it until May 1, 2023, [*id.* ¶ 77]. Messrs. Diamantis and Mahan testified at the meeting. [*Id.* ¶¶ 70–71.] Three days later, the Township rescinded all three of Plaintiffs' zoning permits. [*Id.* ¶ 73; *see also* Cherry Hill Twp. Rescissions of Zoning Permits, First Am. Compl. Ex. E, Docket No. 22-5 (hereinafter, "**Rescission Notice**").] Each rescission notice advised that the applicable zoning permit was rescinded "without prejudice," as follows:

> [F]or "failure to comply with any and all conditions of the Planning Board approval (#18-P-0020), particularly those enumerated under #6 on pages 24 through 26 of the approving Resolution," and specifically condition u, which strictly prohibited the use of car horns or alarms to locate vehicles, and condition z, which required compliance with applicable Township Noise Ordinance, as noted in the Zoning Violation dated February 22, 2023. Moreover, the Township has received additional complaints regarding violations of condition g (no parking shall be permitted in any drive aisles on site), condition h (no off-site deliveries will be permitted ... on Fulton Ave ...), and condition j (no test drives car repair tests in the surrounding neighborhood) at a Township Council Meeting on February 27, 2023, and a Community Meeting with Locustwood Neighbors on April 17, 2023.

[First Am. Compl. ¶ 74 (citing Rescission Notice).] The notice also provided that each applicable zoning permit would be reissued "upon confirmation that the Applicant is in compliance with any and all applicable conditions of the Planning Board approval." [*Id.* ¶ 75 (citing Rescission Notice).] Officer Gaeta signed each permit rescission. [*See generally* Rescission Notice.]

Shortly after receiving notice of the permit rescissions, on May 9, 2023, Plaintiffs filed an appeal with the Zoning Board under N.J. Stat. Ann. §§ 40:55D-70(a), 40:55D-72. [First Am. Compl. ¶ 84; *see also* Notice of Administrative Appeal, First Am. Compl. Ex. H, Docket No. 22-8.] The Zoning Board held a hearing on September 7, 2023. [First Am. Compl. ¶ 87.] During that proceeding, the Zoning Board considered whether there was sufficient evidence to justify the rescissions. [*Id.* ¶ 92 (citing Tr. of Zoning Bd. Hr'g at 41:17–19, First Am. Compl. Ex. I, Docket No. 22-9).] To establish that the record was incomplete, Plaintiffs questioned Officer Gaeta. [*Id.* ¶ 93.] She testified, among other things, that she did not independently investigate whether the conditions outlined in Resolution No. 18-P-0020 were violated and that, rather, she rescinded the permits at the direction of her supervisor, Mr. Diamantis. [*Id.* ¶ 94.] She also did not take into account the credibility of the complainants. [*Id.*] At the conclusion of the hearing, the Zoning Board denied Plaintiffs' appeal. [*Id.* ¶ 101.] Memorializing its decision in a written statement, the Zoning Board indicated that Mr. Foulke failed to call any witnesses or introduce any evidence to refute the noise and other complaints against him. [*Id.* ¶¶ 108–09; *see also* Zoning Bd. Resol. Re: Appl. No. 23-Z-0018, at 2–3, First Am. Compl. Ex. J, Docket No. 22-10 (dated Oct. 19, 2023).]

***4** Following the appeal, Plaintiffs provided Defendants with a certification attesting to compliance with Resolution No. 18-P-0020, but Defendants have refused to reissue the permits. [First Am. Compl. ¶¶ 111–12.] On October 31, 2023, Plaintiffs filed a complaint in lieu of prerogative writs in New Jersey Superior Court to challenge the determination of the Zoning Board. [*Id.* ¶ 114.] That civil action involves essentially the same facts and similar, although substantively different, claims as those involved here. [*Compare* First Am. Compl., *with* Compl., *Lenny Realty LLC v. Twp. of Cherry Hill*, Case No. CAM-L-003053-23 (N.J. Super. Ct. filed Oct. 31, 2023).] It remains pending.

## II. PROCEDURAL HISTORY

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

On May 9, 2023, Plaintiffs filed this action under 42 U.S.C. § 1983, appearing to assert claims under the Fourteenth Amendment of the U.S. Constitution. [*See generally* Compl., Docket No. 1.] They sought to compel reissuance of the demolition permits. [*Id.*] After the parties exchanged pre-motion letters pursuant to Rule I.A. of this Court's Individual Rules and Procedures, [Docket Nos. 9, 10], the Court scheduled this matter for a pre-motion conference, [Text Order, Docket No. 11], which it held via Microsoft Teams on July 6, 2023, [Docket No. 12]. The Court directed the parties to pursue informal settlement discussions and to apprise the Court of their efforts. [*See id.*] In a joint submission a few weeks later, the parties advised the Court that their efforts had been unsuccessful, and the Court scheduled an in-person conference for September 14, 2023. [Text Order, Docket No. 13.] The Court held the in-person conference on September 26, 2023. [Docket Nos. 15, 16.]

During the conference, the Court once more attempted to assist the parties to resolve their dispute informally and without unnecessary motion practice. [Docket No. 16.] That effort again failed, and Defendants filed their initial motion to dismiss. [Docket No. 19.] On November 13, 2023, amending their pleading pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiffs filed the operative First Amended Complaint, asserting: (i) a violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution, [First Am. Compl. ¶¶ 120–44 (Count I)]; (ii) a violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, [*id.* ¶¶ 145–59 (Count II)]; (iii) a procedural violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, [*id.* ¶¶ 160–69 (Count III)]; and (iv) a substantive violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution, [*id.* ¶¶ 170–77 (Count IV)]. Plaintiffs now seek damages, an injunction directing Defendants to cease violating their rights, attorneys' fees and costs, and punitive damages. [*Id.* at "Wherefore" clauses.] Plaintiffs no longer seek mandamus in the form of an order directing the reissuance of the rescinded zoning permits. [*Compare* First Am. Compl. at "Wherefore" clauses, *with* Compl. at "Wherefore" clause.] As a result of Plaintiffs' filing the First Amended Complaint, the Court denied Defendants' initial motion to dismiss as moot. [Text Order, Docket No. 23.]

On December 8, 2023, Defendants filed their pending Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6). [Mot. Dismiss, Docket No. 26; Defs.' Mem. Supp. Mot. Dismiss, Docket No. 26-1 ("**Defs.' Br.**").] Plaintiffs opposed, [Pls.' Mem. Opp'n Defs.' Mot. Dismiss, Docket No. 27 ("**Pls.' Opp'n**")], and Defendants filed an overlength reply brief, [Defs.' Br. Reply Pls.' Opp'n, Docket No. 31 ("**Defs.' Reply Br.**")].[1] As the Motion to Dismiss is fully briefed, it is ripe for adjudication.

## III. LEGAL STANDARDS

### A. Rule 12(b)(1).

***5** A complaint may be dismissed for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1); *In re Schering Plough Corp. Intron / Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012). Subject-matter jurisdiction challenges can be either facial or factual. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Facial challenges contest the sufficiency of the pleadings and require a court to consider only " 'the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.' " *In re Shering Plough Corp.*, 678 F.3d at 243 (quoting *Gould Elec. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)). Factual challenges contest the allegations in the complaint and "the court may consider evidence outside the pleadings." *Gould Elec.*, 220 F.3d at 176. The burden of persuasion lies with Plaintiffs, as the party invoking federal jurisdiction. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006); *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408–09 (3d Cir. 1991).

A challenge to the ripeness of an action is properly brought as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1). *Save Ardmore Coal. v. Lower Merion Twp.*, 419 F. Supp. 2d 663, 669 (E.D. Pa. 2005) (first citing *Phila. Fed'n of Teachers, Am. Fed'n of Teachers, Local 3, AFL-CIO v. Ridge*, 150 F.3d 319 (3d Cir. 1998); then citing 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (3d ed. 2004)). "Because ripeness affects justiciability, ... unripe claims should ordinarily be disposed of on a motion to dismiss." *Taylor Inv., Ltd. v. Upper Darby Twp.*, 983 F.2d 1285, 1290 (3d Cir. 1993). And "[a]s long as the parties are given an adequate opportunity to address the justiciability of the claim, the district court 'may inquire, by affidavit or otherwise, into facts as they exist.' " *Id.* at 1290 n.7 (quoting *Armstrong World Indus. v. Adams*, 961 F.2d 405, 410 n.10 (3d Cir. 1992)).

### B. Rule 12(b)(6).

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6);

*Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). To withstand a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard is met when there is enough factual content in the complaint to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When reviewing the sufficiency of a complaint, a court must accept as true all well-pleaded allegations in the complaint, including all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Evancho v. Fisher*, 423 F.3d 347, 350–51 (3d Cir. 2005). A court need not accept "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A court may "generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

***6** A district court's role in reviewing the sufficiency of a complaint is thus limited: the issue is not "whether the plaintiffs will ultimately prevail" but "whether they are entitled to offer evidence to support their claims." *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). "When presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016) (citation omitted).

**IV. DISCUSSION** [2]

Plaintiffs sue the Township, the Zoning Board, and Officer Gaeta pursuant to 42 U.S.C. § 1983. [First Am. Compl. ¶ 1.] Section 1983 provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute does not create substantive rights; "it provides only remedies for deprivation of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (citations omitted). To prevail under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States[ ] and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *Burella v. City of Phila.*, 501 F.3d 134, 139 (3d Cir. 2007). Municipalities and other local government units are "persons" for the purposes of § 1983. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1976).

Here, Plaintiffs claim violations of their rights to due process and equal protection as guaranteed by the Fourteenth Amendment. [3] [*See* First Am. Compl. ¶¶ 145–77.] They also assert that they were deprived of just compensation for the taking of private property as secured by the Takings Clause of the Fifth Amendment. [4] [*See id.* ¶¶ 120–44.] They allege that the Township, the Zoning Board, and Officer Gaeta deprived them of these rights while acting under color of state law. [*Id.* ¶¶ 120–77.]

***7** Defendants move to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6). They offer several arguments in support of their position. Preliminarily, they argue that the First Amended Complaint is a "shotgun" pleading that must be dismissed as procedurally improper, [Defs.' Br. at 11–13], and they submit that Plaintiffs' due-process claims are not yet ripe because of the pending action in New Jersey Superior Court, [*id.* at 14–17]. On the merits, they argue that Plaintiffs have not pleaded sufficient facts to establish a plausible violation of the Takings Clause, the Equal Protection Clause, or the Due Process Clause. [*Id.* at 17–37.] Finally, Defendants contend that Plaintiffs' suit against Officer Gaeta must be dismissed and that there is no basis for punitive damages in this action. [*Id.* at 37–38.] As Defendants' preliminary argument is a threshold matter concerning the Court's ability

to construe Plaintiffs' claims against each Defendant, the Court addresses it first.

* * *

Defendants seek to dismiss the First Amended Complaint as an improper "shotgun" pleading. In Defendants' view, Plaintiffs fail to differentiate among them, leaving the Township, the Zoning Board, and Officer Gaeta to guess as to the relevance of each claim. Plaintiffs oppose, arguing that "[t]he facts of this case are not complicated" and that they make clear in the First Amended Complaint that "Defendants worked in concert to deprive Plaintiffs of their Constitutional rights." [Pls.' Opp'n at 4 (citing First Am. Compl. ¶ 81).]

Every pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought." Fed. R. Civ. P. 8(a)(2), (3); *Travaline v. U.S. Supreme Ct.*, 424 F. App'x 78, 79 (3d Cir. 2011). Each averment must be "simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). In the Third Circuit, pleadings that violate Rule 8 are sometimes disparagingly referred to as "shotgun" pleadings. *See, e.g.*, *Cambridge Mut. Fire Ins. Co. v. Stihl Inc.*, 2023 WL 5928319, at *2 (D.N.J. Sept. 12, 2023); *Conserve v. City of Orange Twp.*, 2022 WL 1617660, at *1 n.2 (D.N.J. May 23, 2022); *Radhakrishnan v. Pugliese*, 2021 WL 11593799, at *1 (D.N.J. May 21, 2021); *Karupaiyan v. Atl. Realty Dev. Co.*, 2020 WL 13728036, at *2 (D.N.J. Jan. 17, 2020); *Rosenberg v. C.R. Bard, Inc.*, 387 F. Supp. 3d 572, 582 (E.D. Pa. 2019); *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017); *Litwak v. Tomko*, 2017 WL 168053, at *4 (M.D. Pa. Jan. 17, 2017); *Lapella v. City of Atlantic City*, 2012 WL 2952411, at *5 n.3 (D.N.J. July 18, 2012).

In brief, a shotgun pleading is a complaint that "fails to specify which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Morales v. New Jersey*, 2023 WL 5003891, at *4 (D.N.J. Aug. 3, 2023) (cleaned up) (citing *Pugliese*, 2021 WL 11593799, at *1). More commonly, courts in this circuit refer to these types of complaints as impermissible "group" pleadings. *See, e.g.*, *Salyers v. A.J. Blosenski, Inc.*, ––– F. Supp. 3d ––––, ––––, 2024 WL 1773368, at *6 (E.D. Pa. Apr. 24, 2024); *SEC v. Mintz*, ––– F. Supp. 3d ––––, ––––, 2024 WL 1173096, at *17–18 (D.N.J. Mar. 18, 2024) (Bumb, C.J.); *Reddick v. Hicks*, 2023 WL 4579884, at *3 (D.N.J. July 18, 2023); *Pellecchia v. Cnty. of Burlington*, 2022 WL 17667906, at *2 (D.N.J. Dec. 13, 2022); *Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 386–87 (D.N.J. 2019); *Forero v. APM Terminals*, 2019 WL 6168031, at * 5 (D.N.J. Nov. 19, 2019); *Sheeran v. Blyth Shipholding S.A.*, 2015 WL 9048979, at *3 (D.N.J. Dec. 16, 2015); *Ingris v. Borough of Caldwell*, 2015 WL 3613499, at *6 (D.N.J. June 9, 2015); *Japhet v. Francis E. Parker Mem'l Home, Inc.*, 2014 WL 3809173, at *2 (D.N.J. July 31, 2014); *Falat v. Cnty. of Hunterdon*, 2013 WL 1163751, at *3 (D.N.J. Mar. 19, 2013).

No matter the label, pleadings of this nature have long been criticized. *See* *Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988) (seeking to "eliminate the all too common shotgun pleading approach" because it fails "to provide the defendant with sufficient notice of the claims asserted" (citing *Frazier v. Se. Pa. Transp. Auth.*, 785 F.2d 65, 68 (3d Cir. 1985))); *see also, e.g.*, *Morales*, 2023 WL 5003891, at *4 ("Shotgun pleadings or 'vague group pleadings' are impermissible under Rule 8." (quoting *Karupaiyan*, 2020 WL 13728036, at *2)). But it is the Eleventh Circuit that has the robust doctrine prohibiting shotgun pleadings. *See* *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015). Courts in the Third Circuit often cite to it. *E.g.*, *Stihl Inc.*, 2023 WL 5928319, at *2; *Pugliese*, 2021 WL 11593799, at *1; *Karupaiyan*, 2020 WL 13728036, at *2; *Bartol*, 251 F. Supp. 3d at 859; *see also* *Bartol*, 251 F. Supp. 3d at 859 n.3 ("[D]istrict courts within the Third Circuit often cite to the Eleventh Circuit for this [shotgun-pleading] law." (first citing *Lapella*, 2012 WL 2952411, at *5 n.3; then citing *Tomko*, 2017 WL 168053, at *4)).

***8** The Eleventh Circuit has categorized shotgun pleadings into four distinct groups: (i) when a complaint contains "multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (ii) when a complaint "does not commit the mortal sin of re-alleging all preceding counts but is guilty of the venial sin of being replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (iii) when a complaint "commits the sin of not separating into a different count each cause of action or claim for relief"; and (iv) when a complaint asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland*, 792 F.3d at 1321–23 (citations omitted). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the

claims against them and the grounds upon which each claim rests." *Id.* at 1323.

Here, the First Amended Complaint violates Rule 8 because it is an impermissible shotgun pleading of the fourth variety. *See id.* When identifying the allegations supporting each of their constitutional claims, [see First Am. Compl. ¶¶ 120–77], Plaintiffs fail to identify the specific conduct establishing each Defendant's liability. Instead, they repeatedly refer to "Defendants" as a collective unit, [*see id.*], which they continue to do even in their Opposition Brief, [*see, e.g.*, Pls.' Opp'n at 6–7]. This practice sows confusion about Plaintiffs' theories of liability, requiring the Court to wade through the pleading to discern whether Plaintiffs truly intended to assert every claim against each Defendant.[5] The Court has little tolerance for imprecise pleadings. "They waste scare judicial resources, inexorably broaden the scope of discovery, wreak havoc on ... court dockets, and undermine the public's respect for the courts." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018) (cleaned up) (citation omitted). Such pleadings should be dismissed without prejudice. *See, e.g.*, *Galicki v. New Jersey*, 2015 WL 3970297, at *4 (D.N.J. June 29, 2015) (dismissing substantive constitutional claims under § 1983 without prejudice where plaintiffs' allegations "suffer[ed] from 'collectivized' pleading" and "fail[ed] to put each individual defendant on notice of the particular allegations alleged against that defendant"); *see also Mills*, 406 F. Supp. 3d at 387 (following the general rule that an initial dismissal for inadequate pleading is without prejudice).

To illustrate the practical consequences of Plaintiffs' improper shotgun approach, the Court considers some of Defendants' other arguments. For example, Defendants contend that Plaintiffs' claims must be dismissed against Officer Gaeta. [Defs.' Br. at 37.] Observing that the First Amended Complaint does not identify the capacity in which Officer Gaeta has been sued, Defendants submit that an official-capacity suit cannot proceed as a matter of law and a personal-capacity suit fails for lack of specificity under Rule 8. [*Id.* at 37 & n.8.] The Court agrees.

An official-capacity suit is "in all respects other than name" an action against the governmental entity itself, for it is the "real party in interest." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985))). Where a plaintiff sues a public officer in her official capacity and the public entity that employs her, the action against the officer is "redundant," and all claims asserted against her in her official capacity should be dismissed. *Cuvo v. Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006); *see also Gregory v. Chehi*, 843 F.2d 111, 120 (3d Cir. 1988) (observing that claims, "insofar as they are against the defendant officials in their official capacities, are only a duplication of the counts asserted against the [t]ownship itself"). Thus, Plaintiffs cannot pursue their claims against Officer Gaeta in her official capacity.

***9** But Plaintiffs would appear to agree with this result in any case, as they submit in their Opposition Brief that Officer Gaeta can be sued in her *personal* capacity. [Pls.' Opp'n at 36.] In this respect, they contend that Officer Gaeta is individually liable for violating Plaintiffs' constitutional rights by rescinding their zoning permits and refusing to reissue them over Plaintiffs' objection. [*Id.*]

The Court again observes that the First Amended Complaint does not identify the capacity in which Officer Gaeta has been sued. [*See generally* First Am. Compl.] Ordinarily, "[t]o determine whether a plaintiff sued a defendant in his personal capacity, official capacity, or both, we look to the complaint and the course of proceedings." *Atwell v. Schweiker*, 274 F. App'x 116, 118 (3d Cir. 2007) (citing *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990)) *see also Garden State Elec. Inspection Servs. Inc. v. Levin*, 144 F. App'x 247, 251 (3d Cir. 2005). As the First Amended Complaint is silent as to the capacity in which Officer Gaeta has been sued and Plaintiffs have effectively conceded that Officer Gaeta has not been sued in her official capacity, [*see* Pls.' Opp'n at 36 ("Nowhere in the [First Amended Complaint] is it alleged that Defendant Gaeta is being sued in her 'official capacity.' ")], the Court focuses on whether she can be liable in her personal capacity. *See Atwell*, 274 F. App'x at 118 (assuming plaintiff sued public official in personal capacity where complaint was ambiguous and punitive damages were demanded); *Gregory*, 843 F.2d at 120 (resolving doubts in plaintiff's favor and assuming public officials were sued in personal capacities).

Personal-capacity suits seek to impose liability against the individual official for actions she takes under color of state law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). "On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166. Therefore, to succeed on their individual liability theory, Plaintiffs must allege sufficient facts to establish that Officer

Gaeta's own conduct violated Plaintiffs' constitutional rights. *See* *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (explaining that a plaintiff must demonstrate the defendant's personal involvement in the constitutional violations by "describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct" (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988))).

Defendants argue that Plaintiffs' individual liability theory fails because they have not alleged sufficient facts to satisfy the baseline requirements of Federal Rule of Civil Procedure 8(a)(2). [Defs.' Br. at 37 n.8.] In opposition, Plaintiffs point to several factual allegations, [Pls.' Opp'n at 36 (citing First Am. Compl. ¶¶ 73, 75, 78, 81–83, 88, 93–97, 110–12)], but these paragraphs fail to elucidate how Officer Gaeta herself violated Plaintiffs' constitutional rights under the Takings Clause, the Due Process Clause, and the Equal Protection Clause. For instance, they do not adequately describe how she personally exhibited conscience-shocking behavior by rescinding Plaintiffs' zoning permits or specify how she denied Plaintiffs' due process during the September 7, 2023, hearing. In fact, most of the paragraphs do not even mention Officer Gaeta; they detail the actions of non-party employees of the Township and/or Zoning Board. And Plaintiffs' sparse treatment in opposition offers little clarity. [*See* Pls.' Opp'n at 36–37.]

***10** Ultimately, all the Court can discern from Plaintiffs' First Amended Complaint is that Officer Gaeta is the official who executed the Rescission Notice that revoked their demolition permits for the Additional Property and who testified at the September 7, 2023, Zoning Board hearing regarding her basis for doing so. [*See* First Am. Compl. ¶¶ 45, 93, 94.] Because Plaintiffs have failed to allege sufficient facts that Officer Gaeta violated Plaintiffs' constitutional rights, the claims against Officer Gaeta in her personal capacity must be dismissed, without prejudice. *See, e.g.*, *Fennell v. Penchishen*, 2019 WL 1934877, at *6 (E.D. Pa. Apr. 30, 2019) (dismissing, without prejudice, claims against officers sued in their individual capacities because plaintiff failed to show how they were personally involved in violating his right to equal protection); *Danielson v. Chester Twp.*, 2013 WL 6094578, at *6–7 (D.N.J. Nov. 19, 2013) (dismissing, without prejudice, First Amendment and Equal Protection Clause claims asserted against individual members of municipal council because plaintiff failed to plead plausible claims); *Goldey v. Pennsylvania*, 1993 WL 93376, at *2–3 (E.D. Pa. Mar. 30, 1993) (dismissing suit against state troopers without prejudice because plaintiffs failed to specify sufficient facts to establish their individual liability). If Plaintiffs can articulate how Officer Gaeta violated their constitutional rights in her personal capacity, they may file a further amended complaint to assert an individual-capacity suit against her.

The Court recognizes that Defendants have argued in their Reply Brief that Officer Gaeta is entitled to the privilege of qualified immunity. [Defs.' Reply Br. at 15–17.] The doctrine shields officials " 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To determine whether a public official is entitled to qualified immunity, courts engage in a two-step process. First, the court must determine whether the facts alleged make out a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court asks whether the right was clearly established at the time of the challenged conduct. *Id.* A court may tackle these steps in the order it deems appropriate. *Pearson*, 555 U.S. at 236; *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018).

"[B]ecause the entitlement is an immunity from suit rather than a mere defense to liability, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991) (internal citation, quotation marks, and alterations omitted). Here, however, it would be premature to resolve Officer Gaeta's asserted defense of qualified immunity given the pleading deficiencies addressed above. The Court is not able to discern whether Officer Gaeta has violated Plaintiffs' constitutional rights because it is not clear what the contours are of Plaintiffs' individual liability theory. Accordingly, Officer Gaeta may seek to invoke immunity at a later stage in this proceeding, if appropriate. [6] *See* *Assocs. in Obstetrics & Gynecology v. Upper Merion Twp.*, 270 F. Supp. 2d 633, 661 (E.D. Pa. 2003) (rejecting defendant's qualified immunity defense at motion to dismiss stage where based on defendant's unfair reading of complaint's allegations); *see also* *Danielson*, 2013 WL 6094578, at *7 (declining to rule on individual defendants' qualified immunity arguments at pleading stage).

***11** Consider one more consequence of Plaintiffs' shotgun-pleading approach. In the First Amended Complaint, Plaintiffs demand punitive damages from Defendants as to each claim asserted. [First Am. Compl. ¶¶ 144(d), 159(c), 169(c), 177(c).] Defendants, however, argue that Plaintiffs

cannot obtain punitive damages from a municipality, [Defs.' Br. at 37–38], and Plaintiffs would appear to concede the point by implication, arguing in a single sentence that Plaintiffs *can* obtain punitive damages from Officer Gaeta insofar as she is sued in her personal capacity, [Pls.' Opp'n at 37]. Thoughtful planning and careful pleading would obviate this exercise.

It is, of course, well-settled that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *see also Smith v. Borough of Dunmore*, 633 F.3d 176, 183 (3d Cir. 2011) (recognizing continued application of municipal immunity from punitive damages under *City of Newport*). Such immunity extends to subordinate municipal entities as well. *See, e.g.*, *Jowett v. Churchill*, 2021 WL 3879084, at *11 (D.N.J. Aug. 31, 2021) (Bumb, J.) (precluding plaintiffs from seeking punitive damages against township board of education); *McLaughlin v. Forty Fort Borough*, 2013 WL 4069528, at *15 (M.D. Pa. Aug. 9, 2013) (striking request for punitive damages against borough and zoning hearing board); *Jodeco, Inc. v. Hann*, 674 F. Supp. 488, 499 (D.N.J. 1987) (dismissing claim for punitive damages against township "and its municipal entities" in zoning dispute). Accordingly, Plaintiffs cannot seek punitive damages from the Township or the Zoning Board.

Nor can Plaintiffs seek punitive damages from Officer Gaeta. While it is true that a plaintiff can demand punitive damages from a public official sued in her personal capacity, *Atwell v. Schweiker*, 274 F. App'x 116, 118 (3d Cir. 2007); *Strickland v. Mahoning Twp.*, 647 F. Supp. 2d 422, 428–29 (M.D. Pa. 2009); *King v. Twp. of East Lampeter*, 17 F. Supp. 2d 394, 426 (E.D. Pa. 1998); *Pica v. Sarno*, 907 F. Supp. 795, 805 (D.N.J. 1995), the Court has no basis here to permit Plaintiffs to pursue punitive damages from Officer Gaeta based on the deficient allegations of the First Amended Complaint. The availability of an award of punitive damages in an individual-capacity suit depends on proving that a defendant's conduct was "motivated by evil motive or intent" or "involve[d] reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see also Savarese v. Agriss*, 883 F.2d 1194, 1204 (3d Cir. 1989) (elaborating on punitive damages standard in personal-capacity suit). Punitive damages are to be "reserved for special circumstances." *Savarese*, 883 F.2d at 1205. Because Plaintiffs' claims against Officer Gaeta are not sufficiently pleaded and because they have not alleged facts to establish Officer Gaeta's "evil motive" or "reckless or callous indifference" to their constitutional rights, Plaintiffs' demand for punitive damages must be dismissed without prejudice. *See, e.g.*, *Reed v. Jersey City*, 2022 WL 1664621, at *9 (D.N.J. May 24, 2022) (dismissing demand for punitive damages where plaintiff had failed to state a viable claim); *McKenna v. Toll Bros., Inc.*, 2015 WL 1874236, at *2–3 (E.D. Pa. Apr. 23, 2015) (dismissing claim for punitive damages because plaintiffs had failed to allege sufficient facts concerning defendants' evil motive, actual malice, or wanton and willful disregard of plaintiffs' rights).

In sum, the First Amended Complaint must be dismissed as an improper shotgun pleading. Though the Court agrees with Plaintiffs that "[t]he facts of this case are not complicated," [Pls.' Opp'n at 4], additional attention must be devoted to Plaintiffs' theories of liability. The Court will not address Defendants' other arguments until Plaintiffs specify the conduct that they believe to establish each Defendants' liability for each claim asserted.

***12** Careful pleading in civil rights cases is not a matter of etiquette or housekeeping; it is necessary to provide defendants with notice of the claims asserted against them and the grounds upon which each claim rests so that they can properly frame an answer. *See Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988) (explaining that specificity is critical "to provide defendants with adequate notice to frame an answer" (citing *Frazier v. Se. Pa. Transp. Auth.*, 785 F.2d 65, 68 (3d Cir. 1985))); *see also Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321 (11th Cir. 2015) ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."). Because the First Amended Complaint fails to do so, the Court concludes that it must be dismissed, without prejudice. *See, e.g.*, *Bartol v. Barrowclough*, 251 F. Supp. 3d 855, 860–61 (E.D. Pa. 2017) (dismissing shotgun pleading without prejudice where plaintiff failed to specify which of thirteen causes of action pertained to each defendant and failed to explain whether claims were brought in individual or official capacities); *see also Rosenberg v. C.R. Bard, Inc.*, 387 F. Supp. 3d 572, 582 (E.D. Pa. 2019) (dismissing negligence claim without prejudice with leave to amend because plaintiff left defendant to guess as to which facts supported negligence claim asserted).

