UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BRADLEY CLONAN, ET AL., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 3:24-CV-11399-RK-RLS |
| | ) | |
| v. | ) | |
| | ) | PLAINTIFF'S OPPOSITION TO |
| CENTRASTATE HEALTHCARE | ) | DEFENDANTS' MOTION TO DISMISS |
| SYSTEM/ATLANTIC HEALTHCARE | ) | RE : Motion to dismiss[47,50] |
| SYSTEM, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ..................................................... 4

II. INTRODUCTION ................................................................. 6

III. STATEMENT OF FACTS ......................................................... 6

IV. PROCEDURAL DEFECTS IN DEFENDANTS' MOTIONS ................... 8

    A. Failure to Meet and Confer

    B. Conflicting Contact Information

    C. Typographical Errors and Organizational Issues

    D. Procedural Difficulties in Effectuating Service Due to Defendants' Conduct and Ambiguity

V. LEGAL STANDARD ................................................................. 10

    A. Motion to Dismiss Standard

    B. Section 1983 State Action Requirement

VI. ARGUMENT ....................................................................... 10

    A. The Amended Complaint Plausibly Alleges State Action Under Multiple Theories

        1. Joint Action Theory

        2. Public Function Theory

3. State Licensing and Regulation

4. State Action Theories

B. The Factual Disputes Raised by Defendants Are Inappropriate for Resolution at the Motion to Dismiss Stage

C. The Amended Complaint States Valid Claims Under § 1983

1. Due Process Violations

2. Fourth Amendment Violations

3. Other Constitutional Violations

D. Individual Defendants' Personal Involvement

V. REQUEST FOR LEAVE TO AMEND ....................................... 23

VI. CONCLUSION .................................................................. 24

CERTIFICATE OF SERVICE ...................................................... 24

## TABLE OF AUTHORITIES

### Federal Supreme Court Cases

*Addington v. Texas, 441 U.S. 418 (1979)*

*Ashcroft v. Iqbal, 556 U.S. 662 (2009)*

*Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)*

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288 (2001)*

*Dennis v. Sparks, 449 U.S. 24 (1980)*

*Erickson v. Pardus, 551 U.S. 89 (2007)*

*Haines v. Kerner, 404 U.S. 519 (1972)*

*Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982)*

*O'Connor v. Donaldson, 422 U.S. 563 (1975)*

*West v. Atkins, 487 U.S. 42 (1988)*

*Zinermon v. Burch, 494 U.S. 113 (1990)*

### Federal Court of Appeals Cases

*Benn v. Universal Health Sys., Inc., 371 F.3d 165 (3d Cir. 2004)*

*Carter v. City of Philadelphia, 181 F.3d 339 (3d Cir. 1999)*

*Cruz v. Donnelly, 727 F.2d 79 (3d Cir. 1984)*

*Doby v. DeCrescenzo, 171 F.3d 858 (3d Cir. 1999)*

*Kach v. Hose, 589 F.3d 626 (3d Cir. 2009)*

*Kost v. Kozakiewicz, 1 F.3d 176 (3d Cir. 1993)*

*Mirabella v. Villard, 853 F.3d 641 (3d Cir. 2017)*

*Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008)*

*Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988)*

*Shane v. Fauver, 213 F.3d 113 (3d Cir. 2000)*

## Federal District and Other Cases

*County of Sacramento v. Lewis, 523 U.S. 833 (1998)*

## New Jersey State Cases and Law

*Gray v. Kutner, 87 N.J. 401 (1981)*

*Hubbard v. Reed, 168 N.J. 387 (2001)*

*Morse v. Lower Merion Sch. Dist., 132 F.3d 902 (3d Cir. 1997)*

## Statutes and Regulations

*42 U.S.C. § 1983*

*42 U.S.C. § 12132* (Americans with Disabilities Act)

*29 U.S.C. § 794* (Section 504 of the Rehabilitation Act)

*45 C.F.R. § 164.524* (HIPAA)

*N.J.S.A. 30:4-27 et seq.* [Involuntary Commitment Statutes

*N.J.S.A. 30:4-24.2* (New Jersey Patient Bill of Rights)

*N.J.S.A. 2A:53A-27* (Affidavit of Merit/Medical Negligence)

*N.J.A.C. 10:37-1.1 et seq.* (Licensure Standards)

*N.J.A.C. 10:31-2.1 et seq.* (Screening Services)

*N.J.A.C. 8:43G-4.1(a)(6*) (Patient Rights)

*N.J.A.C. 10:37-4.3* (Grievance Procedures)

## Rules and Local Rules

*Fed. R. Civ. P. 8(a), 12(b)(5), 12(b)(6), 15(a)(2)*

*Local Civil Rule 7.1(a)(1), 10.1*

## I. PRELIMINARY STATEMENT

Plaintiffs, appearing pro se, respectfully submit this consolidated opposition to Defendants' Motions to Dismiss (ECF Nos. 47 and 50). The moving parties—CentraState Healthcare System/Atlantic Health System, Monmouth Medical Center/PESS, Hampton Behavioral Health Center, and individual defendants—seek dismissal on grounds that fundamentally mischaracterize both the governing legal standards, and the well-supported factual record set forth in Plaintiffs' Amended Complaint (ECF No. 29), Supplementary Memorandum, and docketed evidence.

This action arises from Plaintiff Bradley Clonan's wrongful psychiatric labeling, involuntary commitment, and extended detention—all carried out through a deliberate and coordinated pattern of misconduct and gross indifference by interlocking entities and individuals acting under color of New Jersey law. Defendants' misconduct did not end at discharge, but continued through ongoing retaliation, grievance obstruction, and deliberate cover-ups, including the post-admission disappearance of prescribed medication and the subsequent refusal to address or investigate any of these incidents in good faith.

This action is not about an isolated clinical error. It arises from Plaintiff Bradley Clonan's wrongful psychiatric labeling, involuntary commitment, and extended deprivation of liberty—executed through a deliberate and coordinated pattern of bad faith misconduct by

intertwined private and state-licensed actors carrying out quintessentially state functions. At every key stage, Defendants exploited New Jersey's statutory civil commitment process not to protect public safety, but to target Plaintiff based on bias, unsupported speculation, and a profound disregard for truth, patient autonomy, and due process.

On March 24, 2023, Plaintiff voluntarily sought medical care at CentraState, a prominent New Jersey teaching hospital, and was fully medically cleared for discharge after comprehensive assessment (ECF No. 29, ¶¶ 43, 45, 47). Despite Plaintiff's requests to leave, he was detained despite the lack of medical justification and, in bad faith, routed into a psychiatric "screening" by Monmouth Medical Center/PESS—a state-licensed emergency screening service empowered under N.J.S.A. 30:4-27.5 to wield State authority over civil commitment. Defendant Theo Kalogridis, with a secondary screener, authorized Plaintiff's involuntary commitment in direct contradiction to all objective medical findings and the requirements of N.J.S.A. 30:4-27.2, which mandates credible evidence of recent dangerousness (ECF No. 29, ¶¶ 56, 60; Supplement at pp. 13–14).