## V. CONCLUSION

Accordingly, the Court having carefully considered the parties' submissions, and for the reasons expressed above, and for good cause shown,

**IT IS**, on this **29th** day of **July 2024**, hereby:

1. **ORDERED** that Defendants Motion to Dismiss [Docket No. 26] is **GRANTED**; and it is further

2. **ORDERED** that the First Amended Complaint [Docket No. 22] is **DISMISSED, WITHOUT PREJUDICE**; and it is further

3. **ORDERED** that Plaintiffs may file a second amended complaint no later than twenty-one (21) days from the date hereof if they can remedy the deficiencies outlined above; and it is finally

4. **ORDERED** that Plaintiffs shall keep the Court apprised, by letter submitted on the docket, of all material developments in their pending action in lieu of prerogative writs in New Jersey Superior Court, and that Defendants may respond to such submission(s) if they so choose.

**All Citations**

Slip Copy, 2024 WL 3568841

## Footnotes

1 Plaintiffs object to the length and formatting of Defendants' Reply Brief as a violation of Local Civil Rule 7.2. [Docket No. 32.] They do not seek a particular form of relief, however. [*See id.*] In response, Defendants submitted a post-hoc request for leave to file an overlength brief. [Docket No. 33.] Local Civil Rule 7.2 provides that reply briefs are limited to 15 "ordinary typed or printed pages" and briefs of greater length "will only be accepted if special permission of the Judge is obtained prior to submission of the brief." L. Civ. R. 7.2(b). Usually, the Court would strike an overlength reply brief where a party had failed to obtain the Court's prior written consent, especially if a submission were egregiously overlength. Here, however, Defendants' 18-page Reply Brief is not egregiously overlength. Nor would striking it make an ounce of difference. So, the Court will decline to do so in this instance. *See, e.g.*, *Fisher v. Pratt*, 2020 WL 773262, at *3 n.7 (D.N.J. Feb. 18, 2020) (declining to strike reply brief where party had failed to obtain prior consent of court, as party's brief was overlength by one page); *Certain Underwriters at Lloyd's, London v. 170 Estell Manor, LLC*, 2020 WL 1864604, at *2 n.1 (D.N.J. Apr. 14, 2020) (noting that, although party "obviously violated the Local Rules" in filing overlength reply brief without obtaining court's prior consent, court would still grant post-hoc motion for leave to file excess pages); *see also* *Johnson v. Guhl*, 91 F. Supp. 2d 754, 765 (D.N.J. 2000). Therefore, Defendants' request is granted, and the Court accepts the overlength Reply Brief as filed on the docket. "Nevertheless, the parties are advised that future violation of the Local Civil Rules will result in [an] appropriate sanction." *170 Estell Manor, LLC*, 2020 WL 1864604, at *2 n.1.

2 As Plaintiffs assert violations of the United States Constitution pursuant to 42 U.S.C. § 1983, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. *See* *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003) (explaining that district courts have jurisdiction over federal civil rights claims brought under § 1983).

3 The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.

4 The Takings Clause of the Fifth Amendment provides that "private property [shall] not be taken for public use, without just compensation." U.S. Const. amend V. The clause applies to state and local government

through the Fourteenth Amendment. *Murr v. Wisconsin*, 582 U.S. 383, 392 (2017); *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151 (3d Cir. 2018).

5 The problem is not remedied by claiming that the Township, the Zoning Board, and Officer Gaeta acted "in concert" to deprive Plaintiffs of their constitutional rights, [*see* Pls.' Opp'n at 4], as if they were jointly and severally liable for each claim. To the contrary, Plaintiffs' Opposition Brief suggests that they intend to assert some claims against the Township and/or Officer Gaeta, and others against the Zoning Board. The Court will not speculate where an amended pleading could provide clarity. *Cf. Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (internal citation and quotation marks omitted)).

6 In determining whether they can plead facts to show a violation of a clearly established constitutional right, Plaintiffs should be mindful that other doctrines may shield Officer Gaeta from suit. For instance, zoning officials cannot be sued in their individual capacities for conduct relating to the performance of "quasi-judicial" functions. *See, e.g.*, *Lonzetta Trucking & Excavating Co. v. Schan*, 144 F. App'x 206, 210–11 (3d Cir. 2005) (explaining that zoning officials are entitled to absolute immunity from individual-capacity claims to the extent the official was performing a "quasi-judicial" function).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

2013 WL 149658
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Arnold GREENSTEIN, Plaintiff–Appellant,
v.
SUNITHA MOONTHUNGAL, P.C., Sunitha Moonthungal, M.D., and Cogent Healthcare of New Jersey, P.C., [1] Defendants–Respondents.

A-1233-11T1
|
Submitted Dec. 4, 2012.
|
Decided Jan. 15, 2013.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L–7070–10.

**Attorneys and Law Firms**

Arnold Greenstein, appellant pro se.

O'Connor Kimball, LLP, attorneys for respondents (Stephen E. Siegrist, on the brief).

Before Judges LIHOTZ and OSTRER.

**Opinion**

PER CURIAM.

***1** Plaintiff Arnold Greenstein appeals from the summary judgment dismissal of his civil rights complaint against defendants Cogent Healthcare of New Jersey, P.C. (Cogent), and Sunitha Moonthungal, M.D. [2] We affirm.

On January 14, 2010, plaintiff sought medical treatment at the Hackensack University Medical Center for persistent rib pain following a fall from his bicycle. He was admitted for treatment and first interviewed by a nutritionist the next day. She recorded his responses, including his statement, "[I] will kill myself if I don't lose weight."

Later on July 15, 2010, Dr. Moonthungal, who was employed by Cogent, performed her rounds and met with plaintiff, who became upset because he felt she ignored his question about necessary treatment. Plaintiff recalls Dr. Moonthungal offering a diagnosis of "a lung blockage" and explained he needed to use an oxygen canister. Plaintiff suggests she failed to consult with a pulmonologist.

A second consulting physician, Dr. Cyrus Yau, spoke to plaintiff and reaffirmed he might be required to continue his use of oxygen when discharged. That afternoon, plaintiff again spoke to Dr. Moonthungal because he wanted to check himself out of the hospital. She explained he needed to remain because his statement referencing a desire to harm himself required a psychiatric consultation. Plaintiff averred Dr. Moonthungal refused to issue his discharge. Dr. Moonthungal left the hospital at 7 p.m. The psychiatry department had not yet cleared plaintiff for discharge.

Later that evening, two psychiatrists evaluated plaintiff. At approximately 9 p.m., he desired to leave the hospital and was told by the nurses on duty he must execute a general release relieving the hospital and its staff for liability resulting from his "voluntary departure from said hospital and the termination of [his] stay as a patient therein." He declined to do so. After speaking to someone by telephone, the nurse was instructed she could not make plaintiff execute the release. He left the hospital at approximately 9:15 p.m.

Plaintiff's complaint alleged Dr. Moonthungal violated the New Jersey Patients' Bill of Rights; did not treat him "as a human being, but as a machine"; and engaged in a "shouting match." Further, he blamed her for including a retaliatory, false chart entry, listing him as suicidal (which he claims was subsequently removed from his records), requiring him to remain hospitalized. Finally, he attributes the release instruction to Dr. Moonthungal, who sought to be absolved of liability for her conduct. Plaintiff sought one million dollars for "[e]motional [s]tress and [d]istress, for the [t]hreat that would have put [him] in a[m]ental [h]ospital, and for [f]alse [i]mprisonment, in preventing [him][f]rom leaving the [h]ospital unless he sign [sic] a 'General Release.' "

Following discovery, defendants moved for summary judgment. Judge Rachelle L. Harz considered the parties' arguments. The judge found no factual basis to support plaintiff's civil rights claims. She concluded Dr. Moonthungal did not violate the Patients' Bill of Rights, *N.J.A.C.* 8:43G–4.1, and, nevertheless, the sole remedy for such a violation

was administrative. As for the tort claim of intentional infliction of emotional distress, the conduct alleged was not intentional, reckless, or outrageous, but rather the facts reflected "a concern for the well being of the patient[.]" Further, the judge determined the facts did not support a claim for false imprisonment, as defendants' actions were directed at reviewing plaintiff's expressed statement of possible self-harm. The judge dismissed plaintiff's complaint. Plaintiff appeals.

***2** Our review of the trial court's decision is governed by well-established principles. When reviewing the grant of summary judgment, we " 'view the facts in the light most favorable to plaintiff.' " *Livsey v. Mercury Ins. Group,* 197 *N.J.* 522, 525 n. 1 (2009) (quoting *Sciarrotta v. Global Spectrum,* 194 *N.J* . 345, 348 (2008)). "[W]hen the evidence is so one-sided that one party must prevail as a matter of law, the trial court should not hesitate to grant summary judgment." *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540 (1995) (internal quotation marks and citations omitted). We employ the same standard in our review. *Busciglio v. DellaFave,* 366 *N.J.Super.* 135, 139 (App.Div.2004) (citations omitted).

On appeal, plaintiff suggests factual disputes rendered summary judgment inappropriate. He poses several questions he believes should be presented to a jury for review. However, he has failed to present the foundational facts supporting determination by a trier of fact. For example, he asks: "May a physician require a patient to sign a 'general release' as a condition for [r]elease from a hospita[l]?" However, plaintiff admitted he did not know with whom the nurses were conversing on the telephone; he merely assumed it was Dr. Moonthungal. However, Dr. Moonthungal's shift ended at 7 p.m. and she left the hospital. Plaintiff also asks: "May a physician use the threat of the commitment to a mental hospital as a vendetta?" However, he cannot establish such a threat was ever uttered by Dr. Moonthungal.

We reject plaintiff's arguments, as " 'unsubstantiated inferences and feelings' are not sufficient to support or defeat a motion for summary judgment." *Petersen v. Twp. of Raritan,* 418 *N.J.Super.* 125, 132 (App.Div.2011) (quoting *Oakley v. Wianecki,* 345 *N.J.Super.* 194, 201 (App.Div.2001)). "In addition, '[b]are conclusions in the pleadings, without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment.' " *Ibid.* (quoting *U.S. Pipe & Foundry Co. v. Am. Arbitration Ass'n,* 67 *N.J.Super.* 384, 399–400 (App.Div.1961)).

Regarding plaintiff's assertion rights granted by *N.J.A.C.* 8:43G–4.1 were abridged, Judge Harz correctly explained the remedy for such claims rests with the hospital administration, not the courts. Specifically, the regulatory provision states "[t]he hospital administrator shall be responsible for developing and implementing policies to protect patient rights and to respond to questions and grievances pertaining to patient rights." *N.J.A.C.* 8:43G–4.1(a).

The New Jersey Civil Rights Act (CRA), *N.J.S.A.* 10:6–1 to –2, was adopted "for the broad purpose of assuring a state law cause of action for violations of state and federal constitutional rights and to fill any gaps in state statutory anti-discrimination protection." *Owens v. Feigin,* 194 *N.J.* 607, 611 (2008) (citations omitted). However, plaintiff expressed no facts demonstrating Dr. Moonthungal or Cogent acted to deprive him " 'of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State,' " or that the " 'exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law.' " *Ibid.* (quoting *N.J.S.A.* 10:6–2(c)). Simply stated, Dr. Moonthungal provided medical advice after reviewing plaintiff's chart, which included his comments to the nutritionist and Dr. Yau's psychiatric referral. Because plaintiff had suggested he would kill himself if he did not lose weight, Dr. Moonthungal acted prudently, following through with the psychiatric consultation to assure plaintiff's protection.

***3** Moreover, the doctor's conduct does not form the basis of the intentional torts of infliction of emotional distress or false imprisonment. *See Taylor v. Metzger,* 152 *N.J.* 490, 509 (1998) (stating the proofs necessary to sustain a cause of action for intentional infliction of emotional distress); *Mesgleski v. Oraboni,* 330 *N.J.Super.* 10, 24 (App.Div.2000) (listing the elements of false imprisonment).

Following our review of the arguments presented on appeal, in light of the record and applicable law, we conclude Judge Harz correctly determined there were no materially disputed facts, and summary judgment in favor of defendants was appropriate. Consequently, we may not disturb the dismissal of plaintiff's complaint.

Affirmed.

**All Citations**

Not Reported in A.3d, 2013 WL 149658

## Footnotes

1 Cogent Healthcare of New Jersey, P.C., was incorrectly named as Cogent Hospital Group.

2 Dr. Moonthungal's medical practice was dismissed from the litigation by order dated March 25, 2011.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 941351
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Roosevelt HARRIS, Plaintiff,
v.
Commonwealth of PENNSYLVANIA, DEPARTMENT OF CORRECTIONS, et al., Defendants.

Civil Case No. 13–02888.
|
Signed March 11, 2014.

**Attorneys and Law Firms**

Adrian J. Moody, Moody & Shields Group LLC, Philadelphia, PA, for Plaintiff.

Barry N. Kramer, PA Office of Atty. General, William Lance Banton, Jr., Marshall Dennehey Warner Coleman & Goggin, Philadelphia, PA, for Defendants.

***MEMORANDUM RE: MOTION TO DISMISS***

BAYLSON, District Judge.

**I. Introduction**

***1** Plaintiff Roosevelt Harris, a state prison inmate, filed a Complaint on May 23, 2013. ECF 1. In his complaint, Plaintiff asserts:

(a) § 1983 Claims under the Eighth Amendment against Commonwealth of Pennsylvania's Department of Corrections ("DOC") in Counts I and III;

(b) § 1983 Claims under the Eighth Amendment against two prison physicians, Dr. Vivian Gandy ("Gandy") and Dr. Benjamin Robinson ("Robinson"), in Counts II and III respectively;

(c) a state law negligence claim against DOC in Count IV;

(d) and a state law medical malpractice claim against Gandy and Robinson in Count V

On October 16, 2013, Defendants DOC and Robinson each filed Motions to Dismiss Plaintiff's complaint. ECF 10; ECF 11. Plaintiff responded to Robinson's and DOC's motions on October 24, 2013 and November 18, 2014, respectively. ECF 12; ECF 17. On October 24, 2013, Robinson filed a motion for joinder as to DOC's argument regarding lack of jurisdiction for Plaintiff's failure to exhaust administrative remedies. ECF 13.

Defendant Gandy was not properly served in this action because she no longer works for the same employer and could not be located by the process server. ECF 6.

For reasons that follow, DOC's motion is GRANTED, Robinson's motion is GRANTED WITH PREJUDICE as to Count III, and Plaintiff's complaint against Gandy is DISMISSED without prejudice for lack of service. The Court declines to exercise supplemental jurisdiction the remaining state law medical malpractice claim against Robinson in Count V. 28 U.S.C. § 1367(c)(3).

**II. Plaintiff's Factual Allegations**

Plaintiff, Roosevelt Harris, is a state prison inmate. Plaintiff was incarcerated at two State Correctional Institutions, one in Camp Hill, PA ("SCI–Camp Hill"), and the other in Chester, PA ("SCI–Chester"). The same set of facts gives rise to all claims against all defendants.

**Events at SCI–Camp Hill**

As alleged in the complaint, Plaintiff suffered an ankle injury on August 12, 2012 while playing basketball in the yard at SCI–Camp Hill. ECF 1 ¶ 14. Plaintiff alleges that he was injured due the condition of the basketball court, which was in a state of disrepair with cracked and broken concrete. *Id.* at ¶¶ 12–13. On the day Plaintiff was injured, a doctor treated Plaintiff's injury and ordered an x-ray for the following day. *Id.* at ¶ 19.

On the day of the x-ray, Dr. Vivian Gandy (unserved defendant) assessed Plaintiff's injury and "cursorily examined" the x-ray film. *Id.* at ¶ 23. Dr. Gandy informed Plaintiff that his x-ray was "unofficially negative", and "prescribed that the Plaintiff take Motrin, but failed to ... indicate that it be taken in any particular amount." *Id.* at ¶¶ 23, 27. Plaintiff alleges that Dr. Gandy would have appreciated the severity of his injury if she had examined the x-ray film more carefully. *Id.* at ¶¶ 23–24.

On August 14, 2012 a radiologist examined the x-ray film and determined that Plaintiff had fractured his ankle. *Id.* at ¶ 25. Dr. Gandy documented this diagnosis and put Plaintiff's ankle

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

in a "half cast." *Id.* at ¶ 28. Plaintiff alleges that Dr. Gandy later altered the report to falsely reflect that Plaintiff had only sprained his ankle. *Id.* at ¶ 28.

**Events at SCI–Chester**

***2** Plaintiff was transferred from SCI–Camp Hill to SCI–Chester on August 20, 2012. *Id.* at ¶ 34. Plaintiff reported to "sick call" three times during his first two weeks at SCI–Chester. At his first visit, Plaintiff complained of right ankle swelling, and a physician assistant (PA) treated his injury. *Id.* at ¶ 35. The next visit, Plaintiff requested a pair of crutches. *Id.* at ¶ 39. During his third visit, a doctor x-rayed plaintiff's ankle through the "half cast" already in place. The x-ray showed that the fracture could not be identified and the bones had apparently aligned. *Id.* at ¶ 43.

On October 4, 2012, Plaintiff returned to sick call and requested a doctor. *Id.* at ¶ 50. The PA treated Plaintiff, told Plaintiff to begin using a cane, and put in a request for an orthopedic consultation. *Id.* at ¶ 51. On October 10, 2012 a third x-ray was taken, which showed soft-tissue swelling and no fracture. *Id.* at ¶ 53. Two days later, Plaintiff returned to sick call to request a cane because it had not yet been provided to him. *Id.* at ¶ 52.

On October 25, 2012, Dr. Benjamin Robinson (moving defendant) examined Plaintiff's charts and x-rays and indicated on Plaintiff's record that there was no evidence of a fracture. *Id.* at ¶ 54. Robinson diagnosed Plaintiff with a "soft tissue abnormality," prescribed physical therapy, and requested an orthopedic consultation from a specialist. *Id.* at ¶ 55.

Plaintiff returned to sick call on November 8, 15, and 29, 2012. On all three occasions he was treated by a PA. *Id.* at ¶¶ 57, 59, & 60. On November 8, the PA documented that Plaintiff's ankle was swollen and had a decreased range of motion. *Id.* at ¶ 57. He prescribed Elavil for sleep and told him to come back to sick call as needed. *Id.* at ¶ 57. On November 15, the PA "referred [Plaintiff] to a doctor." *Id.* at ¶ 59. It is unclear from the complaint whether Plaintiff saw a doctor on this day. On November 29, the PA documented that Plaintiff's ankle was swollen, and indicated in Plaintiff's medical records that the October 26, 2012 consultation record should be examined. *Id.* at ¶ 61.

On December 4, 2012, an unidentified consultant wrote in Plaintiff's records that Plaintiff had "significant range of motion and strength deficiencies in his right ankle as well as gait dysfunction." The consultant recommended a "comprehensive rehabilitation program." *Id.* at ¶ 63. Robinson reviewed this report, and wrote a consultation review on December 6, 2012, ordering a "second physical therapy consultation." *Id.* at ¶ 66. Plaintiff alleges that Robinson falsified Plaintiff's medical records, changing the date of his October 26, 2012 and December 6, 2012 reports to November 26, 2012 and December 26, 2012 respectively. *Id.* at ¶¶ 56. 66.

On January 3, 2013, a consultant documented in Plaintiff's medical records that Plaintiff received various physical therapy exercises, and that Plaintiff would need to "learn how to walk again." Robinson co-signed this report. *Id.* at ¶¶ 68–70.

**III. Claims Against Defendant DOC**

***3** Plaintiff asserts two claims against DOC: (1) an Eighth Amendment violation claim pursuant to § 1983 and (2) a state law negligence claim for negligent maintenance of state property. ECF 1. Defendant DOC filed a Motion to Dismiss, arguing that Plaintiff's claims are barred by Eleventh Amendment sovereign immunity. ECF 11. Plaintiff responds to this motion by conceding to DOC's arguments, and requests this Court to dismiss DOC as a defendant in this action. ECF 17. All claims against DOC are therefore dismissed.

**IV. Claims Against Defendant Dr. Benjamin Robinson**

**A. Parties' Arguments**

Plaintiff asserts two claims against Robinson: (1) a § 1983 action for an Eighth Amendment violation, averring that Robinson was deliberately indifferent to Plaintiff's serious medical need, and (2) a medical malpractice state law claim based on Robinson's treatment of Plaintiff's injury. Plaintiff alleges that Robinson "delay[ed] medical treatment for the Plaintiff, misdiagnos[ed] Plaintiff's injuries ... and alter[ed] his medical records." Plaintiff alleges that this exposed him to a "substantial risk of serious injury." ECF 1 ¶ 71.

Defendant Robinson filed a Motion to Dismiss for failure to state a claim, requesting dismissal of both the § 1983 and medical malpractice claims. ECF 10. In regards to the § 1983 action, Robinson argues that Plaintiff's complaint fails to allege "deliberate indifference" to Plaintiff's medical needs. In particular, Robinson points out that Plaintiff's complaint details prompt care and treatment provided to Plaintiff for his injury. Robinson characterizes Plaintiff's complaint as a

dispute regarding the proper course of treatment, which does not give rise to an Eighth Amendment claim.

In his opposition brief to Defendant Robinson's Motion to Dismiss, Plaintiff focuses on the § 1983 action and does not address the medical malpractice claim. ECF 12. Plaintiff iterates that he has sufficiently stated a claim for an Eighth Amendment Violation, and that it is a mischaracterization to say that Plaintiff's claim amounts only to a disagreement among professionals. ECF 12 at 9. Plaintiff highlights the allegation that Robinson falsified medical records to show that Robinson was deliberately indifferent to his medical needs. ECF 12 at 13–14. In doing so, Plaintiff stresses the "wrongness" of falsifying records. *Id.*

**B. Analysis**

**1. Section 1983 Eighth Amendment Claim**

**a. Legal Standard**

To survive a motion to dismiss, a plaintiff's complaint must allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element [of the claim]." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That is, the well-pleaded facts in the complaint and attached exhibits viewed in the light most favorable to the plaintiff must state a plausible claim for relief. *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 232–34 (3d Cir.2008). Conclusory allegations and "threadbare recitals" of the elements of a claim are insufficient to survive a motion to dismiss. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

***4** Section 1983 enables plaintiffs to assert civil claims for deprivation of their constitutional rights against persons acting under the color of state law. The Eighth Amendment constitutionally protects prisoners against "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999). "Unnecessary and wanton infliction of pain" may include failure to provide adequate inmate medical care because inmates rely on prison officials to treat their medical conditions. *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Failure to provide adequate medical care to an inmate may therefore form the basis of an Eighth Amendment § 1983 claim. *Id.*

To state an Eighth Amendment claim based on failure to provide medical care, the plaintiff must provide facts that show that the prison doctor or official was "deliberately indifferent to a serious medical need." *Id.* at 106; *Spruill v. Gillis,* 372 F.3d 218, 237–38 (3d Cir.2004). To meet this standard, a plaintiff must show: (1) that his or her medical needs were objectively serious, and (2) that prison official(s) acted in deliberate indifference to those needs. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346–47 (3d Cir.1987). The first prong is an objective inquiry, asking whether the medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 347. The second prong is a subjective inquiry, focusing on the prison official's actions and mental culpability. *Montgomery v. Pinchak,* 294 F.3d 492, 499 (3d Cir.2002).

To show that a prison doctor acted with deliberate indifference, a plaintiff must allege facts that go beyond negligence. *Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575, 582 (3d Cir.2003) (comparing deliberate indifference mental state to recklessness in the criminal law context). Deliberate indifference is sufficiently pled if the plaintiff alleges facts that support the inference that the prison doctor intentionally refused or delayed necessary treatment for nonmedical reasons, or persisted in a particular course of treatment "in the face of resultant pain and risk of permanent injury." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999); *see also Spruill v. Gillis,* 372 F.3d 218, 237–38 (3d Cir.2004) (allegations that doctors "maliciously and sadistically" inflicted pain on plaintiff during physical therapy stated a § 1983 claim for an Eighth Amendment violation).

The "deliberate indifference" standard affords wide latitude to doctors to exercise their professional judgment in treating prisoner medical needs. *Durmer v. O'Carroll,* 991 F.2d 64, 67–69 (3d Cir.1993); *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346–47 (3d Cir.1987). Notably, federal courts are reluctant to constitutionalize claims sounding in state medical malpractice law, particularly where the prisoner has received treatment and the dispute concerns the adequacy of the treatment. *White v. Napoleon,* 897 F.2d 103, 108–10 (3d Cir.1990) ("There may, for example, be several ways to treat an illness."); *Inmates of Allegheny Cnty. Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir.1979).

***5** To illustrate, in *Darden v. Laurie,* the plaintiff fell onto a concrete floor and sustained injuries to his back. CIV.A. 05–2118, 2006 WL 120037 (E.D.Pa. Jan.13, 2006). He asserted a

§ 1983 claim against prison doctors, alleging that the doctors failed to treat his injuries, and were deliberately indifferent to his serious medical needs. In his complaint, the plaintiff alleged that he was not seen by a doctor for five days following his accident, despite complaining that he was in severe pain. He also alleged that the doctors inaccurately diagnosed his injuries, and did not provide him with a "wheelchair, cane or walker" which resulted in permanent damage and prevented him from finding employment. The court dismissed the plaintiff's complaint for failure to state a claim, finding persuasive that the plaintiff documented the regular and consistent treatment he received from his treating physicians in his complaint. The court noted that the plaintiff's arguments were essentially disagreements about the proper course of treatment which did not amount to constitutional violations. The plaintiff appealed. The Third Circuit endorsed the District Court's reasoning and dismissed the appeal in unpublished opinion. *Darden v. Laurie,* 193 F. App'x 169 (3d Cir.2006).

**b. Application to Facts**

Robinson does not challenge that Plaintiff's medical needs were objectively serious, so this Court's focus is on the subjective prong of the *Estelle* test. 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). On this prong, viewing Plaintiff's allegations in the light most favorable to him, Plaintiff has not alleged facts which support any inference that Robinson acted with deliberate indifference to Plaintiff's serious medical need. As such, Plaintiff has failed to state a § 1983 claim for an Eighth Amendment violation against Robinson. Therefore, Robinson's motion to dismiss is granted with prejudice as to Count III of the complaint.

Plaintiff has not alleged facts that go beyond negligence. To support his § 1983 claim, Plaintiff relies primarily on his allegation that Robinson falsified his medical records to inaccurately reflect when Plaintiff received treatment. However, Plaintiff does not allege how this falsification affected his medical treatment. In fact, Plaintiff does not provide any explanation as to how changing the date of his reports would show that Robinson was deliberately indifferent to Plaintiff's medical needs. Instead, in his response to Defendant Robinson's motion, Plaintiff focuses on the essential "wrongness" of submitting false medical reports. This allegation of falsifying medical reports, without more, does not support the inference that Robinson was deliberately indifferent to Plaintiff's serious medical need. *Compare Rivera v. Tennis,* CIV.A. 1:09–0888, 2010 WL 2838603 (M.D.Pa. May 20, 2010) (allegations of falsifying medical records without explanation as to how the falsification affected medical treatment insufficient to state a § 1983 claim for Eighth Amendment violation), *with Curbeam v. Montgomery Cnty. Corr. Facility,* CIV .A. 12–2309, 2013 WL 315719 (E.D.Pa. Jan.28, 2013) (complaint alleging that nurse falsely recorded that plaintiff did not want medical treatment causing a 21–day delay in treatment stated a § 1983 claim for Eighth Amendment violation).

***6** Plaintiff does not allege facts to support any inference that Robinson intentionally refused or delayed necessary treatment for non-medical reasons. Plaintiff's conclusory allegation that Robinson "delayed" treating him is insufficient because it has no factual allegations to support it. To the contrary, as the plaintiff in *Darden,* 2006 WL 120037 (E.D.Pa. Jan.13, 2006) (discussed above), Plaintiff documents the regular treatment that he received from Robinson and other medical professionals. The "deliberate indifference" standard affords wide latitude to doctors to exercise their professional judgment in treating prisoner medical needs, and here the facts as alleged by Plaintiff indicate that Robinson exercised his professional judgment. *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir.1993). Though Plaintiff emphasizes in his response to Robinson's motion to dismiss that he should have been given more treatment than "just physical therapy"; this claim amounts to a disagreement as to the proper course of medical treatment, and does not constitute an Eighth Amendment violation. *White v. Napoleon,* 897 F.2d 103, 108–10 (3d Cir.1990).