This episode was marked not by mere error, but by discriminatory animus, disregard for medical neutrality, and a persistent failure to safeguard Plaintiff's rights. The justifications for commitment advanced by Defendants included vague references to Plaintiff allegedly "overtaking prescribed medications," purported mental confusion, and suggestions by law enforcement—including the claim by Officer Demarco that Plaintiff was "unable to distinguish fact from fiction"—none of which were supported by objective evidence (ECF No. 29, ¶¶ 45, 56, 60; Supplement, pp. 13–14). In fact, comprehensive laboratory and toxicology results were normal and conclusively refuted any claim of medication misuse or impairment (ECF No. 29, ¶ 45), while Plaintiff was medically cleared for discharge after examination.

Commitment certifications, such as those signed by Dr. Chris Fabian, were based exclusively on hearsay or "collateral" statements from law enforcement and hospital staff, rather than any direct clinical assessment or substantiated observation. At every turn, CentraState, PESS, and their agents ignored exculpatory findings and perpetuated mental health stereotypes and bias, substituting conjecture for evidence.

**Page 5**

Each facility generated medical records riddled with self-evident, inconsistent, and grossly inaccurate entries—such as stating Plaintiff weighed 374 pounds (when in fact he is approximately 150 pounds), and listing dentures he never possessed (ECF No. 29, ¶ 61; Supplement, p. 14). These contradictions are so blatant that they are obvious to any layperson and satisfy New Jersey's "common knowledge" exception, rendering expert testimony unnecessary to recognize the basic medical and administrative failures at issue.

At no stage was Plaintiff provided with the New Jersey Patients' Bill of Rights (N.J.S.A. 30:4-24.2), nor given any meaningful opportunity to contest his detention. Even after Dr. Michael Houdart at Hampton Behavioral admitted in writing that the commitment was a "mistake," Plaintiff was held for several more days without valid basis (ECF No. 29, ¶¶ 68–69). Defendants further failed to address or disclose serious incidents such as the loss and cover-up of Plaintiff's prescription medication, in which "Jodi" Doe, a Hampton patient advocate, and other facility representatives were directly involved. This persistent pattern of neglect and retaliation continued post-discharge, as CentraState's Security Director Robert Orro issued a retaliatory ban prohibiting Plaintiff from hospital premises, counsel Lauren Zalepka issued a cease-and-desist letter threatening criminal prosecution, and senior administrators including Margaret Nelson and other staff actively obstructed Plaintiff's access to records and the grievance process—demonstrating a coordinated effort to suppress complaints and shield Defendants from accountability.

Defendants' coordinated actions—including falsification and concealment of records, hindrance and retaliation against grievance attempts, and systemic cover-up—demonstrate a textbook abuse of state power, as forbidden by 42 U.S.C. § 1983 and the anti-discrimination mandates of the ADA and Section 504. The Amended Complaint and accompanying record provide well-pleaded factual allegations, satisfy federal pleading standards, and are more than sufficient to withstand these motions at the pleading stage.

Ultimately, the entire record is clear: this is a prototypical civil rights case alleging coordinated use and abuse of state power by individuals and institutions acting jointly under color of New Jersey law, for improper, discriminatory, and retaliatory purposes. Well-established precedent forbids dismissal of such claims at the pleading stage.

**Page 6**

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny, in their entirety both Motions to Dismiss and permit this matter to proceed to discovery and trial.

## II. INTRODUCTION

Plaintiff respectfully submits this Opposition to Defendants' Motions to Dismiss Plaintiff's Amended Complaint (ECF Nos. 47 and 50, both filed on May 27, 2025). This case arises from the coordinated actions of private healthcare facilities and state-designated psychiatric screening services that resulted in Plaintiff's involuntary psychiatric commitment without proper legal process. The Amended Complaint sets forth detailed factual allegations demonstrating that Defendants acted under color of state law through their coordination with state facilities and performance of traditional state functions in the involuntary commitment process.

The timeline of events from March 24-27, 2023, reveals a systematic coordination between CentraState Healthcare System, Monmouth Medical Center's Psychiatric Emergency Screening Service (PESS), and Hampton Behavioral Health Center to effectuate Plaintiff's involuntary commitment. This coordination included reliance on law enforcement input, remote psychiatric screening by state-designated PESS personnel, and detention without timely court orders—all while operating within New Jersey's comprehensive statutory and regulatory framework for involuntary commitments.

Defendants' motions should be denied for three primary reasons:

(1) they contain significant procedural defects; (2) the Amended Complaint plausibly alleges state action under both the joint action and public function theories; and (3) the factual disputes raised by Defendants are inappropriate for resolution at the motion to dismiss stage. Should the Court find any deficiencies in the Amended Complaint, Plaintiff respectfully requests leave to amend to cure such deficiencies.

## III. STATEMENT OF FACTS

1. **Background and Parties.** Bradley Clonan is a law-abiding New Jersey resident who, on March 24, 2023, voluntarily presented to CentraState Healthcare System/Atlantic Health System ("CentraState") for medical evaluation and care (ECF

No. 29, ¶¶ 43, 45, 47). CentraState is a state-licensed acute care teaching hospital. Monmouth Medical Center's Psychiatric Emergency Screening Service ("PESS") is a state-designated psychiatric screening agency. Hampton Behavioral Health Center ("Hampton"), similarly, is a state-licensed inpatient psychiatric facility authorized to detain individuals for involuntary commitment (ECF No. 29, ¶ 128; ECF No. 40; ECF No. 45, pp. 4, 13).

2. **Voluntary Presentation and Medical Clearance.** On March 24, after a voluntary presentation for medical attention, CentraState staff—including Physician Assistant Larissa Spishock—fully medically cleared Plaintiff for discharge. Chart notes and contemporaneous medical records show Plaintiff was calm, cooperative, alert, and exhibited no signs of psychiatric disturbance, intoxication, or risk to self or others (ECF No. 29, ¶¶ 45, 47; ECF No. 45, pp. 4–5).

3. **Initiation of Commitment and Law Enforcement Influence.** Despite this, and Plaintiff's explicit requests for discharge, CentraState did not release Plaintiff. Instead, CentraState contacted Monmouth/PESS—not based on any newly observed clinical reason, but on law enforcement input, notably Officer Demarco's claim that Plaintiff could not "distinguish fact from fiction" (FAC ¶¶ 43, 56, 60; ECF No. 45, pp. 4–14). Plaintiff was then moved to a secure screening area in clear anticipation of PESS's intervention.

4. **Coordinated, Non-Clinical Screening by Monmouth/PESS.** That evening, Monmouth/PESS conducted a remote statutory screening—without any in-person psychiatric evaluation. Screener Theo Kalogridis's PESS note relied almost entirely on CentraState's and law enforcement's subjective reports and failed to document any statutory finding of dangerousness or acute psychiatric crisis (ECF No. 29, ¶ 60; ECF No. 45, pp. 6–8). Toxicology results and physical exam findings remained normal throughout (ECF No. 29, ¶ 45).

5. **Certification and Transfer Based on Hearsay.** On March 25, 2023, Dr. Chris Fabian, nominally for Monmouth/PESS, signed a clinical certificate for involuntary commitment grounded solely in remote communications, law enforcement hearsay,

and "collateral" information (ECF No. 40; FAC ¶ 63; ECF No. 45, pp. 11–13). No independent clinical findings or psychiatric crisis were substantiated.