The Court concludes that Plaintiff does not have grounds to sue Robinson under the Eighth Amendment so leave to amend will not be granted because Plaintiff has set forth a detailed factual summary and the facts taken in the light most favorable to Plaintiff cannot satisfy the requirements Eighth Amendment jurisprudence.

**2. State Law Malpractice Claim**

Federal jurisdiction for this claim is supplemental to 28 U.S.C. § 1331 jurisdiction for Plaintiff's § 1983 claims. 28 U.S.C. § 1367(a). As there are no § 1983 claims remaining, this Court declines to exercise supplemental jurisdiction over the state law medical malpractice claim against Robinson. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Therefore, Count V as to Robinson is dismissed.

**IV. CONCLUSION**

At the request of both parties, Plaintiff's claims against DOC are dismissed. Plaintiff failed to adequately serve Gandy, so the claims against her are also dismissed. Fed. R. Civ. Proc. 4(m). For the reasons stated above, Plaintiff has not alleged sufficient facts to support his § 1983 claim for an Eighth Amendment violation against Robinson. Therefore, Count III of the complaint is dismissed with prejudice. This Court declines to exercise supplemental jurisdiction over the remaining state law medical malpractice claim against Robinson. 28 U.S.C. § 1367(c)(3).

An appropriate Order follows.

***ORDER***

**AND NOW,** this 11th day of March, 2013, upon consideration of co-defendant Pennsylvania Department of Corrections' Motion to Dismiss, which is not opposed, and the Joinder of Defendant, Dr. Benjamin V. Robinson, the Motion to Dismiss filed by Dr. Robinson is **GRANTED** and it is hereby **ORDERED** plaintiff's complaint is **DISMISSED** as to Dr. Robinson for the reasons set forth in the foregoing Memorandum, and **DISMISSED** without prejudice as to defendant Dr. Vivian Gandy, who was never served, for lack of prosecution. The Clerk shall close this case.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 941351

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 3896627
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Yuliya MIRETSKAYA, Plaintiff,
v.
RUTGERS, the STATE UNIVERSITY OF NEW JERSEY, et al., Defendants.

Civil Action No. 20-14856 (RK) (JTQ)
|
Signed August 12, 2024
|
Filed August 21, 2024

**Attorneys and Law Firms**

Yuliya Miretskaya, Avenel, NJ, Pro Se.

Joseph A. Dicroce, Law Offices of Joseph A. Dicroce, LLC, Manasquan, NJ, for Defendants Raritan Bay Medical Center (RBMC), Hackensack Meridian Health Medical Group, Arunesh P. Mishra M.D., Rajkumar Singh M.D., Emma Locke, Maritza Brown, Rosario Sencion-Pou.

Anthony Peter D'Elia, Edward Sponzilli, Norris McLaughlin & Marcus, PA, Bridgewater, NJ, for Defendant Rutgers University Behavioral Healthcare (UBHC).

Andrew J. Gibbs, Wade Clark Mulcahy LLP, Springfield, NJ, for Defendant Mariam Bekhit M.D.

Mark A. Petraske, Ryan Notarangelo, Dughi, Hewit and Domalewski, P.C., Cranford, NJ, for Defendant Krystyna Banfield.

**OPINION FILED TEMPORARILY**

KIRSCH, District Judge

***1 THIS MATTER** comes before the Court upon five Motions to Dismiss filed by Defendants Krystyna Banfield, APN ("Banfield"), (ECF No. 108), Mariam Bekhit, M.D. ("Bekhit"), (ECF No. 138), HMH Hospitals Corporation d/b/a Raritan Bay Medical Center ("RBMC"), Hackensack Meridian Health, Inc. ("HMH"), Arunesh K. Mishra, M.D. ("Mishra"), Rajkumar R. Singh, M.D. ("Singh"), Emma Locke, LCSW ("Locke"), Maritza Brown, R.N. ("Brown"), and Rosario F. Sencion-Pou, P.C.T. ("Sencion-Pou") (collectively, "RBMC Defendants"), (ECF No. 171), Carmencita T. Lanez, M.D. ("Lanez"), (ECF No. 172), and Rutgers, the State University of New Jersey ("Rutgers"), (ECF No. 173).[1] Defendants move to dismiss *pro se* Plaintiff Yuliya Miretskaya's ("Plaintiff" or "Miretskaya") Amended Complaint, (ECF No. 38), and Revised Second Amended Complaint, (ECF No. 162). The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motions to Dismiss are **GRANTED in part** and **DENIED in part as moot.**

## I. BACKGROUND

At the outset, the Court notes that Plaintiff is proceeding *pro se*, and as such, the Court will construe Plaintiff's pleadings liberally. Plaintiff's numerous pleadings are asserted against sixteen defendants, only some of whom have been served, with multiple constitutional, statutory, and common law claims asserted. In total, Plaintiff has filed a total of four complaints, (*see* ECF Nos. 1, 38, 147, 162), not including a previously stricken complaint, (ECF No. 14). The Court will treat Plaintiff's Revised Second Amended Complaint, ("SAC," ECF No. 162) as the operative pleading, but in light of Plaintiff's *pro se* status, and in an abundance of caution, the Court will construe the SAC in conjunction with Plaintiff's Amended Complaint, ("Am. Compl.," ECF No. 38).[2] *See Cason v. Middlesex Cnty. Prosecutors' Off.*, No. 18-2101, 2022 WL 2871195, at *3 (D.N.J. July 21, 2022) (A *pro se* plaintiff's complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (quoting *Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002))).[3]

The underlying facts of this dispute have been thoroughly discussed and set forth in the July 12, 2021 Memorandum Order ("Shipp I," ECF No. 34) and the July 29, 2022 Memorandum Opinion ("Shipp II," ECF No. 118) of the Honorable Michael A. Shipp, U.S.D.J. Judge Shipp's prior Order granted in part and denied in part a previous Motion to Dismiss filed by Rutgers, (*see generally* Mem. Order), and granted subsequent Motions to Dismiss filed by Rutgers and Lanez, respectively, (*see generally* Shipp II). As such, the Court recites only those facts necessary to resolve the pending Motions.

### A. PROCEDURAL HISTORY

***2** On July 22, 2020, Plaintiff filed his original Complaint in the Superior Court of New Jersey, Middlesex County, Law Division. (*See* ECF No. 1.) Shortly thereafter, Rutgers removed this case to federal court, (*id.*), after which Rutgers filed a Motion to Dismiss for Ineffective Service of Process under Federal Rule of Civil Procedure (the "Rules") 12(b)(5) or, in the alternative, for Failure to State a Claim under Rule 12(b)(6), (ECF No. 7). On July 12, 2021, Judge Shipp granted in part and denied in part Rutgers' Motion, dismissing Plaintiff's False Imprisonment claim without prejudice, ordering the Clerk of Court to issue a new summons for Plaintiff to effectuate proper service, and granting Plaintiff leave to file an Amended Complaint. (*See generally*, Mem. Order.) On August 12, 2021, Plaintiff filed an Amended Complaint. (ECF No. 38.) The RBMC Defendants filed an Answer to Plaintiff's Amended Complaint, (ECF Nos. 52, 60), as did Banfield, (ECF No. 57).[4] Lanez and Rutgers filed respective Motions to Dismiss Plaintiff's Amended Complaint. (ECF Nos. 58, 77.)

Once these motions were fully briefed, Judge Shipp granted both Motions. (*See* ECF Nos. 118, 119.) Judge Shipp dismissed Plaintiff's negligent infliction of emotional distress ("NIED") claim against Rutgers with prejudice, finding that Plaintiff failed to file the requisite notice of claim pursuant to the New Jersey Tort Claims Act ("NJTCA"). (Shipp II at 5–6.) Judge Shipp also dismissed the NIED claim against Lanez without prejudice as it was group pled. (*Id.* at 6–7.) With respect to Plaintiff's federal and state constitutional claims under 42 U.S.C. § 1983 ("Section 1983") and N.J. Stat. Ann. § 10:6-2, the New Jersey Civil Rights Act ("NJCRA"), Judge Shipp held that because Rutgers could not be vicariously liable for the actions of its employees under Section 1983, and Plaintiff failed to plead "a policy or custom that sufficiently violates constitutional rights," Plaintiff failed to state a claim for constitutional violations against Rutgers. (*Id.* at 8–10.) Judge Shipp also held that Plaintiff failed to state a claim against Lanez for constitutional violations. (*Id.* at 10–11.) Next, Judge Shipp dismissed Plaintiff's claims under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"), finding that neither Rutgers' employees nor Lanez were aware of Plaintiff's disability or discriminated against Plaintiff based on same. (*Id.* at 11–14.) Finally, Judge Shipp dismissed Plaintiff's false imprisonment claim on the basis that Plaintiff failed to "allege that Dr. Lanez acted without proper legal authority or justification" and that Dr. Lanez acted reasonably in relying on the medical opinions of her colleagues. (*Id.* at 13–14.)

Following Judge Shipp's Memorandum Opinion, on December 5, 2022, Plaintiff filed a Second Amended Complaint. (ECF No. 162.) Thereafter, as referenced above, Defendants have filed a number of Motions to Dismiss, and these Motions are now ripe before the Court.[5] After a brief discussion of the factual background of the case at bar, the Court will turn to each of Plaintiff's claims.

### B. FACTUAL BACKGROUND

This matter arises from Plaintiff's twelve day—from July 22, 2018 to August 3, 2018—involuntary confinement at RBMC. (SAC ¶ 1.) Plaintiff, a New Jersey resident, was previously diagnosed with Asperger's Syndrome and Attention Deficit Disorder ("ADD"). (*Id.* ¶ 8.) On July 22, 2018, Plaintiff called a Suffolk County, New York mental health crisis hotline. (*Id.* ¶¶ 61–62.) During the conversation, Plaintiff's own SAC sets forth that Plaintiff "resort[ed] to parodic speech and [began to] speak in a comedic 'Borat' accent" and expressed a desire "to harass and terrorize a 'third-cousin's sister-in-law.' " (*Id.* ¶¶ 63–64.) Plaintiff, "[w]ith similar sarcasm," discussed "honor killings" and observed that these practices "unreasonably [ ] exposed families ... to criminal causes of action, despite [that] such practices comport[ed] with conservative values and [were] 'Biblically encouraged.' " (*Id.* ¶ 66.) The hotline operator told Plaintiff he planned to call the police and thereafter ended the conversation. (*Id.* ¶ 73.) That evening, Woodbridge, New Jersey Police Officers conducted a welfare check and explained that they had received "a report that someone called a suicide hotline and was allegedly 'threatening to kill their sister' and 'was planning to hire a hit-man.' " (Am. Compl. ¶ 39.) The Police detained Plaintiff and took Plaintiff to the Crisis Stabilization Unit ("CSU") at RMBC for a welfare check. (*Id.* ¶¶ 44–45.)

***3** At RMBC, Brown, the "Nurse-On-Duty" that evening, provided Plaintiff with hospital gowns into which Plaintiff was "ordered" to change. (*Id.* ¶ 47.) Plaintiff proceeded to watch TV, until Plaintiff was directed to bed. (*Id.* ¶¶ 50–51.) Following a disagreement concerning Plaintiff's request to continue watching TV, Plaintiff was restrained and medicated. (*Id.* ¶¶ 52–57.) Plaintiff alleges that Brown administered the medication, while Banfield authorized "an Order for use of physical and chemical restraints upon Plaintiff." (*Id.* ¶ 60.) Defendant Sencion-Pou assisted in restraining Plaintiff and drew Plaintiff's blood. (*Id.* ¶¶ 61–62.) While Plaintiff was in

the CSU, Locke, a social worker, took a series of clinical notes of Plaintiff, in which she observed Plaintiff was "agitated" and "unable to redirect." (*Id.* ¶ 67.) Lanez thereafter determined Plaintiff was "likely committable" based on Locke's notes. (*Id.* ¶69; *see also* SAC ¶¶ 104–05.)

Dr. Bekhit, a psychiatrist, also assessed Plaintiff, in which she made the "preliminary diagnosis of 'Disorganized Schizophrenia' " and determined that Plaintiff met the "criteria for involuntary psychiatric treatment." (Am. Compl. ¶¶ 72, 75.) Plaintiff contends that Greg Fitzpatrick ("Fitzpatrick"), as La Shauna Richardson's ("Richardson") supervisor, and Dr. Mishra, as Chief of Psychiatry at RBMC, failed to properly supervise the medical professionals at RBMC which resulted in Plaintiff's involuntary commitment as opposed to an unspecified lesser alternative. (*Id.* ¶¶ 94–95; SAC ¶ 137.)

Following these evaluations of Plaintiff,[6] an independent evaluation was conducted by Richardson, a Mental Health Clinician, licensed clinical social worker, and an employee of Rutgers, on July 23, 2018. (Am. Compl. ¶ 76; *see also* ECF No. 27.)[7] Plaintiff claims he explained to Richardson that he "wished to pursue voluntary treatment." (Am. Compl. ¶ 85.) Richardson, like Dr. Bekhit, determined that Plaintiff met the criteria for involuntary commitment. (*Id.* ¶ 82.) [Redacted]

[Redacted]

(ECF No. 27 at *2–3.)

[Redacted]:

[Redacted]

(*Id.* at *3.) [Redacted] (*Id.*) [Redacted]. [Redacted] (*Id.*) [Redacted] (*Id.*)

[Redacted] (*Id.* at *6.)[8] [Redacted] (*Id.* at *15.)

On July 25, 2018, Plaintiff was admitted to RBMC's Center for Living. (Am. Compl. ¶ 96.) On July 27, 2018, an *ex parte* petition for involuntary commitment was submitted to and approved by a Middlesex County Superior Court judge. (*Id.* ¶ 87.) Dr. Singh was the Attending Psychiatrist during Plaintiff's stay in the Center for Living, but Plaintiff alleges Dr. Singh "failed to provide the appropriate standard of care" by relying on Dr. Bekhit's assessment, thus prolonging Plaintiff's commitment. (*Id.* ¶ 97.) On August 3, 2018, Plaintiff was deemed "stable" and discharged. (*Id.* ¶ 108.)

***4** Plaintiff's Revised Second Amended Complaint, in conjunction with the Amended Complaint, asserts nine causes of action against sixteen Defendants—three entities: Rutgers, HMH, and RBMC, and thirteen individuals—asserting constitutional, statutory, and common law causes of action: a Section 1983 claim for violation of both the substantive and procedural Due Process Clauses of the Fourteenth Amendment (Count One); violations of Title II of the ADA and Section 504 of the RA (Counts Two and Three); violation of the NJCRA (Count Four); Simple Assault (Count Five); Battery (Count Six); False Imprisonment (Count Seven); Intentional Inflicting of Emotional Distress ("IIED") (Count Eight); and NIED (Count Nine).

### C. STATUTORY BACKGROUND

Before turning to the Court's analysis, the Court believes it helpful to provide a brief overview of the relevant statute that provides the backdrop of this lawsuit. Pursuant to N.J. Stat. Ann. 30:4-27.1 *et seq.* (the "Act"), the New Jersey legislature "provide[d] a mechanism for the short-term civil commitment of individuals deemed to be harmful to themselves, others, or property." *Ianni v. Bergen Reg'l Med. Ctr.*, No. A-5911-09T3, 2011 WL 2410120, at *2 (N.J. Super. Ct. App. Div. May 11, 2011). The purpose of the Act is "to encourage each county or designated mental health service area to develop a screening service, outpatient treatment provider and short-term care facility which will meet the needs for evaluation and treatment of mentally ill persons in the county or service area." N.J. Stat. Ann. § 30:4-27.1. To those ends, the Act outlines the statutory requirements for involuntary commitment. *Id.*

The Act requires that each county "designate one or more mental health agencies or facilities ... as a screening service." § 30:4-27.4(a). The "screening service" serves as the emergent treatment center for an individual undergoing a mental health assessment, where medical professionals assess said individual to determine the appropriate care and the "least restrictive environment" for same. § 30:4-27.5(a). A mental health screener, "shall determine, in consultation with the psychiatrist or another physician, as appropriate, the least restrictive environment for the appropriate treatment to which the person shall be assigned or admitted, taking into account the person's prior history of hospitalization and treatment and the person's current mental health condition." § 30:4-27.5(b). The mental health screener only must determine "if there is reasonable cause to believe that a person is in need of unvoluntary commitment[.]" N.J. Stat. Ann. § 30:4-27.5(e). An individual may be "admitted involuntarily to a facility

only by referral from a screening service or temporary court order." N.J. Stat. Ann. § 30:4-27.9(b). Within 72 hours, the mental health agency or facility must obtain a temporary court order to keep an individual involuntary committed. N.J. Stat. Ann. § 30:4-27.10(a)–(c). If a court orders a temporary order of commitment, the individual must receive a subsequent hearing within 20 days. N.J. Stat. Ann. § 30:4-27.12(a). The decision to involuntary commit an individual under the Act is discretionary. *See Ziemba v. Riverview Med. Ctr.*, 645 A.2d 1276, 1280 (N.J. Super. Ct. App. Div. 1994). The Act provides for civil and criminal immunity for police and medical professionals who "act[ ] in good faith" to assess and detain an individual for mental health treatment. N.J. Stat. Ann. § 30:4-27.7.

## II. LEGAL STANDARD

### A. MOTION TO DISMISS UNDER RULE 12(B)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under this rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In evaluating the sufficiency of a complaint, "[a]U allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citations omitted). However, the Court "need not credit bald assertions or legal conclusions" or allegations "involv[ing] fantastic factual scenarios lacking any arguable factual or legal basis" or that "surpass all credulity." *Degrazia v. F.B.I.*, No. 08-1009, 2008 WL 2456489, at *3 (D.N.J. June 13, 2008), *aff'd*, 316 F. App'x 172 (3d Cir. 2009) (citations and quotation marks omitted).

***5** A court must only consider "the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Furthermore, "[a] pleading that offers labels and conclusions or a formulistic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). "Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth." *Valentine v. Unifund CCR, Inc.*, No. 20-5024, 2021 WL 912854, at *1 (D.N.J. Mar. 10, 2021) (citing *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011)).

A *pro se* plaintiff's complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Cason v. Middlesex Cnty. Prosecutors' Off.*, No. 18-2101, 2022 WL 2871195, at *3 (D.N.J. July 21, 2022) (quoting *Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002)). Notwithstanding the liberal interpretation, the complaint "may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief." *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013).

## III. DISCUSSION

Defendants move to dismiss Plaintiff's Complaints in their entirety. The Court addresses each of Plaintiff's claims in turn.

### A. COUNTS ONE AND FOUR

In Counts One and Four, Plaintiff asserts causes of actions under Section 1983 and the NJCRA. Plaintiff argues that Defendants violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution, as well as the New Jersey Constitution. Plaintiff asserts these causes of action against all Defendants.

To establish a claim under Section 1983, a plaintiff "must show that the defendants 1) were state actors who 2) violated his rights under the Constitution or federal law." *Benn v. Universal Health Sys., Inc.*, 371 F.3d 165, 169–70 (3d Cir. 2004). As the Third Circuit has explained, "[t]he color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law." *Bates v. Paul Kimball Hosp.*, 346 F. App'x 883, 887 (3d Cir. 2009) (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)). The Court first turns to Plaintiff's claim against Rutgers before turning to the claims against the remaining Defendants. [9]

1. Rutgers

Plaintiff contends that Rutgers is responsible for the actions of its employees, Fitzpatrick and Richardson, and thus liable under Section 1983 for their alleged constitutional violations. (SAC ¶¶ 110; 123–28.) However, "[u]nder § 1983, a government entity, such as Rutgers, cannot be held liable for the actions of its employees on a theory of respondeat superior." *Harel v. Rutgers, State Univ.*, 5 F. Supp. 2d 246, 267 (D.N.J. 1998), *aff'd sub nom.*, 191 F.3d 444 (3d Cir. 1999) (citing *Monell v. Department of Social Serv.*, 436 U.S. 658, 691 (1978)); *see also Hahn v. New Jersey*, No. 11-1874, 2012 WL 870335, at *7 (D.N.J. Mar. 12, 2012) ("[C]ourts do not recognize § 1983 liability on a theory of *respondeat superior*, rather, a plaintiff is required to allege that the defendant, through defendant's own actions, violated the Constitution."). As Judge Shipp found previously, Plaintiff's Amended Complaint "relie[d] solely on vicarious liability and the doctrine of respondeat superior" and thus failed to assert a Section 1983 claim against Rutgers. (Shipp II at 9.)

***6** To assert a constitutional claim against Rutgers as an employer, a plaintiff must instead prove "the existence of a policy or custom that has resulted in a constitutional violation." *Groman*, 47 F.3d at 637 (citing *Monell*, 436 U.S. at 691); *see also Winberry Realty P'ship v. Borough of Rutherford*, 253 A.3d 636, 650 (N.J. 2021) ("Under the [NJ]CRA and § 1983, a municipality can be held liable only if it causes harm through the implementation of official municipal policy." (quotation marks omitted)). "A government policy or custom can be established in two ways: (1) a decision-maker with final authority to set a policy with respect to the action exercises such authority; or (2) certain practices are so well-settled as to 'virtually constitute law' even if there is no official policy." *Sharp v. Kean Univ.*, No. 14-423, 2014 WL 6908775, at *4 (D.N.J. Dec. 8, 2014) (citing *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).

Plaintiff's Revised Second Amended Complaint fails to allege facts that demonstrate the existence of a policy or custom that resulted in constitutional violations. [10] Plaintiff alleges that Rutgers "is the sole entity responsible for providing continuing education, certification, and re-certification for all certified screeners" and "carries ultimate responsibility for all programs conducted under its auspices." (SAC ¶¶ 135–36.) Plaintiff further argues that "Rutgers had full responsibility for ensuring that certified screeners were competent, were not committing egregious misapplications of involuntary commitment, and did not violate the law while executing their duties." (*Id.* ¶ 136.) Plaintiff argues that Rutgers operates "in a joint project with NAMI Central Middlesex [National Alliance on Mental Illness]" which Plaintiff alleges "has a toxic culture, where hard paternalism and a general disregard for civil rights guide its operation and polices." (*Id.* ¶ 139.) [11] As such, "Rutgers worked directly with an organization whose activities may be plainly construed as promoting civil rights violations and abuses." (*Id.* ¶ 142.)

While it may be true that Rutgers has a policy on how to train certified screeners and how to implement New Jersey's civil commitment law, Plaintiff alleges no facts as to how this policy caused alleged constitutional violations. Plaintiff does not contend that the New Jersey Act is unconstitutional. [12] While Plaintiff asserts that NAMI has a "toxic culture" that has somehow, without specification, seeped into Rutgers' training and civil commitment detention procedures, Plaintiff's conclusory allegations that this culture results in constitutional violations are insufficient to state a claim under Section 1983. [13] *See Green v. Domestic Rels. Section Ct. of Common Pleas Compliance Unit Montgomery Cnty.*, 649 F. App'x 178, 180 (3d Cir. 2016) ("Conclusory allegations are insufficient to survive a motion to dismiss." (citing *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009))); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405 (3d Cir. 1997) (explaining that the Court need not credit "unsupported conclusions and unwarranted inferences").

2. Remaining Private Defendants

***7** Plaintiff also asserts Section 1983 and NJCRA claims against the remaining Defendants—HMH, RBMC, Lanez, Bekhit, Locke, Brown, Sencion-Pou, Mishra, and Singh. [14] As referenced above, the threshold issue in a Section 1983 action is whether Defendants were state actors. *See Benn*, 371 F.3d at 169–70. Plaintiff concedes that RBMC and HMH are private entities, and thus the two medical centers and its employees are not public persons; however, Plaintiff nonetheless contends that Defendants "were acting under color of State law," (Am. Compl. ¶ 111), and "must be construed to be [ ] state actor[s]," (SAC ¶ 112). Plaintiff argues that New Jersey's civil commitment law, N.J. St. Ann. 30:4-27.1 *et seq.* establishes the statutory scheme through which Defendants operated, thus their actions constituted state action. (*See* SAC ¶¶ 88–107.)

*i. State Action*

The Supreme Court has explained that whether a private party is a state actor "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001). In *Brentwood*, the Supreme Court "identified a host of facts" that can bear on this determination:

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents .... We have treated a nominally private entity as a state actor when it is controlled by an agency of the State, when it has been delegated a public function by the State ... when it is entwined with governmental policies, or when government is entwined in [its] management or control ....

*Id.* at 296 (internal quotation marks and citations omitted).

In *Benn*, the Third Circuit analyzed each of these factors to determine whether a private Pennsylvania healthcare clinic, its parent corporation, and its employees—a doctor and a counselor—could be considered state actors. *Benn*, 371 F.3d at 171. The plaintiff brought suit following his short-term involuntary commitment pursuant to Pennsylvania's Mental Health Procedures Act ("MHPA"). *Id.* at 168. The Third Circuit held that the actions of the private individuals and facility could not be deemed state action despite the medical professionals acting in accordance with the MHPA. *Id.* at 171. First, the Third Circuit held that "the MHPA ... did not coerce [the defendant appellees] to file the application that led to [the plaintiff appellant's] commitment," nor did it "provide significant encouragement, either overt or covert." *Id.* (citations and internal quotation marks omitted). Because the MHPA "permits a physician ... to file an application for an emergency examination," the Third Circuit explained that "nothing in the MPHA [ ] compels or even significantly encourages the filing of an application." *Id.*

Next, the Third Circuit held that the defendants were not "willful participant[s] in joint activity with the State or its agents." *Id.* (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)). In *Lugar*, the Supreme Court found state action where "a private party's joint participation with state officials ... is sufficient to characterize that party as a 'state actor' ...." *Lugar*, U.S. at 941. However, "private misuse of a state statute does not describe conduct that can be attributed to the State." *Id.* The Third Circuit, in applying *Lugar*, held that the appellant's complaint—that appellees "violated his constitutional rights because they allegedly did not comply with the MHPA"— was insufficient to demonstrate that the appellees were state actors. *Benn*, 371 F.3d at 172. As the Third Circuit explained, even a "seriously defective evaluative process [under the MHPA]" was "inadequate to establish state action." *Id.* The Third Circuit also found that involuntary commitment was "not a 'public function' that the MPHA delegated to private persons," *Id.* The Circuit found "no basis for concluding that petitioning for involuntary confinement is or ever was the exclusive prerogative of the state, either in Pennsylvania or in the country in general." *Id.* (collecting cases).

***8** The Third Circuit next considered whether there was "entwinement" under the Supreme Court's decision in *Brentwood. Id.* at 172–73. In *Brentwood*, the Supreme Court considered whether a non-profit interscholastic athletic association of public and private secondary schools was a state actor in enforcing its regulations. *Brentwood*, 531 U.S. at 290. The Supreme Court answered the question in the affirmative, finding that "[t]he nominally private character of the [a]ssociation is overborne by the pervasive entwinement of public institutions and public officials in its compositions and workings ...." *Id.* at 298. The Court focused on the facts that, *inter alia*, the majority of the association, 84%, was comprised of public schools, state board members served as "ex officio" members of the association's board, many of the board's meetings occurred during school hours, association employees were members of the state retirement system, and public schools provided the vast majority of the association's financial support. *Id.* at 298–300. Thus, the Supreme Court held that "the [a]ssociation is an organization of public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling," and this "[e]ntwinement" substantiated a finding of state action. *Id.* at 300–01. On the other hand, the Third

Circuit, in *Benn*, found similar factors lacking such that there was no entwinement to support a finding that the private doctors and entity were state actors. *Benn*, 371 F.3d at 173.

Further, the Third Circuit considered whether there was a "symbiotic relationship" between the state and a private entity such that there could be considered state action. *Id.* The Third Circuit explained that this test requires " 'a close association of mutual benefit' between the state and the private entity or person." *Id.* (quoting *Crissman v. Dover Downs Entertainment, Inc.*, 289 F.3d 231, 240 (3d Cir. 2002)). No such relationship existed in *Benn* where the private defendants did not profit financially from the plaintiff's involuntary commitment, nor did the state incur "any tangible benefit ... save from a possible increase in the general welfare." *Id.* In summary, the Third Circuit counseled "[t]hat a private entity performs a function which serves the public does not make its acts state action." *Id.* (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 842 (1982)).

Finally, the third Circuit surveyed "decisions of other courts of appeals and those of district courts in this circuit," observing that they "also support the conclusion that persons who petition for the involuntary commitment of others are not state actors." *Id.* (collecting cases).

In the case at bar, Plaintiff's Complaints allege that Defendants were state actors. (*See, e.g.*, SAC ¶¶ 111–12; Am. Compl. ¶¶ 111.) Plaintiff contends that Defendants were acting pursuant to the regulatory scheme required by the Act. Thus, according to Plaintiff, "the existence of [ ] position[ ]s and duties [performed by Defendants] were explicitly required and stipulated by law" and constituted state action. (*See SAC* ¶ 114.)