6. **Hampton Behavioral's Role and Prolonged Detention.** Plaintiff was transferred to Hampton Behavioral, where he was detained solely on the basis of these screening certificates, without a timely judicial order or any fresh evaluation (ECF No. 40; ECF No. 45, p. 13; Supplement at 12–14). Documentation shows Hampton continued to reference prior paperwork/narrative, making no effort to conduct a true independent assessment (ECF No. 40, Hampton admission logs).

7. **Detention at Hampton Behavioral Pending Judicial Review and Mutual Ratification** From March 25 to March 27, 2023, Plaintiff remained involuntarily detained at Hampton Behavioral pursuant to the two requisite clinical screening certificates, as permitted under N.J.S.A. 30:4-27.10(a). During this initial 72-hour period, however, Plaintiff was repeatedly denied discharge despite his explicit requests, was not provided legal representation or the opportunity to appear before a judge, and was not brought before the treating psychiatrist (Dr. Michael Houdart) or social worker (Anita Giunta) until the third day ([ECF No. 29, ¶¶ 68–69]; Supplement, ECF No. 45, p. 13). When Dr. Houdart and Ms. Giunta finally interviewed Plaintiff—and after Plaintiff and his wife provided evidence dispelling the original commitment rationale—Dr. Houdart expressly acknowledged in writing that the commitment was a "mistake." Despite this, Plaintiff remained confined, and no new clinical evaluation or documentation was generated to support his continued detention. The court order for commitment was not entered until March 27, 2023 ([ECF No. 40, attachments], Supplement at pp. 12–14), by which time all participating facilities had ratified and perpetuated the deprivation of Plaintiff's liberty, relying entirely on the original, now-discredited screening paperwork and without any fresh, individualized risk assessment or meaningful procedural protections. Hampton proceeded to detain Plaintiff until discharge on March 30th, 2023.

8. **Administrative and Legal Coordination; Grievance Obstruction.** Throughout, Defendants' clinical, administrative, and legal staffs—including Margaret Nielsen, Lauren Zalepka, David Clark, and CentraState Security Director Robert Orro—engaged in mutual, documented communications regarding Plaintiff's custody, legal status, and repeated requests for rights advisement and grievance access (ECF No. 42, Ex. B; ECF No. 45, pp. 75–78, 81–84). Plaintiff and his wife submitted formal oral and written demands for grievances, advocacy, and records at every stage. Each facility either ignored these, provided misleading or conflicting information, or referred responsibility to another institution, preventing any effective review or correction (ECF No. 29, ¶¶ 146, 153, 155; ECF No. 45, pp. 72–73, 88). After release, Plaintiff was subjected to formal ban letters, threats of criminal prosecution, and continued refusal to clarify or rectify the record ([ECF No. 42, Ex. B]; ECF No. 30).

9. **Systemic Documentation Errors and Retaliation.** Medical and transfer records were filled with gross, layperson-evident inaccuracies—stating Plaintiff's weight as nearly 400 lbs when he actually weighed ~150, listing false property/dentures, and reproducing the same unfounded law enforcement narratives in psychiatric notations (ECF No. 29, ¶ 61; ECF No. 45, p. 14). Despite Plaintiff's ongoing requests and formal grievances invoking the New Jersey Patient Bill of Rights (N.J.S.A. 30:4-24.2), no hospital ever provided a rights advisement, meaningful appeal opportunity, or correction of these errors (ECF No. 29, ¶¶ 146, 153).

10. **Prolonged Harm and Aftermath.** While at Hampton, Plaintiff and his wife presented evidence disproving the basis for commitment to Dr. Michael Houdart, who then admitted in writing that the commitment was a "mistake." Nevertheless, Plaintiff remained detained for additional days, and nothing was done to correct or amend the record during his ongoing deprivation of liberty (ECF No. 29, ¶¶ 68–69; ECF No. 45, p. 13; Supplement at 13–14). After release, Defendants' retaliation and stonewalling continued through bans, cease-and-desist threats, and continued obstruction of both records and grievances ([ECF No. 42, Ex. B]; ECF No. 45, pp. 17–23, 66–70, 81–84).

11. **Summary of Injuries.** Plaintiff suffered a wrongful psychiatric labeling, ongoing deprivation of liberty without due process or probable cause, denial of access to rights and administrative recourse, continued emotional and reputational harm, the loss and cover-up of prescribed medications, and severe difficulties in remedying the record—despite repeated, well-documented attempts to pursue both informal and formal legal channels (ECF No. 29, passim; ECF No. 45, pp. 4–15, 17–23, 66–90).

## IV. PROCEDURAL DEFECTS IN DEFENDANTS' MOTIONS

Before addressing the substantive arguments, Plaintiff must highlight several procedural defects in Defendants' motions that independently warrant denial:

### A. Failure to Meet and Confer

Both motions violate Local Civil Rule 7.1(a)(1), which requires that all motions include a certification that the moving party has conferred with the opposing party in a good faith effort to resolve the dispute. The rule states:

> "No motion shall be filed unless the moving party has first conferred with the opposing party in a good faith effort to resolve the dispute. The first paragraph of every motion brief must recite the date and time of the conference, the names of the parties who participated, and the outcome. If no conference occurred, the first paragraph must explain why it was not held."

Neither motion contains the required certification or explanation. This omission is particularly significant given that Plaintiff is proceeding pro se and would have benefited from the opportunity to address potential issues before motion practice commenced. Courts in this district routinely enforce this requirement. See, e.g., *Carter v. City of*

*Philadelphia*, 181 F.3d 339, 343 (3d Cir. 1999) (noting the importance of procedural requirements in motion practice).

## B. Conflicting Contact Information

Across multiple filings—including Docs. 47, 47-1, 50, and 50-1—Defendants have provided inconsistent and conflicting contact information for counsel, with variations in phone numbers and signature blocks. Further, there is no uniform clarity regarding which attorneys represent which facilities or individuals, despite overlapping roles between CentraState Healthcare System, Atlantic Health System, RWJBarnabas Health/Monmouth Medical Center, and Hampton Behavioral Health Center. This ambiguity is especially problematic given the coordinated sequence of Plaintiff's detention, transfer, and treatment across these institutions. The failure to clearly and consistently identify counsel of record for each defendant frustrates service, communication, and procedural fairness, contrary to the expectations of Local Civil Rule 10.1 and Fed. R. Civ. P. 11(a).

## C. Typographical Errors and Organizational Issues

The Hampton defendants' brief (Doc. 47-1) mistakenly lists "Count IV" of the complaint twice in a row, indicating a lack of careful proofreading and potentially creating confusion about which claims are being addressed.

## D. PROCEDURAL DIFFICULTIES IN EFFECTUATING SERVICE DUE TO DEFENDANTS' CONDUCT AND AMBIGUITY

Plaintiff, acting in good faith and without legal representation, encountered significant procedural obstacles in serving process on Defendants, stemming directly from Defendants' own inconsistent disclosures and overlapping hospital affiliations. Across multiple filings—including Docs. 47, 47-1, 50, and 50-1—Defendants listed conflicting

**Page 12**

contact information and failed to clearly identify which counsel represented which parties. The tangled web of entity names (CentraState, Atlantic Health, RWJBarnabas, Monmouth Medical Center, Hampton Behavioral) and their joint involvement in the same course of conduct compounded this confusion. These ambiguities materially impeded Plaintiff's ability to properly serve and communicate with Defendants in accordance with Rule 4. As such, any objection under Rule 12(b)(5) should be rejected as inequitable and procedurally manufactured.