Plaintiff, however, misinterprets the provisions of the state law which do not require a medical professional to involuntary commit someone they suspect in need of assistance. Rather, it outlines a procedure to follow and authorizes discretion in deciding whether to commit an individual. *See Ziemba*, 645 A.2d at 1280. As such, similar to the MHPA in *Benn*, while the two state laws "permit" medical professionals to petition a court for an order involuntary committing an individual, neither "compels or even significantly encourages the filing of an application," and thus the discretionary decision to commit an individual did not constitute state action. *Benn*, 371 F.3d at 171.

Moreover, the "private misuse of a statute does not describe conduct that can be attributed to the State." *Id.* (quoting *Lugar*, 457 U.S. at 940). The Supreme Court explained that "state action requires *both* an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.' " *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (emphasis in original) (quoting *Lugar*, 457 U.S. at 937). Without this second requirement, "private parties could face constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them." *Lugar*, 457 U.S. at 937. Moreover, "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Sullivan*, 526 U.S. at 52 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974)).[15] As such, the fact that Defendants were acting pursuant to a state law does not render their action state conduct.

***9** In addition, Plaintiff fails to allege any facts in the Complaints that "nominally private persons were controlled by an agency of the Commonwealth" or that the challenged action "relates to a function that has been traditionally the exclusive prerogative of the State." *Benn*, 371 F.3d at 172 (citations and internal quotation marks omitted). Nor does Plaintiff allege any facts demonstrating a "symbiotic relationship" between the private Defendants and New Jersey in which there is a "mutual benefit." *Id.* at 173. As the Third Circuit explained in *Benn*, there was no "symbiotic relationship" where the plaintiff fails to show the private defendants profited from the decision to commit the plaintiff. *Id.* Such allegations are similarly lacking in the case at bar.

Plaintiff also argues that "RBMC and Rutgers ... were mutually *entwined* and in a *symbiotic relationship*, and were clearly performing a public function." (SAC ¶ 114 (emphasis in original).) Aside from such conclusory allegations which fail to state a claim, *Iqbal*, 556 U.S. at 679, Plaintiff fails to demonstrate that the case at bar involves "entwinement" under the Supreme Court's decision in *Brentwood.* Plaintiff's allegations merely contend that the Act creates a procedure that Defendants followed. Plaintiff fails to show that the "nominally private character" of RBMC is "overborn by the pervasive entwinement" with either Rutgers or the state of New Jersey such that RBMC or its employees may be

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

deemed state actors. *Brentwood*, 531 U.S. at 298. Plaintiff's Complaints are devoid of allegations that state professionals control the private facility or state medical professionals, or that a large portion of the facility's funding or employee's salary come from the state. *Id.* Plaintiff does not contend that RBMC's employees are paid salaries from the state. Plaintiff makes no allegations that seemingly neutral medical personnel have any financial incentive from the discretionary determination of an involuntary commitment. RMBC and its parent company HMH are private, rather not state-owned facility. Even if the facility receives some state funding for its participation in the Act, this does not transform a private entity into a state actor. *See Leshko v. Servis*, 423 F.3d 337, 341 (3d Cir. 2005) ("detailed regulation and receipt of state funds, without more, do not create state action" (citing *Crissman*, 289 F.3d at 244)). As such, *Brentwood* does not mandate a finding of state action. [16]

***10** Finally, this decision comports with findings by other courts in this Circuit which have similarly declined to find state action on the part of private hospitals deciding to involuntarily commit an individual under New Jersey law or treating an individual. *See Bates*, 346 F. App'x at 887 (holding that complaint failed to allege private medical facilities were acting under state law with respect to plaintiff's involuntary commitment); *Hahn*, 2012 WL 870335, at *7 (private medical facility not a state actor); *D.V. v. Miller*, No. 08-552, 2008 WL 4816484, at *4 (W.D. Pa. Nov. 4, 2008) (private employees who hold state licenses not state actor); *Layser v. Morrison*, 935 F. Supp. 562, 566 (E.D. Pa. 1995) ("Private physicians unaffiliated with a state institution are not state actors.").

*ii. Due Process*

Even assuming *arguendo* that Defendants were state actors, Plaintiff's Section 1983 claims nonetheless fail to state a claim for procedural or substantive due process. The Due Process Clause of the Fourteenth Amendment declares that no state shall "deprive any person of life, liberty, or property, without due process of law.' " U.S. Const. amend XIV. There are both substantive and procedural components of the Fourteenth Amendment. *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000). "To state a claim for deprivation of procedural due process, a plaintiff must demonstrate that (1) he was deprived of an individual interest included within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.' " *Toussaint v. Szeto*, No. 22-2446, 2022 WL 1541545, at *2 (D.N.J. May 13, 2022) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006)).

Plaintiff's Complaints contend that Defendants violated New Jersey's involuntary civil commitment statute. For example, Plaintiff contends that Defendants failed to "satisfy the requirements for 'dangerousness' " under the statute, (Am. Compl. ¶ 115), and failed to provide Plaintiff "with appropriate treatment in the least restrictive setting," (SAC ¶ 129). According to Plaintiff, failure to "adhere to the statutory requirements governing the initiation of involuntary commitment proceedings must be construed as an action in law that violates an individual's substantive and procedural due process rights, thus giving rise to claims under 42 U.S.C. § 1983." (*Id.* ¶ 125.) However, "Section 1983 does not provide a cause of action for violations of state statutes." *Benn*, 371 F.3d at 174 (quoting *Brown v. Grabowski*, 922 F.2d 1097, 1113 (3d Cir. 1990)); *Hahn*, 2012 WL 870335, at *7 (same). As such, Plaintiff's claims for violations of the Act cannot serve a basis for his Section 1983 claims.

Moreover, as referenced above, in emergency situations, short-term commitments do not violate procedural due process. *Benn*, 371 F.3d at 174. Plaintiff admits in the Complaints that Plaintiff "sarcastically" called the Suffolk County mental health crisis hotline and discussed terrorizing another family member, using an assumed feigned dialect. (Am. Compl. ¶¶ 27–33.) The police who conducted the welfare check and visited Plaintiff's home were concerned Plaintiff wanted to hire a "hitman" to murder a family member. (*Id.* ¶ 39.) Moreover, Plaintiff was evaluated by both a social worker and medical doctor who both determined that Plaintiff met the criteria for involuntary commitment. (*Id.* ¶¶ 69–82.) A judge of the New Jersey Superior Court approved Defendants' petition for involuntary confinement, and Plaintiff was stabilized and released well before a second hearing was required. (*Id.* ¶¶ 87, 108.) As such, Plaintiff has failed to allege under these circumstances that Plaintiff's procedural due process rights were violated. *See Benn*, 371 F.3d at 174; *Matter of Commitment of Raymond S.*, 623 A.2d 249, 251 (N.J. Super. Ct. App. Div. 1993) (citing the Act and noting that the "Legislature and the New Jersey Supreme Court have promulgated statutes and rules to ensure that no person is involuntarily committed to a psychiatric institution without having been afforded procedural and substantive due process," such as the requirements of "clear and convincing evidence that the individual has a mental illness, and the

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

mental illness causes the patient to be dangerous to self, to others, or to property"). [Redacted] (*See* ECF No. 27.)

***11** Plaintiff also fails to allege a violation of substantive due process. As the Third Circuit has explained:

> [T]he appropriate test for assessing liability in the context of involuntary commitment decisions is the "shocks the conscience" standard announced in *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). *Benn*, 371 F.3d at 174. Writing for our Court, then-Judge Alito observed that "[w]hether an incident 'shocks the conscience' is a matter of law for the courts to decide." *Benn*, 371 F.3d at 174. Applying this standard in *Benn*, we found that medical decisions to commit the plaintiff, which the plaintiff characterized as reflecting " 'total incompetenc[e],' " were nonetheless not conscience-shocking given the totality of the circumstances presented. *Id.* at 175.

*Obado v. UMDNJ, Behav. Health Or.*, 524 F. App'x 812, 815 (3d Cir. 2013). Plaintiff fails to allege facts that demonstrate Defendants' conduct "shocks the conscience." As discussed above, Plaintiff concedes that Plaintiff's own call to the mental health hotline spurred a welfare check, which led to Plaintiff's involuntary commitment. Plaintiff admits that multiple professionals evaluated him and recommended his commitment. Even accepting Plaintiff's allegations that Defendants' opinions regarding Plaintiff were misguided, or failed to recognize Plaintiff's claimed sarcasm, or the supposed cleverness of his now self-servingly described "prank," this conduct fails to allege a substantive due process violation. *See Benn*, 371 F.3d at 175 (holding that "the doctors' conduct was not conscience-shocking" in light "of the events that led to [the plaintiff's commitment and the steps taken after his arrival" even if the doctors failed to "properly analyze[ ]" the plaintiff's condition); *Obado*, 524 F. App'x at 814–16 (despite plaintiff's disagreement with doctor's choice, "decision to recommend [the plaintiff] for involuntary civil commitment does not shock the conscience" where mental health screener and doctor had recommended plaintiff "posed a danger to himself and others"); *see also Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000) ("Mere negligence is never sufficient for substantive due process liability." (citing *Daniels v. Williams*, 474 U.S. 327, 330-31(1986))).

Nor does the fact that Defendants forcibly medicated Plaintiff, (Am. Compl. ¶¶ 52–57), result in a substantive due process violation. The Third Circuit has "held that authorities may administer antipsychotic drugs over a patient's objection 'where the decision is a product of the authorities' professional judgment.' " *Benn*, 371 F.3d at 175 (quoting *White v. Napoleon*, 897 F.2d 103, 112 (3d Cir. 1990)); *see also Rennie v. Klein*, 720 F.2d 266, 269 (3d Cir. 1983); *Obado*, 524 F. App'x at 816–17 (same). Accordingly, the Court finds that Plaintiff failed to allege a substantive due process violation. [17]

***12** Because Plaintiff has not properly pled violations of Section 1983, Plaintiff's claims under the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2, fail for the same reasons. *See Hottenstein v. City of Seal Isle City*, 793 F. Supp. 2d 688, 695 (D.N.J. 2011) (dismissing New Jersey Civil Rights Act claims "for the same reason the § 1983 claims fail"); *Chapman v. New Jersey*, No. 08–4130, 2009 WL 2634888, *3 (D.N.J. August 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart."); *Desilets on Behalf of Desilets v. Clearview Reg'l Bd. of Educ.*, 627 A.2d 667, 673 (N.J. Super. Ct. App. Div. 1993) ("We are not persuaded that the New Jersey Constitution provides greater protection under the circumstances of this case than its federal counterpart."). Accordingly, Plaintiff's NJCRA claims are also dismissed. For the above reasons, Counts One and Four are dismissed.

### B. COUNTS TWO AND THREE

In Counts Two and Three, Plaintiff alleges violations of Title II of the ADA and Section 504 of the RA against Defendants Rutgers, Fitzpatrick, Richardson, Lanez, RBMC, HMH, and Singh. (*See* SAC ¶¶ 145–160; Am. Compl. ¶¶ 128–37.) Save for a few exceptions, courts "treat claims under [the ADA and RA] identically." *KM v. Gloucester City Bd. of Educ.*, 379 F. Supp. 3d 334, 354–55 (D.N.J. 2019) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). Accordingly, the analysis applies to both claims. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, Section 504 of the RA provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

In order to state a *prima facie* case under either statute, "a plaintiff must show that he is a qualified individual with a disability; that he was excluded from a service, program, or activity of a public entity; and that he was excluded because of his disability." *Disability Rts. New Jersey, Inc. v. Comm'r, New Jersey Dep't of Hum. Servs.*, 796 F.3d 293, 301 (3d Cir. 2015) (citations and internal quotation marks omitted); *see also Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007) ("To succeed on a claim under Title II, Bowers must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."). "To satisfy the fourth prong, a plaintiff must establish a causal connection between his or her disability and the alleged discrimination." *Heine v. Comm'r of The Dep't of Cmty. Affs.*, No. 11-5347, 2016 WL 7042069, at *9 (D.N.J. Dec. 1, 2016), *aff'd sub nom.*, 794 F. App'x 236 (3d Cir. 2020) (citations and internal quotation marks omitted).

The Court turns to the fourth prong of the analysis. Plaintiff contends that Defendant Richardson wrote that Plaintiff had "paranoid delusions of the police being dangerous and out to get [Plaintiff]," as well as "ruminating thoughts of injustice of involuntary hospitalization." (SAC ¶ 149.) In Plaintiff's subjective view, Richardson "interpreted otherwise reasonable statements and commonly-held beliefs [regarding police violence and involuntary commitment] through the lens of psychiatric pathology" and as such, "any statements emanating from the mouth from someone deemed to be 'crazy'—however reasonable—were invariably symptoms of some underlying lunacy or other mental derangement." (*Id.* ¶ 151.) Further, Plaintiff contends that "Richardson's interpretation of Plaintiff's opinions and beliefs being evidence of mental 'ruminations' and 'paranoia,' " as well as, inter alia, her "pronounced tendency to interrupt him —and her general lack of interest in listening to him" must necessarily result from Richardson's discrimination based on Plaintiff's disability. Plaintiff argues that Richardson's "perceptions and interpretations" can only be construed "as arising from [ ] stereotypical and prejudicial view[s] of the 'mentally ill.' " (*Id.*) In toto, Plaintiff alleges that Richardson's actions "appear to be clearly driven by either some prejudice or stereotypes." (*Id.* ¶ 153.) With respect to Fitzpatrick, Plaintiff avers that as Richardson's supervisor, he had responsibility for his superior's actions under a theory of *respondeat superior. (Id.* ¶ 155.) As Richardson's employer, Plaintiff argues that Rutgers had responsibility for ensuring their employees did not violate the ADA and RA. (*Id.* ¶ 156.)

***13** Plaintiff is correct that Rutgers "can be vicariously liable for its employee's ADA and RA violations." *Ali v. City of Newark*, No. 15-8374, 2018 WL 2175770, at *5 (D.N.J. May 11, 2018) (citations omitted).[18] And Plaintiff also correctly notes that an ADA claim can rise from a plaintiff's involuntary commitment "based on a stereotyped view of the mentally ill." *Obado*, 2012 WL 12903880, at *9 (quoting *Bolmer v. Oliveira*, 594 F.3d 134, 149 (2d Cir. 2010)). However, Plaintiff's allegations against Richardson, and thus Fitzpatrick or Rutgers, fail to demonstrate that these parties discriminated against Plaintiff due to a disability as yet again Plaintiff fails to cure the defects identified by Judge Shipp in his July 29, 2022 Memorandum Opinion. The Second Amended Complaint again "fails to allege 'discriminatory animus on the part of [Rutgers] or [Richardson or Fitzpatrick]' or "point[ ] to [any] discriminatory policies, contemporaneous statements, or any circumstantial evidence suggesting [Rutgers] or [Richardson or Fitzpatrick] acted under the assumption that all individuals with mental illness ... require involuntary commitment.' " (Shipp II at 14 (quoting *Obado*, 524 F. App'x at 817).)

Plaintiff only sets forth conclusory allegations regarding Richardson's supposed discriminatory animus or views of the disabled, but fails to allege any facts regarding same. Plaintiff's Second Amended Complaint is devoid of any facts which allege or infer that Richardson took any actions based on Plaintiff's disability, as opposed to, as Plaintiff admits, Plaintiff's own unprompted phone call and threats to the Suffolk County mental health line and then to police. *See Heine*, 2016 WL 7042069, at * 10 (dismissing complaint because "[i]t fails to allege that [plaintiffs] have suffered discrimination on the basis of disability. It fails to allege the required causal connection."). Plaintiff's own allegations confirm and bespeak surmise and conjecture— not fact. Plaintiff seeks the Court to impute discrimination based on allegations that "*appear to be* clearly driven by either some prejudice or stereotypes," (SAC ¶ 153 (emphasis added)), "*may be* plainly construed as promoting civil rights violations and abuses," (*id.* ¶ 142 (emphasis added)), that are not "*beyond the pale of possibility*," (Am. Compl. ¶ 130 (emphasis added)), or that misinterpreted "Plaintiff's unique manner of communication, and his *obvious* proclivity to resorting to sarcasm or provocative manner of speech," (*id.* ¶ 132 (emphasis added)). Such conjecture is not tantamount to evidence establishing the required causal connection.

Plaintiff also contends that other Defendants' actions resulted from differential treatment because of Plaintiff's disability. With respect to Lanez, Plaintiff contends that "it can be inferred" that her actions resulted from an unlawful view that those with mental illness required involuntary commitment. (SAC ¶ 159.) Plaintiff contends that Defendant Bekhit's notes discuss Plaintiff's "prank call" and "desire to 'hire a hitman' to kill a fictitious target," but still determined Plaintiff was a danger to others and thus committed him. (Am. Compl. ¶ 130.) Plaintiff contends that such action occurred because of Defendants' "prejudicial and baseless judgments" because of Plaintiff's disability. (*Id.*) According to Plaintiff, "Defendants seemingly ignored the fact that 'prank calls' to suicide hotlines were hardly an unheard of phenomenon, and that it wouldn't be beyond the pale of possibility for an otherwise 'sane' person to call a suicide hotline ...." (*Id.*) Plaintiff contends that Singh "consistently relied upon prejudicial and stereotypical assumptions about the Plaintiff and failed to independently arrive at the conclusion that Plaintiff suffered from a mental illness. (*Id.* ¶ 131.)

Similar to the allegations against Rutgers, Fitzpatrick, and Richardson, Plaintiff's Complaint fails to state an ADA or RA claim against the remaining Defendants. Plaintiff's conclusory allegations fail to demonstrate any facts that discriminatory animus based on Plaintiff's disability caused Defendants to commit Plaintiff. As such, Plaintiff fails to allege the "required causal connection" and thus fails to state a claim. *See Heine*, 2016 WL 7042069, at *10. Therefore, the Court dismisses Plaintiff's Counts Two and Three.

### C. COUNTS FIVE THROUGH NINE

***14** In Counts Five through Nine, Plaintiff asserts state law claims of simple assault, battery, false imprisonment, IIED, and NIED. Because Plaintiff does not allege diversity jurisdiction and the Court dismisses Plaintiff's federal claims, the Court could only exercise supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367. Having dismissed Plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Pursuant to 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction ...." 28 U.S.C. § 1367(c)(3). For a district court to exercise supplemental jurisdiction, the court "requires, at a minimum, a federal claim of sufficient substance to confer subject matter jurisdiction on the court." *City of Pittsburgh Comm'n. on Hum. Rels. v. Key Bank USA*, 163 F. App'x 163, 166 (3d Cir. 2006) (quoting *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195 (3d Cir. 1976)); *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) ("[W]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.") (emphasis in original) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).

The Third Circuit has explained that "if it appears that all federal claims are subject to dismissal, the court should not exercise jurisdiction over remaining claims unless 'extraordinary circumstances' exist." *Key Bank USA*, 163 F. App'x at 166 (quoting *Tally*, 540 F.2d at 195); *see Robert W. Mauthe, M.D., B.C. v. Optum Inc.*, 925 F.3d 129, 135 (3d Cir. 2019) ("[A] court does not err if it declines to exercise supplemental jurisdiction over state claims after it dismisses a federal claim on which its jurisdiction is based in the absence of extraordinary circumstances."). "[S]ubstantial time devoted to the case" and "expense incurred by the parties" do not qualify as extraordinary circumstances. *See Tully*, 540 F.2d at 195; *Rivera v. United States*, No. 21-3131, 2023 WL 8108642, at *5 (D.N.J. Jan. 17, 2023), *aff'd sub nom.*, No. 23-1286, 2023 WL 8058753 (3d Cir. Nov. 21, 2023) ("[T]ime already invested in litigating the state cause of action is an insufficient reason to sustain the exercise of pendent jurisdiction.") (quoting *Lovell Mfg. v. Exp.-Imp. Bank of the U.S.*, 843 F.2d 725, 735 (3d Cir. 1988)).

Taking into consideration judicial economy, convenience, and fairness, no exceptional circumstances are present such that the Court should retain supplemental jurisdiction. Plaintiff may continue to assert the state law claims in Plaintiff's preferred jurisdiction before a court apt to interpret its own state law. Moreover, the case remains at the motion to dismiss stage, and it does not appear that any discovery has occurred. As such, the Court denies Defendants' Motions to Dismiss counts five through nine against Defendants without prejudice as moot.

As Plaintiff originally filed this case in state court, the Court will remand what remains of this action to state court rather than dismissing it without prejudice. *See Borough of West Mifflin*, 45 F.3d at 788 ("[W]e believe that in a case that has been removed from a state court, a remand to that court is a

viable alternative to a dismissal without prejudice."); *see also* *Alston v. Verizon Delaware LLC*, 746 F. App'x 154, 155 (3d Cir. 2019) (affirming district court's discretionary decision to decline supplemental jurisdiction and remanding case to state court); *Williams v. Cnty. of Union*, No. 17-6672, 2019 WL 102407, at *4 (D.N.J. Jan. 3, 2019) (dismissing Section 1983 claims without prejudice and remanding matter to state court).[19] The Court takes no view as to the merits or viability of Plaintiff's state law claims, only that it lacks subject-matter jurisdiction to preside over them and declines to exercise supplemental jurisdiction.

## IV. CONCLUSION

***15** For the foregoing reasons, Defendants' Motions to Dismiss are **GRANTED in part** and **DENIED in part as moot**. Plaintiffs' claims are **DISMISSED** without prejudice.[20] The matter will be remanded to the Superior Court of New Jersey. An appropriate Order will accompany this Opinion.

**All Citations**

Slip Copy, 2024 WL 3896627

## Footnotes

1 The Court will refer to all Defendants collectively as "Defendants."

2 Plaintiff's SAC includes only counts one through four, seven, and nine; though, in the SAC, Plaintiff "incorporates and preserves and claims all causes of action ... in his First Amended Complaint." (SAC ¶ 184.) The Amended Complaint includes nine total claims. (Am. Compl. ¶¶ 110–188.) Plaintiff's Complaints, in the aggregate, total 125 pages and 372 paragraphs, with the numbering of the causes of actions continuing across Complaints and appearing confusing at times.

3 At times, the Court refers to ECF Nos. 38 and 162 collectively as the "Complaints" when describing the totality of Plaintiff's allegations. The Court will specify when referring to one only one specific Complaint.

4 The RBMC Defendant appear to have filed an Amended Answer at ECF No. 60, which includes Defendant Locke and asserts crossclaims for indemnification and contribution against their co-defendants.

5 The five pending Motions to Dismiss were filed by Banfield, (ECF No. 108), Bekhit, (ECF No. 138), RBMC Defendants, (ECF No. 171), Lanez, (ECF No. 172), and Rutgers, (ECF No. 173). For each motion, Plaintiff filed a brief in opposition, (*see* ECF Nos. 126, 154, 203, 183, and 215), and the relevant Defendant filed a reply brief, (*see* ECF Nos. 136, 161, 205, 186, and 218).

6 The Court notes that Plaintiff refers to himself using masculine pronouns in the Complaints. Richardson's evaluation refers to Plaintiff using feminine pronouns. In light of the fact that Plaintiff uses the masculine pronouns, so too will the Court.

7 The "Acute Services Brief Assessment" of Plaintiff was filed by Rutgers in this action and reflects the events described in Plaintiff's Complaints. *See* *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (a court may also review "exhibits attached to the complaint and matters of public record," as well as "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"). Plaintiff himself repeatedly relies and cites the document at various points throughout the Second Amended Complaint. (*See, e.g.*, SAC ¶¶ 53, 87, 124, 149.)

8 It is not clear to the Court the date of this additional social worker's comments. The page with said comments contains two dates—[Redacted] and [Redacted]—the latter of which indisputability was the date that [Redacted]. The Court believes the reference to [Redacted] may be a typographical error, or quite a

coincidence. Regardless, as Richardson relied on these notes in making her recommendation, the import of the social worker's notes remains that [Redacted].

9 Rutgers does not dispute it is a state actor.

10 As discussed above, because Plaintiff may not proceed on a theory of *respondeat superior* for either a Section 1983 or NJCRA claim, the Court need not address Plaintiff's allegations concerning Rutgers' employees.

11 Plaintiff does not elaborate by what he means by "hard paternalism," and thus the Court is unclear of its meaning.

12 Moreover, the Third Circuit has held that "in an emergency situation, a short-term commitment without a hearing does not violate procedural due process." *Benn*, 371 F.3d at 174.

13 Plaintiff appears to latch onto Judge Shipp's statement that "[t]he closest Miretskaya comes to alleging a custom or policy is the use of 'Rutgers' IFSS [Intensive Family Support Services] program." (Shipp II at 10.) Plaintiff's Second Amended Complaint alleges that IFSS had, in part, a culture in which "civil rights protections were just pesky impediments that ought to be disregarded." (SAC ¶¶ 138–42.) However, despite Plaintiff's disagreements with IFSS, Plaintiff again fails to "allege that the system catalyzed or sanctioned any constitutional violation." (Shipp II at 10.) As Judge Shipp found in his prior decision, this Court similarly finds that Plaintiff's allegations "do not establish that the Rutgers training program was the impetus for the [alleged] constitutional violation." (*Id.* at 10 n.5.)

14 The Court refers to "Defendants" in § HLA.2 as all Defendants except Rutgers.

15 The same analysis applies to the state actor requirement under Section 1983 and the Fourteenth Amendment. *See* *Lugar*, 457 U.S. at 929. ("[I]t is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical.").

16 The Court recognizes one court in this district has held otherwise. That case held that a private doctor's "role in certifying individuals for involuntary commitment and treating them at a short-term facility, although private, is deeply entwined with a highly coordinated effort by the State of New Jersey to screen, evaluate, and treat mentally ill individuals who may be dangerous to themselves or others" and thus found state action under *Brentwood.* *Obado v. Univesity of Med. & Dentistry of New Jersey-Behav. Healthcare*, No. 09-1344, 2012 WL 12903880, at *6 (D.N.J. May 21, 2012). The district court in that case focused on the record evidence that established that the plaintiff was initially screened by state employees at a public hospital before being transferred to a private short-term care facility, and the private short-term facility was funded by the state. *Id.* The Third Circuit affirmed on other grounds and explicitly declined to rule on the district court's finding of state action. *See* *Obado v. UMDNJ, Behav. Health Ctr.*, 524 F. App'x 812, 817 n.7 (3d Cir. 2013). In contrast, in the case at bar, Plaintiff never was placed at a state facility, but was merely examined by one Rutgers employee. Moreover, while Plaintiff alleges RBMC receives state funding, as discussed above, such funding does not compel a finding of state action. The factors identified in the Supreme Court's decision in *Brentwood* and Third Circuit's decision in *Benn* govern this Court's analysis.

17 Moreover, Plaintiff contends that Plaintiff "requested voluntary treatment numerous times" such that Plaintiff should not have been involuntarily committed. (*See* SAC ¶¶ 3, 119.) However, this does not alter the Court's opinion. A mental health screener need only discern "reasonable cause to believe that a person is in need of involuntary commitment[.]" N.J. Stat. Ann. § 30:4-27.5(e). Moreover, under the Act, the decision of what constitutes the least restrictive environment is up to the discretion of the medical professionals based on their assessment of the individual, rather than the individual's own belief. N.J. Stat. Ann. § 30:4-27.5(a). As such, even if Plaintiff disagrees with the professional judgment of Defendants who recommended Plaintiff's

involuntary commitment, such does not give rise to a substantive due process violation. *Benn*, 371 F.3d at 174–75.

18 The Court need not decide whether a supervisor, under these alleged facts and circumstances, can be liable under a theory of vicarious liability at this time.

19 Certain Defendants contend that Plaintiff failed to properly utilize fictitious pleading in prior Complaints to preserve claims against previously unnamed Defendants. (*See e.g.*, ECF No. 108-3 at 10–12; ECF No. 172-2 at 11–12.) As the Court dismisses the underlying federal claims and exercises its discretion not to retain jurisdiction on the state law claims, the Court need not address this argument.

The Court also notes that Plaintiff's Complaints name additional defendants who have not been served and thus did not move to dismiss. In accordance with 28 U.S.C. § 1915(e)(2), "[T]he court shall dismiss the case at any time if the court determines that ... the action ... fails to state a claim on which relief may be granted." Therefore, while not all Defendants moved to dismiss, the Court dismisses claims against all Defendants "pursuant to 28 U.S.C. § 1915(e)(2) for Plaintiff's failure to state a claim ... for which relief may be granted." *Mason v. City of Philadelphia*, No. 13-5163, 2014 WL 4473724, at *7 n.16 (E.D. Pa. Sept. 10, 2014).

Finally, as the underlying Complaints have been dismissed, the Court dismisses any cross claims by Defendants without prejudice as moot. *See* *Rakowski v. City of Brigantine*, No. 19-21847, 2022 WL 326992, at *1 n.1 (D.N.J. Feb. 3, 2022) (dismissing crossclaims as moot following dismissal of underlying complaint).