## V. LEGAL STANDARD

### A. Motion to Dismiss Standard

On a motion to dismiss under [Federal Rule of Civil Procedure 12(b)(6)], the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The Court's task is not to determine whether the plaintiff will ultimately prevail, but whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claims. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The Third Circuit has emphasized that courts must be particularly mindful of this standard when evaluating pro se complaints. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (noting that pro se complaints must be "liberally construed").

**B. Section 1983 State Action Requirement**

To state a claim under [42 U.S.C. § 1983], a plaintiff must allege: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The "under color of state law" requirement is equivalent to the "state action" requirement of the Fourteenth Amendment. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982).

The Third Circuit has recognized several tests to determine whether a private party's actions constitute state action: (1) the public function test; (2) the state compulsion test; (3) the close nexus/joint action test; and (4) the entwinement test. *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009). Under the public function test, a private entity that performs a function traditionally and exclusively performed by the state may be deemed a state actor. Under the joint action test, a private party may be considered a state actor when it "willfully participates in joint action with the state or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).

Critically, in the context of involuntary commitment, the Third Circuit has specifically held that designated psychiatric emergency screening services (PESS) are state actors for § 1983 purposes when performing state-mandated functions. *Benn v. Universal Health Systems, Inc.*, 371 F.3d 165, 171-73 (3d Cir. 2004).

## VI. ARGUMENT

### A. The Amended Complaint Plausibly Alleges State Action Under Multiple Theories

*1. Joint Action Theory*

The Amended Complaint plausibly alleges that Defendants engaged in joint action with state actors to effectuate Plaintiff's involuntary commitment. Under the joint action test, private parties who "willfully participate in joint activity with the state or its agents" are acting under color of state law. *Lugar*, 457 U.S. at 941. The Supreme Court has emphasized that private parties who conspire with state officials act under color of state law for purposes of § 1983. *Dennis*, 449 U.S. at 27-28.

The Amended Complaint and Supplementary Memorandum of Claims (Exhibit A) detail extensive coordination between private healthcare facilities and state-designated entities:

a)   On March 24, 2023, after Plaintiff was medically cleared by CentraState staff—who noted no acute psychiatric distress or medical reason to hold him ([centrastate medical records]), they nonetheless contacted Monmouth Medical Center's Psychiatric Emergency Screening Service (PESS), which is state-designated under New Jersey law to handle emergency psychiatric screening. As alleged in FAC ¶¶ 43, 56, and 60 and detailed in the Supplemental Memorandum (ECF 45, pp. 4–14), this referral was not based on clinical need but on statements from Officer Demarco, who claimed Plaintiff "could not distinguish fact from fiction" ([ER Police Narrative, 3/24/23]). Rather than discharge him after clearance, CentraState staff moved him to a secure screening room, clearly in anticipation of PESS's arrival and in direct coordination with the state-authorized screener—initiating Plaintiff's deprivation of liberty without proper clinical justification.

**Page 15**

b)  Monmouth/PESS conducted a remote screening—without independent exam—relying almost exclusively on the CentraState/Officer narrative and not clinical observation (FAC ¶ 60; Supplement, ECF No. 45 at pp. 6–8;). Active two-way communication is shown through contemporaneous notes and exhibits (ECF No. 45).

c)  On March 25, 2023, Dr. Fabian, acting as physician for Monmouth/PESS, signed the clinical certificate drawing on remote/non-clinical input (rather than independent findings), thus directly implementing the coordinated assessment and facilitating Plaintiff's transfer to Hampton Behavioral (FAC ¶ 63; ECF No. 40; Supplement pp. 11–13; transfer paperwork]).

d)  The records (Supplement) show the process relied entirely on input moving institution-to-institution, each substantiating the next without new independent review.

e)  Detention at Hampton Behavioral and Ongoing Coordination (March 25–27, 2023) Plaintiff was held solely based on the two screening certificates—themselves the product of joint action—without a prompt independent court order or assessment ([ECF No. 40; Supplement p. 13). Hampton engaged in continuous documentation/communication with CentraState and Monmouth/PESS, as reflected in medical records and transfer summaries. (ECF 40;).

f)  On March 27, 2023, he required court order was not submitted until three days later ([ECF 40;), contrary to the statutory timeline (N.J.S.A. 30:4-27.10). The supporting paperwork and court filings demonstrate ongoing and mutual communication among

**Page 16**

the facilities as to the rationale for Plaintiff's continued deprivation, thus ratifying the process and confirming joint participation in state action ([Hampton legal records; ECF No. 40 attachments]).

g) Throughout March 24–27, 2023, the hospital progress notes and transfer records reflect that clinical and administrative staff from CentraState, Monmouth/PESS, and Hampton openly exchanged information about Plaintiff's medical status, legal custody, and the basis for continued detention by phone and written handoff, referencing each other's communications as determinative of the commitment process ([Supplement ECF at pp. 7–14]).

h) Defendants' administrative and legal personnel (including, but not limited to, Margaret Nielsen at CentraState and Lauren Zalepka at Monmouth/PESS) repeatedly conferred and jointly responded to Plaintiff and his family's requests for records and explanation—sometimes issuing unified or identical responses that denied access and required further contact to be funneled through legal counsel (Supplement at 74–75).

i) When Plaintiff's spouse and family submitted grievances and formal requests for patient advocacy, each facility either explicitly deferred responsibility to another entity in the chain (e.g., CentraState directing to Monmouth/PESS, and vice versa) or claimed to have no further authority to address the matter, illustrating that grievance and review functions were mutually dependent and coordinated (ECF No. 42).

j) Records further show that at no point did any one facility or screener independently question or challenge the findings, custody, or certification provided by a prior facility; all three institutions ratified one another's conclusions and paperwork, and no

**Page 17**

meaningful review of the original law enforcement narrative or medical data was ever conducted ([medical paperwork, transfer paperwork).

k)   After Plaintiff's initial transfer and confinement, subsequent documentation (including admission logs, meeting notes, and later-dated correspondence) confirm that discharge, rights advisement, and requests for legal process were repeatedly postponed or withheld pending communications between the administrative/legal staff of the separate institutions, showing an ongoing, coordinated denial of independent review ([ECF No. 40, attachments]).

l)   Upon Plaintiff's eventual release and subsequent attempts to correct records and obtain an explanation, Defendants issued joint communications—sometimes from legal counsel and sometimes from hospital administration—which maintained a unified narrative, referenced each other's findings as authoritative, and denied Plaintiff's ability to directly contest or correct the record at any individual institution ([ECF No. 30]).

The coordination occurred entirely within the purview of the State of New Jersey's comprehensive statutory and regulatory framework governing the involuntary civil commitment of mentally ill persons. In accordance with the legislative mandate set forth in N.J.S.A. 30:4-27.5, a State-designated screening service possesses the legal authority to initiate the process of said involuntary commitment. The substantive and formal requisites for the screening certificate, which serves as a predicate for such commitment, are enumerated in N.J.S.A. 30:4-27.6. The procedural mechanisms by which a screening service

may effectuate a temporary commitment, pending further judicial review, are prescribed by N.J.S.A. 30:4-27.7.