20 The Court will dismiss Counts One, Two, Three, and Four against Rutgers with prejudice. The Court need not dismiss without prejudice and with leave to amend if amendment would be "inequitable or futile." *See also* *Columbus LTACH Mgmt., LLC v. Quantum LTACH Holdings, LLC*, No. 16-6510, 2019 WL 2281632, at *4 (D.N.J. May 29, 2019) (dismissing with prejudice because plaintiff had repeatedly failed to correct the same deficiency in his pleading); *Mesadieu v. City of Linden*, No. 18-14561, 2019 WL 2514715, at *5 (D.N.J. June 18, 2019), *aff'd*, 791 F. App'x 294 (3d Cir. 2020) (dismissing with prejudice and finding any "further amendment would be futile" where the Court previously "set forth the deficiencies with Plaintiff's claims and Plaintiff failed to cure any of those deficiencies in the FAC."); *Prince v. Trumark Fin. Credit Union*, No. 22-3097, 2022 WL 10584444, at *5 (E.D. Pa. Oct. 18, 2022), *appeal dismissed*, No. 22-3173, 2023 WL 3529406 (3d Cir. Mar. 2, 2023) (dismissing "claim with prejudice as [Plaintiff] has now twice failed to plead" his claims). Here, Plaintiff's claims against Rutgers have now been dismissed three times, and allowing Plaintiff a fourth bite at the apple against Rutgers would only serve to needlessly extend this litigation, and subject Rutgers to additional cost in added time, attention and financial expense. As such, the Court finds that any amendment would be futile.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5003891
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Ruben D. MORALES, Plaintiff,
v.
State of NEW JERSEY, The New Jersey Department of Corrections, Northern State Prison, The New Jersey Department of Corrections Special Investigation Division, Marcus Hicks, Victoria Kuhn, Patrick Nogan, George Robinson, Jr., Matthew Schlusselfeld, Duane Grade (In Their Personal and Official Capacities), Shawn Zambrano, John and Jane Does (1-50) (In Their Personal and Professional Capacities), and XYZ Entities and Corps (1-50), Defendants.

Civil Action No. 21-11548 (JXN) (AME)
|
Signed August 3, 2023

**Attorneys and Law Firms**

David J. Heintjes, Weiner Law Group LLP, Parsippany, NJ, for Plaintiff.

Agnes Irene Rymer, Marvin L. Freeman, Katherine Ellen Chrisman, State Of New Jersey Office Of The Attorney General, Trenton, NJ, for Defendant.

**MEMORANDUM OPINION AND ORDER**

JULIEN XAVIER NEALS, United States District Judge

***1 THIS MATTER** comes before the Court on Defendants the State of New Jersey, the New Jersey Department of Corrections ("the DOC"), Northern State Prison ("Northern State"), the New Jersey Department of Corrections' Special Investigation Division (the "Special Investigation Division"), Marcus Hicks, Victoria Kuhn, Jr., Matthew Schlusselfeld, and Duane Grade's (collectively, "the State Defendants' ")[1] motion to dismiss Plaintiff Ruben D. Morales's ("Plaintiff's") complaint (ECF No. 1-1) (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 7) (the "Motion"). Plaintiff opposes the Motion (ECF No. 13) (the "Opposition"), and the State Defendants Replied (ECF No. 15). The Court has carefully considered the parties' submissions and decides this matter without oral argument under Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, the Motion is **GRANTED in part** and **DENIED in part**.

1. As an initial matter, the Court takes note of Plaintiff's suggestion that the Motion is premature because fact discovery has not yet taken place (*see* Opp., at 14-15[2]), but this does not preclude a review of the merits of the Motion. *See Thomas v. Ford Motor Co.*, 70 F.Supp.2d 521, 524 (D.N.J.) (Dismissal is warranted "where, under any set of facts ... the plaintiff is not entitled to relief.") (citations omitted).

2. On April 22, 2021, Plaintiff initiated this action in the Superior Court of New Jersey, Civil Division, Essex County, under caption *Ruben D. Morales v. State of New Jersey, et al.*, ESX-L-003226-21, alleging eighteen causes of action related to Plaintiff's employment with the DOC. *See, gen.,* Compl. On May 19, 2021, the State Defendants removed this action to this District pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1441(a), (c), and 28 U.S.C. § 1443 on the grounds that the "United States District Court has original jurisdiction over this matter[.]" State Defs.' Notice of Removal (ECF No. 1), at 3 ¶¶ 5-6. On July 8, 2021, the State Defendants filed the Motion.

3. This action appears to arise out of Plaintiff's employment as a "Senior Correctional Police Officer" at the DOC and an alleged injury he sustained while employed. Compl. ¶ 1. The following allegations are from Plaintiff's Complaint. On April 22, 2019, Plaintiff was "assigned to the Administrative Segregation Unit of" Northern State (the "Segregation Unit"). Compl. ¶ 16. The Segregation Unit's "locks on the cell doors ... did not work and did not lock[.]" *Id.* ¶ 19. The DOC "had direct and actual knowledge from Plaintiff ... that the locks on the cell doors" in the Segregation Unit "were defective, faulty, and or inoperable prior to April 22, 2019[,] and took no steps to repair the locks on the cell doors[.]" *Id.* ¶ 20. Additionally, that the DOC "was aware [that] the prisoners incarcerated in" the Segregation Unit "had knowledge that the safety locks on the cell doors did not lock." *Id.* ¶ 24.

***2** 4. On April 22, 2019, Plaintiff was injured by defendant Shawn Zambrano ("Zambrano") when Zambrano "let himself out of his cell and proceeded to viciously attack and beat" Plaintiff "after following [him] out of the unlocked door of his cell." *Id.* ¶ 32. On April 22, 2019, Plaintiff allegedly "reported to Defendants ... that he was" assaulted and severely injured by Zambrano. *Id.* ¶ 33. Plaintiff alleges that his injury was "a

result of the lack of properly working and locking safety and cell doors[,]" which "caused [him] to suffer severe, painful bodily injuries ... causing [Plaintiff] great pain and suffering," that "left him with permanent reputational damage, loss of income and permanent disabilities[.]" *Id.* ¶ 26.

5. On May 14, 2019, Plaintiff "filed a workers' compensation Claim Petition." *Id.* ¶ 36. "[S]hortly after the assault[,] ... Defendants began an unlawful investigation into Plaintiff[.]" *Id.* ¶ 37. "Defendants then used information from their malicious investigation to portray Plaintiff in a false light as a criminal." *Id.* ¶ 39. "Defendants' false portrayal of Plaintiff lead to him being both administratively and criminally prosecuted for offenses he did not commit[,]" and his "inability to return to his position at DOC" and "reputational damage[.]" *Id.* ¶¶ 40-42. Also, "[w]hile on Workers' Compensation [leave], ... criminal and administrative charges were instituted against Plaintiff[,] which ... prevented his ability to return to work[.]" *Id.* ¶ 45.

6. On April 22, 2021, Plaintiff filed the Complaint against the State Defendants and Non-Moving Defendants with the following claims: Law Against Discrimination ("LAD") - Failure to Accommodate (Count One); LAD - Retaliation (Count Two); LAD Aiding and Abetting (Count Three);[3] the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, et. seq. (the "Civil Rights Act") (Count Four); Retaliation - Constitutional Violation under 42 U.S.C. § 1983 (Count Five); New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, *et seq.* ("CEPA") (Count Six); Giving Dangerous Person Opportunity to Injure (Count Seven); Enhancing Risk of Criminal Attack (Count Eight); Discharge Due to Workers' Compensation Claim ("Workers' Comp.") (Count Nine); Intentional Infliction of Emotional Distress (Count Ten); False Complaint of Unprofessional Conduct (Count Eleven); Intentional Interference with Prospective Economic Advantage (Count Twelve); Tortious Interference with Prospective Economic Advantage (Count Thirteen); Assault (Count Fourteen); Battery (Count Fifteen); Fundamentally Unfair Government Action (Count Sixteen); Public Employee Wrongfully Enforcing Law (Count Seventeen); and Wrongful Discharge in Violation of Public Policy - Pierce Claim (Count Eighteen).

7. Under Rule 8 of the Federal Rules of Civil Procedure, a pleading is sufficient so long as it includes "a short and plain statement of the claim showing that the pleader is entitled to relief" and provides the defendant with "fair notice of what the ... claim is and the grounds upon which it rests[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). A complaint will survive a motion to dismiss if it provides a sufficient factual basis to state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

8. To determine whether a complaint is sufficient under these standards, the Third Circuit requires a three-part inquiry: (1) the court must first recite the elements that must be pled in order to state a claim; (2) the court must then determine which allegations in the complaint are merely conclusory and therefore need not be given an assumption of truth; and (3) the court must "assume the[ ] veracity" of well-pleaded factual allegations and ascertain whether they plausibly give rise to a right to relief. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (citations omitted).

**A. The Deprivation of Rights and Civil Rights Claims - Counts Four and Five**

***3** 9. Plaintiff's allegations are brought under § 1983 (Count Five) and the Civil Rights Act (Count Four). Compl. ¶¶ 61-71. The State Defendants argue that Counts Four and Five should be dismissed as the statutes do not provide causes of action against the State Defendants because the DOC, Northern State, and the Special Investigation Division are not "persons[,]" and the individual State Defendants cannot be sued in their official capacity. State Defs.' Letter Br. (ECF No. 7-2) (the "Letter Brief"), at 7-10. The Court agrees.

10. § 1983 and Civil Rights Act claims are analyzed similarly. *Duardo v. City of Hackensack*, No. 22-6779, slip op., 2023 WL 4418606, at *5 (D.N.J. July 10, 2023) (citation omitted). The Court, therefore, will consider both claims under the same analysis. To state a § 1983 claim, a "plaintiff [must] prove two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011) (citation omitted).

11. "To be liable under Section 1983[,]" a "defendant must be a 'person' within the meaning of the statute." *Reddick v. Hicks*, No. 22-6926, slip op., 2023 WL 4579884, at *3 (D.N.J. July 18, 2023) (citation omitted). This is also true of claims under the Civil Rights Act. *See, id.*, 2023 WL 4579884, at

*3 (The Civil Rights Act "premises liability on the conduct of a person.") (citations and internal quotations and brackets omitted). A "person" does not include the DOC, Northern State, and the Special Investigation Division except "when used to designate the owner of property which may be the subject of an offense." N.J.S.A. 1:1-2.

12. State officials are also not persons under § 1983 and the Civil Rights Act. *See* *Reddick*, 2023 WL 4579884, at *3 ("It is well established that neither a State nor its officials acting in their official capacities are persons under § 1983.") (citation and internal quotations omitted). Indeed, such a reading "is reinforced by Congress' purpose in enacting the statute." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65-66 (1989). This is because "suit[s] against a state official in his or her official capacity [are] not a suit against the official but rather is a suit against the official's office ... [a]s such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71 (citations omitted). Thus, claims against the DOC, Northern State, the Special Investigation Division, and the individual State Defendants sued in their official capacity under § 1983 or the Civil Rights Act are dismissed with prejudice because they "are not persons within the meaning of" the statutes. *Reddick*, 2023 WL 4579884, at *3 (internal quotations omitted)*; see also* *Didiano v. Balicki*, 488 Fed.Appx. 634, 638 (3d Cir. 2012).

13. Here, the DOC, Northern State, the Special Investigation Division, and the individual State Defendants are not "person[s][.]" Indeed, Plaintiff does not dispute that the State Defendants are not "person[s][.]" Opp., at 16. Instead, Plaintiff alleges that the individual defendants maintained a policy or permitted an "unlawful custom" to take place that violated Plaintiff's rights. *Id.*, *see also* Compl. ¶¶ 61-64. Such an argument, however, supports claims against municipalities and not State entities and state officials, like here. *See* *Lockhart v. Willingboro High School*, 170 F.Supp.3d 722, 730 (D.N.J. 2015) (Providing criteria for liability against municipalities "through one of its policymakers promulgat[ing] an unconstitutional policy, or acquiesce[ing] in a widespread custom that caused the constitutional violation") (citations omitted).

***4** 14. To sustain a § 1983 or the Civil Rights Act claim, a plaintiff must also allege that the defendant was personally involved in the misconduct. *See* *Duardo*, 2023 WL 4418606, at *5 ("[A]n individual defendant is liable for constitutional violations only if he had 'personal involvement' in the alleged violations.") (citation omitted). To "sufficiently allege a defendant's personal involvement, a plaintiff must describe the defendant's participation in or actual knowledge of an acquiescence in the wrongful conduct[.]" *Id.* at *5 (citation and internal quotations and brackets omitted). Here, the Complaint does not allege that any individual State Defendants "participated in[,]" had "actual knowledge of[,]" or "acquies[ed] in the wrongful conduct." *See* Compl. ¶¶ 66-71.

15. To be sure, as to Counts Four and Five, the Complaint appears to be a "shotgun pleading" as it fails to "specify[ ] which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Radhakrishnan v. Pugliese*, No. 20-220, slip op., 2021 WL 11593799, at *1 (D.N.J. May 21, 2021) (citations omitted). Shotgun pleadings or "vague group pleadings" are impermissible under *Rule* 8. *Karupaiyan v. Atlantic Realty Development Co., Inc.*, No. 18-12532, 2020 WL 13728036, at *2 (D.N.J. Jan. 17, 2020) (citations omitted); *see also* *Radhakrishnan*, 2021 WL 11593799, at *1 (same). Third Circuit courts generally dismiss such pleadings as "insufficiently vague and an impermissible shotgun pleading." *Nash v. New Jersey*, No. 22-1804, 2022 WL 4111169, at *3 (D.N.J. Sept. 8, 2022).

16. Because the State Defendants are not "persons" within the meaning of § 1983 or the Civil Rights Act, Plaintiff failed to state a plausible claim under either statute. The Complaint also does not allege that the individual State Defendants were personally involved in the alleged misconduct. Finally, the allegations related to Counts Four and Five are vague under Federal Rule of Civil Procedure 8. The Motion, therefore, is granted as to Counts Four and Five, which are accordingly dismissed with prejudice.

**B. The CEPA and Workers' Comp. Claims - Counts Six and Nine**

17. The State Defendants argue that the allegations in the Complaint "are too vague to establish that [Plaintiff] engaged in a whistleblowing act, that he suffered an adverse job action, or that there was a causal connection between the adverse job action and the whistleblowing." Letter Br. at 20. The Court disagrees.

18. CEPA provides in relevant part that "[a]n employer shall not take any retaliatory action against an employee because the employee ... [d]iscloses ... to a supervisor or to a public body any activity, policy or practice of the employer, ... that the employee reasonably believes ... is

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

in violation of a law ... or ... is fraudulent or criminal[.]" N.J.S.A. 34:19-3(a.)(1)-(2). To establish a *prima facie* case under CEPA, a plaintiff "must show: (1) a reasonable belief that her employer's conduct violated a law ...; (2) a whistle-blowing activity; (3) an adverse employment action; and (4) a causal connection between her whistle-blowing activity and the adverse employment action." *Smith v. Township Of East Greenwich*, 519 F.Supp.2d 493, 510 (D.N.J. 2007) (citations omitted). "Once the plaintiff meets his prima facie burden, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions." *Id.* at 510 (citation omitted).

19. The Complaint alleges that Plaintiff: (i) "complained about unsafe conditions in the jail specifically, the conditions which lead to and ultimately caused his injuries[;]" which (ii) "[a]s a result of this protected whistleblowing" activity, Plaintiff "was retaliated against by the initiation of malicious criminal and administrative processes[;]" and (iii) that in "engaging in such protected activity, Plaintiff was subjected to ongoing retaliation in the form of adverse employment actions including ... inability to return to his position, criminal and administrative prosecution or continued threats of same[;]" and (iv) that "[t]his ongoing retaliatory conduct by Defendants constitutes a violation of CEPA." Compl. at ¶¶ 73-75. Such allegations are sufficient to state a CEPA claim.

***5** 20. State Defendants alternatively argue that even if Plaintiff establishes a *prima facie* case of a CEPA violation, the claim fails because "[i]t goes without saying that probable cause to believe that a law enforcement officer such as Plaintiff has committed a crime is a legitimate reason to take adverse actions against him, up to and including termination." Letter Br. at 26. The Court agrees that State Defendants' "reliance upon possible defenses to Plaintiff's claim are irrelevant at this stage of the litigation." Opp., at 19. Thus, the Motion is denied as to Count Six.

21. Without argument and/or authority, the State Defendants contend by point heading alone that Plaintiff's Workers' Comp. claim should be dismissed for the same reasons as the CEPA claim. Letter Br. at 26. The Court disagrees.

22. To establish "a *prima facie* case for retaliatory discharge, the employee must prove that: (1) he or she attempted to make a claim for workers' compensation benefits; and (2) he was discharged for making that claim[.]" *Morris v. Siemens Components, Inc.*, 928 F.Supp. 486, 493 (D.N.J. 1996) (citation omitted).

23. The Complaint alleges that on May 14, 2019, Plaintiff "filed a workers' compensation Claim Petition. Compl. ¶ 36. The Complaint further alleges that Plaintiff was "removed ... from employment and discriminated against ... because he claimed workers' compensation benefits from DOC." *Id.* ¶ 86. Additionally, that "malicious criminal and administrative prosecutions" were caused "against Plaintiff" to "retaliate against [him] for filing a claim for workers' compensation benefits." *Id.* at ¶ 87.

24. In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. *Phillips*, 515 F.3d at 231. Such allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Moreover, "in weighing a motion to dismiss," courts consider "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Perry v. OCNAC #1 Fed. C.U.*, 423 F.Supp.3d 67, 74 (D.N.J. 2019) (citations omitted).

25. Here, in accepting Plaintiff's allegations as true, the Court finds that the Complaint sufficiently pleads that Plaintiff suffered an adverse employment action due to his informing and/or complaining about unsafe conditions in the jail and, particularly, the faulty locks in the Segregation Unit, and that such adverse employment action was the result of Plaintiff filing a Workers' Comp. claim. And that Plaintiff may have been "subjected to" additional adverse employment actions due to his complaint(s) and/or report(s) concerning the Segregation Unit's cell door locks. In so pleading, Plaintiff, "at this early stage of the proceedings," has "raise[d] a reasonable expectation that discovery will reveal evidence of a" CEPA violation and retaliatory discharge. *McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 267 (3d Cir. 2016) (citation and quotation omitted). The Motion, therefore, is denied as to Counts Six and Nine.

**C. The State Tort Claims - Counts Seven to Eight, Ten to Thirteen, and Sixteen to Eighteen**

26. The State Defendants assert that Counts Seven to Eight, Ten to Thirteen, and Sixteen to Eighteen ("the State Tort Claims") were "brought against all of the Defendants under the Tort Claims Act," N.J.S.A. 59:1-1, et seq. (the "Tort Claims Act"), and that the State Tort Claims "are barred" because "Plaintiff did not file a notice of claim[,]" within 90 days of the cause of action. Letter Br., at 3, 15. The Court

agrees that the State Tort Claims are barred for noncompliance with the Tort Claims Act.

***6** 27. Here, the Complaint does not allege that Plaintiff filed the notice of claim within 90 days of the accrual of his cause of action, such date "generally [being] the date on which the alleged tort is committed." *Lassoff v. New Jersey*, 414 F.Supp.2d 483, 490, n.17 (D.N.J. 2006) (citations omitted). Indeed, Plaintiff does not dispute that he did not file a Tort Claim Notice, and instead argues that "within seventy-two (72) hours of the" alleged assault by Zambrano, Plaintiff completed an "Employer's First Report of Accidental Injury or Occupational[,] form, Ex. A to the August 18, 2021, Certification of David J. Heintjes, Esq. (the "Heintjes Cert.") (ECF No. 13-1) (the "Accident Injury Form"), and that the document "is nearly identical to a Tort Claim Notice[.]" Opp., at 7-8. Plaintiff also attached a copy of the April 24, 2019, Supervisor's Accident Investigation Report (*see* Ex. C to Heintjes Cert. (ECF No. 13-1) (the "Supervisor's Report")), which provides information similar to the Accident Injury Form (together "the Injury Documents").

28. The Tort Claims Act "sets forth a procedural framework for making claims against public entities and public employees." *Geissler v. City of Atlantic City*, 198 F.Supp.3d 389, 400 (D.N.J. 2016) (citing N.J.S.A. 59:8-3). In failing to file a notice of tort claim, the plaintiff is "forever barred from recovering against a public entity or public employee if ... [t]he claimant failed to file the claim with the public entity within 90 days of the claim[.]" N.J.S.A. 59:8-8(a.); *see also White v. City of Vineland*, 500 F.Supp.3d 295, 309 (D.N.J. 2020) (Failure to "comply with the notice requirement" means that the plaintiff "cannot pursue [the] tort claims[.]"). "The notice provision" of the Tort Claims Act "applies to both intentional and non-intentional torts[.]" *Lassoff*, 414 F.Supp.2d at 490 (citations omitted). The lack of tort claim notice triggers dismissal with prejudice. *See Geissler*, 198 F.Supp.3d at 402, *see also Lassoff*, 414 F.Supp.2d at 489-490.

29. The Injury Documents appear to be the standard forms completed after an accident whether litigation ensues or not. Permitting the Injury Documents to serve as notice of a tort claim here does not "achieve[ ]" any of the public policy goals of N.J.S.A. 59:8-8 because it does not afford "the public entity time to review the claim and to promptly investigate the facts and prepare a defense[,]" does not provide the public entity and/or employee "an opportunity to settle meritorious claims before bringing suit[,]" does not "grant[ ] them an opportunity to correct the conditions which gave rise to the claim," and does not "allow[ ] them to inform the State in advance as to the expected liability." *Ewing v. Cumberland County*, 152 F.Supp.3d 269, 296 (D.N.J. 2015) (citations omitted). In the Opposition, Plaintiff counters that "[t]he information conveyed ... was sufficient to notify the State of its potential liability[,]" and that if the State Defendants "wanted more information," they "had every ability to investigate further[.]" Opp., at 28.

30. A notice of tort claim "must include: ... the name and post office address of the claimant;" the mailing address for "notices to be sent; ... the name or names of the public entity, employee or employees causing the injury," and "[t]he amount claimed as of the date of presentation of the claim[.]" N.J.S.A. 59:8-4(a.)-(b.), (e.)-(f.). The notice must also state "the date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted" and "provide a general description of the injury, damage or loss incurred so far as it may be known at the time of presentation of the claim." *Panarello v. City of Vineland*, 160 F.Supp.3d 734, 745 (D.N.J. 2016) (citations and internal brackets omitted). It is clear from the face of the Injury Documents that neither document provides the required information.

31. Plaintiff next argues that "[t]he doctrine of substantial compliance requires that Plaintiff's claims against the public entities and employees survive." Opp., at 24. A court "deciding a substantial compliance claim" must consider the following factors: (i) "the lack of prejudice to the defending party;" (ii) "a series of steps taken to comply with the statute involved;" (iii) "a general compliance with the purpose of the statute;" (iv) "a reasonable notice of petitioner's claim[;]" and (v) "a reasonable explanation why there was not a strict compliance with the statute." *H.C. Equities, LP v. County of Union*, 247 N.J. 366, 386 (2021) (citations omitted).

***7** 32. The Court finds that the doctrine of substantial compliance does not apply here. Rather than, for example, Plaintiff's counsel submitting a letter to the State Defendants to inform them of the allegations raised in the Complaint, and requesting that the State Defendants "preserve surveillance tapes[,]" and the alleging that Plaintiff and the State Defendants communicated in regards to this matter between the alleged assault and this litigation, the Injury Documents provide basic information related to Plaintiff's alleged injury, which is insufficient to put the State Defendants on notice "of an incident for which they could be liable and [did not] g[i]ve enough detail for them to begin investigations and to find the correctional officers who were involved."

*Ewing*, 152 F.Supp.3d at 296-98. While Plaintiff alleges that "[t]he only information that was not provided by Plaintiff" in the Injury Documents "was the estimated amount of his damages" (*see* Opp., at 23), the Injury Documents do not identify the "names of the public entity, employee or employees causing the injury" as required under N.J.S.A. 59:8-4(e). The Injury Documents also do not "specify the amount claimed" or "provide notice that" Plaintiff "intended to seek money damages[,]" and Plaintiff, relatedly, "also never sought permission for leave to file a late notice of claim[.]" *Martin v. U.S. Marshals*, 965 F.Supp.2d 502, 549 (D.N.J. 2013).

33. The face of the Accident Injury Form provides that the document "is designed to collect pertinent data to be used should an employee report a work-related injury or illness[,]" and does not state that this information serves as a notice of tort claim and/or provides the State Defendants with adequate notice of pending litigation. *See* Accident Injury Form, at p. 1. The Accident Injury Form also does not inform Plaintiff's supervisors and/or employer that this document will be used in a future litigation or will support claims against the State Defendants. *See, gen.,* the Accident Injury Form. The Supervisor's Report similarly does not provide the required notice of tort claim. *See, gen.*, the Supervisor's Report. Thus, the State Defendants will be prejudiced if the Injury Documents are allowed to substitute the required the notice of tort claim because in completing these documents, Plaintiff did not: (i) give the State Defendants time to prepare for the pending litigation; (ii) allow the State Defendants to communicate with Plaintiff regarding his allegations; (iii) provide for the preservation of likely discoverable information; and (iv) allow the State Defendants to attempt to resolve this matter without the need for motion practice.

34. Additionally, Plaintiff has not demonstrated that his counsel acted "unreasonably or delayed in providing [the required] information." *Ewing*, 152 F.Supp.3d at 298. Plaintiff also did not make an application with the Court for leave to file a "late notice of claim" demonstrating "sufficient reasons constituting extraordinary circumstances for his failure to file a notice of claim within the" required time. N.J.S.A. 59:8-9. Or, alternatively, "file a motion seeking leave to file a late notice of claim within a reasonable time thereafter[.]" *Ibid.*

35. Accordingly, the Court finds that the doctrine of substantial compliance does not apply because Plaintiff has not complied with the notice requirement, "failed to show that" he "took any steps to comply with the statute or that" he "generally complied with the purpose of the statute, and has not provided a reasonable explanation why there was not strict compliance." *May v. Borough of Pine Hill*, 755 F.Supp.2d 623, 630 (D.N.J. 2010). Further, Plaintiff's argument that his claim should survive because the claim accrued on April 24, 2019, has no merit "because Plaintiff[ ] never filed a notice of the claim as required[.]" Martin, 965 F.Supp.2d at 549.

36. And while the lack of notice of tort claim is sufficient to dismiss the State Tort Claims, the result would be the same as to the DOC, Northern State, and the Special Investigation Division because these entities are "immune" from the "intentional and willful wrongdoing of their employees[,]" *see* N.J.S.A. 59:2-10 (State entities are not "liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful conduct)"; N.J.S.A. 59-2(c) (Punitive damages may not be sought against State entities); N.J.S.A. 59:9-2(d) (Pain and suffering damages may not be sought against State entities).

***8** 37. Accordingly, the Motion is granted as to the State Tort Claims (Counts Seven to Eight, Ten to Thirteen, and Sixteen to Eighteen) and are dismissed with prejudice.

38. For all the foregoing reasons, it is hereby,

**ORDERED** that the State Defendants—State of New Jersey, the DOC, Northern State, the Special Investigation Division, Marcus Hicks, Victoria Kuhn, Jr., Matthew Schlusselfeld, and Duane Grade's Motion to Dismiss (ECF No. 7) the Complaint (ECF No. 1-1) is **GRANTED in part** and **DENIED in part**; it is further

**ORDERED** that the Motion to Dismiss is **GRANTED** as to Counts Four and Five and to the State Tort Claims (Counts Seven to Eight, Ten to Thirteen, and Sixteen to Eighteen) and are dismissed *with prejudice*; it is further

**ORDERED** that the Motion to Dismiss is denied as to Counts Six and Nine; it is further

**ORDERED** that this Memorandum Order neither addresses nor dismisses Counts One to Three or Counts Fourteen to Fifteen; it is further

**ORDERED** that the claims herein dismissed do not apply to the Non-Moving Defendants—Patrick Nogan, George Robinson, Jr., and Shawn Zambrano.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 5003891

## Footnotes

1 The State Defendants do not include Patrick Nogan, George Robinson, Jr., and Shawn Zambrano (the "Non-Moving Defendants").

2 The Court refers to the ECF page numbers at the top of the documents discussed herein.

3 The State Defendants did not move to dismiss Counts One to Three.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17667906
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

Nicholas D. PELLECCHIA, Plaintiff,
v.
COUNTY OF BURLINGTON, et al., Defendants.

Civil Action No. 22-4707 (CPO) (MJS)
|
Signed December 13, 2022

**Attorneys and Law Firms**

Nicholas D. Pellecchia, Mount Holly, NJ, Pro Se.

**OPINION**

O'HEARN, District Judge.