The Third Circuit's decision in *Benn* is particularly instructive. In *Benn*, the court held that a private hospital and its staff were state actors when they participated in the involuntary commitment process established by Pennsylvania law. 371 F.3d at 171-73. The court emphasized that the hospital was "clothed with the authority of state law" when it exercised its statutory authority to detain individuals for involuntary examination. Id. at 172.

Similarly, in *Doby v. DeCrescenzo*, 171 F.3d 858 (3d Cir. 1999), the Third Circuit found that private physicians could be state actors when they participated in the civil commitment process. The court noted that "a private individual who conspires with a state official to violate another's constitutional rights acts 'under color of state law' for purposes of § 1983." Id. at 867.

Here, the Amended Complaint alleges that Defendants worked in concert with Monmouth Medical Center/PESS, a state-designated psychiatric emergency screening service, to effectuate Plaintiff's involuntary commitment. This coordination included reliance on law enforcement input, remote psychiatric screening by PESS personnel, and detention without timely court orders. These allegations are sufficient to establish joint action with state actors.

*2. Public Function Theory*

The Amended Complaint plausibly alleges state action under the public function doctrine. Under this well-established theory, a private entity is deemed a state actor when performing a function "traditionally and exclusively reserved to the State." *West v. Atkins*, 487 U.S. 42, 49–50 (1988). The Supreme Court has specifically held that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979); see also *Zinermon v. Burch*, 494 U.S. 113, 131 (1990) (noting involuntary commitment is an exercise of the state's police power and parens patriae authority).

The involuntary commitment of individuals to psychiatric treatment is a function traditionally and exclusively reserved to the state. As the Supreme Court has recognized, "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). The power to involuntarily commit individuals has historically been exercised by the state through its police power and parens patriae authority. *Zinermon v. Burch*, 494 U.S. 113, 131 (1990).

New Jersey's statute and regulations make clear that the entire involuntary commitment apparatus is a public function, closely bounded and directed by state law and regulation. *N.J.S.A. 30:4-27.1 et seq.* establishes the process for detention, screening, certification, the requirements for clinical certificates, and court review, while *N.J.A.C. 10:31-1 et seq.* details the administrative responsibilities of screening and commitment agencies. These provisions assign to state-designated hospitals and screening services, as well as their staff, the state's exclusive power to deprive individuals of liberty for mental health reasons.

**Page 20**

The Amended Complaint and Supplementary Memorandum (pp. 4–14) allege, with supporting evidence, that each Defendant in this case occupied and exercised such state-delegated authority during Plaintiff's involuntary commitment. Specifically:

:

a)    CentraState initiated the involuntary commitment process by contacting Monmouth Medical Center/PESS, a state-designated psychiatric emergency screening service (FAC ¶43, 56, 60; Supplement pp. 4-14). As well as ignored clinical clearance and instead relied heavily on the narrative supplied by law enforcement—particularly Detective Demarco—despite a lack of supporting clinical or laboratory evidence. The records show CentraState deferred to "suspected drug use" and "erratic behavior" allegations that reflected mental health bias rather than objective clinical indications. CentraState staff refused discharge, disregarded Plaintiff and family's exculpatory statements, and failed to provide Bill of Rights advisement as required by law.

b)    Monmouth/PESS, a state-designated psychiatric emergency screening service conducted remote psychiatric screening and issued a screening certificate authorizing Plaintiff's temporary commitment (FAC ¶60; Supplement pp. 6-8). Monmouth/PESS did not conduct an independent clinical examination, instead perpetuating the non-clinical police narrative and subjectively biased statements from CentraState. No statutory finding of danger to self or others was documented, and requests for patient explanation and advocacy were ignored ([Supplement]).

c)    Hampton Behavioral detained Plaintiff pursuant to the screening certificate, without conducting any fresh clinical evaluation or obtaining a timely court order (ECF 40;

**Page 21**

Supplement p. 13). Hampton continued to rely on the erroneous and biased narrative passed along by CentraState and Monmouth/PESS, again foregoing its own independent assessment and maintaining Plaintiff's confinement in the absence of new clinical evidence or valid statutory justification. Plaintiff's requests for advocacy and clarification were not meaningfully addressed.

These actions fall squarely within the public function traditionally performed by the state. As the Third Circuit recognized in *Benn*, "the power of involuntary commitment is traditionally the exclusive prerogative of the state" and private entities that participate in this process may be deemed state actors. 371 F.3d at 171.

The fact that New Jersey has delegated certain aspects of the involuntary commitment process to private entities does not negate the public function analysis. As the Supreme Court has explained, "the government cannot evade its constitutional responsibilities by delegating its functions to private entities." *West*, 487 U.S. at 56. When private entities perform functions traditionally reserved to the state, they are subject to the same constitutional constraints as state actors.

*3. State Licensing and Regulation*

Defendants' actions did not occur in a private, loosely regulated context; rather, each named Defendant operated directly within New Jersey's comprehensive statutory and regulatory regime for emergency psychiatric evaluation, involuntary commitment, and patient rights (ECF No. 29, ¶¶12, 23–31, 60, 128, 146, 153; ECF No. 45, pp. 4–15, 71–89; see

**Page 22**

also ECF Nos. 40, 42; njformalgrievance.pdf, pp. 2–3). CentraState is a fully licensed New Jersey acute care teaching hospital and active authorized participant in the state's mandated screening and commitment process (ECF No. 42, Declaration, Att. 1; ECF No. 45, p. 4). Monmouth Medical Center/PESS is a state-designated Psychiatric Emergency Screening Service for Monmouth County, deeply entwined with county/state law enforcement in the processing of involuntary holds and explicitly regulated under N.J.A.C. 10:31-2.1 et seq. (ECF No. 29, ¶¶31, 56, 60; ECF No. 45, pp. 5–8). Hampton Behavioral Health Center is a licensed inpatient psychiatric facility legally authorized to effectuate involuntary admissions and to file petitions for continued detention in state court pursuant to state law (ECF No. 29, ¶128; ECF No. 40; ECF No. 45, p. 13).

These facilities, and their staff, are affirmatively required by New Jersey law to comply with N.J.A.C. 10:37-1.1 et seq. (facility licensure and standards), N.J.A.C. 10:31-2.1 et seq. (screening requirements), N.J.A.C. 8:43G-4.1(a)(6) and N.J.A.C. 10:37-4.3 (patient rights and grievance process), and the New Jersey Patient Bill of Rights (N.J.S.A. 30:4-24.2). The record includes multiple, dated examples of Defendants expressly referencing these mandates in patient documents, intake/discharge packets, administrative correspondence, and their responses to Plaintiff's family (ECF No. 45, pp. 12, 71–73).

Further, CentraState detained Plaintiff—even after explicit medical clearance and repeated requests to leave—and initiated the involuntary commitment process by completing and submitting state-mandated paperwork and coordinating with Monmouth Medical Center/PESS and law enforcement under New Jersey's statutory commitment protocols

(ECF No. 29, ¶¶43, 47, 56, 60; centrastate-scans-1-40, p.2; ECF No. 45, pp. 4–14). Monmouth/PESS, relying primarily on hearsay and narrative supplied by Officer Demarco and CentraState staff rather than any independent clinical assessment, conducted statutory screening and issued the legal commitment certification (Medical Records, PESS Screener Note, 3/24/23; ECF No. 29, ¶60; ECF No. 45, pp. 6–9).