***1** Before the Court is Plaintiff's Complaint, raising claims pursuant to 42 U.S.C. § 1983. (ECF No. 1.) The Court attempted to screen the Complaint pursuant to 28 U.S.C. § 1915A to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from suit. For the following reasons, the Court finds that Plaintiff must address various deficiencies within the Complaint before the Court can complete its screening process. The Court will therefore dismiss the Complaint without prejudice and direct Plaintiff to submit a proposed amended complaint that addresses the issues discussed below.

### A. Standard of Review

District courts must review complaints in civil actions in which a plaintiff is proceeding *in forma pauperis. See* 28 U.S.C. § 1915(e)(2)(B). District courts may *sua sponte* dismiss any claim that is frivolous, is malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *See id.* According to the Supreme Court's decision in *Ashcroft v. Iqbal*, "a pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To survive *sua sponte* screening for failure to state a claim, the complaint must allege "sufficient factual matter" to show that the claim is facially plausible. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the [alleged] misconduct." *Iqbal*, 556 U.S. at 678. Moreover, while courts liberally construe *pro se* pleadings, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).

In addition to these pleading rules, a complaint must satisfy Federal Rule of Civil Procedure 8(a), which states that a complaint must contain:

> (a) A pleading that states a claim for relief must contain[:] (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

"Thus, a *pro se* plaintiff's well-pleaded complaint must recite factual allegations which are sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation, set forth in a 'short and plain' statement of a cause of action." *Johnson v. Koehler*, No. 18-00807, 2019 WL 1231679, at *3 (M.D. Pa. Mar. 15, 2019). Stated differently, Rule 8 requires a showing that the plaintiff is entitled to relief in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

### B. Request to Proceed as a Class Action

***2** As a preliminary matter, Plaintiff seeks to proceed with the Complaint as a class action. Under Federal Rule of Civil Procedure 23(a)(4), a plaintiff can only maintain a class action if the class representative "will fairly and adequately protect

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

the interests of the class." *Hennessey v. Atl. Cty. Dep't of Pub. Safety*, No. 06-143, 2006 WL 2711510, at *4 (D.N.J. Sept. 18, 2006). "When confronting a request for class certification from a *pro se* litigant, however, courts have found that *pro se* plaintiffs generally cannot represent and protect the interests of the class fairly and adequately." *Id.* (citing *Cahn v. U.S.*, 269 F. Supp. 2d 537, 547 (D.N.J. 2003)).

Here, Plaintiff is a *pro se* prisoner without formal training in the law. Thus, Plaintiff would not be able to represent the interests of the class and maintain this suit as a class action. *Id.* (citing *Krebs v. Rutgers*, 797 F. Supp. 1246, 1261 (D.N.J. 1992) (denying class certification to pro se plaintiffs without sufficient legal education)). Accordingly, the Court will deny Plaintiff's request to proceed as a class action. When preparing his proposed amended complaint, Plaintiff must remove any class allegations.

**C. Group Pleading**

Next, the Court finds that Plaintiff's Complaint fails to comply with Federal Rule of Civil Procedure 8. As discussed above, Rule 8 requires a complaint to be simple, concise, direct, and set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The primary flaw in the Complaint is that it often alleges that some or all of the Defendants acted in unison, without delineating the actions of each Defendant or explaining under what circumstances they acted or failed to act. (ECF No. 1, at 16–18.) Alternatively, the Complaint often contends that an unspecified individual or individuals committed a wrong, and then argues that some or all of the Defendants were somehow responsible. (*Id.* at 5–16, 16–18.) These types of allegations are known as improper group pleading. Mere "conclusory allegations against defendants as a group" that "fail[ ] to allege the personal involvement of any defendant" are insufficient to state a claim. *Galicki v. New Jersey*, No. 14-169, 2015 WL 3970297, at *2 (D.N.J. June 29, 2015). A plaintiff must allege facts that "establish each individual [d]efendant's liability for the misconduct alleged." *Id.* When a plaintiff names a number of defendants in a complaint, plaintiff cannot refer to all defendants "who occupied different positions and presumably had distinct roles in the alleged misconduct" without specifying "*which* defendants engaged in what wrongful conduct." *Falat v. County of Hunterdon*, No. 12-6804, 2013 WL 1163751, at *3 (D.N.J. Mar. 19, 2013) (emphasis in original). A complaint that contains "impermissibly vague group pleading" is subject to dismissal. *Id.*

In the present case, in each of its fifteen counts, Plaintiff's Complaint alleges that some or all of the Defendants are liable due to "paragraphs 26 through 73," which constitute nearly all of the factual allegations in the Complaint. (ECF No. 1, at 16–18.) As a result, Defendants would be unable to determine which paragraphs apply to any specific defendant. (*Id.* at 5–16.) Of course, the paragraphs that contain names are attributable, but many do not identify the defendant at issue. (*Id.*) Further, Plaintiff could easily believe, without clearly stating, that Defendants other than the named Defendant(s), are liable for the conduct in a particular paragraph. Consequently, Defendants would be unable to reliably decipher the true scope of Plaintiff's claims against any individual defendant.

***3** Accordingly, Plaintiff's Complaint fails to comply with Rule 8 as it fails to simply or directly allege what Plaintiff's claims are against each Defendant and fails to provide fair notice of the grounds on which he intends to rest his claims. Fed. R. Civ. P. 8. In other words, the Complaint "would not provide any meaningful opportunity for the Defendants to decipher or answer the vague allegations levied against them." *Koehler*, 2019 WL 1231679, at *3; *see Twombly*, 550 U.S. at 555. Accordingly, the Court will dismiss without prejudice Plaintiff's Complaint for failure to comply with Rule 8.

Additionally, Plaintiff may not have been aware, but each of his fifteen claims is a separate cause of action that requires him to allege different facts to state a claim. Plaintiff cannot rely *solely on legal conclusions*; the Complaint must allege "sufficient factual matter" to show that the claims are facially plausible. *See Fowler*, 578 F.3d at 210. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the [alleged] misconduct." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555) ("a pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' "). Plaintiff cannot simply allege that a defendant committed a dozen wrongs, *without explaining the factual circumstances underlying each claim*, *i.e.*, the who, what, when, where, and how, of each claim and as to each defendant.

For all those reasons, the Court will give Plaintiff an opportunity to submit a proposed amended complaint that cures the deficiencies discussed above. In particular, Plaintiff *must* include a separate section for each individual Defendant, detailing the specific factual allegations and legal claims

against that individual Defendant only. He must do this for each Defendant. In those individualized sections, he must also separate each legal claim and explain how that particular Defendant committed that alleged legal wrong. For example:

1. Defendant John Doe #1

   a. All factual allegations as to only John Doe #1.

   b. First legal allegation as to only John Doe #1.

   c. Second legal allegation as to only John Doe #1.

   d. Etc.

2. Defendant John Doe #2

   a. All factual allegations as to only John Doe #2.

   b. First legal allegation as to only John Doe #2.

   c. Second legal allegation as to only John Doe #2.

   d. Etc.

Additionally, Plaintiff must ensure that his proposed amended complaint does not contain group pleading allegations. If Plaintiff continues to include group pleading allegations, the Court will dismiss those allegations. Finally, the Court reminds Plaintiff that he cannot rely solely on legal conclusions; complaints must allege "sufficient factual matter" to show that the claims are facially plausible. *See Fowler*, 578 F.3d at 210. Plaintiff cannot allege that a defendant committed a particular wrong without adequately explaining the factual circumstances underlying each claim.

### D. Conclusion

For the reasons set forth above, the Court will dismiss without prejudice Plaintiff's Complaint for failure to comply with Rule 8. Additionally, the Court will deny Plaintiff's request to proceed as a class action. Finally, the Court will deny as moot Plaintiff's various requests for injunctive relief. (ECF No. 1, at 18–19.) Plaintiff shall have thirty days to file a proposed amended complaint in accordance with this Opinion. An appropriate Order follows.

### All Citations

Not Reported in Fed. Supp., 2022 WL 17667906

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 11593799
Only the Westlaw citation is currently available.
**Not for Publication**
United States District Court, D. New Jersey.

Kannaki RADHAKRISHNAN;
and Palani Karupaiyan, Plaintiffs,
v.
Elizabeth PUGLIESE; Marco Lopez; Jiminez
Leonel Lopez; and Daisy Lopez, Defendants.

Civil No. 20-220 (ES) (MAH)
|
Signed May 21, 2021

**Attorneys and Law Firms**

Kannaki Radhakrishnan, Pro Se.

Palani Karupaiyan, Philadelphia, PA, Pro Se.

Elizabeth Pugliese, Edison, NJ, Pro Se.

**ORDER**

Esther Salas, United States District Judge

***1** It appearing that:

1. Before the Court is an application to proceed *in forma pauperis* ("IFP") of *pro se* Plaintiffs Kannaki Radhakrishnan and Palani Karupaiyan. (D.E. Nos. 1-1 & 1-2). Plaintiffs bring this action against Defendants Elizabeth Pugliese, Marco Lopez, Jiminez Leonel Lopez, and Daisy Lopez. (D.E. No. 1 ("Compl.")).

2. 28 U.S.C. § 1915 ensures that "no citizen shall be denied an opportunity to commence, prosecute, or defend an action, civil or criminal, 'in any court of the United States' solely because his poverty makes it impossible for him to pay or secure the costs." *Adkins v. Dupont Co.*, 335 U.S. 331, 342 (1948). In order to proceed IFP, a litigant must show that he "cannot because of his poverty 'pay or give security for the costs * * * and still be able to provide' himself and dependents 'with the necessities of life.' " *Id.* at 339.

3. Based on Plaintiffs' IFP applications, made under penalty of perjury, the Court finds they cannot both pay the filing fee and still be able to provide themselves with the necessities of life. Accordingly, the Court **GRANTS** their application.

4. Having granted Plaintiffs' application, the Court will screen their Complaint under § 1915(e)(2)(B) before permitting service of process. *See Burrell v. Loungo*, 750 F. App'x 149, 154 (3d Cir. 2018). Specifically, the Court must *sua sponte* dismiss any claim that (i) is frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief. *See* § 1915(e)(2)(B)(i)–(iii). "When considering whether to dismiss a complaint for failure to state a claim pursuant § 1915(e)(2)(B)(ii), the District Court uses the same standard it employs under Fed. R. Civ. P. 12(b)(6)." *Vaughn v. Markey*, 813 F. App'x 832, 833 (3d Cir. 2020). To survive dismissal under Rule 12(b)(6), the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" are all disregarded. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)).

5. A complaint must also comply with Rule 8. Rule 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim[s] showing that the [plaintiff] is entitled to relief." Each allegation in the complaint "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). The Rule further requires that the complaint set forth the plaintiff's claims with enough specificity as to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). Thus, the complaint must contain "sufficient facts to put the proper defendants on notice so they can frame an answer" to the plaintiff's allegations. *See Dist. Council 47, Am. Fed'n of State, Cty. & Mun. Emps., AFL–CIO by Cronin v. Bradley*, 795 F.2d 310, 315 (3d Cir. 1986). Importantly, vague group pleadings "undermine[ ] the notice pleading regime of Rule 8." *Japhet v. Francis E. Parker Mem'l Home, Inc.*, No. 14-1206, 2014 WL 3809173, at *2 (D.N.J. July 31, 2014). Moreover, shotgun pleading

have been regularly criticized by the Third Circuit and fail to meet the pleading requirements of Rule 8. *See, e.g., Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 n.13 (3d Cir. 1988) (criticizing the "all too common shotgun pleading approach" to complaints). A shotgun pleading can arise in any of the following circumstances: (i) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts;" (ii) a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (iii) a complaint that does not separate "into a different count each cause of action or claim for relief;" or (iv) a complaint that "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015). Such pleadings impose on the Court and the defendants the onerous task of sifting out irrelevancies to determine which facts relate to which causes of action. *See id.* at 1323.

***2** 6. Here, Plaintiffs' Complaint does not meet the above standards. Plaintiffs assert nine causes of action against Defendants: (i) discrimination on the basis of race, color, and ethnicity; (ii) discrimination on the basis of national origin; (iii) discrimination on the basis of disability (iv) "damaging Health/assault/injuring the plaintiffs"; (v) "robbery/damaging/stealing property"; (vi) vandalism; (vii) unfair renting practices; (viii) retaliation; and (ix) "emotional distress/suffering." (Compl. ¶¶ 42–59). However, in support of each count, Plaintiffs do not specify which facts apply to which cause of action; instead, they merely incorporate by reference all of the previous 41 paragraphs in their Complaint. Nor do Plaintiffs specify whether certain causes of action apply only to certain of Defendants; instead, they assert all of the causes of action against all of Defendants, even though some causes of action clearly do not apply to all of them. Nor do Plaintiffs specify which source of law applies to which claim; in the beginning of the Complaint, they merely offer a laundry list of statutes, but later on, they do not specify which conduct and which of Defendants violated which statute. The Court therefore **DISMISSES** their Complaint as an impermissible shotgun pleading. The dismissal is without prejudice to Plaintiffs to replead. If Plaintiffs replead, they must clearly delineate which factual allegations relate to each claim, which claim is brought under which statute, and which of Defendants violated which statute.

Accordingly, it is on this 21st day of May 2021,

**ORDERED** that Plaintiffs' IFP application is **GRANTED**; and it is further

**ORDERED** that Plaintiffs' Complaint is **DISMISSED** without prejudice for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that the Clerk of Court shall **TERMINATE** docket entry 7; and it is further

**ORDERED** the Clerk of Court is directed to close this matter; and it is further

**ORDERED** that Plaintiffs may file an amended complaint within 30 days from the date of this order addressing the deficiencies outlined above.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 11593799

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4579884
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Jaquan REDDICK, Plaintiff,
v.
Marcus O. HICKS, et al., Defendants.

Civil Action No. 22-6926 (ZNQ) (RLS)
|
Signed July 18, 2023

**Attorneys and Law Firms**

Ryan J. Murphy, Gertner Murphy LLC, Jackson, NJ, for Plaintiff.

Dana Lynn Paolillo, NJ Office of the Attorney General, Trenton, NJ, for Defendants Marcus O. Hicks, New Jersey Department of Corrections.

Aqua Godwin Etuk, Office of County, Mercer County, County Counsel Office, Trenton, NJ, Paul Richard Adezio, County of Mercer, Trenton, NJ, for Defendants County of Mercer, Charles Ellis.

**OPINION**

QURAISHI, District Judge

***1** Plaintiff Jaquan Reddick, a former inmate of Mercer County Correctional Center ("MCCC") in Mercer County, New Jersey, is proceeding with a civil rights complaint pursuant to 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. §§ 10:6-1 to 10:6-2. (Compl., ECF No. 2-1.) Before the Court is Defendants New Jersey Department of Corrections ("NJDOC") and Marcus O. Hicks' (the "State Defendants") motion to dismiss. (Mot., ECF No. 6.) Defendants County of Mercer and Charles Ellis (the "County Defendants") join the motion in part. (*See* County Defs.' March 7, 2023 Letter, ECF No. 16; Mar. 8, 2023 Order, ECF No. 17.) Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b). For the reasons below, the Court will: (1) grant the Motion in part as to the State Defendants' argument that the NJDOC and Defendant Hicks in his official capacity are not "persons" subject to liability within the meaning of Section 1983 and the NJCRA and as to the County Defendants' argument that the Complaint engages in improper "group pleading"; (2) deny the Motion in part without prejudice as to Defendants' remaining arguments; (3) dismiss with prejudice the claims against Defendants NJDOC and Defendant Hicks in his official capacity; and (4) dismiss without prejudice the remainder of the Complaint.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case arises from Plaintiff's contraction of COVID-19 while incarcerated at the MCCC in May 2020. (Compl. ¶¶ 11–12.) Plaintiff names the County of Mercer, MCCC, Mercer County Sheriff's Office, New Jersey Department of Corrections, Charles Ellis, John Kemler, Marcus Hicks, and several unspecified individuals and corporations as defendants. (*Id.* at 1.)

According to Plaintiff, the Defendants, collectively, failed to follow proper COVID-19 protocols and CDC guidance regarding COVID-19, failed to develop, implement, and/or enforce policies and procedures to prevent the spread of COVID-19, and failed to properly train and/or supervise guards, staff, and/or other employees in the proper procedures to prevent the spread of COVID-19. (*Id.* ¶¶ 15–16, 23, 25.) Moreover, Plaintiff contends that the Defendants failed to provide adequate medical attention and/or treatment to Plaintiff, failed to properly train and/or supervise guards, staff, and/or other employees to provide proper medical attention and/or treatment to individuals infected with COVID-19, and failed to implement and/or enforce policies and procedures to provide adequate medical attention and/or treatment to Plaintiff and other inmates who contracted COVID-19. (*Id.* ¶¶ 22–24.)

Plaintiff initiated this matter in state court on April 29, 2022 by filing a complaint in the Superior Court of New Jersey, Mercer County. (*See* Compl.) The complaint asserts a single count alleging that the Defendants violated Plaintiff's rights to due process, equal protection, to be free from cruel and unusual punishment, and other rights, privileges, and immunities secured by the Constitution of the United States, the New Jersey State Constitution, the New Jersey Civil Rights Act, and/or the laws of the State of New Jersey. (*Id.* ¶¶ 38–43.) On July 22, 2022, the Superior Court dismissed Defendants MCCC, Mercer County Sheriff's Office, and John Kemler from the matter. (ECF No. 2-7.)

***2** On December 1, 2022, the Defendants removed the matter to this Court. (Notice of Removal, ECF No. 1.) Thereafter, the State Defendants filed the instant motion to

dismiss on December 29, 2022. (*See* Mot.) On March 8, 2023, the County Defendants joined part of the motion. (*See* County Defs.' March 7, 2023 Letter.) Plaintiff submitted a brief in opposition on May 26, 2023. (Pl.'s Opp'n, ECF No. 28.) The State and County Defendants submitted a reply brief on June 8th and 9th, 2023, respectively. (Defs.' Reply Brs., ECF Nos. 29–30.)

**II. LEGAL STANDARD**

In deciding a motion to dismiss, a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a ... motion to dismiss does not need detailed factual allegations ...." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 560 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.' " *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**III. DISCUSSION**

In the Motion, the State Defendants contend that: (i) the Court should dismiss the Complaint because it fails to plead sufficient facts to show that the State Defendants are responsible for the MCCC or Mercer County employees; (ii) the State Defendants are not subject to liability under Section 1983 or the NJCRA;[1] (iii) the Complaint otherwise fails to plead sufficient facts to state a claim against them; and (iv) Plaintiff's claim for damages should be dismissed because they are entitled to qualified immunity. (*See* Mot.) The County Defendants join the motion as to Points III and IV. (*See* County Defs.' March 7, 2023 Letter; County Defs.' Reply Br. 4, ECF No. 30.) Moreover, the County Defendants further argue that the Complaint utilizes improper "group pleading." (*See* County Defs.' Reply Br. 4–6.)

**A. Whether the State Defendants are Persons Within the Meaning of Section 1983 and the NJCRA**

***3** As an initial matter, the Court first addresses the State Defendants' argument that they are not subject to liability under Section 1983 or the NJCRA. Specifically, the State Defendants contend that the NJDOC and Defendant Hicks in his official capacity are not "persons" within the meaning of Section 1983 or the NJCRA.

Section 1983 imposes liability on "[e]very *person* who, under color of [State law] ... subjects ... any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights ... secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). To be liable under Section 1983, therefore, a defendant must be a "person" within the meaning of the statute. *See id.* It is well-established that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Likewise, the NJCRA "premise[s] liability on the conduct of a 'person.' " *Estate of Lagano v. Bergen County Prosecutor's Office*, 769 F.3d 850, 856 (3d Cir. 2014) (quoting *Lopez-Siguenza v. Roddy*, No. 13-2005, 2014 WL 1298300, at *7 (D.N.J. Mar. 31, 2014)). Accordingly, "New Jersey district courts have interpreted the NJCRA as having incorporated the Supreme Court's decision in *Will* that, for purposes of § 1983, states and state officials acting in their official

capacity are not amenable to suit." *Id.*; *see Didiano v. Balicki*, 488 F. App'x 634, 638 (3d Cir. 2012) (affirming district court order granting summary judgment on plaintiff's NJCRA claims against the State and state officials acting in their official capacity because the New Jersey Code's definition of "person" does not include the State or defendants which are the functional equivalent of the State).

Here, the Complaint asserts Section 1983 and NJCRA claims against the NJDOC and Defendant Hicks in his official capacity. As those parties are arms of the State or the functional equivalent of the State, they are not "persons" within the meaning of Section 1983 or the NJCRA, and the Court dismisses those claims against them with prejudice.

**B. Whether the Complaint Utilizes Improper "Group Pleading"**

Next, the Court addresses the argument that the Complaint utilizes improper "group pleading."

Rule 8 of the Federal Rules of Civil Procedure requires that a pleading must contain a short and plain statement showing that the plaintiff is entitled to relief. *See Travaline v. U.S. Supreme Court*, 424 F. App'x 78, 79 (3d Cir. 2011). The Third Circuit has explained that, in determining whether a pleading meets Rule 8's "plain statement" requirement, the Court should "ask whether, liberally construed, a pleading 'identifies discrete defendants and the actions taken by these defendants' in regard to the plaintiff's claims." *Garrett v. Wexford Health*, 938 F.3d 69, 93 (3d Cir. 2019) (citation omitted).

In this regard, the Court has consistently held that "a complaint may not indiscriminately attribute wrongdoing to a group of defendants, leaving [the defendants] to guess as to who allegedly did what[.]" *Yu-Chin Chang v. Upright Fin. Corp.*, No. 19-18414, 2020 WL 473649, at *3 (D.N.J. Jan. 28, 2020) (collecting cases). Thus, when a plaintiff names numerous defendants in a complaint, a plaintiff cannot refer to all defendants "who occupied different positions and presumably had distinct roles in the alleged misconduct" without specifying "*which* defendants engaged in what wrongful conduct." *Falat v. County of Hunterdon*, No. 12-6804, 2013 WL 1163751, at *3 (D.N.J. Mar. 19, 2013) (emphasis in original).

***4** Here, the Complaint asserts due process, equal protection, and cruel and unusual punishment claims arising from distinct alleged acts – failure to provide adequate medical care, failure to train, failure to implement adequate policies – against a variety of defendants without identifying the discrete acts of each defendant. Rather, the Complaint lumps together all the allegations against unspecified corporations, John/Jane Doe defendants, the former commissioner of the NJDOC, the Warden of the MCCC, and Mercer County, leaving the Defendants and the Court to "guess as to who allegedly did what." *Yu-Chin Chang*, 2020 WL 473649, at *3. Accordingly, the Court dismisses without prejudice the remainder of the Complaint in its entirety for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.

**C. Defendants' Remaining Arguments**

Having dismissed the entirety of the Complaint for the reasons stated above, the Court need not address Defendants' remaining arguments at this time. Accordingly, the Court denies the remainder of Defendants' motion without prejudice as moot.

**IV. CONCLUSION**

For the reasons above, the Court will: (1) grant the Motion in part as to the State Defendants' argument that the NJDOC and Defendant Hicks in his official capacity are not "persons" subject to liability within the meaning of Section 1983 and the NJCRA and as to the County Defendants' argument that the Complaint engages in improper "group pleading"; (2) deny the Motion in part without prejudice as to Defendants' remaining arguments; (3) dismiss with prejudice the claims against Defendants NJDOC and Defendant Hicks in his official capacity for failure to state a claim for relief; and (4) dismiss without prejudice the remainder of the Complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. An appropriate order follows.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4579884

## Footnotes

1 Although the title of this argument contends that Plaintiff fails to plead sufficient facts to establish the State Defendants' personal involvement, the Court construes the substance of the argument to contend that the State Defendants are not subject to liability under Section 1983 or the NJCRA.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2838603
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
M.D. Pennsylvania.

Orlando Cortes RIVERA, Plaintiff,
v.
Franklin J. TENNIS, et al., Defendants.

Civil Action No. 1:09–0888.
|
May 20, 2010.

**Attorneys and Law Firms**

Orlando Cortes Rivera, Bellefonte, PA, pro se.

***REPORT AND RECOMMENDATION*** [1]

MALACHY E. MANNION, United States Magistrate Judge.

***1** Pending before the court are five separate motions to dismiss. The first motion is on behalf of defendants Burke, Zelznick and Ishler, employees of the Pennsylvania Board of Probation and Parole ("Parole Defendants"). (Doc. No. *88* ). The second motion is on behalf of defendant Symons. (Doc. No. *99* ). The third motion is on behalf of defendants Tennis, Eaton, Dale, Vance, Wagner, Foose, Williams, Italia, Kotzur, Myers, Boone, Koehle, Oliver, Rocca and Kuhn ("Corrections Defendants"). (Doc. No. *101* ). The fourth motion is on behalf of defendant Sucigell, (Doc. No. *209* ), and the fifth motion is on behalf of defendants Thompson, Senko and Pensiero, (Doc. No. *213* ). For the reasons set forth below, the court will recommend that defendants Symons, Sucigell, Thompson, Senko, Pensiero and the Parole Defendants' motions be **GRANTED,** and that the Corrections Defendants motion be **GRANTED** in part and **DENIED** in part.

**I. FACTS AND PROCEDURAL BACKGROUND**

Plaintiff Orlando Cortes Rivera is an inmate presently confined at the State Correctional Institution at Rockview in Bellefonte, Pennsylvania ("SCI–Rockview"). (Doc. No. *74* at 4). On April 27, 2008, during his incarceration at SCI–Rockview, plaintiff alleges he was beaten up by two other inmates, and as a result he sustained injuries [2]. *Id.* More specifically, plaintiff alleges that (1) defendant Wagner gave false information to inmates that he was a snitch for the Department of Corrections which resulted in the alleged beating [3], (2) defendant Eaton failed to protect him from the beating by the inmates [4], and that (3) he was allegedly locked up by defendant Dale, after the incident, because he could not recall what happened to him. *Id.* at 12.

Moreover, plaintiff primarily complains that he did not receive proper medical care for his injuries following the incident, that the medical records relating to the incident were fabricated, and that he was verbally harassed by the medical staff at SCI–Rockview. *Id.* at 4.

In addition, plaintiff appears to allege that his mail has been tampered with by the staff at SCI–Rockview. More specifically, plaintiff alleges that defendant Vance told him that his legal mail could be opened because he was not a lawyer and as such, he has no rights. *Id.* at 12. Plaintiff also alleges that defendant Vance covers up the illegal activities relating to his mail as well as defendant Eaton's unlawful activities. *Id.*

Based on the foregoing allegations, plaintiff commenced this action by filing a complaint on May 11, 2009. (Doc. No. *1* ). On June 3, 2009, this court ordered plaintiff to file an amended complaint, and, as such, plaintiff filed his first amended complaint on June 17, 2009. (Doc. No. *18;* Doc. No. *22* ).

On July 24, 2009, the Corrections Defendants filed a motion for a more definite statement of the claims set forth in plaintiff's first amended complaint. (Doc. No. *44* ). On July 31, 2009, this court granted the Corrections Defendants' motion because a review of the first amended complaint confirmed the defendants' allegations that the first amended complaint did not comply with the requirements of Rules 8–10, nor with the court's prior order of June 3, 2009. (Doc. No. *48* ). Within that order, the court included detailed instructions to aid the plaintiff in filing a final acceptable amended complaint. *Id.* Furthermore, within these instructions, the court directed plaintiff that the "amended complaint shall be complete, in and of itself, *without reference* to any prior filings." *Id.* at ¶ 2. After having been granted an extension of time, plaintiff filed his second amended complaint on August 26, 2009. (Doc. No. *74* ). [5]

***2** In the second amended complaint, plaintiff alleges violations of his Eighth Amendment rights, namely denial of medical care and cruel and unusual punishment; his Fourteenth Amendment rights, namely due process violations; and finally, a false imprisonment claim. (Doc. No. *74* ). By way of relief, plaintiff seeks an unspecified amount of monetary damages and both injunctive and declaratory relief. *Id.*

All defendants have filed motions to dismiss accompanied by briefs in support. (Doc. No.'s *88, 89, 99, 101, 119, 123, 208, 209, 213* & *214* ). As of the date of this report, plaintiff has only filed a brief in opposition to the Parole Defendants' motion. (Doc. No. *93,* Doc. No. *98* ). In accordance with Local Rule 7.6, the remainder of the motions are deemed unopposed. They will, however, be given a merits review in accordance with *Stackhouse v. Mazurkiewicz, 951 F.2d 29 (3d Cir.1991)*, as plaintiff is proceeding *pro se.*

## II. STANDARDS

### A. Rule 12(b)(6) Standard of Review

The defendants' motions to dismiss are brought pursuant to the provisions of *Fed.R.Civ.P. 12(b)(6).* This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, *Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005)*, and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)* (abrogating "no set of facts" language found in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." *Twombly, 550 U.S. 544, 127 S.Ct. at 1965, 167 L.Ed.2d 929.* This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. *Id.* Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir.2008)* (brackets and quotations marks omitted) (quoting *Twombly,* 550 U.S. 544, 127 S.Ct. at 1964–65, 167 L.Ed.2d 929).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick, 502 F.3d 263 (3d Cir.2007)*. The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1993)*. Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir.2002)*. However, the court may not rely on other parts of the record in determining a motion to dismiss. *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994)*.