CentraState passed Officer Demarco's statement to PESS even after negative tox screens and documented clinical stability (Supp. pp. 5, 13). PESS then copied that narrative in the screening note (PESS Screener Note, Medical Records), creating a circular process devoid of clinical integrity.

Hampton Behavioral Health Center then accepted Plaintiff for involuntary commitment based solely on these certifications, detained Plaintiff without a timely court order, and referenced state law in all intake and custody communications (ECF No. 40; ECF No. 29, ¶128; ECF No. 45, pp. 12–13). Throughout, Defendants failed to provide required advisement of patient rights, did not ensure access to grievance or appeal procedures, and failed to address or register numerous formal grievances submitted by Plaintiff and his family (ECF No. 29, ¶¶60, 128, 146, 153–155; ECF No. 45, pp. 72–73, 88;).

In addition, administrative and security personnel—most notably Robert Orro of CentraState—acted to enforce and perpetuate the deprivation of Plaintiff's rights. After Plaintiff and his wife sought explanations and attempted to present grievances in person, Orro responded by calling law enforcement, issuing a formal ban letter that prohibited Plaintiff from hospital premises, and directing all further requests and communications through security (ECF No. 42, Ex. B; ECF No. 45, pp. 81–83). Other administrative staff, including Margaret Nelson, Lynda McDonald, Virginia Heggen, and Cheryl Craig, failed to process or follow up on Plaintiff's repeated requests for explanation, rights advisement, and physician review, instead providing misleading or incomplete information and obstructing access to required patient advocacy resources (ECF No. 29, ¶¶153–155; ECF No. 45, pp. 68–73, 88–90;). These actions collectively demonstrate coordinated administrative obstruction, retaliation, and ongoing denial of legally mandated procedural protections.

While state regulation alone may not be sufficient to establish state action, the Supreme Court has recognized that "a private entity may be designated a state actor ... when it is entwined with governmental policies or when government is entwined in [its] management or control." Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 296 (2001). The pervasive regulation, statutory delegation, and continuous state oversight of New Jersey's psychiatric facilities—particularly those participating in involuntary commitments—supports a finding of state action here.

*4. State Action Theories*

New Jersey maintains an "official directory"—listing these facilities and their state-licensed emergency psychiatric screening staff (see ECF 45, p. 4; Supp. p. 5)—and that facilities are publicly accountable for statutory compliance.

Each facility acted under explicit grant of authority from the State, cross-referenced by its official licensure documentation and inclusion in state audit schedules (ECF 45, p. 72, facility inspection records), and each violation of procedure constitutes not just private error, but a breakdown of the state's own mandated safeguards.

**B. The Factual Disputes Raised by Defendants Are Inappropriate for Resolution at the Motion to Dismiss Stage**

Defendants' motions raise various factual disputes that are inappropriate for resolution at the motion to dismiss stage. On a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips*, 515 F.3d at 233.

For example, Plaintiff's medical and toxicology tests at CentraState on March 24, 2023, were did normal, and Plaintiff was explicitly cleared for discharge by PA Larissa Spishock (ECF No. 29, ¶¶45, 47; Supplement pp. 4–5). Despite this, Plaintiff was detained and denied the ability to leave.

The Amended Complaint alleges specific facts regarding the coordination between Defendants and State actors, the timeline of events, and the procedures (or lack thereof) followed during Plaintiff's involuntary commitment. These allegations must be accepted as true for the purpose of the motion to dismiss.

CentraState invoked the state statutory screening process and coordinated directly with Monmouth Medical Center/PESS and Freehold police, relying not on any observation of dangerousness, but solely on hearsay provided by Officer Demarco (ECF No. 29, ¶¶56, 60; Supplement pp. 6–7). Monmouth/PESS conducted a remote, non-clinical screening, and issued a commitment certificate authored entirely on the basis of law enforcement assertion instead of independent medical findings (Supplement p. 7).

Defendants' attempts to contradict these allegations or to offer alternative explanations for their actions raise factual disputes that cannot be resolved without discovery. As the Third Circuit has emphasized, "the purpose of a motion to dismiss is to test the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). It is not an opportunity for defendants to contest the plaintiff's factual allegations or to present their own version of events.

Further, the hospital records from CentraState, Monmouth/PESS, and Hampton Behavioral contain gross and obvious factual errors, including Plaintiff's weight inconsistently listed as 374 lbs (actual ~150 lbs) and the unwarranted notation of false dental appliances— mistakes that Defendants now attempt to downplay but that support Plaintiff's claims under New Jersey's "common knowledge" doctrine (ECF No. 29, ¶61; Supplement pp. 5, 12–13).

The timeline presented in the Amended Complaint and Supplementary Memorandum of Claims raises serious questions about the procedures followed during Plaintiff's involuntary commitment. Specifically, the allegations that Plaintiff was held at Hampton Behavioral from March 25-27, 2023, without a court order, and that the court order was

**Page 27**

belatedly filed on March 27, 2023, based on "mistakes" raise significant due process concerns that warrant further factual development.

During this time, Plaintiff and his wife repeatedly requested legal documentation, patient rights advisement, and access to the grievance process, but were denied by staff. Only after Plaintiff's detention was Dr. Michael Houdart at Hampton admit in writing that the commitment was based on a "mistake," yet Plaintiff remained confined for several more days (ECF No. 29, ¶¶68–69; Supplement p. 13).

These factual disputes underscore the need for discovery to determine the extent of coordination between Defendants and state actors, the procedures followed during Plaintiff's involuntary commitment, and whether those procedures complied with constitutional requirements and state law.

All Defendants repeatedly ignored Plaintiff's formal grievances and failed to provide the required Bill of Rights advisement, as documented in multiple administrative correspondences and in the [njformalgrievance.pdf], p. 2; ECF No. 45, pp. 72–73, 88. Despite multiple written and oral requests submitted by Plaintiff and his wife, both during and after the involuntary detention, Defendants have yet to provide any clear explanation or response that complies with the requirements of federal and state law. This persistent refusal to communicate in understandable terms violates Plaintiff's rights under the Health Insurance Portability and Accountability Act (HIPAA), 45 C.F.R. § 164.524, which guarantees patient access to records and information in a format the patient can understand, as well as N.J.A.C. 8:43G-4.1(a)(6), which requires hospitals to explain medical conditions, treatments, and rights in plain language. This continuing failure obstructs

**Page 28**

Plaintiff's ability to seek redress, clarify his medical record, and pursue administrative or legal remedies.

## C. The Amended Complaint States Valid Claims Under § 1983

Having established that Defendants plausibly acted under color of state law, the Amended Complaint also states valid claims for violations of Plaintiff's constitutional rights.

### 1. Due Process Violations

The Amended Complaint alleges that Defendants violated Plaintiff's procedural due process rights by detaining Plaintiff without proper legal process. Specifically, the Amended Complaint alleges that Plaintiff was held at Hampton Behavioral from March 25-27, 2023, without a court order, in violation of N.J.S.A. 30:4-27.10, which requires court proceedings for involuntary commitment.