### B. Standard of Review of Substantive Law Under 42 U.S.C. § 1983

***3** Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Section 1983 creates no substantive rights, but rather allows a plaintiff to vindicate violations of rights created by the United States Constitution or federal law. *Baker v. McCollan, 443 U.S. 137, 145 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir.2006)*.

**III. LEGAL ANALYSIS**

The defendants have set forth various arguments as to why they should generally be dismissed from this action. The court will consider these arguments below.

**A. Official Capacity Claims**

Federal courts cannot consider suits by private parties against states and their agencies unless the state has consented to the filing of such a suit. *Atascadero State Hospital v. Scanlon, 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); Edelman v. Jordan, 415 U.S. 651, 662, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)*. This immunity extends to suits asserting civil rights violations where the state is named as a defendant. *Laskaris v. Thornburgh, 661 F.2d 23, 26 (3d Cir.1981)*. “Under the Eleventh Amendment, a plaintiff other than the United States or a state may not sue a state in federal court without the latter state's consent unless Congress abrogates the state's Eleventh Amendment immunity pursuant to a constitutional provision granting Congress that power.” *Chittister v. Dep't of Cmty. & Econ. Dev., 226 F.3d 223, 226 (3d Cir.2000)*. The Commonwealth of Pennsylvania has not waived its rights under the Eleventh Amendment. “By statute Pennsylvania has specifically withheld consent [to be sued].” *Laskaris, 661 F.2d at 25* (citing PA. CONS.STAT. ANN. § 8521(b)). Section 1983 does not “abrogate the Eleventh Amendment immunity of the States.” *Quern v. Jordan, 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); Galvani v. Pennsylvania,* No. 08–0393, 2008 U.S. Dist. LEXIS 89150, at *16 (M.D.Pa. Nov. 4, 2008).

Furthermore, an essential element of any claim under § 1983 is that the alleged wrongdoing was committed by a “person.” *42 U.S .C. § 1983*. “[N]either a State nor its officials acting in their official capacities are ‘persons' under § 1983.” *Will v. Michigan Dep't. of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)*.

***4** Consequently, to the extent plaintiff brings claims against the defendants in their official capacities for monetary damages, the court recommends that the complaint be dismissed. *See Melo v. Hafer, 912 F.2d 628, 635 (3d Cir.1990)* (Eleventh Amendment bars suits for monetary damages by private parties in federal court against a state, stage agencies, or state officials in their official capacities because the state is the real party in interest inasmuch as the plaintiff seeks recovery from the state treasury) (citations omitted).

**B. Compliance with Rule 10(b)**

Defendants Thompson, Pensiero, Senko, Symons and the Corrections Defendants argue that plaintiff's second amended complaint should be dismissed because it fails to comply with the Federal Rules of Civil Procedure, specifically Rule 10(b), [6] as well as this court's prior order dated July 31, 2009, (Doc. No. *48* ). More specifically, defendants argue:

> “The averments in the Second Amended Complaint are not short, concise, and direct ... The averments consist largely of phrases and incomplete sentences, and they are presented in narrative form with minimal organization and coherence.
>
> Rivera's Second Amended Complaint makes it virtually impossible to frame an answer to it, and he has been given ample opportunity and sufficient instructions to file this initial pleading. *See* Documents No. 18, 48. Accordingly, the Second Amended Complaint should be dismissed with prejudice.”

(Doc. No. *119* at 5).

In an action brought pursuant to *42 U.S.C. § 1983* case, a plaintiff need only satisfy the liberal notice pleading requirement of Rule 8. *Washington v. Grace,* No. 08–3034, 2009 U.S.App. LEXIS 25906, at *4 (3d Cir. Nov. 25, 2009) (citing *Abbott v. Latshaw, 164 F.3d 141, 149 (3d Cir.1998)*. Rule 8(a) requires a short and plain statement setting forth: (1) the grounds upon which the court's jurisdiction rests; (2) the claim(s) showing that the pleader is entitled to relief; and (3) a demand for judgment for the relief sought by the pleader. See *Fed.R.Civ.P. 8, Washington,* 2009 U.S.App. LEXIS 25906, at *4 (citations omitted). Courts are to construe complaints so “as to do substantial justice,” *Fed.R.Civ.P. 8(e),* keeping in mind that *pro se* complaints in particular should be construed liberally. *See Washington,* 2009 U.S.App. LEXIS 25906, at *4 (citing *Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir.2003))*.

Although the court agrees with defendants, and finds that the second amended complaint may not be clear in all respects, the court does not find that it is wholly unintelligible. Moreover, the argument that the complaint be dismissed

because it fails to comply with *Fed.R.Civ.P. 10(b)* is insufficient. *See Washington,* 2009 U.S.App. LEXIS 25906, at *4. Given plaintiff's *pro se* status, and the fact that the court finds the second amended complaint meets the minimal notice pleading requirements under Rule 8, the court declines to recommend dismissing plaintiff's second amended complaint for failure to comply with Rule 10(b) or this court's order dated July 31, 2009.

**C. Lack of Personal Involvement**

1. Defendants Sucigell, Italia, Kotzur, Myers, Koehle, Oliver, Rocca and Kuhn

***5** Defendants Sucigell, Italia, Kotzur, Myers, Koehle, Oliver, Rocca and Kuhn, seek dismissal of the complaint against them on the grounds that plaintiff has not set forth any personal allegations of wrongdoing, and therefore, defendants could not have violated plaintiff's constitutional rights. The court agrees. A viable section 1983 claim requires allegations of personal involvement on the part of defendants. *See Rhode, 845 F.2d at 1207*. As plaintiff has failed to set forth any allegations of personal involvement on the part of defendants Sucigell, Italia, Kotzur, Myers, Koehle, Oliver, Rocca and Kuhn, the court recommends that these defendants be dismissed from the action.

2. Defendant Tennis

Defendant Tennis seeks that the complaint be dismissed against him because the allegations in the complaint fail to establish that he was personally involved in the alleged violations of plaintiff's constitutional rights. The court agrees. Plaintiff's allegations, with respect to defendant Tennis, are that he requested, via written correspondence or grievances, that defendant Tennis speak to the staff at SCI Rockview about the violations of his constitutional rights, and that defendant Tennis failed to do so. As such, it appears plaintiff really takes issue with the unfavorable responses that he received from defendant Tennis with respect to his written correspondence. Thus, the allegations in the complaint really indicate defendant Tennis' lack of action or personal involvement, and not that defendant Tennis was personally involved in the alleged violations of plaintiff's constitutional rights. Consequently, the court recommends that defendant Tennis be dismissed from this action. *See Brooks v. Beard, 167 Fed. Appx. 923, 925 (3d Cir.2006) (holding* that a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to a prison grievance, did not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct); *Alexander v. Fritch,* No. 07–1732, 2010 U.S. Dist. LEXIS 28905, at *46 (W.D.Pa. Mar. 26, 2010) ("Plaintiff cannot impose liability against any of the Defendants based solely on his or her involvement with his correspondence, grievances and misconducts as such conduct is insufficient to establish personal involvement as required under *42 U.S.C. § 1983."* ).

3. Defendant Williams

Defendant Williams also seeks that the complaint be dismissed against him because the allegations in the complaint do not indicate that he violated plaintiff's constitutional rights. The court agrees. In the complaint, plaintiff alleges that defendant Williams (1) failed to answer his written requests for medical care, and (2) responded unfavorably to his grievances, *i.e.* he ignored the violations of his constitutional rights. These allegations do not show the requisite personal involvement on the part of defendant Williams to give rise to § 1983 liability. *See Brooks, 167 Fed. Appx. at 925; Alexander,* 2010 U.S. Dist. LEXIS 28905, at *46. Consequently, the court recommends that defendant Williams be dismissed from this action.

**D. Eighth Amendment Claims**

***6** Plaintiff claims he was denied proper medical care in violation of the Eighth and Fourteenth Amendments. However, a prisoner's claim for deliberate indifference to a serious medical need is scrutinized under the Eighth Amendment. *See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)*. In order to establish an Eighth Amendment claim based upon allegations of denial of proper medical care, an inmate must demonstrate a deliberate indifference to a serious medical need. *Id.* This standard requires both deliberate indifference on the part of the prison officials and a serious medical need on the part of the prisoner. *See West v. Keve, 571 F.2d 158 (3d Cir.1978)*.

A deliberate action is one which is intentional, requiring the actor to have knowledge of the events attributed to the injury and the ability to control the outcome. "To establish a constitutional violation, the indifference must be deliberate and the actions intentional." *Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3d Cir.1976)*. A mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives, does not support an Eighth Amendment claim. *Farmer v. Carlson, 685 F.Supp. 1335, 1339 (M.D.Pa.1988)*.

*See McCracken v. Jones, 562 F.2d 22, 24 (10th Cir.1977); Smart v. Villar, 547 F.2d 112, 113 (10th Cir.1976)*. A medical need is "serious" where it has been diagnosed by a physician as mandating treatment, or if it is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1 st Cir.1990), cert. denied, 500 U.S. 956, 111 S.Ct. 2266, 114 L.Ed.2d 718 (U.S.Mass. June 3, 1991)* (No. 90–7632) (citing *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326 (3d Cir.1987)).

Further, where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, the federal courts are generally reluctant to second guess medical judgment and to constitutional ize claims which sound in state tort law. *See Ellison v. Scheipe, 570 F.Supp. 1361, 1363 (E.D.Pa.1983); Inmates of Allegheny Jail v. Pierce, 612 F.2d 754,762 (3d Cir.1979); See also Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir.1976)*. The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desired. *Farmer, 685 F.Supp. at 1339*.

The Parole Defendants and defendants Foose, Symons, Pensiero, Thompson and Senko argue that the complaint should be dismissed against them because plaintiff has failed to allege facts that indicate they acted with deliberate indifference. For the reasons set forth below, the court agrees. The court further notes that even if the plaintiff had alleged facts that would support a finding of deliberate indifference, the court will still recommend these defendants be dismissed from this action because plaintiff has failed to identify any serious medical need. As such, his failure to identify his serious medical need provides an alternative reason for recommending plaintiff's Eighth Amendment claims be dismissed. *See West, 571 F.2d 158*.

1. Defendant Foose

***7** Defendant Foose is a registered nurse supervisor at SCI–Rockview. The only allegations that plaintiff has made with respect to defendant Foose are for the denial of medical care, deliberate indifference to a need, threats, lies to cover up medically incorrect actions, and false co-pay charges for no medical care. Defendant Foose argues that these allegations do not amount to deliberate indifference, and therefore plaintiff's Eighth Amendment claims against her should be dismissed. The court agrees.

The court finds that plaintiff's allegations with respect to defendant Foose are simply labels, conclusions, and formulaic recitations of the elements of a cause of action for an Eighth Amendment denial of medical care claim, which is insufficient to withstand a motion to dismiss. *See Phillips v. County of Allegheny, 515 F.3d at* 231) (quoting *Twombly,* 127 S.Ct. at 1964–65). *See also Estelle,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (to prevail on an Eighth Amendment claim based upon allegations of *denial of proper medical care,* an inmate must demonstrate a *deliberate indifference to a serious medical need* ) (emphasis added). Plaintiff's allegations are merely a list of short phrases which do not indicate how defendant Foose was personally involved in the denial of his request for medical assistance. Moreover, plaintiff also fails to allege that he had a serious medical need [7], or that defendant Foose even knew that plaintiff had a serious medical need.

In addition, to the extent plaintiff may have intended that the court find the alleged threats, false co-pay charges and lies to cover up medically incorrect actions, demonstrate deliberate indifference, this fares no better for plaintiff. With respect to the alleged "threats," the court construes this allegation as a conclusion because plaintiff does not state what the alleged threats were or when they were made. In addition, plaintiff does not allege how or if these alleged threats impacted his medical care. As such, this allegation cannot withstand a motion to dismiss, and moreover, threats alone do not amount to a constitutional violation of an inmate's rights. *See Phillips v. County of Allegheny, 515 F.3d at 231) (quoting Twombly, 127 S.Ct. at 1964–65). See Maclean v. Secor, 876 F.Supp. 695, 698–99 (E.D.Pa.1995) (noting* it is well established that verbal harassment or threats do not state a constitutional claim) (collecting cases). With respect to the alleged false co-pay charges, this too, does not amount to a denial of medical care in violation of plaintiff's Eighth Amendment rights. The Third Circuit has held that co-pay policies requiring inmates to pay for medical services do not violate the Eighth Amendment as long as they do not interfere or impede with the timely and effective treatment of serious medical needs. *See Reynolds v. Wagner, 128 F.3d 166, 173–82 (3d Cir.1997)*. Here, plaintiff has not alleged that he was denied medical treatment because he could not afford to pay for medical services, rather it appears he alleges he was unfairly charged when he did not receive medical care, or the medical care he desired. *See Duran v. Merline,* No. 07–3589, 2008 U.S. Dist. LEXIS 18973, at *23–24 (D.N.J. Mar. 11, 2008). Finally, to the extent plaintiff takes issue with the defendant's alleged lies to cover up "medically incorrect action [8]," this too, does not support a

finding of deliberate indifference. Plaintiff fails to state what the lies or medically incorrect actions were, and how this impacted his medical care. Furthermore, the court construes this allegation as plaintiff alleging that defendant Foose filed false medical reports, and/or that he disagreed with her course of treatment. Regardless, either of these theories does not establish a denial of medical care claim in violation of the Eighth Amendment. *See Moore v. Casselberry, 584 F.Supp.2d 580, 582 (S.D.N.Y.2008)* (the conclusory statement that the defendant nurse filed of an incomplete or false medical report does not state a federal constitutional violation) (collecting cases). *See also Farmer, 685 F.Supp. at 1339* (a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives, does not support an Eighth Amendment claim). Thus, none of plaintiff's allegations indicate defendant Foose knew of plaintiff's serious medical need and refused to provide him with medical care, delayed treatment for a non-medical reason, or prevented him from receiving needed medical care. *See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir.1999)*.

***8** Consequently, the court recommends that defendant Foose be dismissed from this action.

2. Defendant Symons

Plaintiff alleges that defendant Symons denied him medical care, showed deliberate indifference to a medical need, lied, fabricated records, gave false information to specialists, provided the wrong x-rays to fabricate false reports to the court, engaged in cruel punishment, interfered with medical orders, and plotted with the Parole Defendants to make him sign illegal documents. Plaintiff fails to provide any additional factual support for these "bare bones" allegations and clear conclusory statements. *See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir.2009) (conclusory* or "bare-bones" allegations are not sufficient to survive a motion to dismiss).

First, the court finds that plaintiff's allegations that defendant Symons denied him medical care, showed deliberate indifference to a medical need, interfered with medical orders, and engaged in cruel punishment, are merely assertions that amount to labels, conclusions and formulaic recitations of the elements of an Eighth Amendment claim. *See* U.S. Const. amend. VIII. *See also Estelle, 429 U.S. at 104–05* (for plaintiff to establish an Eighth Amendment violation, he must establish that defendants acted with *deliberate* indifference to his serious medical need, and deliberate indifference may be established if plaintiff shows that a prison official intentionally interfered with the treatment once prescribed) (emphasis added). As such, these statements which simply recite the elements of an Eighth Amendment claim are insufficient to survive a motion to dismiss. See *Ashcroft v. Iqbal, ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)* (internal citations omitted). Second, with respect to the alleged lies and fabrications on the part of defendant Symons, these too, do not amount to a constitutional violation. Moreover, plaintiff's scant allegations with respect to the alleged fabrications cannot support a finding of deliberate indifference. See *Moore v. Casselberry, 584 F.Supp.2d 580, 582 (S.D.N.Y.2008)*. Plaintiff has failed to state what the fabricated statements or reports were, and how, if at all, the alleged fabrications impacted his medical treatment. Likewise, to the extent plaintiff may be alleging the falsification of records, these allegations without further factual support, also do not support a finding of deliberate indifference. *See Oliver v. Haddock,* No. 08–4608, 2009 U.S. Dist. LEXIS 112126, at *16 (S.D.N.Y. Dec. 3, 2009) (finding the allegedly false entry in plaintiff's medical record was insufficient to show the defendant acted with deliberate indifference to plaintiff's medical needs). Third, to the extent plaintiff alleges that defendant Symons plotted with the Parole Defendants to make him sign illegal documents, the court, again, cannot find that this allegation supports a finding of deliberate indifference. Plaintiff fails to state what the alleged illegal documents were, when he signed them, and how, if at all, these documents impacted his medical care. Finally, assuming *arguendo* that plaintiff did establish deliberate indifference on the part of defendant Symons, the court would still recommend plaintiff's Eighth Amendment claim be dismissed because plaintiff alleges deliberate indifference to a medical need, and *not* a serious medical need.[9] *See Estelle, 429 U.S. at 104–05*.

3. Defendants Thompson, Senko and Pensiero

***9** Plaintiff states that defendants Thompson, Senko and Pensiero are all employees, in the medical department, at SCI–Rockview.

With respect to defendant Senko, besides indicating that she was a physician's assistant at SCI–Rockview, plaintiff has failed to set forth any personal allegations of wrong doing against her. As such, defendant Senko must be dismissed from this action. *See Rhode, 845 F.2d at 1207*.

With respect to defendant Pensiero, the plaintiff alleges that she verbally harassed and threatened him. Plaintiff fails to state how the alleged threats and verbal harassment impacted his medical care, if at all. As such, the court cannot find that plaintiff's allegations support a finding that defendant Pensiero violated plaintiff's Eighth Amendment rights. Moreover, verbal harassment and threats do not amount to a constitutional violation. *See Maclean v. Secor, 876 F.Supp. 695, 698–99 (E.D.Pa.1995)* (noting it is well established that verbal harassment or threats do not state a constitutional claim) (collecting cases).

With respect to defendant Thompson, plaintiff alleges he repeatedly took him off antibiotics which he should not have done, gave the wrong x-rays to a neurologist to cover up plaintiff's injuries, and both threatened and verbally harassed him. First, to the extent plaintiff complains that defendant Thompson stopped medications, this appears to be a disagreement as to the course of treatment, which does not amount to a violation of plaintiff's Eighth Amendment rights. *See Farmer, 685 F.Supp. at 1339* (the key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desired). Moreover, plaintiff has attached to his complaint an inmate grievance response that states plaintiff has been treated appropriately by defendant Thompson, and that he was appropriately prescribing antibiotics, but that plaintiff continues to challenge his decisions. Second, with respect to defendant Thompson giving incorrect x-rays to a neurologist to cover up plaintiff's injuries, the court cannot find this statement supports a finding of deliberate indifference. Plaintiff has failed to provide any additional factual support for this allegation. For instance, he does not state which x-rays were supposed to be given to the neurologist, what the wrong x-rays depicted, how the alleged wrong x-rays impacted his medical care or that he was denied medical care as a result. Finally, to the extent plaintiff alleges he was threatened or verbally harassed by defendant Thompson, as explained above, this alone, does not support a finding of deliberate indifference, nor does it give rise to a constitutional violation. *See Maclean, 876 F.Supp. at 698–99*.

Consequently, the court recommends that defendants Thompson, Senko and Pensiero be dismissed from this action. [10]

4. Parole Defendants

The Parole Defendants argue they should be dismissed from this action because (1) plaintiff has failed to allege facts sufficient to support a claim of deliberate indifference against them, and (2) the amended complaint does not contain anything that can support the conclusion that any employee of the Pennsylvania Board of Probation and Parole has or had any responsibilities regarding medical care in a state correctional institution or the ability to control or influence medical care provided to inmates. The court agrees. A review of the complaint indicates that plaintiff has failed to make any allegations with respect to the Parole Defendants and deliberate indifference to the medical care he was receiving, thereby warranting the Parole Defendants' dismissal from this action.

***10** In addition, non-medical prison personnel are generally not liable under § 1983 for medical mis-or nontreatment once a prisoner is under the care of medical personnel [11]. *Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir.2004)* (non-medical personnel are "justified in believing that the prisoner is in capable hands" because they are not responsible for medical treatment) (citing *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir.1993)). However, they may be liable if they had "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* Here, the allegations in plaintiff's complaint indicate that he was receiving treatment from SCI–Rockview's medical personnel, and that he was dissatisfied with the treatment he was receiving. [12] Moreover, plaintiff has not alleged any facts which would support a finding that the Parole Defendants could have had a reason to believe, or that they possessed actual knowledge, that SCIRockview's medical personnel was mistreating the plaintiff. Consequently, the court recommends that the Parole Defendants be dismissed from this action.

**D. False Imprisonment Claim**

Plaintiff alleges a cause of action under Pennsylvania law, namely false imprisonment, against defendant Dale. As the court has supplemental jurisdiction pursuant to *28 U.S.C. § 1367(a),* the court will consider this state law claim below.

Defendant Dale argues that plaintiff's false imprisonment claim is barred by sovereign immunity. The doctrine of sovereign immunity bars damage claims for state law torts against "the Commonwealth, and its officials and employees acting within the scope of their duties." 1 Pa. Const. Stat. Ann. § 2310. The statute further provides that such parties "shall continue to enjoy sovereign immunity and official

immunity ... unless the General Assembly shall specifically waive immunity," except for several narrow enumerated exceptions. 1 Pa. Const. Stat. Ann. § 2310; *McGrath v. Johnson, 67 F.Supp.2d 499, 511 (E.D.Pa.1999)*. The Pennsylvania General Assembly has only made sovereign immunity inapplicable in certain prescribed circumstances. *See* 42 Pa. Const. Stat. Ann. § 8522(b). The nine exceptions set forth in 42 Pa. Const. Stat. Ann. § 8522 relate to: (1) Vehicle liability; (2) Medical-professional liability; (3) Care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) Potholes and other dangerous conditions; (6) Care, custody or control of animals; (7) Liquor store sales; (8) National Guard activities; and (9) Toxoids and vaccines. These nine exceptions to the rule of immunity provided for in the Code must arise out of negligent acts. *Id.* Thus, when an employee of a Commonwealth agency is acting within the scope of his or her duties, the Commonwealth employee is protected by sovereign immunity from the imposition of liability for intentional torts. *See Story v. Mechling, 214 Fed. Appx. 161,163 (3d Cir.2007)* (citing *La Frankie v. Miklich, 152 Pa.Cmwlth. 163, 618 A.2d 1145, 1148 (Pa.Commw.Ct.1992)*.

***11** Defendant Dale argues that plaintiff's false imprisonment claim is barred by sovereign immunity because it is an intentional tort alleged to have been committed within the scope of his employment. The court agrees. Plaintiff alleges that defendant Dale, acting as Lieutenant at SCI–Rockview, locked him up because he did not remember what happened to him after the April 27, 2008 incident. Because the complaint clearly supports the conclusion that defendant Dale was acting within the scope of his employment when the alleged intentional tort, false imprisonment, was committed, he is immune from liability on this state law cause of action. *See Story, 214 Fed. Appx. at 163* (finding a Corrections Officer acting within the scope of his duties could not be held liable for damages arising out of an intentional tort); *Ginter v. Skahill,* No. 04–2444, 2006 U.S. Dist. LEXIS 77038, at *39 (E.D.Pa. Oct. 17, 2006) (finding Pennsylvania state law claim of false imprisonment was barred by sovereign immunity). In addition, the alleged false imprisonment of plaintiff does not fall within one of the statutory exceptions to sovereign immunity under Pennsylvania law. *See* 42 Pa. Const. Stat. Ann. § 8522(b). Consequently, the court recommends that defendant Dale be dismissed from this action.

**E. Remaining Defendants**

The Corrections Defendants' motion to dismiss fails to address why defendants Eaton, Vance, Wagner and Boone should be dismissed from this action. At best, it appears that these defendants argue, along with the remainder of the Corrections Defendants, that plaintiff's second amended complaint be dismissed because it fails to comply with the Federal Rules of Civil Procedure as well as this court's prior order dated July 31, 2009, (Doc. No. *48* ). As explained above, the court declines to recommend dismissing the plaintiff's second amended complaint on that basis.

However, as explained below, because the court finds plaintiff fails to state a claim against defendants Eaton, Vance, and Boone, the court will recommend dismissing these defendants from this action. [13]

1. Defendant Boone

A review of the second amended complaint reveals that plaintiff has failed to set forth sufficient personal allegations of wrongdoing against defendant Boone. Therefore, the court recommends that defendant Boone be dismissed from this action. *See Rhode, 845 F.2d at 1207*.

2. Defendant Vance

Plaintiff has alleged that defendant Vance (1) committed perjury to cover up for Captain Eaton, (2) told plaintiff that his legal mail could be opened outside of his presence [14], (3) gave false reports to the superintendent regarding plaintiff's legal mail, and (4) covered up Mr. Boone's, the mail room supervisor's, illegal activities. (Doc. No. *74* at 12). First, with respect to the alleged statement by defendant Vance regarding the opening of his legal mail, the court finds that plaintiff does not allege defendant Vance personally violated his rights by opening his legal mail. Rather, he appears to complain that his mail was opened outside of his presence, and that defendant Vance told him it was permissible. This allegation is insufficient to give rise to liability under § 1983. *See Martin v. Ulisny,* No. 09–3967, 2010 U.S. Dist. LEXIS 16057, at *8–11 (E.D.Pa. Feb. 23, 2010). Second, with respect to the alleged false report to the superintendent, it appears that plaintiff takes issue with the grievance procedure. As such, this allegation cannot give rise to a constitutional violation. *See Rivera v. Pa. Dep't of Corr., 346 Fed. Appx. 749, 751 (3d Cir.2009)* . Third, with respect to the remaining allegations, namely regarding the "cover up" and perjury, the court finds that plaintiff has likewise failed to state a claim. Plaintiff does not clarify *what* defendant Vance said, *when* he said it, and to *whom* he said it. As such, the court finds that plaintiff has failed to state sufficient factual allegations to survive a

motion to dismiss. *See Fowler, 578 F.3d at 210* (conclusory or "bare-bones" allegations are not sufficient to survive a motion to dismiss). *See also Purveegiin v. Gonzales, Civ. A. No. 3:07–1020, 2007 WL 4081393, at *3 (M.D.Pa. Nov. 15, 2007)* (Vanaskie, J.) (complaint in Section 1983 action subject to dismissal for failure to make specific allegations of time and place).

***12** Consequently, the court recommends defendant Vance be dismissed from this action.

3. Defendant Eaton

Plaintiff alleges that defendant Eaton (1) failed to protect him from the alleged beating by the inmates, (2) gave illegal documents to the parole agents to force him via threats to sign, (3) gave false reports to the superintendent, (4) threatened him, and (5) lied and covered up for the medical department and parole agents.

The court finds that plaintiff has failed to state a claim against defendant Eaton. First, the court finds that threats, alone, do not give rise to a constitutional violation. *See Maclean, 876 F.Supp. at 698–99.* As such, this claim must be dismissed as plaintiff merely states defendant Eaton threatened him. Second, the court finds plaintiff's allegations that defendant Eaton gave false reports to the superintendent, again, appear to be plaintiff taking issue with the grievance procedure at SCI–Rockview. As explained above, this does not give rise to a constitutional violation. *See Rivera, 346 Fed. Appx. at 751.* Third, with respect to the lying and covering up for the medical department and parole agents, without any additional factual support, the court cannot find that plaintiff has stated a claim. Again, plaintiff does not state *what* defendant Eaton said, *when* he said it, and to *whom* he said it. As such, the court finds that plaintiff has failed to state sufficient factual allegations to survive a motion to dismiss. *See Fowler, 578 F.3d at 210* (conclusory or "bare-bones" allegations are not sufficient to survive a motion to dismiss). *See also Purveegiin, 2007 WL 4081393,* at *3. Fourth, with respect to the allegations that defendant Eaton gave illegal documents to the parole agents to force plaintiff to sign, the court cannot find the necessary personal involvement on the part of defendant Eaton to give rise to § 1983 liability. Plaintiff alleges that unidentified parole agents forced him to sign illegal documents, not defendant Eaton. *See Iqbal, 129 S.Ct. at 1948*.[15] Finally, the court finds that plaintiff's allegation that defendant Eaton failed to protect him from the beating, in violation of the Eighth Amendment, is insufficient to withstand a motion to dismiss. Plaintiff fails to allege any factual support whatsoever in relation to this claim. *Phillips, supra, 515 F.3d at 231. See also Farmer v. Brennan, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)* ("[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").

As such, the court recommends that defendant Eaton be dismissed from this action.