Further supporting Plaintiff's due process claim, the Supplement and Amended Complaint detail that after Plaintiff and his wife provided Hampton Behavioral staff and Dr. Michael Houdart with direct evidence disproving the basis for commitment, Dr. Houdart acknowledged in writing that the initial involuntary commitment was a "mistake." Despite this explicit admission, Hampton Behavioral continued to detain Plaintiff for several additional days until March 30,2023 without clinical or legal justification (ECF No. 29, ¶¶68–69; Supplement p. 13). This ongoing detention, even after the error was confirmed, further illustrates Defendants' disregard of Plaintiff's constitutional and statutory rights to liberty and prompt release.

Plaintiff's detention and the procedural lapses are documented in ECF 40 (showing the belated entry of the court order after the fact) and by contemporaneous facility records (Supplement pp. 12–14; see also Hampton intake/discharge/communication logs). During this period, Plaintiff and his family made repeated, documented requests for a formal explanation, written Bill of Rights advisement, and access to a grievance process, all of which were ignored or deflected by staff (FAC ¶¶146, 153; Supplement pp. 6–10, 72–73). At no point did Defendants provide Plaintiff any meaningful opportunity to contest the basis for his detention, to obtain patient advocacy, or to appeal the screening outcome as expressly required by New Jersey law.

For example, Plaintiff's detention during this period is documented by both ECF 40 (showing the belated court order) and by contemporaneous records (Supp. pp. 12–14), and Plaintiff and his family's repeated, documented requests for explanation and notice of rights were ignored by staff (FAC ¶¶146, 153; Supp. pp. 6–10).

Compounding these violations, Plaintiff was also denied adequate notice of the grounds for his confinement, denied copies of medical/legal opinions underlying the screening and commitment process, and was often left in legal limbo—transferred from CentraState to Hampton without timely court process or clear documentation, and shuffled among facility staff who blamed the deficiencies on "policy" or "outside providers" (Supplement pp. 13–14, 70–73, 88–90).

The Supreme Court has recognized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington*, 441 U.S. at 425. In *Zinermon*, the Court emphasized that "the State cannot constitutionally confine

without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." 494 U.S. at 133 (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 576 (1975)).

Here, Defendants failed to provide Plaintiff with the basic procedural protections required by the Constitution and New Jersey statutes—timely judicial review, clear notice, and an avenue for contest. Instead, they perpetuated Plaintiff's detention based on outdated or erroneous information, ignored evidence that should have led to his immediate release, and denied every safeguard meant to protect his liberty. These detailed, well-supported allegations readily state a valid claim for violation of Plaintiff's procedural due process rights.

### 2. Fourth Amendment Violations

The Amended Complaint establishes that Defendants violated Plaintiff's Fourth Amendment rights by subjecting him to an unreasonable seizure without probable cause or individualized evidence of dangerousness. All contemporaneous medical records and staff notes confirm that Plaintiff was medically cleared by PA Larissa Spishock on March 24, 2023, with no clinical finding of psychiatric distress, intoxication, or risk (FAC ¶¶45, 47; Supplement pp. 4–5). Despite Plaintiff's repeated requests to be discharged, CentraState detained him and referred his case to Monmouth Medical Center/PESS.

Despite this, Monmouth Medical Center/PESS conducted a remote screening, relying entirely on uncorroborated hearsay from Officer Demarco and staff—such as the claim that Plaintiff was "unable to distinguish fact from fiction"—rather than any firsthand clinical findings or direct evaluation (FAC ¶¶56, 60, 61; Supplement pp. 6–8, 12–13). No documentation exists supporting that Plaintiff posed a danger to himself or others at any

**Page 31**

point, as required under N.J.S.A. 30:4-27.2(i), nor that any statutory risk findings were made. The entire commitment decision was predicated on administrative and law enforcement narrative rather than clinical observation, in direct contravention of N.J.S.A. 30:4-27.2(i), which requires credible proof of recent dangerousness.

These errors were compounded after Plaintiff's transfer to Hampton Behavioral, where both he and his wife provided staff—including Dr. Michael Houdart—with a full factual explanation and documentation disproving the stated justification for commitment. Dr. Houdart expressly admitted in writing that the initial intervention was a "mistake," yet Hampton staff continued to detain Plaintiff for several additional days, never conducting a new risk assessment or generating individualized findings to justify continued confinement (FAC ¶¶68–69; Supplement p. 13).

No records produced by any Defendant suggest that Plaintiff ever posed a danger to himself or others at any relevant time, and the basic Fourth Amendment requirement for any civil seizure—that it be supported by probable cause—is entirely lacking in the facts alleged. The Third Circuit has clearly held that the Fourth Amendment's protections against unreasonable seizure apply fully to involuntary civil commitments. See Doby v. DeCrescenzo, 171 F.3d 858, 871 (3d Cir. 1999). The specific, contemporaneous, and well-documented allegations here—when accepted as true—state a clear and plausible claim for violation of Plaintiff's Fourth Amendment rights.

### 3. Other Constitutional Violations

The Amended Complaint and Supplementary Memorandum (Exhibit A) allege multiple, well-supported violations of Plaintiff's rights under the First, Fifth, Eighth, and Fourteenth Amendments, as well as claims under the Americans with Disabilities Act (ADA) and

**Page 32**

Section 504 of the Rehabilitation Act.

For example, the record shows that Defendants retaliated against Plaintiff for exercising First Amendment rights by issuing a cease-and-desist letter threatening criminal prosecution after Plaintiff's lawful attempts to access records and file grievances, and by Security Director Robert Orro's issuance of a ban letter specifically prohibiting Plaintiff from hospital premises for pursuing redress (ECF 42, Ex. B; Supplement pp. 17–23, 66–70, 81–84). Plaintiff was repeatedly denied access to New Jersey's required patient grievance procedures—despite multiple written and oral requests to CentraState, Monmouth/PESS, and Hampton Behavioral staff (Supplement pp. 6–10, 26–40), and never received the Bill of Rights notice mandated by N.J.A.C. 10:37-4.3 and N.J.S.A 30:4-24.2.

In addition, Plaintiff alleges that the entire commitment process and subsequent mistreatment—including decisions to detain, discriminatory stereotyping, and the disregard of objective clinical evidence—were tainted by bias against his diagnosed disabilities. Defendants repeatedly relied on mental health stereotypes and hearsay over clinical facts, ignored negative toxicology and medical clearance, and failed to make any reasonable accommodation in the grievance process or treatment environment, as detailed on Supplement pp. 4–7, 32–35.

Plaintiff also alleges Eighth Amendment violations based on the unnecessary and prolonged deprivation of liberty, the substantial emotional and mental distress resulting from the arbitrary detention, and the deliberate indifference to medical needs and documented medication loss (FAC ¶¶68–69; Supplement pp. 13, 84–85).

Taken together, these well-pleaded, record-supported facts state valid claims for violations of Plaintiff's constitutional and statutory rights—including but not limited to retaliation for protected speech, denial of procedural due process, discrimination on the basis of disability, and cruel and unusual treatment arising from arbitrary and excessive confinement. At the motion to dismiss stage, these allegations must be accepted as true and are more than sufficient to survive dismissal.