4. Defendant Wagner

Plaintiff alleges that defendant Wagner "pass[ed] false information to inmates that [he is] a snitch for Department of Corrections" and as a result he was beat up by inmates and threatened to be killed. (Doc. No. *74* at 12). In this instance, the court finds that plaintiff has stated a claim minimally sufficient to survive under the Eighth and Fourteenth Amendments. *See Shockley v. McCarty, 677 F.Supp.2d 741, 746–47 (D.Del.2009)* (declining to dismiss plaintiffs's Eighth and Fourteenth Amendment claims when plaintiff alleged defendant told other inmates he was a snitch) (collecting cases). Consequently, the court recommends the plaintiff's claims against defendant Wagner to proceed as they are presently unopposed.

**IV. RECOMMENDATION**[16]

***13** For the reasons elaborated above, **IT IS RECOMMENDED THAT:**

**(1)** The Parole Defendants' motion to dismiss, (Doc. No. *88* ), be **GRANTED;**

**(2)** Defendant Symons' motion to dismiss, (Doc. No. *99* ), be **GRANTED;**

**(3)** Defendant Sucigell's motion to dismiss, (Doc. No. *209* ), be **GRANTED;**

**(4)** Defendants Thompson, Senko and Pensiero's motion to dismiss, (Doc. No. *213* ), be **GRANTED;** and

**(5)** The Corrections Defendants' motion to dismiss, (Doc. No. *101* ), be **GRANTED** in part and **DENIED** in part, specifically dismissing all claims against the Corrections Defendants except:

(a) Defendant Wagner on Eighth and Fourteenth Amendment claims set forth in paragraph 4 on page 12.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2838603

## Footnotes

1 For the convenience of the reader of this document in electronic format, hyperlinks to the court's record and to authority cited herein have been inserted. No endorsement of any provider of electronic resources is intended by the court's practice of using hyperlinks.

2 Plaintiff fails to state what the alleged injuries are.

3 He also alleges these inmates threatened to kill him. The court further notes that it is not entirely clear if plaintiff's allegations against defendant Wagner resulted in the April 27, 2008 incident, or if there were other times he was beat up prior to the commencement of this action.

4 He also alleges that defendant Eaton (1) gave him illegal documents that he was forced, via threats, into signing, (2) gave false reports when defendant Tennis requested he investigate plaintiff's claims, (3) made illegal threats and lied, and (5) covered up for both the medical department and parole. (Doc. No. *74* at 12).

5 On that same day, plaintiff filed, separately, a memorandum of law and various exhibits in support of his second amended complaint, the operative complaint. (Doc. No. *75* ). To the extent plaintiff may have set forth additional allegations in that separate filing, the court cannot consider those allegations as plaintiff did not include those allegations in his second amended complaint.

6 Rule 10(b) requires that “A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances.” *Fed.R.Civ.P. 10(b).*

7 As stated above, plaintiff simply alleges that defendant Foose was deliberately indifferent to his “need.”

8 It is unclear what plaintiff means by medically incorrect action. However, this statement appears to imply that plaintiff was treated by defendant Foose and that he disagreed with that treatment.

9 Furthermore, plaintiff seeks injunctive relief, in particular, that defendant Symons stop ordering therapy and stop lying to the surgeons. As such, despite plaintiff's insufficient factual allegations, his request for injunctive relief indicates that plaintiff has received medical treatment from defendant Symons, and that he simply disagrees with that course of treatment. However, plaintiff's mere disagreement with the treatment he received does not rise to the level of a constitutional violation of the Eighth Amendment. *Farmer v. Carlson, supra, 685 F.Supp. at 1339*.

10 The court notes that defendants also argue they should be dismissed from this action because the plaintiff failed to serve them. As explained in a previous order, this argument lacks merit. *See* (Doc. No. *216* ).

11 They are, however, liable for “intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.” *Estelle v. Gamble, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)* (internal citations omitted). The plaintiff has alleged no facts indicating that the non-medical defendants prevented him from receiving medical treatment or interfered with that treatment. He claims only that the treatment he received was improper or insufficient.

12 Throughout the complaint and attached exhibits, plaintiff discusses treatment plans that he disagrees with, *i.e.* "meds for chronic pain don't work". (Doc. No. *74* at 6).

13 When a court reviews a complaint under § 1915(e) and under § 1915A to determine if it fails to state a claim upon which relief can be granted, a federal district court applies the same standard applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Tucker v. Angelone, 954 F.Supp. 134, 135 (E.D.Va.1977)* ("Under 28 U.S.C. §§ 1915A, 1915(e) and 42 U.S.C. § 1997e(c) the courts are directed to dismiss any claims made by inmates that 'fail to state a claim upon which relief could be granted' ").

14 Plaintiff does not state that it was defendant Vance who opened his legal mail.

15 As such, to the extent plaintiff may be seeking to impose liability on defendant Eaton pursuant to a vicarious liability theory, vicarious liability is inapplicable in a § 1983 action. *See id.*

16 For the convenience of the reader, the court has attached copies of unpublished opinions cited within this document.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

1993 WL 21209
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Joan SAVACOOL, Plaintiff
v.
DELAWARE COUNTY DEPARTMENT OF MENTAL HEALTH & MENTAL RETARDATION, et al., Defendants

Civ. A. No. 92–2142.
|
Jan. 25, 1993.

**Attorneys and Law Firms**

Joan Savacool, pro se.

Joseph M. Fioravanti, Curran Winning & Fioravanti, P.C., Media, PA, William Mc Govern, Mylotte, David & Fitzpatrick, Philip G. Kircher, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, Patricia N. Kreb, Holsten & White, Media, PA, for defendants.

MEMORANDUM AND ORDER

YOHN, District Judge.

***1** Before the court is a motion by defendants, Lankenau Hospital, John M. Donnelly, M.D., John Ezell, Patricia Shanfeld, and Julia E. Gabis ("the Lankenau Hospital Defendants"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss plaintiff's Second Amended Complaint on the grounds that (1) plaintiff has failed to plead a federal claim against the Lankenau Hospital Defendants and (2) in the absence of a federal claim, the court may decline pendent jurisdiction over the state law claims. Before considering the merits of any claims, a federal court must inquire as to whether it has jurisdiction to do so. The court agrees with the defendants that it lacks jurisdiction as to the federal claims against them and will grant the motion.

BACKGROUND

The plaintiff, Joan Savacool, has sued hospitals, hospital personnel, a county mental health agency, attorneys, and others in connection with two involuntary commitments under the Pennsylvania Mental Health Procedures Act, 50 Pa.Stat.Ann. 7101 *et seq.* ("the Act"), that occurred in June and September of 1990.

Mrs. Savacool's *pro se* complaint, while at times difficult to follow, clearly alleges a violation of 42 U.S.C. § 1983, charging that defendants have violated her rights under a number of Amendments to the United States Constitution. The complaint also claims violations of the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, but that is not applicable here because it applies only to torts by the federal government and its agents. In addition, there are a number of state law claims.

Since there is not complete diversity of the parties, jurisdiction is based on the federal question, to which plaintiff's state law claims are pendent. However, the Lankenau Hospital Defendants claim that the complaint fails to allege that any of them acted under color of state law, as required under § 1983, and, moreover, that none of them did act under color of state law. Therefore, they claim, this court lacks federal question jurisdiction, and under 28 U.S.C. § 1367, the court may decline supplemental jurisdiction over the state law claims. Accordingly, they ask that all claims against the Lankenau Hospital Defendants be dismissed.

FACTS

On June 4, 1990, Mrs. Savacool's mother, Ruth Glotkin, filed a petition pursuant to section 302 of the Act seeking involuntary commitment of her daughter. A warrant was issued under the same section of the Act authorizing transportation of Mrs. Savacool to the Fitzgerald Mercy Division of the Mercy Catholic Medical Center, which is specified as a receiving facility for involuntary commitments in Delaware County. Mrs. Savacool was picked up at her home by local police officers and taken to Fitzgerald Mercy. Within several hours of her arrival, she was examined by a physician, Dr. Schecker, who determined that Mrs. Savacool was in need of psychiatric treatment. She was then taken to Lankenau Hospital and admitted for treatment.

***2** While at Lankenau, plaintiff was seen by defendant John M. Donnelly, M.D., Chief of Psychiatry, and by John Ezell and Patricia Shanfeld, social workers at the hospital. Julia E. Gabis, who was included as a defendant in the first complaint, but not the second amended complaint, was an attorney acting for Lankenau Hospital. A petition pursuant to section 303 of

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

the Act was filed for extended involuntary treatment and the required commitment hearing before a commitment officer was held on June 8, 1990. As a result of the hearing, Mrs. Savacool was released from Lankenau Hospital, allowed to return home, and required to receive involuntary emergency treatment on an out-patient basis for twenty days. She was referred to another local health care provider, Life Guidance Services, Inc., where she saw a psychiatrist once a week for three weeks.

On September 20, 1990, Mrs. Savacool's father, Joseph Glotkin, filed another petition pursuant to section 302 of the Act, again seeking involuntary commitment of plaintiff. A warrant was issued and the sequence of events that had occurred in June was repeated: Mrs. Savacool was taken to Fitzgerald Mercy, was examined, was determined by a physician to be in need of psychiatric treatment, was admitted to Lankenau Hospital and was examined by Dr. John M. Donnelly. Shortly thereafter, a petition requesting extended involuntary emergency care was filed and a hearing was held on the petition on September 25, 1990. This time, the petition was dismissed, and plaintiff was allowed to return home without having to undergo additional treatment.

DISCUSSION

The only federal cause of action at issue here is under 42 U.S.C. § 1983. That section provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured....

42 U.S.C. § 1983. The section provides a cause of action only against persons who act "under color of state law." This means that section 1983 is applicable only to actions that are fairly attributable to the state and not to private actors. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744 (1982); *United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152 (1966); *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836 (1948). The question facing this court is whether the actions of the Lankenau Hospital Defendants, or any of them, with regard to the involuntary commitments of Joan Savacool in June and September of 1990, are fairly attributable to them as agents of the state rather than as private actors.

While there is no question that the Lankenau Hospital Defendants are not employed by the Commonwealth of Pennsylvania, or by any political subdivision or agency of the Commonwealth, the mere fact that defendants are not governmental entities, or directly employed by governmental entities, does not automatically shield them from section 1983 claims. There are other ways to act under color of state law.

***3** The United States Supreme Court "has crafted a number of approaches to determine whether sufficient state involvement with private activity exists so that the imprimatur of the state may be attributed to an essentially private actor." *Janicsko v. Pellman,* 774 F.Supp. 331, 335 (M.D.Pa.1991), *aff'd without op.,* 970 F.2d 899 (3d Cir.1992). They are: the "close nexus" test of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449 (1974); the "government compulsion" test of *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764 (1982), *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598 (1970) and *Peterson v. Greenville,* 373 U.S. 244, 83 S.Ct. 1119 (1963); the "symbiotic relation" test of *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856 (1961); and, most important for this case, the "public function" analysis, discussed by the court in *Rendell–Baker v. Kohn,* and also discussed in *Jackson;*

Defendants rely on *Janicsko v. Pellman,* 774 F.Supp. 331 (M.D.Pa.1991), *aff'd without op.,* 970 F.2d 899 (3d Cir.1992), a case in which the court granted summary judgment for the defendants on the ground that the actions of a private hospital and its personnel did not constitute state action for purposes of a section 1983 claim. In that case, Mrs. Janicsko was involuntarily committed to a private hospital under section 302 of the Act and held there until her mandatory commitment hearing, when she was released. Mrs. Janicsko then brought an action under 42 U.S.C. § 1983 against, *inter alia,* the private hospital and the private physicians who had participated in her commitment.

In the "close nexus" test of state action, under *Jackson,* the government must be "so involved in the specific act at issue that it has effectively placed its imprimatur on the act." *Liem Duc Nguyen v. United States Catholic Conference,* 548

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

F.Supp. 1333, 1342 (W.D.Pa.1982), *aff'd,* 719 F.2d 52 (3d Cir.1983). The government's mere acquiescence or approval of the private action does not convert the act into state action. *Id.*

In looking at the "close Nexus" test, the *Janicsko* court was guided by *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777 (1982), in which the Supreme Court addresses that test in terms of private health care facilities subject to strict government regulation. *Janicsko* at 336. *Blum* concerned a suit against the Commissioner of the New York State Department of Public Service based on the actions of a privately operated nursing home which had decided to downgrade plaintiff medicaid patients from high level care to lower level care. Although the state subsidized the nursing homes, licensed and regulated them extensively, and paid the expenses of the patients, the Court, focusing on the specific decision to downgrade care rather than on the overall relationship between the state and the nursing homes, held that the homes' decision constituted private action. The court in *Blum* said:

> ***4** [A s]tate normally can be held responsible for a private decision only when it has exercised coercive power or has provided significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state.

457 U.S. at 1004. Using those criteria under the "close nexus" test, the Janicsko court found that decisions of the private hospital and its personnel with regard to Mrs. Janicsko's commitment were not state action. This court similarly finds that decisions by the Lankenau Hospital Defendants with regard to Joan Savacool's commitments do not constitute state action under the "close nexus" test.

The "government compulsion" test also failed to provide grounds to sustain a section 1983 action against the private hospital defendants in *Janicsko.* The *Janicsko* court looked to *Rendell–Baker v. Kohn, supra,* in which the Supreme Court applied that test to the question of the relationship between a private school and the state of Massachusetts in a section 1983 claim brought by several discharged teachers. The school, which catered to "problem" students, was extensively regulated by state imposed guidelines in personnel matters. Nevertheless, the Court refused to see the firings as state action because they were not "compelled or even influenced by any state regulation." 457 U.S. at 842–43. The *Janicsko* court found in similar fashion that the commitment was not compelled or even influenced by the state. This court also finds that to be true with regard to the Lankenau Hospital Defendants' role in Joan Savacool's commitments.

The third test, the "symbiotic relationship" test, looks at the overall relationship between the state and the asserted state actor to see if there is a great degree of interdependence between the two. *See Burton v. Wilmington Parking Authority, supra.* Under this test, government action may be found where "[t]he State has so far insinuated itself into a position of interdependence with ... [the Defendants] that it must be recognized as a joint participant in the challenged activity...." *Id.* at 725. As the court in *Liem Duc Nguyen v. U.S. Catholic Conference, supra,* noted:

> The dispositive factor in *Burton* with respect to the state action issue was the "extent and nature of the overall relationship between the state and the private enterprise." The establishment of an "inextricably linked" relationship renders the government a joint participant in the challenged activity, obviating the need for the Plaintiff to show state involvement in the specific action being challenged.

*Id.* at 1341 (citations omitted).

No facts have been alleged in this case that establish state action under the *Burton* test, and the court believes that no state action exists. The Lankenau Hospital Defendants and the state are not so inextricably linked in their overall relationship as to render any action by the defendants state action. Therefore, the plaintiff cannot sustain a section 1983 action under this test.

***5** Finally, and most importantly for this case, is the "public function" test. Under it, government action may be present where the function performed by the private entity was "traditionally the exclusive prerogative of the State." *Jackson v. Metropolitan Edison Co., supra,* at 353. The performance of a function which merely serves the public will not satisfy this test. *Rendell–Baker v. Kohn, supra* at 842. Rather, the activity must be one which is traditionally associated with sovereignty. *Liem Duc Nguyen v. United States Catholic Conference, supra* at 1234, *quoting Jackson, supra* at 353. The question in this case is whether the compulsion underlying the involuntary commitment of Joan Savacool stems solely from the state, whether the power

to commit people involuntarily for mental illness is one traditionally and exclusively associated with the state.

*Davenport v. St. Mary Hosp.,* 633 F.Supp. 1228 (E.D.Pa.1986) touches on the question of whether the actions of a private hospital and psychiatric center may be declared to be state actions in the case of a *pro se* plaintiff who was involuntarily committed for nearly two months. The court in that case opined that involuntarily confining persons on mental health grounds could be considered a traditional function of the state, but it declined to decide the question. *Id.*

The Lankenau Hospital Defendants, as those in *Janicsko,* decline to rely on *Davenport* and rely instead on a recent case from the United State Court of Appeals for the Seventh Circuit, *Spencer v. Lee,* 864 F.2d 1376 (7th Cir.1989), *cert. denied,* 494 U.S. 1016, 110 S.Ct. 1317 (1990), which found that involuntary commitment traditionally was not exclusively in the hands of the state. *Id.* at 1381. The court considered whether a private physician and a private hospital acted under color of state law when they involuntarily committed a mentally disturbed person. It held that such action was not under color of state law, and noted that other courts that had addressed the question agreed with its position. *Id.* at 1377. *See Bryne v. Kysar,* 347 F.2d 734 (7th Cir.1965); *Duzynski v. Nosal,* 324 F.2d 924 (7th Cir.1963); *Hall v. Quillen,* 631 F.2d 1154 (4th Cir.1980) and cases cited therein.

In *Spencer,* plaintiff's physician twice authorized plaintiff to be committed involuntarily to St. Elizabeth's Hospital. On the second of these occasions, the police were called to take Spencer to the hospital against his will. On the fourth of plaintiff's five days of confinement, Dr. Lee directed a nurse to inject plaintiff with a drug to which plaintiff claimed he was allergic. He was injected anyway and sustained bodily injury. 864 F.2d at 1377. Spencer filed a suit *pro se,* seeking damages under 42 U.S.C. § 1983 for deprivation of his liberty without due process of law and for the reckless infliction of injury during his second confinement. *Id.*

The court rejected Spencer's argument that the Illinois Mental Health and Developmental Disabilities Code operated to "deputize" private physicians and hospitals to carry out the exclusive state function of committing the mentally ill. *Id.* at 1378. Spencer's position was that "governmental functions that have traditionally been the exclusive prerogative of government, usually because they involved a high degree of coercion, can be delegated but not abandoned." *Id.* at 1379. The U.S. Court of Appeals for the Seventh Circuit found, however, that treatment of the mentally disabled, like treatment of the sick and infirm generally, was not such a function. The court conceded that the issue was not treatment, but involuntary commitment, and went on to explore the question whether there was a tradition of treating civil commitment of the mentally disturbed as a governmental function and, if so, how well established it was.

***6** The *Spencer* court concluded that commitment had long been a private remedy, albeit one subject to rigorous safeguards. It found that even public commitment in Illinois was private in a sense, because the state required relatives of voluntarily and involuntarily committed mental patients alike to pay the cost of their upkeep in the state's institutions, and it allowed the involuntarily committed to be placed in private homes as well as in public and private hospitals. *Id.* at 1380. The court looked to the law of England, quoting Blackstone, who wrote in 1785, "On the first attack of lunacy, or other occasional insanity, while there may be hope of a speedy restitution of reason, it is usual to confine the unhappy objects in private custody under the direction of their nearest friends and relatives." *Id.* at 1381, *quoting* 1 Commentaries on the Laws of England 305. The court reflected that "[h]istories of the treatment of the insane focus on public institutions, but involuntary extrajudicial commitment to private institutions has long been commonplace." *Id.*

The power to commit persons involuntarily was not, therefore, an exclusive state power that the state delegates to private agents, who thereupon become state agents. Rather, it was traditionally a more diffuse power, and the state merely regulates it by such means as the Illinois and Pennsylvania statutes. The Janicsko court found that, under the public function test, and the Pennsylvania statute, the defendants were not acting as agents of the state in the involuntary commitments of Mrs. Janicsko. The court said:

> Given the language of the relevant sections of the MHPA, this court cannot say that the involuntary commitment of the mentally ill by private physicians and hospitals is, under the MHPA, a function compelled by or sufficiently connected to state directives to attribute those actions to the state. Accordingly, no

> cause of action may be stated under § 1983 against the ... private defendants.

774 F.Supp. at 339. This court similarly finds that the Lankenau Hospital Defendants were not acting as state agents in the involuntary commitment of Joan Savacool.

CONCLUSION

The Lankenau Hospital Defendants do not qualify in this case under any of the various tests devised by the Supreme Court for determining whether private actors are acting under color of state law for purposes of an action under 42 U.S.C. § 1983. Therefore the plaintiff cannot maintain this federal action against them, and the federal claim is dismissed. This dismissal of the federal claim implies nothing about the merits of her state law claims. In the absence of federal question jurisdiction, this court can and will decline supplemental jurisdiction over the plaintiff's state law claims. An appropriate order follows.

ORDER

AND NOW, this 22nd day of January, 1993, upon consideration of defendants' motion to dismiss for failure to state a claim and for lack of subject matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), it is ORDERED that motion is GRANTED and the Second Amended Complaint is DISMISSED as against defendants Lankenau Hospital, John M. Donnelly, M.D., John Ezell, Patricia Shanfeld and Julia Gabis.

**All Citations**

Not Reported in F.Supp., 1993 WL 21209

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1541545
Only the Westlaw citation is currently available.
**Not For Publication**
United States District Court, D. New Jersey.

Fritz Gerald TOUSSAINT, Plaintiff,
v.
May Ping SZETO and Thomas Degise, Defendants.

Civil Action No. 22-2446
|
Signed 05/13/2022

**Attorneys and Law Firms**

Fritz Gerald Toussaint, Brooklyn, NY, Pro Se.

**OPINION & ORDER**

John Michael Vazquez, United States District Judge

***1** *Pro se* Plaintiff Fritz Gerald Toussaint seeks to bring this matter *in forma pauperis* pursuant to 28 U.S.C. § 1915. D.E. 2. For the reasons discussed below, the Court **GRANTS** Plaintiff's application to proceed *in forma pauperis* but **DISMISSES** the matter pursuant to 28 U.S.C. § 1915(e)(2)(B).

Under Section 1915, this Court may excuse a litigant from prepayment of fees when the litigant "establish[es] that he is unable to pay the costs of his suit." *Walker v. People Express Airlines, Inc.*, 886 F.2d 598, 601 (3d Cir. 1989). Plaintiff sufficiently establishes his inability to pay, D.E. 2, and the Court grants his application to proceed *in forma pauperis* without prepayment of fees and costs.

When allowing a plaintiff to proceed *in forma pauperis*, the Court must review the complaint and dismiss the action if it determines that the action is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune. 28 U.S.C. § 1915(e)(2)(B). Because Plaintiff is proceeding *pro se*, the Court construes the Complaint liberally and holds it to a less stringent standard than papers filed by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). The Court, however, need not "credit a *pro se* plaintiff's 'bald assertions' or 'legal conclusions.' " *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).

**I. ANALYSIS**

In this matter, Plaintiff alleges that May Ping Szeto violated his right of equal protection and right against unreasonable search and seizure. D.E. 1 (hereinafter, "Compl.") at 5. While Thomas Degise is also listed as a Defendant, the Complaint does not contain any claims against him. Plaintiff also claims that Szeto violated the Americans with Disabilities Act (the "ADA") by refusing "entry of valid evidence of Plaintiff's disability" and quoting fraudulent documents to "deceive the Judge." *Id.* Plaintiff adds that Szeto was provided proof that his due process rights had been violated because he was never given notice of a hearing where he would have had an opportunity to "defend against the false claims." *Id.* Finally, Plaintiff brings a claim for violation of his privileges and immunities. *Id.*

**A. Section 1983 Claims**

While not explicitly stated, Plaintiff appears to assert Section 1983 claims against Defendants. Section 1983, in relevant part, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

*See* 42 U.S.C. § 1983. Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To state a Section 1983 claim, a plaintiff must demonstrate that "(1) a person deprived him of a federal right; and (2) the person who deprived him

of that right acted under color of state or territorial law." *Burt v. CFG Health Sys.*, No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015). For purposes of this screening, the Court assumes that Szeto is a state actor.

***2** The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. To state an equal protection claim, a plaintiff must allege facts showing that (1) he was a member of a protected class; (2) he was similarly situated to members of an unprotected class; and (3) he was treated differently than the members of the unprotected class. *Oliveira v. Twp. of Irvington*, 41 F. App'x. 555, 559 (3d Cir. 2005). Plaintiff has not alleged any of these elements much less plausible facts to support them. Thus, Plaintiff fails to allege a violation of his equal protection rights.

The Fourth Amendment protects persons from "unreasonable searches and seizures." U.S. Const. amend. IV. The Complaint contains no allegations that could be construed as the basis of an unreasonable search and seizure claim. Therefore, Plaintiff fails to state a Fourth Amendment claim.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. The Fourteenth Amendment's Due Process Clause has a procedural and substantive component. *Nicholas v. Penn. State Univ.*, 227 F.3d 133, 138-39 (3d Cir. 2000). The Court construes Plaintiff's Complaint as alleging a violation of his procedural due process rights. To state a claim for deprivation of procedural due process, a plaintiff must demonstrate that (1) he was deprived of an individual interest included within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Plaintiff alleges that his due process rights were violated because he was not served notice of a hearing. Compl. at 5. However, Plaintiff does not detail the subject of the hearing, or more specifically, which interest he was deprived of because of the hearing at which he was absent. Without such information, the Court cannot assess whether Plaintiff was deprived of an interest protected by the Fourteenth Amendment. Accordingly, Plaintiff's due process claim is dismissed.

The Court construes Plaintiff's allegation that he was deprived of his privileges and immunities as a claim under the Privileges and Immunities Clause of Article IV of the Constitution. [1] Article IV's Privileges and Immunities Clause limits the ability of a state to discriminate against out-of-state residents. *Maldonado v. Houstoun*, 157 F.3d 179, 190 n.9 (3d Cir. 1998). The Complaint specifies that Plaintiff is a citizen of California and Szeto is a citizen of New Jersey. Compl. at 4. However, Plaintiff does not allege that he was discriminated against by virtue of his California citizenship. Nor does the Complaint provide any basis that would allow the Court to reasonably infer that Plaintiff was discriminated against because he is not a New Jersey resident. Accordingly, Plaintiff's privileges and immunities claim fails.

### B. ADA Claim

***3** Plaintiff also alleges that Szeto violated the ADA by refusing entry of valid evidence of Plaintiff's disability and quoting fraudulent documents before a court. Compl. at 5. While it is unclear which particular ADA violation is alleged, the Court construes the Complaint as alleging a violation of Title II of the ADA, which applies to discrimination by state or local governments. *Evans-Sampson v. United States Dep't of Just.*, Civ. No. 21-1834, 2022 WL 883939, at *2 (3d Cir. Mar. 24, 2022). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To establish a violation of Title II of the ADA, a plaintiff must demonstrate that: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Heffley v. Steele*, 826 F. App'x 227, 232 (3d Cir. 2020), *cert. denied*, 142 S. Ct. 181 (2021), *reh'g denied*, 142 S. Ct. 633 (2021). Plaintiff alleges that he possesses valid evidence of his disability and attaches to his Complaint a copy of his "Disabled Person Parking Placard." Compl. at 5, 7. He also claims that Szeto refused entry of Plaintiff's valid evidence of a disability. *Id.* at 5. Even if these allegations were sufficient to satisfy the first element, Plaintiff has not sufficiently alleged the other two elements. Accordingly, even construing the Complaint liberally, Plaintiff fails to state a claim under the ADA.

When dismissing a case brought by a *pro se* plaintiff, a court must decide whether the dismissal will be with prejudice or without prejudice, the latter of which affords a plaintiff with leave to amend. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 110-11 (3d Cir. 2002). The district court may deny leave to amend only if (a) the moving party's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the non-moving party or (b) the amendment would be futile. *Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). Because Plaintiff is proceeding *pro se* and this is the Court's initial screening, the Court will provide Plaintiff with an opportunity to file an amended complaint. Plaintiff is afforded thirty (30) days to file an amended complaint that cures the deficiencies set forth herein. If Plaintiff does not submit an amended complaint curing these deficiencies within thirty (30) days, Plaintiff's claims will be dismissed with prejudice.

## II. CONCLUSION

**IT IS** on this 13th day of May 2022,

**ORDERED** that pursuant to 28 U.S.C. § 1915(a), Plaintiff's application to proceed *in forma pauperis* is **GRANTED**; and it is further

**ORDERED** that the Clerk of the Court is directed to file the Complaint without prepayment of the filing fee; and it is further

**ORDERED** that Plaintiff's Complaint is **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**ORDERED** that Plaintiff is afforded thirty (30) days to file an amended complaint that cures the deficiencies as set forth above. Failure to file an amended complaint within this time will result in the matter being dismissed with prejudice; and it is further

**ORDERED** that the Clerk of the Court shall mail a copy of this Opinion and Order to Plaintiff by regular mail.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1541545

## Footnotes

1 The Fourteenth Amendment also contains a Privileges and Immunities clause, which provides that no state “shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.” U.S. Const. amend XIV, § 1. The Third Circuit has recognized that “the Privileges and Immunities Clause of the Fourteenth Amendment has remained essentially moribund since the Supreme Court's decision in *The Slaughter-House Cases*[.]” *In re Sacred Heart Hosp. of Norristown*, 133 F.3d 237 (3d Cir. 1998) (internal quotation marks omitted).

End of Document
© 2025 Thomson Reuters. No claim to original U.S. Government Works.