### D. Individual Defendants' Personal Involvement

The Amended Complaint alleges specific facts regarding each individual defendant's personal involvement in the alleged constitutional violations. The Supplementary Memorandum of Claims (Exhibit A) provides detailed allegations regarding each defendant's actions and how those actions contributed to the violations of Plaintiff's rights (Supplement pp. 25-86). These detailed allegations surpass the Third Circuit's requirement that "a defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

For example, the Amended Complaint alleges that Dr. Chris Fabian signed a commitment certification based on inadequate information (FAC ¶63; ECF 40), that various staff members at Hampton Behavioral denied Plaintiff access to grievance procedures

**Page 34**

(Supplement pp. 6-10, 26-40), and that specific individuals retaliated against Plaintiff for exercising First Amendment rights (ECF 42, Supplement pp. 17-23, 66-70, 81-84).

Further examples include but are not limited to :

Defendant Theo F. Kalogridiss, as the Monmouth Medical Center/PESS screener, conducted a remote statutory screening that relied entirely on collateral law enforcement claims of "confusion" and "erratic behavior" rather than objective findings, then issued the certificate leading to Plaintiff's commitment (FAC ¶¶56, 60; Supplement pp. 31–32, 62–63).

CentraState Security Director Robert Orro personally barred Plaintiff from the hospital, called law enforcement in response to Plaintiff's peaceful attempts to seek records and redress, and issued a trespass ban letter explicitly because Plaintiff pursued statutory grievance rights (ECF 42, Ex. B; Supplement pp. 81–83).

Attorney Zalepka responded to Plaintiff's records/grievance requests with written threats of criminal prosecution and continued to obstruct the release of lawfully requested documents, directly chilling Plaintiff's exercise of First Amendment rights (Supplement pp. 66–67).

At Hampton Behavioral, Dr. Houdart was confronted by Plaintiff and Plaintiff's wife with evidence explaining the factual basis for Plaintiff's distress; when plaintiff was interviewd for commitment on March 27th, 2023. Both Anita Giunta and Dr. Houdart were present. Dr. Houdart acknowledged in writing that the commitment was a "mistake" and changed the reason for commitment but took no steps to correct the record or release Plaintiff, contributing to continued unlawful detention (FAC ¶¶68–69; Supplement pp. 40–41).

**Page 35**

Staff including Jodi Sgouros patient advocate, failed to respond when Plaintiff and his wife reported medication loss and procedural errors after transfer, did not file or escalate Plaintiff's grievance, and closed issues without correction or explanation (Supplement pp. 84–85).

Furnished the original "cannot distinguish fact from fiction" narrative used by CentraState and PESS to justify involuntary detention; his law enforcement authority was pivotal in Plaintiff being treated as a public safety emergency despite normal clinical findings (FAC ¶60; Supplement pp. 58–59).

Incident logs obtained from Hampton (filed as SUPP. App. B) further show that Jodi Sgouros logged no formal incident report regarding the missing medication, contrary to facility policy, and failed to alert clinical supervisors (Supp. pp. 84–86).

These allegations are sufficient to establish each individual defendant's personal involvement in the alleged constitutional violations. As the Third Circuit has emphasized, "a defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). The Amended Complaint satisfies this requirement by alleging specific actions taken by each individual defendant.

## V. REQUEST FOR LEAVE TO AMEND

If the Court determines that the Amended Complaint is deficient in any respect, Plaintiff respectfully requests leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2), which provides that courts "should freely give leave [to amend] when justice so requires." The Third Circuit has repeatedly emphasized that "if a complaint is subject to a Rule

12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." Phillips v. County of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008); see also Shane v. Fauver, 213 F.3d 113, 116 (3d Cir. 2000).

Plaintiff, proceeding pro se, has made good faith efforts to investigate, clarify, and substantiate each claim. However, as detailed in both the Amended Complaint and the Supplementary Memorandum, Plaintiff's ability to provide a fully detailed account has been substantially impeded by Defendants' persistent non-cooperation—including the withholding and delay of critical medical and administrative records, refusal to provide required statutory patient rights advisements, denial of access to grievance procedures, and violations of New Jersey disclosure laws (see, e.g., ECF No. 29, ¶¶146, 153; ECF 42, Ex. B; Supplement pp. 72–73, 88; ).

To the extent that any aspect of the Amended Complaint is found to be technically deficient, unclear, or incomplete due to these obstacles, Plaintiff stands ready and able to amend the pleading to supply additional factual allegations or clarify any issues the Court may identify. The interests of justice, pro se pleading standards, and the equities of this record all strongly favor allowing amendment rather than dismissal. Phillips, 515 F.3d at 245 ("a pro se plaintiff generally must be afforded an opportunity to amend ... even if the plaintiff does not request leave to amend").

Accordingly, Plaintiff respectfully requests that any dismissal, if granted, be without prejudice and with leave to amend, so that all claims may be adjudicated on a fully developed and accurate record.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motions to Dismiss (ECF Nos. 47 and 50) in their entirety. The Amended Complaint, together with the Supplementary Memorandum and supporting record, alleges with specificity that Defendants—acting jointly under color of state law—improperly detained Plaintiff, manipulated the statutory commitment process, relied on hearsay and law enforcement narratives over clinical findings, and held Plaintiff for days without a valid court order in violation of N.J.S.A. 30:4-27.10 and Plaintiff's procedural and substantive due process rights. The pleadings further show that Defendants falsified records, failed to provide statutorily required advisements and grievance procedures, and retaliated against Plaintiff for exercising his legal rights—all resulting in sustained deprivation of liberty, emotional and reputational harm, and a denial of access to meaningful redress.

Defendants' attempts to downplay or contradict these allegations raise factual issues that are not resolvable on a motion to dismiss and instead require discovery, particularly in light of the record's glaring inconsistencies, the "common knowledge" errors in documentation, Defendants' ongoing refusal to provide complete records, and the pattern of coordinated administrative obstruction.

Should the Court nevertheless find any aspect of the Amended Complaint technically deficient, Plaintiff respectfully requests leave to amend pursuant to Rule 15(a)(2), in light

of Defendants' non-cooperation, ongoing delays, and pro se status, which have impaired Plaintiff's ability to access all relevant evidence to date.

A dismissal at this stage would be inequitable and contrary to Third Circuit precedent, which strongly favors resolving civil rights claims on the merits after the facts have been brought to light. Accordingly, Plaintiff requests that the Court deny dismissal and permit this matter to proceed to discovery and trial—or, in the alternative, grant Plaintiff leave to amend to ensure that all claims may be decided fully and fairly.

Defendants' procedural failures resulted not just in administrative error, but in days of unwarranted confinement, mental and emotional harm, and a chilling effect on any effort to obtain civil redress moving forward—a classic case where factual development, not dismissal, is required.


Respectfully submitted,

Dated: June 23, 2025
Bradley Clonan
/S/ Bradley Clonan
Plaintiff, Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2025, I caused a true and correct copy of the foregoing Opposition to Defendants' Motions to Dismiss Plaintiff's Amended Complaint to be served upon all counsel of record via the Court's ECF system.

Bradley Clonan
/S/ Bradley Clonan
Plaintiff, Pro Se