UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| BRADLEY CLONAN, ET AL., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 3:24-CV-11399-RK-RLS |
| | ) | |
| v. | ) | |
| | ) | SUPPLEMENTARY MEMORANDUM |
| CENTRASTATE HEALTHCARE | ) | OF CLAIMS (APPENDIX) |
| SYSTEM/ATLANTIC HEALTHCARE | ) | RE : Motion to dismiss[47,50] |
| SYSTEM, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

GLOBAL CLAIM MEMORANDA .......................................................................... 2

PATTERN OR PRACTICE OF SYSTEMIC VIOLATIONS ................................... 11

QUALIFIED IMMUNITY DOES NOT BAR PLAINTIFFS` CLAIMS.................................. 14

LIBERAL CONSTRUCTION AND LEAVE TO AMEND .................................... 16

RETALIATION FOR PROTECTED ACTIVITY .................................................... 17

FAILURE TO TRAIN OR SUPERVISE ................................................................. 23

INDIVIDUALIZED CLAIM MEMORANDA ........................................................ 25

     I.    CentraState Healthcare System/Atlantic Health System

     II.   RWJBarnabas Health / Monmouth Medical Center / PESS

     III.  Hampton Behavioral Health Center

IV.     Dr. Steven Guillen, MD

V.      Dr. Chris Fabian

VI.     Dr. Stephen Van Pelt, MD

VII.    Dr. Michael P. Houdart, DO

VIII.   Dr. Atta-ur Rehman, MD

IX.     Larissa Spishock, PA

X.      Heather Guzy, PA

XI.     Aradla Tabasko, PA-C

XII.    Antonella Salony, RN

XIII.   Nichole Perez, RN

XIV.    Lori Conrad, LPN

XV.     Mariecarmel Carre-Lee, MHT

XVI.    Theo Kalogridis

XVII.   Lynda McDonald

XVIII.  Margaret Nielsen

XIX.    Tracey Deaner, MSN, RN, NEA-BC

XX.     Virginia Heggen

XXI.     Johanna Rosario

XXII.   David Clark, Esq.

XXIII.  Anita Giunta, LSW

XXIV.   Robert Orro

XXV.     Jodi Doe

XXVI.    Eric Carney

XXVII.    Marie Levasseur

XXVIII.    Cheryl Craig

XXIX.    Jordan White, RN

XXX.    Lauren Richard, RN

XXXI.    Dr. Mohsen Rehim

## INTRODUCTION

As pro se plaintiffs, we are not attorneys or medical professionals and do not have access to all information that may be relevant. Accordingly, we respectfully submit this Supplementary Memorandum of Claims to clarify, to the best of our ability, the factual and legal bases for each claim asserted in the Amended Complaint (ECF No. 29) and in response to Defendants' Motions to Dismiss (ECF Nos. 47 and 50). We request that the Court construe our pleadings liberally in light of our pro se status and the complexities of this matter.

This memorandum provides a timeline of events, identifies specific factual allegations as to each Defendant, and references the supporting evidence and relevant ECF filings. Plaintiffs expressly reserve the right to further supplement or amend these claims as additional information becomes available through discovery .

## GLOBAL CLAIM MEMORANDA

Plaintiffs allege that all events giving rise to this action are the product of a systematic, coordinated pattern and practice of deliberate indifference, administrative neglect, retaliation, and procedural bad faith by and among all named defendants, acting under color of state law. Defendants—including CentraState Healthcare System/Atlantic Health System, Monmouth Medical Center/PESS, Hampton Behavioral Health Center, their staff, administrators, and legal counsel—engaged in actions and omissions that together violated the United States Constitution, 42 U.S.C. § 1983, the ADA, Section 504 of the Rehabilitation Act, and New Jersey law.

This was not isolated negligence. Rather, Defendants collectively and individually engaged in a concerted effort to frustrate, cover up, and perpetuate a deprivation of Plaintiffs' rights at every critical stage: medical clearance, commitment, transfer, grievance, and post-discharge advocacy. At CentraState Healthcare System/Atlantic Health System, staff—including nurses, physician assistants, and physicians—ignored medical clearance, failed to discharge Plaintiff when no clinical justification for commitment existed, and instead relied on law enforcement narrative and subjective, unsupported perceptions of mental illness or drug use (Medical Charts). Plaintiff and family's documented requests for a physician's explanation (see ECF No. 30; ECF No. 42; Sealed Documents Grievance Paperwork) were ignored or obstructed. The medical record was rife with layperson-evident errors, including the misdocumented weight of "300 lbs." at transfer, property mismatches, and references to "dentures" that did not belong to Plaintiff—errors so self-evident that, under the "common knowledge" exception (see Hubbard v. Reed, 168 N.J. 387 (2001)), expert testimony is not required. Staff did not correct these errors despite repeated

complaints, and failed to provide a Bill of Rights advisement or access to advocacy as mandated by New Jersey law.

At Monmouth Medical Center/PESS, the state-licensed psychiatric emergency screening service, screener Theo Kalogridis and others failed to conduct an independent clinical evaluation or document any statutory finding of danger to self or others. Instead, they perpetuated non-clinical, bias-driven law enforcement allegations ("suspected drug use," "erratic behavior") without corroboration by clinical or laboratory data (Sealed Documents Medical Charts], PESS Screener Note, 03/24/2023, 23:18; [Medical Records]). Plaintiffs' requests for explanation and rights advisement—submitted through grievance and directly to administration—were met with silence, delays, or evasive and incorrect responses (see ECF No. 42). Administrative staff failed to facilitate review or remedy, and even provided wrong contact numbers or false timelines to Plaintiff and outside advocates.

At Hampton Behavioral Health Center, Plaintiff was transferred and held without a new clinical evaluation or confirmation of the statutory criteria for commitment. Staff, including social workers, accepted and perpetuated the flawed narrative from CentraState and Monmouth without challenge. Medication and property errors persisted (see Jodi Doe section, above), and the Plaintiff's direct and repeated requests for patient advocacy, incident reporting, and clarification were not addressed. Notably, social worker Jodi Doe's mishandling of Plaintiff's medication complaint—including reviewing the wrong patient's chart, providing contradictory and obviously incorrect explanations ("your sister dropped it off"—not allowed and never occurred), and then closing the issue without resolution—exemplifies a lack of basic professionalism and

duty. The failure to document or escalate this incident, or to correct clear record inaccuracies, is a paradigmatic layperson-obvious deviation from standard care.

Across all institutions, Defendants covered up errors, stonewalled grievances, and retaliated against Plaintiff and his family for pursuing redress. When Plaintiff and his wife appeared in person to request an explanation (October 2023), hospital security and administrators called police, falsely claimed Plaintiff was represented by counsel or refused to leave, and then issued directives to isolate all communication through security (see October 2023 incident, Sealed Documents Grievance Paperwork, [Medical Records, p.___]). No meaningful follow-up or explanation was ever provided.

As of the date of this filing, June 14, 2025, Plaintiff has not received any medical or legal justification from any defendant or their counsel explaining the statutory, clinical, or factual basis for his involuntary commitment, despite repeated formal requests, grievances, and court filings seeking such explanation ([ECF No. 30]; [ECF No. 42]; Sealed Documents Grievance Paperwork).

Legal counsel for Defendants (including Lauren Zalepka, Esq. and David Clark, Esq.) participated in this pattern of bad faith and retaliation—sending threatening correspondence, obstructing access to records, and making misrepresentations to both Plaintiff and the Court. In their filings, Defendants have at times conceded the factual substance of Plaintiffs' allegations ("no formal diagnosis was made": emil2.pdf, 09/09/2023; see also ECF No. 47-1, ECF No. 50-1), while continuing to resist accountability on technical or procedural grounds.

Widespread documentation flaws and lack of professionalism are evident throughout the record and are pervasive across all institutional defendants. At CentraState Healthcare System, the medical and transfer records reflect egregious errors, including the documentation of an incorrect patient weight and personal property, the failure to provide required advisement of patient rights, and the disregard of documented medical clearance when continuing with involuntary detention (Medical Records). At Monmouth Medical Center/PESS, staff routinely relied on subjective bias and unsubstantiated law enforcement narratives in lieu of independent statutory findings or clinical evaluation, resulting in unlawful commitment decisions and perpetuation of record inaccuracies (Sealed Documents Medical Charts], PESS Screener Note, 03/24/2023, 23:18). At Hampton Behavioral Health Center, staff mishandled Plaintiff's medication, misattributed patient information in the clinical record, and failed to escalate or resolve clear charting and safety errors despite repeated requests and the obviousness of the discrepancies (Sealed Documents Grievance Paperwork; [Jodi Doe section]). Across all institutions, the grievance process was deliberately frustrated—Plaintiffs and their family were provided incorrect or misleading information regarding rights and procedures, denied meaningful access to advocacy or review, and subjected to persistent delays and obstruction in response to their attempts to seek redress (Sealed Documents Grievance Paperwork; [ECF No. 30]; [ECF No. 42]).

This pattern of widespread documentation error, professional indifference, and failure to uphold statutory duties constitutes both an independent ground for relief and further corroborates the coordinated and systemic nature of the underlying constitutional and statutory violations at issue in this case.

Plaintiffs repeatedly asked for explanations and due process at every step—see ECF No. 30 (request for medical explanation), ECF No. 42 (procedural rights letter), and formal grievances (Sealed Documents Grievance Paperwork, [ecf dockets])—and were met with silence, obstruction, or retaliation.

These events, as detailed in the record—including Plaintiffs' formal grievances (Sealed Documents Grievance Paperwork, p. 2, 03/25/2023), sworn declarations ([ECF No. 30], Request for Explanation; [ECF No. 42], Letter Brief on Procedural Rights), medical records (Medical Records), and correspondence with Defendants' counsel (Email Correspondence , 09/09/2023)—demonstrate a pervasive, coordinated pattern and practice of bad faith, bias, retaliation, documentation errors, and layperson-obvious malpractice.

As a direct and proximate result of the systemic misconduct, coordinated administrative neglect, and bad faith of all Defendants as detailed throughout this memorandum and the case record, Plaintiffs have sustained severe, multi-faceted, and ongoing harm. Among the most pronounced injuries is significant emotional distress and psychological trauma, including but not limited to persistent panic attacks, clinical anxiety, and chronic fear—symptoms that have required ongoing medical and therapeutic intervention and are substantiated by contemporaneous medical records and sworn declarations ([medical records,]; [Plaintiff's Declaration, ECF No. 42]). As a consequence of the wrongful detention, hostile grievance environment, and lack of closure, Plaintiffs' ability to work and maintain professional responsibilities was substantially impaired, necessitating the use of intermittent FMLA leave, causing loss of income and career disruption,

and threatening long-term employment stability ([employer correspondence, FMLA documentation, Exhibit];; [ECF No. 42], Plaintiff's Declaration).

These events have also led to a profound loss of enjoyment of life and erosion of familial stability, as evidenced by difficulties in daily functioning, social withdrawal, reduced participation in family activities, and an enduring sense of mistrust toward the healthcare and legal systems that Plaintiffs once relied upon for protection and redress ([ECF No. 42], Plaintiff's Declaration; Sealed Documents Grievance Paperwork;). The record further demonstrates an ongoing need for both medical and mental health care—necessitated not only by the initial trauma, but also by the protracted denial of due process, meaningful explanation, or apology by Defendants ([medical records, p. __]; [healthcare provider correspondence, Exhibit __]). Plaintiffs' repeated attempts to obtain information, file grievances, and secure advocacy or independent review have been met with obstruction, misleading statements, and delays at every stage, as reflected in the administrative record, ECF filings, and formal complaints ([ECF No. 30]; [ECF No. 42]; Sealed Documents Grievance Paperwork).

These cumulative injuries are neither abstract nor speculative: they are consistently documented across the medical record, employment records, contemporaneous communications, and Plaintiffs' ongoing submissions to this Court. Defendants' persistent refusal to provide a remedy, acknowledgment of wrongdoing, or meaningful review has perpetuated the harms, ensuring their impact remains ongoing and further aggravating Plaintiffs' inability to achieve closure or timely redress.

The cumulative effect of these coordinated acts and omissions was the wrongful psychiatric misdiagnosis of Plaintiff with schizophrenia, a diagnosis made in the absence of any clinical evidence and later recognized as mistaken by the very facilities and providers involved ([Medical Records, p.___]; [Hampton Behavioral discharge summary, Exhibit ___]). This error was not a matter of individual oversight, but the direct result of the global, systemic failures and pervasive mental health biases documented throughout the record—including the improper reliance on law enforcement narratives, disregard of medical clearance, and failure to conduct independent evaluations by all institutional defendants. As a result, Plaintiff was subjected to an unjust and unnecessary seven-day involuntary confinement, denied his statutory and constitutional rights, and left without recourse or explanation. These actions raise urgent matters of public concern, revealing a broader, entrenched pattern of mental health bias, lack of accountability, and procedural disregard within New Jersey's emergency screening, commitment, and hospital grievance systems. The harm suffered by Plaintiff is emblematic of the risks posed by such systemic failures not only to individual rights but to the integrity of public health and legal processes statewide.

## PATTERN OR PRACTICE OF SYSTEMIC VIOLATIONS

Plaintiffs allege that the facts set forth in the Amended Complaint ([ECF No. 29]), together with the detailed record in this Supplementary Memorandum and supporting exhibits ([see, e.g., Medical Records.pdf, Formal Grievance , ECF No. 30, ECF No. 42]), demonstrate a coordinated, ongoing pattern and practice of deliberate indifference, administrative neglect, retaliation, and procedural bad faith by and among all named Defendants, acting under color of state law. This

was not isolated negligence or error. Instead, Defendants—including CentraState Healthcare System/Atlantic Health System, Monmouth Medical Center/PESS, Hampton Behavioral Health Center, their clinical and administrative staff, and legal counsel—collectively and individually engaged in a concerted effort to frustrate, cover up, and perpetuate deprivation of Plaintiffs' rights at every critical stage: from medical clearance, to involuntary commitment, transfer, grievance, and post-discharge advocacy ([ECF No. 30]; Sealed Documents Grievance Paperwork).

The evidence in the record—including contemporaneous documentation, witness statements, and referenced exhibits—demonstrates that Defendants, acting both individually and in concert, repeatedly disregarded mandatory clinical and procedural safeguards at every stage of Plaintiffs' confinement. At CentraState, despite explicit medical clearance, staff refused to discharge Plaintiff, choosing instead to rely on subjective narratives provided by law enforcement and non-clinical perceptions of mental illness or substance use, all in the absence of supporting laboratory or clinical evidence (Medical Records). Upon transfer, Monmouth Medical Center/PESS likewise failed to perform an independent clinical screening or to make the statutory findings of imminent danger as required by N.J.S.A. 30:4-27.2(m), instead perpetuating bias-driven allegations and unsubstantiated law enforcement reports, as reflected in the PESS Screener Note dated March 24, 2023 (Sealed Documents Medical Charts]). This pattern continued at Hampton Behavioral, which accepted and detained Plaintiff without conducting a new clinical evaluation or remedying obvious documentation errors, thus compounding the chain of unlawful deprivation (Sealed Documents Medical Charts]; Sealed Documents Grievance

Paperwork). Across all involved institutions, Plaintiffs' documented requests for advisement of rights, physician explanations, and access to records were persistently stonewalled, misdirected, or met with intimidation—including direct threats and the filing of false police reports—in clear retaliation for Plaintiffs' efforts to seek clarification and redress (Sealed Documents Grievance Paperwork; [ECF No. 42]; Sealed Documents Medical Charts], October 2023 incident).

 The perpetuation of factual inaccuracies in Plaintiffs' medical records, such as incorrect weight, dental status, and property documentation, persisted despite repeated and timely complaints, falling squarely within New Jersey's "common knowledge" exception for malpractice and corroborating layperson-obvious negligence (see Hubbard v. Reed, 168 N.J. 387, 394–95 (2001); N.J.S.A. 2A:53A-27; [Medical Records]). Finally, at every level, the involved facilities and their agents failed to adhere to mandated grievance and patient rights protocols established by New Jersey law, including N.J.A.C. 10:37-4.3 and N.J.A.C. 8:43G-4.1, thereby denying Plaintiffs timely access to advocacy, review, and statutory protections (Sealed Documents Grievance Paperwork; [ECF No. 30]; [ECF No. 42]).These allegations are supported by specific, well-pleaded facts, contemporaneous documentation, and are consistent across all key records and ECF filings. Under Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978), a municipality (or private entity acting under color of state law) may be held liable under 42 U.S.C. § 1983 when its policy, practice, or custom is the "moving force" behind the constitutional violation. The Third Circuit recognizes that "a single decision by municipal policymakers may constitute an official policy" and liability attaches where "a deliberate choice to follow a course of action is made from among various alternatives." Pembaur v. City of

Cincinnati, 475 U.S. 469, 483–84 (1986); Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003).

Further, these facts more than satisfy the federal pleading standards for plausibility and specificity under Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face," supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678). The timeline and facts as pled—dates, events, requests, responses, and harm—are consistent and sufficiently particularized to put each defendant on notice of the nature of the claims against them, and to survive a motion to dismiss (Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016)). As of the date of this filing, June 14, 2025, Plaintiffs still have not received any clinical or legal justification for the involuntary commitment, despite formal grievances, ECF filings, and repeated requests for explanation ([ECF No. 30]; [ECF No. 42]; Sealed Documents Grievance Paperwork).

Accordingly, the record demonstrates a pervasive pattern of bad faith, bias, retaliation, documentation errors, and layperson-obvious malpractice. These facts, if proven, establish actionable systemic violations of Plaintiffs' rights under the United States Constitution, 42 U.S.C. § 1983, the ADA, Section 504 of the Rehabilitation Act, and New Jersey law.

## QUALIFIED IMMUNITY DOES NOT BAR PLAINTIFFS` CLAIMS

Defendants' assertion of qualified immunity is without merit and must be rejected at this stage. Qualified immunity shields government officials only where their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Critically, this protection does not extend to conduct that, at the time, was clearly unlawful under established law, nor does it apply where each actor knowingly participates in group or systemic violations. See *Montgomery v. De Simone*, 159 F.3d 120, 126 (3d Cir. 1998).

Here, Plaintiffs' Amended Complaint and Supplementary Memorandum ([ECF No. 29]; Sealed Documents Grievance Paperwork) set forth well-pleaded allegations demonstrating that Plaintiffs were wrongfully detained and involuntarily committed from March 24 to March 31, 2023, despite having a strong family support system and no evidence of dangerousness. The record establishes not only that CentraState staff ignored explicit medical clearance, but also that they disregarded Plaintiffs' family and community context, including clear statements from Plaintiff's wife, who repeatedly requested Plaintiff's return home and confirmed there was no medical or safety justification for continued detention (Medical Records; Sealed Documents Grievance Paperwork; [ECF No. 29, ¶¶ 22, 49]). These requests, corroborated by written and verbal communications, further demonstrate that Plaintiff was not a danger to himself or others and had the ongoing support necessary for safe discharge—circumstances under which the Supreme Court has unequivocally held that involuntary commitment is constitutionally impermissible. See *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) ("A State cannot constitutionally confine... a

nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family or friends.").

Moreover, the factual record reflects additional collaborating circumstances that any reasonable clinician or official should have considered—including the presence of a suspicious individual in all black observed in Plaintiffs' residential development, a reported data breach, and ongoing work-related disputes ([Supplementary Memorandum, pp. 8–10]). These events directly informed Plaintiffs' decision to call the police to report suspected criminal activity—a step that any reasonable and responsible person, under the same circumstances, would have taken. Defendants' subsequent reliance on law enforcement narratives, rather than clinical evidence or actual risk, to justify continued detention cannot be squared with either federal constitutional standards or basic principles of due process.

No reasonable official or provider could have believed it lawful to detain Plaintiffs, who had family support and no clinical findings of dangerousness, or to disregard exculpatory evidence and the express requests of Plaintiff's spouse for his return. See *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). The Third Circuit is clear: qualified immunity is not available where the unlawfulness of conduct would have been apparent to a reasonable official. *Williams v. Borough of West Chester*, 891 F.2d 458, 464–66 (3d Cir. 1989); *Dixon v. City of New Brunswick*, 898 F.2d 628, 637 (3d Cir. 1990).

Additionally, the persistent documentation errors and layperson-obvious mistakes—such as property mismatches, vital statistics errors, and disregard for family communications—fit squarely within New Jersey's "common knowledge" exception to the affidavit of merit statute.

See *Hubbard v. Reed*, 168 N.J. 387, 394–95 (2001); N.J.S.A. 2A:53A-27. The similarity of these facts to those in *Mack v. RWJBarnabas Health*, Docket No. A-2058-22 (N.J. App. Div. 2024), where the New Jersey Appellate Division reinstated malpractice claims for wrongful psychiatric commitment based on record errors and disregard for the patient's actual status, further highlights that Defendants' conduct was plainly beyond the bounds of legal and professional acceptability.

Plaintiffs' Complaint thus alleges not only "specific acts, on specific dates, by identified persons acting in concert," but also the failure to consider exculpatory and contextual facts—further satisfying *Twombly* and *Iqbal*'s pleading requirements. See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, all factual allegations must be accepted as true and all inferences drawn in Plaintiffs' favor. See *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016); *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

Accordingly, because Plaintiffs have set forth conduct that, if proven, constitutes a violation of clearly established statutory, constitutional, and common law rights—while also demonstrating Plaintiff's family support, lack of dangerousness, and the reasonableness of his own actions—qualified immunity cannot shield Defendants at this juncture. The motions to dismiss must therefore be denied and the matter allowed to proceed to discovery.

## LIBERAL CONSTRUCTION AND LEAVE TO AMEND

As pro se litigants, Plaintiffs respectfully request that the Court construe all pleadings and submissions liberally in accordance with established Supreme Court and Third Circuit authority. The federal courts have long recognized that "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); see also *Haines v. Kerner*, 404 U.S. 519, 520 (1972). The Third Circuit has consistently affirmed this rule, instructing that courts must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." *Holley v. Dep't of Veterans Affairs*, 165 F.3d 244, 247–48 (3d Cir. 1999).

Should the Court find any aspect of Plaintiffs' Complaint or supplemental filings insufficiently pleaded or technically deficient, Plaintiffs expressly request leave to amend pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure. Rule 15(a)(2) provides that "leave [to amend] shall be freely given when justice so requires." The Third Circuit has a "strong liberality" policy toward amendments, especially for pro se litigants, and directs that leave should be granted in the absence of undue delay, bad faith, dilatory motive, prejudice, or futility. See *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

Plaintiffs have diligently sought to clarify and substantiate each factual and legal basis for their claims, supplementing the record with detailed allegations, exhibits, and specific references to the governing law ([ECF No. 29]; [ECF No. 30]; [ECF No. 42]). If further detail or clarification

is required to cure any pleading defect, Plaintiffs are prepared to amend as directed by the Court,

consistent with both Rule 15's liberal amendment standard and the interests of justice.

## RETALIATION FOR PROTECTED ACTIVITY

Plaintiffs further assert that Defendants engaged in a sustained and pervasive pattern of

retaliation in direct response to Plaintiffs' exercise of their statutory and constitutional

rights—including, but not limited to, seeking legal counsel, requesting and demanding access to

medical records, issuing cease and desist demands, and attempting to file grievances as required

or permitted under federal and New Jersey law. Throughout the period beginning on or about

March 24, 2023, through March 30, 2023, and in the months that followed, Plaintiffs made

multiple written and verbal requests for rights advisement, access to records, clarification

regarding the basis for their continued confinement, and the formal processing of grievances.

These efforts were supported by repeated attempts to involve family members, particularly

Plaintiff's spouse, who affirmatively communicated the lack of any clinical or factual basis for

continued detention and requested Plaintiff's immediate discharge ([ECF No. 29, ¶¶ 25–27, 45,

49–56]; Sealed Documents Grievance Paperwork).

Defendants' retaliation was multi-faceted and targeted. First, Defendants—individually and

collectively—deliberately obstructed access to the formal grievance process by refusing to

provide required grievance forms, failing to process complaints as mandated under N.J.A.C.

10:37-4.3 and N.J.A.C. 8:43G-4.1, and supplying Plaintiffs and their family with conflicting or

false information regarding their rights and the grievance procedure ([ECF No. 29, ¶¶ 51–56];

Sealed Documents Grievance Paperwork; [ECF No. 42]). Plaintiffs' efforts to initiate formal

complaints and grievances—including those related to medication errors, property discrepancies, access denials, privacy breaches, and staff misconduct—were frequently ignored, diverted, or addressed through informal or off-the-record channels, circumventing the organizational protocols designed to ensure transparency and accountability ( Sealed Documents Grievance Paperwork).

Plaintiffs also experienced direct and indirect forms of intimidation and reprisal, including veiled threats, staff hostility, and, on multiple occasions, unwarranted reports to law enforcement or security without any clinical evidence or objective indication of dangerousness (Medical Records; Sealed Documents Medical Charts]). Plaintiffs and their spouse documented that requests for advocacy, rights advisement, and records often triggered heightened scrutiny and adverse actions by staff—including isolation, denial of advocacy resources, and repeated efforts to undermine the credibility and legal standing of Plaintiffs in both medical records and communications with outside authorities ([ECF No. 30]; [ECF No. 42]). Cease and desist letters and formal objections to ongoing documentation errors and procedural violations were routinely ignored, further compounding Plaintiffs' harm and reinforcing a climate of mistrust.

Defendants perpetuated retaliation by maintaining and formalizing demonstrably false and inaccurate information in Plaintiffs' medical records—including misrepresentations regarding Plaintiff's mental health, medication status, property inventory, and family support—despite repeated correction requests and the submission of exculpatory statements from Plaintiff's spouse (Sealed Documents Grievance Paperwork; [ECF No. 29,   55]). These actions were not isolated but instead formed a continuous chain of adverse treatment designed to chill Plaintiffs'

willingness to seek further advocacy, legal review, or external redress, resulting in both a systemic lack of trust and a chilling effect on Plaintiffs and other similarly situated individuals.

This sustained campaign of retaliation unfolded in numerous forms and at every critical juncture of Plaintiffs' attempts to assert and safeguard their rights. Throughout the period beginning on or about March 24, 2023, through March 30, 2023, and persisting in the weeks and months that followed, Defendants systematically blocked or ignored both formal and informal grievances submitted by Plaintiffs. These included grievances regarding medication administration errors, unexplained changes or withholding of prescriptions, denial of access to patient advocacy services, HIPAA privacy violations (such as the unauthorized sharing of medical information and the refusal to provide records upon request), persistent staff misconduct, and complaints about unsafe or unsanitary conditions within the facilities (Sealed Documents Grievance Paperwork; [ECF No. 42];).

On multiple occasions, Plaintiffs specifically requested independent advocacy and legal representation. These requests were denied or deflected by staff who failed to inform Plaintiffs of their rights to appeal, seek external review, or contact outside parties for support, as expressly required by New Jersey's Patient Bill of Rights, N.J.S.A. 30:4-24.2. In some cases, staff outright refused to provide official grievance forms, told Plaintiffs that "nothing would change," or falsely claimed that no such procedure existed, thus sabotaging the procedural safeguards designed to protect patient rights ([ECF No. 29, ¶¶ 45, 51–56]; Sealed Documents Grievance Paperwork).

Whenever Plaintiffs or their family members, including Plaintiff's spouse, attempted to challenge errors in medical or property records, object to misrepresentations of Plaintiff's health status, or formally report staff misconduct, Defendants responded with escalating restrictions. These included increased surveillance, removal of privileges, threats to involve law enforcement or security, and, in at least one instance, the filing of a false or misleading incident report in retaliation for filing a complaint (Medical Records). Cease and desist demands and repeated requests for corrections—especially those pertaining to property inventories, inaccurate clinical notes, improper medication notations, and the mischaracterization of family support—were routinely ignored. Defendants continued to maintain demonstrably false information in both medical and legal records, using these inaccuracies to justify further confinement, isolation, or denial of advocacy ([ECF No. 29,   55]).

Furthermore, Plaintiffs were threatened, intimidated, and subjected to staff hostility on several occasions in direct connection to their exercise of protected rights. When Plaintiffs and their family sought to escalate complaints or demand external review—including appeals to hospital administration and state authorities—Defendants increased efforts to suppress such conduct, including refusing phone access, denying visits from advocates, and impeding communication with legal counsel. Defendants failed to document or report formal grievances in the required organizational logs and, in some cases, actively discouraged other patients and family members from supporting Plaintiffs' advocacy, creating an environment of distrust and fear among all involved (Sealed Documents Grievance Paperwork; [ECF No. 42]).

The combined effect of these retaliatory actions was not only to prolong Plaintiffs' unlawful involuntary confinement and deepen the harm suffered, but to create a chilling effect on Plaintiffs' willingness—and the willingness of other similarly situated patients and family members—to seek further advocacy, legal redress, or protection of their rights. These adverse acts are precisely the type of governmental misconduct that 42 U.S.C. § 1983 is designed to redress. The Complaint and supporting record set forth "enough facts to state a claim to relief that is plausible on its face," as required by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and provide "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," in accordance with *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The specificity and breadth of these allegations, supported by contemporaneous documentation, family corroboration, and a detailed record of Defendants' repeated procedural violations, are more than sufficient to establish a plausible, actionable claim for retaliation under § 1983 and to withstand a motion to dismiss at the pleading stage.

This conduct constitutes classic unlawful retaliation and is precisely the type of adverse governmental action that 42 U.S.C. § 1983 was enacted to remedy. Section 1983 provides a cause of action against any person who, under color of state law, deprives another of rights secured by the Constitution and federal law—including the right to petition for redress, the right to due process, and the right to be free from retaliatory government conduct. See Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001); Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997) (retaliation against the exercise of First Amendment rights is actionable under §1983); Allah v.

Seiverling, 229 F.3d 220, 224–25 (3d Cir. 2000); Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998).

As a direct result of this campaign of retaliation, Plaintiffs suffered prolonged involuntary confinement, denial of advocacy and record access, intimidation, and the continued inclusion of demonstrably false information in their official records. These adverse actions were not only foreseeable but were the direct and proximate result of Plaintiffs' exercise of rights secured by the First and Fourteenth Amendments, the Americans with Disabilities Act, and New Jersey law. The facts as pleaded—supported by contemporaneous documentation, family corroboration, and the detailed record of Defendants' organizational and procedural misconduct—state a plausible and actionable claim for unlawful retaliation under 42 U.S.C. § 1983 and state law, and are more than sufficient to withstand a motion to dismiss under Twombly, Iqbal, and their progeny.

## FAILURE TO TRAIN OR SUPERVISE

Plaintiffs further allege that the recurring violations and harms described throughout this action were the foreseeable and direct result of Defendants' systemic failure to adequately train, supervise, and monitor their personnel in the discharge of mandatory legal and ethical obligations. As detailed in the Complaint and supporting record, the wrongful detention, retaliation, deprivation of statutory rights, procedural violations, and perpetuation of false documentation were not isolated incidents, but arose from entrenched patterns of misconduct, neglect, and administrative indifference tolerated and enabled by institutional leadership ([ECF No. 29, ¶¶ 31, 51–56] Sealed Documents Grievance Paperwork; [ECF No. 42]).

Despite clear requirements imposed by federal law, New Jersey statutes and regulations, and the institutions' own internal policies, Defendants failed to implement adequate training and oversight regarding the lawful processing of involuntary commitment, patient rights advisement, accurate documentation, the handling of grievances and complaints, and the duty to avoid retaliation. The record demonstrates that staff across all involved facilities—including CentraState Healthcare System/Atlantic Health System, Monmouth Medical Center/PESS, and Hampton Behavioral Health Center—were repeatedly uninformed or indifferent to statutory mandates such as N.J.A.C. 10:37-4.3 (patient rights and grievances), N.J.A.C. 8:43G-4.1 (hospital complaint procedures), and N.J.S.A. 30:4-24.2 (Patient Bill of Rights). The persistent denial of advocacy access, the failure to provide or process grievance forms, and the continued maintenance of inaccurate and misleading medical records—despite cease and desist demands and repeated requests for correction—reflect a widespread and deliberate disregard for mandatory training and supervision ( Sealed Documents Grievance Paperwork).

Supervisory and administrative staff failed to intervene or correct obvious errors, ignored clear warning signs of staff misconduct, and allowed a climate of hostility, retaliation, and procedural shortcuts to flourish. In several instances, as documented in Plaintiffs' grievances and correspondence, managers and directors either failed to respond to formal complaints or took steps to circumvent the creation of a formal record, further perpetuating a culture of noncompliance and lack of accountability (Sealed Documents Grievance Paperwork; [ECF No. 42]). This breakdown in oversight allowed rank-and-file staff, security, and affiliated

professionals to act outside the bounds of established law and policy, directly resulting in the harms suffered by Plaintiffs.

These allegations fall squarely within the standards for municipal and institutional liability established by *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978), and its progeny, which hold that a municipality or institutional actor may be liable under 42 U.S.C. § 1983 where the failure to train or supervise reflects deliberate indifference to the rights of persons with whom the staff come into contact. See *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989) ("Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."); *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019) (municipal liability arises where a pattern of violations and inadequate response establish deliberate indifference). Here, the frequency, consistency, and seriousness of the violations described in the record amply demonstrate that Defendants' failure to train and supervise their personnel was not mere negligence, but a policy and practice of deliberate indifference that was the moving force behind the deprivation of Plaintiffs' constitutional and statutory rights.

Accordingly, Plaintiffs have stated a plausible and actionable claim for liability against each institutional Defendant based on the failure to adequately train, supervise, and monitor staff, in violation of 42 U.S.C. § 1983 and prevailing federal and state law.

# INDIVIDUALIZED CLAIM MEMORANDA

### CentraState Healthcare System/Atlantic Health System

Plaintiffs allege that CentraState Healthcare System/Atlantic Health System ("CentraState"), acting under color of state law, violated Plaintiffs' rights under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and New Jersey medical malpractice law. On March 24, 2023, Plaintiff Bradley Clonan voluntarily presented to the CentraState Medical Center emergency department. Although Plaintiff was medically cleared and there was no clinical evidence to justify further detention, CentraState staff involuntarily detained Plaintiff and initiated state-regulated involuntary commitment procedures. The contemporaneous records reflect that Plaintiff was medically cleared by CentraState's physician assistant, yet staff proceeded to detain and transfer him to Hampton Behavioral Health (Medical Records).

Importantly, Plaintiff explicitly requested to leave the facility after being medically cleared, yet CentraState staff refused to permit his discharge or provide the required advisement of patient rights. Rather than relying on objective clinical evaluation or laboratory findings, CentraState staff deferred to and acted upon the statements of Detective Demarco—who asserted, without medical basis, that Plaintiff "could not distinguish fact from fiction"—and used this law enforcement narrative as the primary basis for continued detention and the initiation of involuntary commitment (Sealed Documents Medical Charts], police narrative entries). The records further reflect that this refusal to discharge was not grounded in clinical evidence but was instead the product of staff's subjective mental health bias and perceptions, as documented by

references to "perceived" or "suspected" mental illness or substance use, unsupported by laboratory or clinical findings (Medical Records). This improper reliance on a non-clinical law enforcement determination, rather than independent medical judgment, underscores the lack of clinical justification and the discriminatory bias underlying the actions taken against Plaintiff, in direct violation of established medical and legal standards.

CentraState Healthcare System/Atlantic Health System ("CentraState") acted not merely as a private health care provider, but as a New Jersey state-licensed and funded teaching hospital deeply intertwined with state mental health protocols, statutory obligations, and regulatory oversight. By coordinating with Monmouth Medical Center/PESS—the state-designated psychiatric emergency screening service—and Detective Demarco, CentraState staff jointly participated in, and anticipated, the statutory process for involuntary psychiatric commitment prior to any legitimate clinical justification. In this capacity, CentraState was not simply providing private medical care, but was instead performing a quintessential public function traditionally and exclusively reserved to the State: the power to detain individuals and initiate involuntary civil commitment under New Jersey law. The public function doctrine, recognized by the Supreme Court and the Third Circuit, establishes that a private entity undertaking such a state-delegated, coercive authority acts under color of state law for purposes of §1983 liability. CentraState's status as a state-licensed teaching hospital, receipt of public funds, and integration into the state's emergency psychiatric screening and commitment infrastructure further support its role as a state actor. Accordingly, CentraState's acts and omissions in concert with PESS and law enforcement constitute actionable deprivation of Plaintiff's constitutional and statutory

rights.

Despite the clear statutory requirement in New Jersey that a patient may only be subjected to involuntary commitment if found, by clear and convincing evidence, to present a danger to themselves or others (see N.J.S.A. 30:4-27.2(m)), CentraState Medical Center staff continued to detain Plaintiff after medical clearance on March 24, 2023, in the absence of any clinical finding that Plaintiff posed such a risk. Contemporaneous records and subsequent laboratory results, including negative toxicology screens and consistent medical observations, showed no signs of acute psychiatric distress, self-harm, or risk to others (Medical Records). Nevertheless, CentraState relied on subjective law enforcement narrative and perceived mental health bias, rather than any independent, objective clinical assessment. As a result, Plaintiff was wrongfully held and transferred for involuntary commitment in direct contravention of statutory and regulatory standards. This failure to document or substantiate any imminent danger not only rendered the commitment process unlawful, but also deprived Plaintiff of essential due process protections guaranteed by both state and federal law.

Plaintiffs further allege a pattern of retaliation and bad faith by CentraState staff and administration. Following Plaintiff's requests for an explanation and for records regarding his involuntary detention, Plaintiffs submitted formal grievances and HIPAA-compliant requests for documentation. CentraState failed to release requested medical records in a timely manner and failed to communicate with Plaintiff and his family, depriving them of both due process and the ability to meaningfully contest the basis for detention (Sealed Documents Grievance Paperwork; [Medical Records, p.1]). Responses to formal grievances contained incorrect contact information

for obtaining further explanation, further impeding Plaintiffs' efforts to resolve their complaints and evidencing a lack of good faith by CentraState staff (see Sealed Documents Grievance Paperwork, response section). These actions, in addition to threatening and obstructive conduct by counsel for CentraState, demonstrate a coordinated effort to deny Plaintiffs fair access to information and remedies, in violation of due process.

Severe documentation and protocol deficiencies further underscore the absence of reasonable care. Notably, CentraState's transfer records incorrectly listed Plaintiff's weight as 300 pounds and included dentures that did not belong to him—errors so egregious and self-evident that they fall within the "common knowledge" exception to New Jersey's Affidavit of Merit statute. Under **N.J.S.A. 2A:53A-27**, and as recognized by the New Jersey Supreme Court in *Hubbard v. Reed*, 168 N.J. 387, 394–95 (2001), expert testimony is not required where "jurors are capable of using their common knowledge to determine negligence." The Court held: "If the matter to be resolved is one upon which the average juror can form a valid judgment solely on the basis of common knowledge, expert testimony is not mandated." These mistakes constitute prima facie evidence of negligence, as they are so apparent that any layperson can recognize the deviation from standard care without specialized medical expertise Medical Records). This principle is further supported by longstanding federal jurisprudence upholding the right of lay juries to determine obvious negligence without expert input (see, e.g., *Tiller v. Atlantic Coast Line R. Co.*, 318 U.S. 54, 68 (1943)).

CentraState staff also failed to provide Plaintiff with a written Bill of Rights, nor did they ensure timely access to legal or advocacy representation, as mandated by state regulations ([Formal

Grievance , p.2]). Contradictory medical notations in Plaintiff's records—such as negative urinalysis and clinical observations of sobriety—were disregarded in favor of unsupported, bias-driven allegations of drug use, further evidencing CentraState's disregard for both professional standards and statutory obligations (Medical Records).

Plaintiffs further allege that CentraState, through its administrative official Robert Orro and other staff, directly misrepresented critical facts to law enforcement officers on or about October 10, 2023, in an effort to frustrate Plaintiffs' lawful attempts to obtain information and assert their rights. Specifically, CentraState staff falsely informed police that Plaintiff was already represented by counsel—when in fact no attorney had been retained or appeared for Plaintiff—and also inaccurately claimed that Plaintiff and his wife refused to leave the premises, despite their peaceful presence in the waiting area solely to request a statutorily guaranteed medical explanation regarding the involuntary commitment. These knowing misrepresentations to law enforcement were intended to obstruct Plaintiffs' access to information, escalate the situation unnecessarily, and subject Plaintiffs to additional intimidation and public embarrassment. Such conduct further demonstrates a pattern of bad faith, deliberate indifference, and retaliation in violation of federal and state law, and underscores CentraState's willingness to mislead both public authorities and Plaintiffs themselves in order to cover up procedural deficiencies and deprive Plaintiffs of due process and statutory rights.

As a direct result of CentraState's actions and omissions—including reliance on law enforcement narrative and mental health bias rather than clinical evidence, refusal to discharge upon Plaintiff's explicit request, coordination with Monmouth Medical Center/PESS and Detective

Demarco in anticipation of involuntary commitment, retaliation, denial of information, negligent transfer protocols, and failure to comply with both state and federal law—Plaintiff suffered a loss of liberty, emotional distress, and a deprivation of rights protected by the Constitution and New Jersey statutes. Accordingly, Plaintiff respectfully submits that these facts, if proven, state claims upon which relief can be granted under federal and state law.

**RWJBarnabas Health / Monmouth Medical Center**

Plaintiffs allege that RWJBarnabas Health and Monmouth Medical Center, as state-mandated mental health screening facilities, violated Plaintiffs' rights under 42 U.S.C. § 1983, the ADA, Section 504 of the Rehabilitation Act, and HIPAA. Monmouth Medical Center performed a deficient and improper screening for involuntary commitment, did not comply with required grievance and notification procedures, and contributed to the creation or perpetuation of false statements in Plaintiff's medical record. Monmouth Medical Center further failed to provide timely access to requested records, and falsely reported compliance to third-party oversight entities. These actions and omissions directly resulted in Plaintiff's unlawful detention and denial of procedural protections.

On or about March 24, 2023, Monmouth Medical Center/PESS, as the state-designated screening agency, was contacted by CentraState Medical Center staff in anticipation of an involuntary commitment. Despite Plaintiff having been medically cleared at CentraState and presenting no clinical evidence justifying involuntary psychiatric commitment, Monmouth Medical Center/PESS actively coordinated with CentraState and law enforcement, including Detective Demarco, to recommend and facilitate Plaintiff's involuntary commitment. PESS clinicians and

administrative staff failed to conduct an independent, objective evaluation or to ensure that the statutory standards for involuntary commitment were met prior to authorizing Plaintiff's continued detention and transfer (Medical Records).

Plaintiffs further allege that Monmouth Medical Center/PESS, in their role as both a state-licensed psychiatric facility and the region's official screening agency under New Jersey law, failed to provide Plaintiff with due process protections mandated by both state and federal law. Monmouth Medical Center/PESS failed to provide timely or meaningful notice of rights, did not facilitate access to legal or advocacy representation, and did not inform Plaintiff or his family of their right to challenge the commitment process. Instead, PESS staff and administration relied on law enforcement narratives and subjective mental health bias rather than objective clinical evidence or statutory criteria for commitment ([Medical Records, p.1]; [Formal Grievance , p.2]).

Monmouth Medical Center, through its Psychiatric Emergency Screening Service ("PESS"), serves as the state-designated agency responsible for independently screening and authorizing involuntary commitments under New Jersey law. On or about March 24–25, 2023, PESS was contacted by CentraState staff to perform a remote screening of Plaintiff. Despite a clear statutory obligation under N.J.S.A. 30:4-27.5 and 30:4-27.6 to determine—based on objective evidence—whether Plaintiff met the legal threshold of presenting a danger to self or others, PESS staff instead relied almost entirely on the unsubstantiated narrative, mental health bias, and perceptions supplied by law enforcement and CentraState personnel. In particular, PESS adopted and repeated allegations of "suspected" drug overuse or substance abuse, despite the complete

absence of clinical or laboratory evidence to support such suspicions (Medical Records). Laboratory tests and medical observations at the time confirmed that Plaintiff was compliant with prescribed medications and showed no signs of intoxication or withdrawal. No independent or contemporaneous clinical review was conducted by PESS staff prior to authorizing Plaintiff's involuntary commitment.

PESS records and subsequent communications contain no documented findings of suicidal ideation, threats, violent behavior, or any clinical indicators of imminent risk. Nevertheless, based on these bias-driven and unsubstantiated suspicions—rather than actual clinical criteria—PESS authorized Plaintiff's involuntary commitment, in clear violation of both the statutory mandate and basic medical due process. This failure to perform an independent, evidence-based screening, coupled with the perpetuation of material inaccuracies and bias, resulted in Plaintiff's continued deprivation of liberty without lawful justification, in direct contravention of New Jersey law and federal constitutional standards.

Plaintiffs further allege that Monmouth Medical Center and PESS failed to comply with both their own internal formal grievance procedures and with New Jersey and federal regulatory requirements regarding patient complaints and investigations. After Plaintiff and his family submitted formal grievances to Monmouth Medical Center, including written and electronic requests for records, explanations, and review by third-party or national accrediting bodies, Monmouth Medical Center/PESS either failed to respond, provided incomplete or incorrect information, or ignored their obligations to escalate grievances to impartial third-party hospital ombudsmen or state agencies as required by law (Sealed Documents Grievance Paperwork,

response section). In addition, Monmouth Medical Center/PESS failed to inform Plaintiff of the outcome of any alleged investigation or to provide any written rationale for their actions, further depriving Plaintiff of fair process and statutory protection.

The records further reveal contradictions and deficiencies in documentation and process. Progress notes and screening evaluations were based on "perceived" or "suspected" mental illness or substance use, without any clinical or laboratory evidence to substantiate such conclusions (Medical Records). Plaintiffs received no timely access to the records necessary to challenge their commitment or subsequent transfer, nor did they receive accurate discharge or property documentation. These failures represent not only a violation of medical and professional standards but also a clear breach of regulatory and statutory requirements for state-licensed psychiatric facilities and screening agencies.

Monmouth Medical Center/PESS's status as a state-licensed psychiatric facility and the state-designated emergency screening service brings their actions squarely within the "color of law" analysis of 42 U.S.C. § 1983 and related federal claims. Their coordination with law enforcement and CentraState, reliance on non-clinical narratives, refusal to provide due process protections, and disregard for internal and external grievance protocols collectively amount to state action, actionable discrimination, and actionable deprivation of constitutional and statutory rights.

As a direct and proximate result of the acts and omissions of Monmouth Medical Center/PESS—including, but not limited to, the failure to conduct an independent clinical evaluation, reliance on subjective mental health bias and law enforcement input in place of

clinical judgment, disregard for statutory standards governing involuntary commitment, retaliation and obstruction throughout the grievance process, and repeated failures to comply with both state and hospital grievance procedures—Plaintiff suffered substantial injury and harm. These injuries include loss of liberty, severe emotional distress, ongoing loss of income, recurrent panic attacks, and significant adverse health consequences that have impaired Plaintiff's ability to perform work and fulfill professional responsibilities. Plaintiff has further experienced a profound loss of enjoyment of life, lasting mistrust in the medical and legal system, and deprivation of rights secured by the United States Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and applicable New Jersey statutes.

Plaintiffs respectfully request that the Court deny any motion to dismiss as to RWJBarnabas Health, Monmouth Medical Center, and PESS, and order appropriate discovery and relief, including but not limited to production of all screening, commitment, and grievance records, communications with law enforcement and CentraState, and documentation of all internal or third-party investigations or reviews conducted in response to Plaintiffs' grievances.

**Hampton Behavioral Health Center**

Hampton Behavioral Health Center ("Hampton Behavioral") is the only state-licensed psychiatric facility operating within its county in New Jersey, uniquely authorized to accept involuntarily committed patients, perform emergency psychiatric intakes, and petition the courts for orders of temporary involuntary commitment and judicial holds. As such, Hampton Behavioral exercises powers and performs functions that are not only subject to extensive state regulation, oversight, and funding, but are also traditionally and exclusively reserved to the

State—namely, the intake, evaluation, custody, and detention of persons alleged to require psychiatric commitment. In its role as the sole county provider, Hampton Behavioral routinely initiates and prosecutes petitions for involuntary commitment or continued stays before New Jersey judges, a quintessential public function that directly impacts liberty interests and due process rights. Accordingly, for purposes of 42 U.S.C. § 1983 and all related statutes, Hampton Behavioral acts under color of state law whenever it receives, detains, or petitions for the continued involuntary commitment of individuals, and is fully subject to the constitutional, statutory, and regulatory duties imposed on public actors.

On or about March 25, 2023, Plaintiff was transferred from CentraState Medical Center to Hampton Behavioral Health Center without any intervening change in medical or psychiatric status and despite having been medically cleared by CentraState staff (Medical Records]). Upon arrival at Hampton Behavioral, Plaintiff was accepted for involuntary admission without any independent or objective clinical evaluation conducted by Hampton staff, nor was there any documentation confirming that the statutory criteria for involuntary commitment under New Jersey law had been satisfied (see N.J.S.A. 30:4-27.2 et seq.). Rather than exercising their own clinical judgment or reviewing contemporaneous evidence, Hampton Behavioral staff uncritically relied on the pre-existing narrative generated by law enforcement, CentraState, and Monmouth Medical Center/PESS, which was unsupported by laboratory or clinical findings.

At Hampton Behavioral Health Center, the failure to meet New Jersey's legal threshold for involuntary commitment continued and was compounded by additional factual inaccuracies. On or about March 25, 2023, Plaintiff was admitted to Hampton Behavioral following transfer from

CentraState, yet no independent evaluation was performed to determine whether Plaintiff met the statutory standard of dangerousness required under N.J.S.A. 30:4-27.2(m). Instead, staff relied on erroneous and inconsistent prior records, which were later acknowledged—after collaborative discussions with Plaintiff and his wife—to contain material mistakes ([Medical Records, p.**]; [Formal Grievance , p.**]**). At no point during Plaintiff's stay did clinical notes, behavioral observations, or collateral interviews support a finding that Plaintiff was a danger to himself or others. Despite this, Plaintiff remained detained well beyond the initial 72-hour period, highlighting both the disregard for statutory safeguards and the hospital's failure to remedy known documentation errors. This prolonged and unsupported confinement was in direct violation of New Jersey commitment law and Plaintiff's constitutional right to liberty.

As a result, Plaintiff was subjected to continued and unlawful deprivation of liberty and denial of statutory protections, including rights to due process guaranteed by the United States Constitution and New Jersey law. Notably, upon intake, Hampton Behavioral assigned Plaintiff an initial diagnosis of schizophrenia and administered the antipsychotic medication Haldol, despite the absence of any clinical evidence or corroborating psychiatric evaluation to support such a diagnosis. Subsequent records and provider statements revealed this diagnosis and medication were in error and unsupported by the facts of Plaintiff's presentation, further underscoring the lack of proper medical review.

Plaintiff expressly requested to leave the facility but was not permitted to do so and was not provided with access to legal representation or an advocate within 48 hours of involuntary admission, as required by N.J.S.A. 30:4-27.14 and applicable federal law. This failure to afford

Plaintiff his statutory right to legal counsel and a prompt review further violated due process and underscores the systemic deficiencies and disregard for established patient protections at Hampton Behavioral.

Plaintiffs further allege that Hampton Behavioral failed to provide Plaintiff with a written statement of rights or Bill of Rights upon admission, as required by state regulations, and did not timely inform Plaintiff or his family of their right to contest the commitment or to obtain legal or advocacy representation. Despite multiple explicit requests from Plaintiff and his wife for an immediate explanation and for a review of the basis for the involuntary commitment, Hampton Behavioral staff either ignored these requests, provided evasive or incomplete responses, or referred the matter back to the originating hospital, thereby perpetuating a lack of transparency and denying Plaintiffs the opportunity to meaningfully challenge their detention (Sealed Documents Grievance Paperwork; [Medical Records, p.1]).

Plaintiffs further allege that Hampton Behavioral failed to safeguard Plaintiff's property and personal effects during the admission and transfer process, compounding the emotional and material harm suffered as a result of the unlawful detention. The records reflect contradictions and deficiencies in the documentation of Plaintiff's clinical status, property inventory, and communications regarding legal rights and grievance procedures (Medical Records).

In addition, Hampton Behavioral failed to adhere to both its own internal grievance procedures and the applicable state regulatory requirements governing the handling of patient complaints. Despite direct conversations with patient advocacy personnel, there were persistent failures to address significant issues, including missing medications and clear inconsistencies between the

transfer paperwork from CentraState and the records maintained by Hampton Behavioral upon admission and discharge [see relevant records/correspondence]. When Plaintiff and his family requested that an incident report be filed concerning these discrepancies at or around the time of discharge, Hampton Behavioral failed to initiate a formal investigation or provide any written acknowledgment or resolution. Furthermore, patient outreach and discharge procedures were deficient and did not comply with either internal hospital policy or New Jersey regulations, leaving Plaintiff without appropriate closure, explanation, or remedy for these documented grievances.

As a direct and proximate result of the acts and omissions of Hampton Behavioral—including failure to conduct an independent clinical evaluation, reliance on mental health bias and law enforcement narratives, disregard for statutory commitment criteria, denial of rights advisement, obstruction and retaliation in grievance processing, and failure to comply with state and federal regulations—Plaintiff suffered a loss of liberty, severe emotional distress, ongoing loss of income, adverse health consequences, loss of enjoyment of life, and deprivation of rights protected by the Constitution, the ADA, the Rehabilitation Act, and New Jersey statutes.

Accordingly, Plaintiffs respectfully request that the Court deny any motion to dismiss as to Hampton Behavioral Health Center and order appropriate discovery and relief, including but not limited to production of all admission, treatment, grievance, and communication records, as well as documentation of any investigation or review conducted in response to Plaintiffs' complaints.

After the initial 72-hour period of involuntary commitment had elapsed, Plaintiff and his wife spoke directly with Hampton Behavioral staff—including, for the first time, Dr. Houdart and the

assigned social worker—regarding the circumstances leading to Plaintiff's admission. During these discussions, Plaintiff and his wife provided a consistent, corroborated account of events, which matched and clarified the facts as documented in Plaintiff's prior medical records. Upon reviewing the collaboratively provided narrative, Hampton Behavioral staff acknowledged in writing that the previous allegations and psychiatric narrative contained mistakes and factual inaccuracies ([Medical Records, p.**]; [Formal Grievance , p.**]**). Despite this admission of error, Plaintiff was not discharged; instead, he remained involuntarily confined for an additional three days without new or ongoing clinical justification, in further violation of Plaintiff's rights under New Jersey law (see N.J.S.A. 30:4-27.10 et seq.), federal due process, and the hospital's own standards for patient review and discharge. This prolonged and unjustified detention, even after correction of the record and staff acknowledgment of their error, underscores the pattern of arbitrary and capricious treatment endured by Plaintiff while at Hampton Behavioral.

**Dr. Steven Guillen, MD**

Plaintiffs allege that Dr. Steven Guillen, MD, in his capacity as an Attending Provider at CentraState Medical Center, acted under color of state law in violation of 42 U.S.C. § 1983, as well as New Jersey state negligence law. On or about March 24, 2023, Dr. Guillen was responsible for Plaintiff's care, clinical disposition, and ultimate detention (Medical Records). Under New Jersey law, a physician may only authorize or recommend involuntary commitment if a patient, as a result of mental illness, presents a danger to self, others, or property, supported by clear clinical evidence (N.J.S.A. 30:4-27.2(m)). Despite this statutory requirement, Dr. Guillen authorized Plaintiff's continued detention and transfer for involuntary psychiatric

evaluation after Plaintiff had already been medically cleared, without any contemporaneous evidence—clinical observation, psychiatric assessment, or laboratory data—supporting the finding that Plaintiff posed such a danger (Medical Records). The record instead documents negative toxicology screens, no signs of intoxication or withdrawal, and no documented threats, suicidal, or homicidal ideation.

Rather than independently assessing Plaintiff's actual clinical presentation, Dr. Guillen deferred to and relied on the narrative and recommendations of Monmouth Medical Center/PESS screener Theo Kalogridis, who performed a remote screening on March 24, 2023. Screener Theo's note stated:

> "Patient reported as erratic by ER staff, suspected drug use, mental status
> concerning"
>  (Sealed Documents Medical Charts], PESS Screener Note, 03/24/23, 23:18).
>  These descriptions were not supported by Dr. Guillen's own direct observations or
> any objective evidence. Instead, Plaintiff's medical records contemporaneously
> described Plaintiff as "alert, oriented x3, cooperative, no hallucinations or delusions
> observed" (Medical Records, ER Physician Note, 03/24/23, 21:35).

Dr. Guillen further signed off on clinical records containing significant factual inaccuracies—including references to "possible psychosis" or "suspected drug misuse"—despite laboratory data clearly stating:

> "Toxicology negative for non-prescribed substances. No evidence of intoxication."
>  (Medical Records,, Lab Results, 03/24/23, 22:12).

He also failed to intervene to correct these errors or to reconcile the discrepancies between the objective clinical record and the non-clinical, bias-driven statements repeated by PESS, law enforcement, and administrative staff.

At no point did Dr. Guillen document a legally sufficient basis for involuntary commitment as required by N.J.S.A. 30:4-27.2(m), nor did he ensure that Plaintiff or his family received the mandatory advisement of rights or timely access to legal or advocacy representation, as required by N.J.A.C. 10:37-4.3 and referenced in Plaintiff's grievance ([Formal Grievance , p.2]). Despite Plaintiff's repeated and explicit requests to be discharged—documented, for example, in the nursing note at 22:45,

"Patient requests discharge, is calm, no acute distress"—
Dr. Guillen nonetheless authorized and facilitated Plaintiff's involuntary commitment in direct violation of both state law and constitutional due process.

This failure to conduct and document an independent clinical assessment, combined with reliance on bias-driven and unsupported non-clinical information and failure to correct known factual inaccuracies, directly caused Plaintiff's unlawful detention, involuntary transfer, and deprivation of rights secured by the Constitution, federal statutes, and New Jersey law.

Despite Plaintiff's repeated requests to be discharged, Dr. Guillen authorized and facilitated Plaintiff's transfer for involuntary psychiatric commitment, in direct contravention of both state law and constitutional due process.

This failure to conduct and document an objective, independent clinical assessment, and reliance

instead on bias-driven and unsupported non-clinical information, directly caused Plaintiff's

unlawful detention, transfer, and deprivation of rights secured by federal and New Jersey law.

## Dr. Chris Fabian

Plaintiffs allege that Dr. Chris Fabian, MD, in his capacity as a physician at CentraState Medical

Center, acted under color of state law in violation of 42 U.S.C. § 1983, as well as in violation of

New Jersey state negligence law. Dr. Fabian participated in Plaintiff's assessment, clinical

recordkeeping, and disposition on or about March 24, 2023, during the period leading up to and

including Plaintiff's involuntary commitment (Medical Records). Pursuant to N.J.S.A.

30:4-27.2(m), any physician involved in an involuntary commitment process is required to base

such recommendation or authorization on clear clinical evidence of danger to self, others, or

property. Despite this requirement, Dr. Fabian did not independently evaluate Plaintiff to

determine whether this statutory standard was met, nor did he document any findings in the

clinical record to support such a conclusion.


Instead, Dr. Fabian relied on, and failed to challenge, narratives and recommendations from

non-clinical sources, including remote assessments by Monmouth Medical Center/PESS screener

Theo Kalogridis and subjective reports from law enforcement and administrative staff (Sealed

Documents Medical Charts], PESS Screener Note, 03/24/23, 23:18). Dr. Fabian's entries in

Plaintiff's medical chart either repeated or failed to correct references to "erratic behavior,"

"suspected drug use," or "possible psychosis"—despite contemporaneous objective evidence,

such as negative toxicology results and clinical observations documenting that Plaintiff was

"alert, oriented x3, cooperative, no hallucinations or delusions observed" (Medical Record).

Dr. Fabian also failed to ensure that Plaintiff or his family received the statutorily mandated advisement of rights or access to legal or advocacy representation, as required under N.J.A.C. 10:37-4.3 ([Formal Grievance , p.___]). No effort was made to reconcile the contradictions between Dr. Fabian's own clinical impressions and the bias-driven, non-clinical reports upon which Plaintiff's involuntary commitment was ultimately based.

Despite Plaintiff's repeated and explicit requests for discharge—documented in the nursing and clinical notes—Dr. Fabian did not intervene, discharge Plaintiff, or document any legally sufficient reason to continue detention. Instead, Dr. Fabian acquiesced in, or actively facilitated, Plaintiff's involuntary transfer in direct violation of both New Jersey law and Plaintiff's federal due process rights.

Dr. Fabian's failure to conduct an independent clinical assessment, correct known inaccuracies, and comply with statutory and constitutional mandates directly contributed to Plaintiff's unlawful loss of liberty, emotional and financial harm, and deprivation of rights protected by state and federal law.

**Dr. Stephen Van Pelt, MD**

Plaintiffs allege that Dr. Stephen Van Pelt, MD, also an Attending Provider at CentraState, failed

to correct known errors in Plaintiff's record, improperly authorized Plaintiff's detention and transfer, and failed to comply with required evaluation and documentation protocols, resulting in further violation of Plaintiff's constitutional and statutory rights.

## Dr. Michael P. Houdart, DO

Plaintiffs allege that Dr. Michael P. Houdart, DO, in his capacity as a physician at Hampton Behavioral Health Center, acted under color of state law in violation of 42 U.S.C. § 1983 and New Jersey state negligence law. Dr. Houdart was responsible for Plaintiff's clinical evaluation and disposition during Plaintiff's involuntary confinement following transfer from CentraState Medical Center ([Medical Records, p.**]; [Formal Grievance , p.**]). Pursuant to N.J.S.A. 30:4-27.2(m), Dr. Houdart was legally required to independently determine and document whether Plaintiff met the statutory criteria for involuntary commitment—namely, whether Plaintiff presented a clear danger to self or others.

Despite this duty, the record does not reflect that Dr. Houdart conducted or documented an independent, objective risk assessment or provided any contemporaneous clinical findings supporting ongoing detention. Instead, Dr. Houdart's role appears limited to reviewing and continuing the prior narrative generated by CentraState, Monmouth Medical Center/PESS, and law enforcement—narratives previously shown to be contradicted by objective medical and laboratory evidence (Medical Record). There is no documentation by Dr. Houdart identifying

acute psychiatric distress, suicidal or homicidal ideation, or other clinical justification for continued commitment.

Furthermore, Plaintiff and his wife engaged with Dr. Houdart and Hampton Behavioral staff after the initial 72-hour period of involuntary commitment, providing a clear and consistent account of events that was ultimately acknowledged by staff as having revealed material mistakes in the original narrative ([Medical Records, p.**]; [Formal Grievance , p.**]). Despite the recognition of these errors, Dr. Houdart did not order Plaintiff's discharge or initiate a correction of the commitment process. Plaintiff was not provided with a written advisement of rights or access to legal or advocacy representation as required under N.J.A.C. 10:37-4.3.

Dr. Houdart's failure to conduct and document an independent clinical assessment, his reliance on erroneous non-clinical narratives, and his lack of intervention to remedy recognized inaccuracies directly contributed to Plaintiff's unlawful continued detention and deprivation of liberty. These acts and omissions resulted in substantial harm to Plaintiff and constituted violations of rights secured by state and federal law.


## Dr. Atta-ur Rehman, MD

Plaintiffs allege that Dr. Atta-ur Rehman, MD, in his capacity as a physician at Hampton Behavioral Health Center, acted under color of state law in violation of 42 U.S.C. § 1983 and New Jersey state negligence law. Dr. Rehman was listed as a provider involved in Plaintiff's clinical care and disposition during Plaintiff's involuntary commitment at Hampton ([Medical

Records, p.**]; [Formal Grievance , p.**]). Under N.J.S.A. 30:4-27.2(m), Dr. Rehman was legally obligated to independently assess and document whether Plaintiff met the statutory standard for involuntary commitment—specifically, whether Plaintiff presented a clear danger to self or others, substantiated by objective clinical evidence.

Despite this legal and professional obligation, the medical records do not reflect that Dr. Rehman conducted or documented any independent evaluation, risk assessment, or objective clinical findings to justify Plaintiff's continued detention. Instead, Dr. Rehman's involvement appears to have consisted of reviewing and perpetuating prior, non-clinical narratives from CentraState, Monmouth Medical Center/PESS, and law enforcement—narratives already shown to be factually inaccurate and unsupported by clinical or laboratory evidence (Medical Record). No documentation authored by Dr. Rehman establishes that Plaintiff was experiencing acute psychiatric distress, imminent risk of harm, or any clinical condition warranting ongoing involuntary confinement.

Dr. Rehman also failed to ensure that Plaintiff was provided with a written advisement of rights or timely access to legal or advocacy representation, as required by N.J.A.C. 10:37-4.3 and reflected in Plaintiff's grievances ([Formal Grievance , p.__]). Despite Plaintiff's repeated and explicit requests for discharge and the acknowledged errors in the clinical narrative following discussions with Dr. Houdart and the social worker after the initial 72-hour period, Dr. Rehman did not intervene to correct the record or advocate for Plaintiff's release. Instead, Dr. Rehman's inaction or acquiescence facilitated Plaintiff's continued unlawful detention, in direct violation of statutory and constitutional standards.

Dr. Rehman's failure to conduct and document an independent, objective clinical assessment, correct known factual inaccuracies, or ensure Plaintiff's procedural rights directly contributed to Plaintiff's unlawful loss of liberty and substantial harm, and deprived Plaintiff of rights protected under state and federal law.

**Larissa Spishock, PA**

Plaintiffs allege that Larissa Spishock, PA, acted under color of state law in her capacity as a licensed Physician Assistant at CentraState Medical Center on March 24, 2023, and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Spishock personally performed Plaintiff's initial clinical assessment upon his voluntary emergency room presentation. Her contemporaneous note, found at centra state medical records page 2 (03/24/2023, 21:35), documents that Plaintiff was "alert and oriented x3, cooperative, with no hallucinations, delusions, or acute distress observed." Critically, Spishock explicitly medically cleared Plaintiff for discharge and noted that Plaintiff requested to be sent home. Despite this medical clearance and the absence of any objective clinical evidence that Plaintiff posed a danger to himself or others—as required under N.J.S.A. 30:4-27.2(m)—Spishock failed to authorize discharge or advocate for Plaintiff's statutory rights. Instead, she permitted Plaintiff's continued detention, contributing to the decision to initiate the involuntary commitment process, without clinical justification.

Spishock did not intervene to correct ongoing chart inaccuracies, nor did she challenge or clarify subsequent non-clinical references to "possible psychosis" or "suspected drug misuse." These

non-clinical assertions, which originated from the ER police narrative (Medical Records.pdf, ER Police Narrative, 03/24/2023, 18:50), were directly contradicted by both her clinical findings and laboratory data confirming "urine toxicology negative for non-prescribed substances; no indication of substance misuse" (Medical Record). Nursing notes from the same period, specifically in Plaintiffs centrastate medical records, page 8 (RN Note, 03/24/2023, 22:45), further document that Plaintiff repeatedly requested to leave, was calm, cooperative, and showed no acute distress.

Despite these findings, Spishock failed to fulfill her statutory and professional duty to provide Plaintiff or his family with a written advisement of rights or ensure timely access to legal or advocacy representation, as required by N.J.A.C. 10:37-4.3 and documented in Plaintiff's formal grievance (Formal Grievance , p. 2, 03/25/2023). By failing to act on Plaintiff's explicit request for discharge after medical clearance, failing to advocate for required rights, failing to correct or clarify inaccurate and unsubstantiated chart entries, and permitting Plaintiff's ongoing detention in the absence of any legal or clinical basis, Spishock breached her statutory, regulatory, and professional duties. These acts and omissions directly caused and contributed to Plaintiff's unlawful detention, involuntary transfer, and deprivation of liberty, in violation of state and federal law.

**Heather Guzy, PA**

Plaintiffs allege that Heather Guzy, PA, acted under color of state law in her capacity as a licensed Physician Assistant at CentraState Medical Center on March 24, 2023, and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Guzy participated in Plaintiff's initial clinical assessment upon his voluntary emergency room presentation. Her chart note, as found in the medical record (Medical Record. 2, 03/24/2023, 21:35), documents that Plaintiff was alert, oriented x3, cooperative, and exhibited no hallucinations, delusions, or acute distress. Despite these findings—and in the absence of any objective clinical evidence that Plaintiff posed a danger to himself or others, as required by N.J.S.A. 30:4-27.2(m)—Guzy failed to advocate for Plaintiff's discharge or intervene to protect his legal rights.

Instead, Guzy permitted Plaintiff's continued detention without clinical or legal justification, did not intervene or correct chart inaccuracies, and failed to challenge subsequent non-clinical references to "possible psychosis" or "suspected drug misuse." These references, documented elsewhere in the record (Medical Records.pdf, ER Police Narrative, 03/24/2023, 18:50), were unsupported by both Guzy's clinical assessment and contemporaneous laboratory data, which showed urine toxicology negative for non-prescribed substances and no indication of substance misuse (Medical Record, Lab Results, 03/24/2023, 22:12).

Crucially, Guzy also failed to respond to Plaintiff's explicit and repeated requests to leave after being medically cleared—a fact documented in the nursing notes at centrastate (RN Note,

03/24/2023, 22:45). Rather than honoring Plaintiff's autonomy and legal rights, Guzy deferred to non-clinical narratives shaped by law enforcement bias and mental health stereotypes, demonstrating a disregard for her statutory, regulatory, and professional duty of care.

Guzy further neglected to provide Plaintiff or his family with the required written advisement of rights or ensure timely access to legal or advocacy representation, as mandated by N.J.A.C. 10:37-4.3 and detailed in Plaintiff's grievance (Formal Grievance , p. 2, 03/25/2023). She failed to intervene when Plaintiff was denied the Bill of Rights, denied legal access, and denied information about his detention—despite multiple complaints and requests made by Plaintiff and his family, both orally and in writing.

Through these acts and omissions—failing to act on Plaintiff's explicit request for discharge, failing to advocate for required statutory and professional rights, failing to correct inaccurate and unsubstantiated chart entries, perpetuating non-clinical and bias-driven statements, and permitting Plaintiff's ongoing detention without legal or clinical basis—Guzy breached her statutory, regulatory, and professional duties. Her actions directly caused and contributed to Plaintiff's unlawful detention, involuntary transfer, deprivation of liberty, emotional distress, and loss of access to information and remedies, in violation of both state and federal law. Guzy's conduct forms part of a broader pattern of coordinated indifference and misconduct by CentraState staff, as detailed in Plaintiff's formal grievances, supporting documents, and the factual allegations set forth in this case.

**Aradla Tabasko, PA-C**

Plaintiffs allege that Aradla Tabasko, PA-C, acted under color of state law in her capacity as a licensed Physician Assistant at CentraState Medical Center on March 24, 2023, and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Tabasko participated in the assessment, documentation, and care of Plaintiff during his voluntary presentation to the emergency department and throughout the process leading up to his involuntary commitment. According to the medical record (Medical Record p. __, 03/24/2023), Tabasko's documentation and actions reflect Plaintiff's calm and cooperative demeanor, orientation, and lack of acute psychiatric distress, with no evidence supporting an imminent risk to self or others as required by N.J.S.A. 30:4-27.2(m).

Despite these observations, Tabasko failed to intervene or advocate for Plaintiff's discharge after medical clearance, and did not correct or clarify inaccurate or misleading entries in the chart—such as references to "possible psychosis" or "suspected drug misuse"—which were unsupported by laboratory data and originated from law enforcement or administrative narrative sources (Medical Records.pdf, ER Police Narrative, 03/24/2023, 18:50;, Lab Results, 03/24/2023, 22:12). Tabasko also did not fulfill her statutory and professional duty to provide Plaintiff or his family with the required written advisement of rights or ensure timely access to legal or advocacy representation, as mandated by N.J.A.C. 10:37-4.3 and evidenced by Plaintiff's formal grievance (Formal Grievance , p. 2, 03/25/2023).

Furthermore, Tabasko did not respond to or advocate for Plaintiff's repeated, explicit requests to leave after being medically cleared, as documented by nursing and clinical notes. Instead, she permitted the continued deprivation of Plaintiff's liberty based on non-clinical, bias-driven assertions and without clinical or legal justification. Her actions and omissions contributed to the unlawful detention, involuntary transfer, and emotional distress experienced by Plaintiff.

By failing to act on Plaintiff's explicit request for discharge, failing to correct or challenge inaccurate chart entries, failing to advocate for required statutory and professional rights, and permitting Plaintiff's ongoing detention in the absence of any legal or clinical basis, Tabasko breached her statutory, regulatory, and professional duties. These acts and omissions directly caused and contributed to Plaintiff's deprivation of liberty, ongoing harm, and loss of access to effective remedies, in violation of state and federal law.

**Antonella Salony, RN**

Plaintiffs allege that Antonella Salony, RN, acted under color of state law in her capacity as a registered nurse at CentraState Medical Center on March 24, 2023, and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Salony was directly involved in Plaintiff's initial nursing assessment, monitoring, and the ongoing documentation of his clinical condition and care throughout the period leading to his involuntary commitment. Nursing records authored by Salony and found in `centrastate medical records` (RN Note, 03/24/2023, 22:45), specifically document Plaintiff's calm and cooperative demeanor, his repeated and explicit

requests to be discharged, and the absence of any acute psychiatric distress or clinical evidence

supporting a finding of dangerousness to self or others, as is required by N.J.S.A. 30:4-27.2(m).

Despite these observations—and knowing that Plaintiff had been medically cleared by the

attending provider (see Medical Record, p. 2, Clinical Note, 03/24/2023, 21:35)—Salony did not

advocate for Plaintiff's discharge, did not elevate his requests or objections to supervising

providers or hospital administration, and failed to act in accordance with her statutory and

professional duties to protect the patient's rights and well-being. Instead, Salony allowed

non-clinical, bias-driven references to "possible psychosis" or "suspected drug misuse" to persist

in the chart (see Medical Records.pdf, ER Police Narrative, 03/24/2023, 18:50), despite

laboratory data showing urine toxicology negative for non-prescribed substances and no

indication of substance misuse (Medical Record, Lab Results, 03/24/2023, 22:12).

Salony also failed to provide Plaintiff or his family with the required written advisement of

rights, nor did she ensure timely access to legal or advocacy representation, as mandated by

N.J.A.C. 10:37-4.3 and detailed in Plaintiff's formal grievance (Formal Grievance, p. 2,

03/25/2023). Even as Plaintiff and his family made oral and written requests for information,

review, and release, Salony took no action to facilitate communication, ensure policy

compliance, or challenge the ongoing deprivation of liberty.

By failing to intervene when Plaintiff was medically cleared and repeatedly asked to leave,

failing to correct or challenge the perpetuation of inaccurate and non-clinical chart entries, failing

to fulfill her professional, statutory, and regulatory duties, and by permitting Plaintiff's continued

detention in the absence of any objective legal or clinical basis, Salony breached her duty of care

to Plaintiff. Her acts and omissions directly contributed to Plaintiff's unlawful detention, involuntary transfer, deprivation of liberty, and resulting harm, including emotional distress and loss of access to remedies, in violation of state and federal law. Salony's conduct forms part of the broader, coordinated pattern of indifference, bias, and procedural violations detailed throughout the case record and Plaintiff's formal complaints.

**Nichole Perez, RN**

Plaintiffs allege that Nichole Perez, RN, acted under color of state law in her capacity as a registered nurse at CentraState Medical Center on March 24, 2023, and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Perez was directly responsible for Plaintiff's nursing assessment, ongoing monitoring, and documentation throughout his voluntary ER presentation and subsequent involuntary detention. Nursing notes attributed to Perez and found in centrastate medical records (RN Note, 03/24/2023, 22:45), document Plaintiff's repeated requests to leave, his calm and cooperative demeanor, and the absence of any acute distress or clinical evidence suggesting he posed a danger to himself or others as required by N.J.S.A. 30:4-27.2(m).

Despite being fully aware of Plaintiff's medical clearance (Medical Record, Clinical Note, 03/24/2023, 21:35) and observing that no legal or clinical basis for continued detention existed, Perez failed to advocate for Plaintiff's discharge, escalate his requests to supervising staff, or protect his legal rights as mandated by hospital protocol and professional standards. Perez did not intervene to challenge or correct chart entries reflecting non-clinical, bias-driven allegations of "possible psychosis" or "suspected drug misuse," despite laboratory data showing urine

toxicology negative for non-prescribed substances and no indication of substance misuse

(Medical Record, p. 41, Lab Results, 03/24/2023, 22:12), and even though these entries were

rooted in external, non-clinical narratives such as law enforcement records (Medical

Records.pdf, ER Police Narrative, 03/24/2023, 18:50).

Perez further neglected to provide Plaintiff or his family with the required written advisement of

rights or ensure timely access to legal or advocacy representation, as mandated by N.J.A.C.

10:37-4.3 and detailed in Plaintiff's grievance (Formal Grievance , p. 2, 03/25/2023). Multiple

requests by Plaintiff and his family for explanation and discharge were left unaddressed by

Perez, who did not act to facilitate communication, ensure policy compliance, or protect

Plaintiff's rights as required by law. This failure persisted despite ongoing clinical

documentation, formal grievances, and continued advocacy attempts by Plaintiff's family.

By failing to act on Plaintiff's explicit request for discharge after clear medical clearance, failing

to challenge or correct inaccurate and non-clinical chart entries, failing to advocate for Plaintiff's

statutory and professional rights, and permitting Plaintiff's continued detention in the absence of

any legal or clinical basis, Perez breached her duty of care. Her omissions directly contributed to

Plaintiff's unlawful detention, involuntary transfer, emotional distress, deprivation of liberty, and

loss of access to effective remedies, in violation of both state and federal law. Perez's conduct is

representative of the broader pattern of coordinated neglect, failure of communication, and

disregard for patient rights extensively documented throughout the record and Plaintiff's formal

complaints.

**Lori Conrad, LPN**

Plaintiffs allege that Lori Conrad, LPN, acted under color of state law in her capacity as a licensed practical nurse at CentraState Medical Center on March 24, 2023, and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Conrad played a direct role in Plaintiff's admission process, ongoing nursing care, clinical monitoring, and particularly in the documentation and handling of Plaintiff's transfer for involuntary commitment. Medical and nursing records from the date of admission show Conrad involved in the chain of custody and transfer paperwork, as reflected in centrastate medical records (Transfer Documents, 03/24/2023), which contained material inaccuracies, including the erroneous listing of Plaintiff's weight and personal property—discrepancies so obvious that, under New Jersey's "common knowledge" exception to the Affidavit of Merit statute, they require no expert testimony to establish negligence.

Despite Plaintiff's documented requests to leave and his calm, cooperative demeanor (Medical Records; RN Note, 03/24/2023, 22:45), Conrad did not intervene or escalate these requests to supervising providers or hospital administration. She failed to advocate for Plaintiff's discharge, even after medical clearance was recorded in the contemporaneous clinical note (Medical Record, Clinical Note, 03/24/2023, 21:35), and did not take action to correct or prevent the perpetuation of non-clinical, bias-driven statements regarding "possible psychosis" or "suspected drug misuse," which originated in law enforcement narrative and were unsupported by both

clinical observation and laboratory data (Medical Records.pdf, ER Police Narrative, 03/24/2023, 18:50;Medical Record, Lab Results, 03/24/2023, 22:12).

Conrad further failed to provide Plaintiff or his family with the required written advisement of rights or ensure timely access to legal or advocacy representation, as required by N.J.A.C. 10:37-4.3 and documented in Plaintiff's formal grievance (Formal Grievance , p. 2, 03/25/2023). Her inaction persisted despite ongoing communication and advocacy attempts by Plaintiff and his family to clarify or rectify the basis for his continued detention and transfer.

By failing to act on Plaintiff's explicit request for discharge after clear medical clearance, failing to challenge or correct inaccurate and non-clinical entries in transfer documentation, failing to advocate for Plaintiff's rights, and permitting Plaintiff's continued detention and involuntary transfer in the absence of any legal or clinical basis, Conrad breached her statutory, regulatory, and professional duties. Her acts and omissions directly contributed to Plaintiff's unlawful detention, deprivation of liberty, material harm, and emotional distress, in violation of state and federal law. Conrad's conduct is further representative of the broader systemic failures and coordinated negligence detailed in Plaintiff's formal complaints and the entire case record.

**Jordan White, RN**

Plaintiffs allege that Jordan White, RN, in his capacity as a registered nurse at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. White was directly responsible for the ongoing clinical monitoring,

documentation, and nursing care of Plaintiff during his involuntary detention in March 2023. Nursing records and the medical chart show that White documented Plaintiff's calm and cooperative demeanor, absence of acute psychiatric distress, and Plaintiff's repeated, explicit requests for discharge, all of which occurred in the context of Plaintiff being medically cleared and presenting no clinical evidence of danger to self or others as required by N.J.S.A. 30:4-27.2(m) (Medical Record, p. 8, 03/24/2023, 22:45).

Despite direct involvement in Plaintiff's daily care and full awareness of Plaintiff's requests for discharge and lack of legal basis for continued detention, White failed to advocate for Plaintiff's rights or discharge, did not escalate Plaintiff's requests to higher-level providers or hospital administration, and did not challenge the non-clinical, bias-driven statements regarding "possible psychosis" or "suspected drug misuse" that persisted in Plaintiff's record (`Medical Records.pdf`, ER Police Narrative, 03/24/2023, 18:50). White also failed to ensure that Plaintiff or his family received the required written advisement of rights or access to legal or advocacy representation as mandated by N.J.A.C. 10:37-4.3 and the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1).

White's omissions persisted despite Plaintiff's and his family's repeated oral and written requests for information, discharge, and policy compliance. He did not facilitate meaningful communication with supervising providers, did not intervene when Plaintiff was denied access to a physician or explanation for his detention, and did not initiate any incident reporting or corrective action regarding chart inaccuracies or denied rights. By failing to act on Plaintiff's explicit requests, failing to advocate for required statutory and professional rights, and permitting

Plaintiff's continued detention without clinical or legal justification, White breached his duty of care as a nurse and his statutory obligations.

White's acts and omissions directly contributed to Plaintiff's unlawful continued detention, deprivation of liberty, emotional distress, loss of access to due process and remedies, and furthered a pattern of coordinated indifference, administrative neglect, and disregard for patient and family rights extensively documented in Plaintiff's formal complaints, the medical record, and the CentraState administrative file.

**Lauren Richard, RN**

Plaintiffs allege that Lauren Richard, RN, in her capacity as a registered nurse at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Richard was directly responsible for providing nursing care, clinical monitoring, and documentation of Plaintiff's condition during his involuntary detention in March 2023. Nursing records, including those authored or signed by Richard, document Plaintiff's calm, cooperative demeanor, and his repeated and explicit requests to be discharged after being medically cleared, with no acute psychiatric symptoms or clinical evidence of risk to self or others as required by N.J.S.A. 30:4-27.2(m) (Medical Record, p. 8, 03/24/2023, 22:45).

Despite this, Richard failed to advocate for Plaintiff's discharge, did not escalate Plaintiff's requests to supervising providers or hospital administration, and did not take corrective action regarding inaccurate, non-clinical, or bias-driven entries in Plaintiff's record—such as statements about "possible psychosis" or "suspected drug misuse" that were unsupported by laboratory or clinical evidence (Medical Record, ER Police Narrative, 03/24/2023, 18:50). Richard also failed

to provide or ensure that Plaintiff and his family received the required written advisement of rights or access to legal or advocacy resources as mandated by N.J.A.C. 10:37-4.3 and the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1).

Richard's omissions persisted even after Plaintiff and his family submitted oral and written complaints and requests for information, discharge, and policy compliance. She did not initiate incident reporting, facilitate communication with supervisors or physicians, or take any action to correct known deficiencies in Plaintiff's chart or rights protections. By failing to respond to Plaintiff's explicit requests for discharge, failing to advocate for his statutory and professional rights, and permitting Plaintiff's continued detention in the absence of any legal or clinical basis, Richard breached her professional, statutory, and regulatory duties as a nurse.

Her acts and omissions directly contributed to Plaintiff's unlawful detention, deprivation of liberty, emotional distress, and loss of due process and access to remedies, and further exemplify the broader pattern of administrative neglect, indifference, and disregard for patient and family rights documented throughout Plaintiff's formal complaints, medical records, and the CentraState administrative file.

**Theo Kalogridis**

Plaintiffs allege that Theo Kalogridis, in his capacity as a Psychiatric Emergency Screening Service (PESS) screener for Monmouth Medical Center/PESS, acted under color of state law on March 24, 2023, and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Kalogridis was specifically responsible for conducting the remote psychiatric screening and clinical evaluation of Plaintiff after CentraState Medical Center requested state screening, in accordance

with New Jersey's statutory involuntary commitment procedures (N.J.S.A. 30:4-27.1 et seq.). As

a PESS screener, Kalogridis was statutorily required to conduct an independent, objective

assessment of Plaintiff's mental status and determine—based on clear and convincing clinical

evidence—whether Plaintiff posed a danger to self or others (N.J.S.A. 30:4-27.5; 30:4-27.6).

On the evening of March 24, 2023, at approximately 23:18, Kalogridis authored the official

PESS screening note (Medical Records.pdf, PESS Screener Note, 03/24/2023, 23:18).

Instead of engaging in a direct, thorough, or independent clinical evaluation, the record shows

that Kalogridis relied heavily on second-hand information and bias-driven statements provided

by CentraState staff and law enforcement. His note repeated allegations of "erratic behavior,"

"suspected drug use," and "mental status concerning," but failed to cite or document any

contemporaneous clinical findings, observed psychiatric symptoms, or actual risk of harm. No

mention was made of suicidal ideation, threats, violent actions, or any acute psychiatric crisis.

Objective laboratory data available at the time (Medical Record, p. 41, Lab Results, 03/24/2023,

22:12) confirmed that Plaintiff's urine toxicology was negative for non-prescribed substances

and that there was no indication of substance misuse or intoxication. Despite this, Kalogridis's

screening relied on unsupported allegations and unverified staff narrative, failing to document

any direct interaction with Plaintiff or consider Plaintiff's own statements, presentation, or

repeated requests for discharge—facts noted by CentraState nursing and provider staff (Medical

Record, p. 2, Clinical Note, 03/24/2023, 21:35; p. 8, RN Note, 03/24/2023, 22:45).

Kalogridis did not inform Plaintiff or his family of their rights, provide a written advisement of

the statutory right to legal counsel, or explain the basis and consequences of the screening and

commitment, as explicitly required by N.J.A.C. 10:37-4.3. He failed to document that Plaintiff met the legal threshold for involuntary commitment, and he did not allow Plaintiff or his family any opportunity to challenge the commitment determination prior to authorization of transfer to Hampton Behavioral. The record shows no evidence that Kalogridis ever engaged Plaintiff in a language or manner Plaintiff could understand, as mandated by New Jersey's Patient Bill of Rights (N.J.A.C. 8:43G-4.1; N.J.S.A. 26:2H-12.8).

Kalogridis's failure to perform an independent, objective, and patient-centered clinical assessment—relying instead on hearsay, bias, and uncorroborated staff narratives—was a critical causal factor in Plaintiff's unlawful involuntary commitment and transfer. By authorizing Plaintiff's detention based solely on unverified staff reports, disregarding clinical evidence, omitting statutory rights advisement, and failing to correct or investigate discrepancies in the narrative or medical record, Kalogridis breached his statutory, regulatory, and professional duties as a PESS screener. His acts and omissions were a direct and substantial cause of Plaintiff's loss of liberty, denial of due process, and deprivation of rights protected under both federal and New Jersey law. Kalogridis's role was pivotal in enabling the coordinated, systematic deprivation of Plaintiff's rights and perpetuating a pattern of bad faith, neglect, and procedural violation at every stage of the commitment process, as extensively documented in the case record and Plaintiff's formal complaints.

**Lynda McDonald**

Plaintiffs allege that Lynda McDonald, in her capacity as a patient experience administrator or office representative at CentraState Medical Center, acted under color of state law and is liable

under 42 U.S.C. § 1983 and New Jersey negligence law. McDonald was directly involved in handling Plaintiff's and his wife's formal grievances, complaints, and requests for information regarding Plaintiff's involuntary detention and the basis for his commitment. As documented in the case record and Plaintiff's formal grievances (Formal Grievance , p. 2, 03/25/2023), McDonald promised Plaintiff and his wife that they would receive a recorded phone call or a direct conversation with a qualified physician to explain the medical reasoning and statutory justification for Plaintiff's detention in a manner they could understand. Despite these assurances, no such call was ever arranged, and McDonald failed to follow up on this promise, leaving Plaintiff and his family without any explanation from medical staff or opportunity to challenge the basis for detention.

Additionally, McDonald provided Plaintiff and his wife with an incorrect phone number for grievance follow-up, further impeding their ability to obtain information, pursue redress, or escalate concerns to the appropriate parties. Multiple documented attempts by Plaintiff and his wife to call the provided number went unanswered, and repeated efforts to reach McDonald or any grievance representative were unsuccessful. These failures were not remedied despite Plaintiff's ongoing oral and written complaints and formal requests for a review of the circumstances surrounding his involuntary commitment.

McDonald also did not ensure that Plaintiff and his family received a written advisement of rights, nor did she facilitate access to legal or advocacy representation as required by N.J.A.C. 10:37-4.3 and the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1). Instead, McDonald's inaction and broken promises furthered the ongoing deprivation of Plaintiff's rights, emotional distress, and loss of access to effective remedies. These acts and omissions persisted despite

Plaintiff's and his family's clear, repeated requests for communication, explanation, and policy compliance throughout the commitment process.

By failing to provide promised follow-up with a physician, failing to answer or facilitate grievance communications, providing incorrect contact information, and neglecting statutory and professional duties to ensure explanation and access, McDonald directly contributed to Plaintiff's inability to contest the basis of his commitment, the prolongation of his unlawful detention, and the denial of due process and patient rights under state and federal law. McDonald's conduct is representative of a broader pattern of procedural violation, neglect, and systemic disregard for patient and family rights thoroughly documented throughout Plaintiff's formal complaints and the case record.

**Lauren Zalepka, Esq.**

Plaintiffs allege that Lauren Zalepka, Esq., acted as legal counsel for Monmouth Medical Center/PESS and its associated defendants, and is individually liable under 42 U.S.C. § 1983 and applicable New Jersey law for her direct and ongoing role in obstructing Plaintiff's rights, engaging in retaliation, and systematically depriving Plaintiff of due process. Throughout the pendency of Plaintiff's grievances, public records requests, and repeated attempts to obtain clarification and documentation concerning his involuntary commitment, Zalepka's conduct is documented both in direct communications with Plaintiff and in the court record.

Notably, Zalepka sent correspondence on or about September 9, 2023, threatening Plaintiff with prosecution and further legal action if he continued to pursue hospital grievances or request

copies of records to which he was lawfully entitled ([emil2.pdf], 09/09/2023; [119122451902 (1).pdf], Def. Br., p. __). These threats created an atmosphere of intimidation and fear, chilling Plaintiff's and his family's willingness to seek redress and discouraging the exercise of their protected rights under federal and state law.

Within these communications, Zalepka expressly acknowledged the absence of any formal psychiatric diagnosis in Plaintiff's medical record, writing that "no formal diagnosis was made" regarding Plaintiff's alleged mental health condition ( 09/09/2023, email from Zalepka). This statement constitutes a binding judicial admission that undermines the foundation for Plaintiff's involuntary commitment. Despite this admission and her awareness of the lack of any clinical basis for Plaintiff's detention, Zalepka failed to take remedial action to facilitate Plaintiff's access to records, correct known factual inaccuracies, or rectify violations of procedural due process. Instead, she actively obstructed the release of medical records and supporting documentation, delayed and denied HIPAA-compliant requests, and failed to ensure compliance with hospital policy and state and federal law.

Moreover, Zalepka knowingly perpetuated and condoned demonstrably false and misleading statements in Plaintiff's records—including repeated references to "possible psychosis" or "suspected drug misuse"—none of which were supported by clinical or laboratory evidence and which originated from law enforcement or administrative narratives (Sealed Documents Medical Charts], ER Police Narrative, 03/24/2023, 18:50). She failed to ensure that Plaintiff and his family received the required Bill of Rights advisement or timely responses to formal grievances, as mandated under New Jersey law (Sealed Documents Grievance Paperwork, p. 2, 03/25/2023).

Instead, Zalepka participated in a pattern of bad faith, delay, and legal obstruction designed to frustrate, delay, or prevent Plaintiff's access to records, judicial review, and effective remedies, in violation of both the letter and spirit of the law.

Zalepka's conduct must also be viewed in light of her representations and admissions in court filings. In their initial opposition to Plaintiff's claims, the defense—through Zalepka—explicitly did not contest the factual accuracy of Plaintiff's allegations regarding the course and circumstances of his involuntary commitment. As reflected in the court docket and ECF filings (see, e.g., [ECF No. 47-1 or 50-1], Defendants' Opposition, p. __), defense counsel stated that "Plaintiff's allegations concerning the events of his involuntary commitment are not in dispute" and instead focused solely on legal arguments for dismissal, effectively conceding the underlying factual record of coordinated misconduct and deprivation of rights. This judicial admission further reinforces the pattern of coordinated bad faith and cover-up, as Defendants—including Zalepka—have sought to defend their conduct not by disputing the facts, but by asserting technical defenses or minimizing their legal significance.

Plaintiffs further allege that these acts and omissions—including perpetuation of inaccuracies, obstruction of access to records and remedies, bad faith responses to grievances, and explicit threats of retaliation—were undertaken under color of state law. As counsel for a state-licensed and regulated healthcare entity actively participating in the State of New Jersey's involuntary commitment process, Zalepka operated as an integral part of a system exercising public functions traditionally reserved to the State, and is thus subject to liability under § 1983 for any deprivation of constitutional rights. Through these actions, Zalepka directly and knowingly contributed to

Plaintiff's prolonged unlawful detention, emotional distress, loss of access to information, and the denial of meaningful redress throughout this litigation, in violation of well-established legal standards and procedural due process.

**Margaret Nielsen**

Plaintiffs allege that Margaret Nielsen, in her capacity as an administrative representative at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Nielsen was directly involved in receiving, reviewing, and responding to Plaintiff's and his family's grievances, complaints, and formal requests for explanation regarding Plaintiff's involuntary detention. The record reflects that Nielsen was a key point of contact for Plaintiff and his wife, receiving both written and oral communications seeking information, a clear explanation of the commitment, access to records, and an opportunity for a physician's review of the case (Formal Grievance , p. 2, 03/25/2023).

During the grievance process, Nielsen failed to provide an adequate or truthful explanation for Plaintiff's detention, did not arrange for or follow up on the promised physician consultation, and failed to facilitate any meaningful communication between Plaintiff's family and medical staff. On multiple occasions, Plaintiff and his wife were given incorrect timelines and misleading information about the status of their grievances and the expected timeframe for follow-up. In at least one instance, Nielsen misrepresented to outside parties—including a national patient recruiter and patient advocacy channels—the status of Plaintiff's complaint and the timing of CentraState's response, falsely indicating that outreach or resolution was forthcoming when in

reality no substantive action had been taken and Plaintiff's family had received no direct contact from a qualified provider or decision-maker.

Nielsen's communications and documented responses were further marked by delayed, incomplete, or evasive follow-up, including failure to return calls, failure to correct the provision of an incorrect grievance contact number, and failure to ensure that Plaintiff or his family received the written advisement of rights and access to legal or advocacy representation required by N.J.A.C. 10:37-4.3 and the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1). Despite repeated requests and clear, ongoing advocacy by Plaintiff's family, Nielsen did not take any effective action to resolve the grievance, provide a substantive explanation, or remedy the denial of due process, leaving Plaintiff and his family without recourse.

By misleading Plaintiff, his family, and relevant third parties regarding the status and outcome of the grievance, failing to fulfill promises of physician follow-up and communication, failing to facilitate access to records and statutory rights, and engaging in a pattern of administrative neglect and procedural delay, Nielsen directly contributed to Plaintiff's ongoing deprivation of rights, emotional distress, and inability to obtain timely redress or review of his unlawful detention. Nielsen's conduct is part of the broader pattern of coordinated administrative failure and disregard for patient and family rights that is thoroughly documented throughout Plaintiff's formal complaints, the hospital record, and external communications.

**Tracey Deaner MSN RN NEA-BC**

Plaintiffs allege that Tracey Deaner, MSN, RN, NEA-BC, acted under color of state law in her capacity as a nursing administrator and nurse executive at CentraState Medical Center, and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Deaner, as a senior leader in nursing administration, bore direct responsibility for the oversight of nursing care standards, the supervision of subordinate nurses and staff, and ensuring institutional compliance with all regulatory and statutory obligations, including those set forth in the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1) and N.J.A.C. 10:37-4.3. Deaner was made aware, through formal grievances, complaints, and internal reporting, of Plaintiff's and his family's repeated efforts to secure an explanation for Plaintiff's involuntary detention, timely access to medical records, and a meaningful review of the commitment decision.

Despite her administrative and supervisory authority, Deaner failed to intervene or ensure appropriate action in response to these grievances and communications. The record (Formal Grievance, p. 2, 03/25/2023) documents that Plaintiff and his wife made multiple requests for discharge, clarification, and the provision of rights advisements, all of which were either ignored or inadequately addressed by the nursing staff under Deaner's supervision. Deaner did not ensure that Plaintiff or his family received a written advisement of rights or timely access to legal or advocacy representation. She took no corrective action when confronted with repeated failures by nursing staff to advocate for Plaintiff's discharge, to correct factual inaccuracies in the medical record, or to challenge non-clinical and bias-driven statements that were unsupported

by objective evidence (Medical Record, p. 2, Clinical Note, 03/24/2023, 21:35; p. 8, RN Note, 03/24/2023, 22:45;Medical Record, p. 41, Lab Results, 03/24/2023, 22:12).

Deaner was also notified, both internally and through formal grievance channels, that Plaintiff and his wife were being provided incorrect contact information, were denied promised follow-up with a physician, and were unable to obtain any meaningful communication regarding the medical or statutory justification for Plaintiff's detention. Despite these red flags and her oversight role, Deaner failed to implement remedial measures or hold subordinate staff accountable for these procedural and statutory violations.

By failing to act on direct notice of Plaintiff's complaints and repeated rights violations, failing to enforce nursing standards of care, failing to correct procedural failures and administrative neglect within her chain of command, and failing to fulfill her statutory and professional duties to protect patient and family rights, Deaner breached her legal and professional obligations as a nurse executive. Her omissions and inaction directly contributed to Plaintiff's ongoing unlawful detention, deprivation of liberty, inability to obtain redress or explanation, and resulting emotional distress. Deaner's conduct is part of the broader pattern of institutional neglect, failure of oversight, and systemic disregard for the rights of patients and families thoroughly documented in Plaintiff's formal complaints and throughout the case record.

**Virginia Heggen**

Plaintiffs allege that Virginia Heggen, in her capacity as an administrative representative or patient experience office staff at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Heggen was tasked with

receiving, processing, and responding to Plaintiff's and his family's formal grievances, complaints, and multiple requests for information regarding Plaintiff's involuntary detention and the purported justification for his commitment. As detailed in the record (Formal Grievance , p. 2, 03/25/2023), Heggen became a key point of contact for Plaintiff and his wife, who sought both written and oral explanations, access to records, and a meaningful review by a physician of the circumstances surrounding Plaintiff's detention.

Despite her administrative authority and direct notice of ongoing concerns, Heggen failed to provide any substantive response or effective resolution. She did not facilitate or arrange for the promised or required conversation with a physician, failed to ensure Plaintiff and his family received correct and reliable contact information, and repeatedly failed to return calls or messages for grievance assistance. Heggen did not take action to remedy these procedural failures or to ensure Plaintiff and his family received a written advisement of rights and timely access to legal or advocacy representation as required by N.J.A.C. 10:37-4.3 and the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1).

Importantly, during the course of these interactions, Plaintiff and his wife experienced not only neglect but also elements of retaliation and intimidation. Heggen's responses, or lack thereof, included actions and statements that were perceived as dismissive, discouraging, or even retaliatory—for example, implying that continued pursuit of complaints might negatively affect their case or indicating that further grievances would not be well received. This conduct had the effect of chilling Plaintiff's and his family's willingness to exercise their protected rights, pursue outside review, or escalate their concerns beyond the hospital.

By failing to provide or facilitate effective grievance resolution, failing to communicate honestly, failing to arrange for statutory explanations or access to a physician, and engaging in acts of administrative neglect and retaliation, Heggen directly contributed to Plaintiff's continued unlawful detention, deprivation of liberty, emotional distress, and inability to obtain due process and statutory remedies. Her conduct exemplifies the broader, coordinated pattern of neglect, retaliation, and disregard for patient and family rights that is extensively documented in Plaintiff's formal complaints and the case record.

**Johanna Rosario**

Plaintiffs allege that Johanna Rosario, in her capacity as a patient advocacy administrator or patient experience office staff at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Rosario was specifically tasked with receiving, processing, and resolving patient complaints, grievances, and advocacy requests, including those raised by Plaintiff and his family regarding the circumstances of Plaintiff's involuntary detention. Documentation in the case record (Formal Grievance, p. 2, 03/25/2023) and follow-up correspondence shows that Rosario was made directly aware of Plaintiff's and his wife's ongoing requests for a written explanation from a physician, timely access to medical records, clarification regarding the legal and clinical justification for commitment, and the required advisement of statutory rights.

Despite these responsibilities and direct knowledge of Plaintiff's situation, Rosario failed to provide or facilitate a substantive response to these requests. She did not arrange for a promised physician consultation, did not ensure that Plaintiff and his family received correct contact

information or a written advisement of rights, and did not return multiple calls, messages, or follow-up communications from Plaintiff and his wife seeking patient advocacy assistance. Rosario also neglected her statutory duties under N.J.A.C. 10:37-4.3 and the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1), which require patient advocacy personnel to ensure patients and their families receive written information about their rights, access to legal or advocacy resources, and an explanation of the basis for significant decisions such as involuntary commitment.

Moreover, Plaintiff and his wife experienced not only neglect but also elements of retaliation, delay, and discouragement throughout their interactions with Rosario. Her communications were marked by a lack of substantive follow-up and, at times, by responses perceived as dismissive, evasive, or even implicitly threatening—suggesting that further pursuit of advocacy or complaints could result in negative consequences or be futile. These omissions and actions had a chilling effect on Plaintiff's and his family's willingness to pursue further review or to escalate their advocacy beyond the hospital's internal process.

By failing to ensure a meaningful response to Plaintiff's and his family's advocacy requests, failing to provide or arrange for physician explanation, failing to ensure access to statutory rights advisement or legal representation, and engaging in acts of administrative neglect, delay, and retaliation, Rosario breached her statutory, regulatory, and professional duties as a patient advocate. Her actions and omissions directly contributed to Plaintiff's ongoing unlawful detention, loss of liberty, emotional distress, and deprivation of due process and statutory remedies. Rosario's conduct is representative of the broader, coordinated pattern of advocacy

failure, procedural neglect, and disregard for patient and family rights extensively documented in Plaintiff's formal complaints and the complete case record.

**David De Simone, Esq. (david clark)**

Plaintiffs allege that David Clark, Esq. (incorrectly referenced as David De Simone, Esq.), in his capacity as legal counsel for CentraState Healthcare System and/or its associated defendants, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey law for his role in obstructing Plaintiff's rights, retaliation, and participation in a systematic deprivation of due process. As legal counsel, Clark bore an affirmative duty to uphold ethical and legal standards, facilitate access to information, ensure compliance with the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1), and protect Plaintiff's rights to records, explanation, and access to appropriate grievance and review mechanisms throughout the commitment process.

During the course of the grievance and follow-up procedures, Plaintiff and his wife spoke directly with Clark on several occasions by telephone. Notably, during one such conversation, Plaintiff made an explicit request for medical records and clarification regarding the legal and clinical justification for his involuntary detention. Clark acknowledged Plaintiff's requests, discussed the hospital's obligations under the New Jersey Patient Bill of Rights, and was clearly aware that Plaintiff had been admitted to a general hospital with statutory rights to timely explanation and record access. Plaintiff informed Clark that he intended to come to CentraState in person to obtain an explanation and to speak directly with a physician, and Clark did not advise Plaintiff not to come in, nor did he state that hospital staff or security would involve the police in response to such a visit.

Subsequently, when Plaintiff and his wife visited CentraState in October to follow up on their requests for explanation, records, and review, hospital security—specifically Robert Orro—called the police and falsely claimed that Plaintiff was represented by counsel, refused to leave, or was otherwise causing a disturbance. After the incident, Clark's subsequent statements to hospital staff and/or authorities contained materially false and misleading statements, including that he had advised Plaintiff not to come in, and that the visit was unwelcome or otherwise unauthorized—contrary to the actual content and tone of the prior phone conversations. Clark's shifting narrative and failure to accurately document the sequence and content of these interactions created a record of confusion and misrepresentation that further harmed Plaintiff and undermined his access to redress.

Clark also participated in a pattern of legal obstruction, delaying or refusing to provide records, failing to correct known inaccuracies or legal deficiencies, failing to provide statutory advisements or ensure due process, and, at times, using adversarial or intimidating language that discouraged Plaintiff and his wife from pursuing their rights. His failure to facilitate proper communication, correct administrative failures, or provide a good faith explanation in response to statutory and ethical requirements exacerbated Plaintiff's unlawful detention, emotional distress, and inability to challenge the basis for his commitment.

By failing to provide timely and accurate information, failing to fulfill promises of explanation or physician follow-up, engaging in shifting, misleading, or retaliatory communications, and actively participating in the denial of Plaintiff's rights, Clark breached his statutory, regulatory, and ethical duties as legal counsel. His actions directly contributed to Plaintiff's prolonged

unlawful detention, deprivation of liberty, emotional harm, and the denial of due process and statutory remedies. Clark's conduct forms part of the broader, coordinated pattern of administrative and legal neglect, retaliation, and disregard for patient and family rights that is thoroughly documented throughout Plaintiff's formal complaints, case record, and communications with hospital staff and external authorities.

**Anita Giunta, LSW**

Plaintiffs allege that Anita Giunta, LSW, in her capacity as a licensed social worker at Hampton Behavioral Health Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Giunta was directly responsible for Plaintiff's psychosocial assessment, monitoring, and facilitation of care during the period of Plaintiff's involuntary commitment at Hampton following transfer from CentraState Medical Center. Records from Hampton and the grievance file indicate that Giunta conducted interviews and follow-up sessions with Plaintiff and his wife, including after the initial 72-hour hold, at which time Plaintiff and his wife provided a detailed and consistent account of the events leading to the commitment and challenged the factual accuracy of the narrative provided by prior facilities and law enforcement (Formal Grievance , p. 2, 03/25/2023; Medical Records, p. __).

Despite being presented with credible, consistent, and documented evidence that contradicted the non-clinical, bias-driven assertions and inaccuracies found in the original commitment record, Giunta failed to take any meaningful action to correct the medical record, advocate for Plaintiff's discharge, or escalate the matter to clinical or legal authorities for immediate review. Instead,

Giunta continued to facilitate Plaintiff's ongoing involuntary detention by relying on or perpetuating the prior narrative, which lacked independent corroboration or clinical justification. Giunta also failed to ensure that Plaintiff and his wife received a written advisement of rights, timely access to legal or advocacy representation, or a formal explanation of the clinical and statutory basis for ongoing detention, as required by N.J.A.C. 10:37-4.3 and the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1).

Plaintiff's and his wife's repeated requests for discharge, explanation, and review—both oral and written—were not adequately addressed by Giunta, who did not facilitate communication with physicians or hospital administration, nor did she take action when it became apparent that the factual and procedural foundation for Plaintiff's detention was fundamentally flawed. These omissions persisted despite Plaintiff's documented lack of dangerousness to self or others, medical clearance from prior providers, and ongoing stable presentation during the course of his commitment.

By failing to intervene after learning of narrative and factual errors, failing to advocate for discharge or corrective action, failing to provide the required advisement of rights or legal access, and continuing to rely on unsupported and biased information, Giunta breached her statutory, regulatory, and professional duties as a social worker. Her acts and omissions directly contributed to Plaintiff's unlawful continued detention, deprivation of liberty, emotional distress, and denial of due process and statutory remedies. Giunta's conduct is emblematic of a broader pattern of coordinated procedural failure, professional indifference, and disregard for patient and

family rights, thoroughly documented in Plaintiff's formal complaints and the record of interactions at Hampton Behavioral Health Center.

**Mariecarmel Carre-Lee, MHT**

Plaintiffs allege that Mariecarmel Carre-Lee, MHT, in her capacity as a Mental Health Technician at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Carre-Lee was responsible for Plaintiff's observation, monitoring, and the chain of custody throughout his admission and involuntary transfer on March 24, 2023, as reflected in the medical record (Sealed Documents Medical Charts, p. 8, 03/24/2023, 22:45). She participated in documenting Plaintiff's calm, cooperative demeanor and repeated, explicit requests to be discharged, with no evidence of acute psychiatric distress or imminent risk to self or others as required by N.J.S.A. 30:4-27.2(m). Carre-Lee did not intervene or advocate for discharge, failed to correct or escalate inaccuracies in Plaintiff's record, and did not fulfill her statutory or professional duty to ensure Plaintiff or his family received rights advisement or legal access, as required by N.J.A.C. 10:37-4.3.

Significantly, Carre-Lee was also present and acting as a direct representative of CentraState Medical Center during the October 2023 event when Plaintiff and his wife returned to the facility seeking answers. During this visit, Plaintiff and his wife explicitly requested access to a physician's explanation of the events and medical basis for Plaintiff's involuntary commitment, asking that it be provided in a language and manner they could understand—rights guaranteed under the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1; N.J.S.A. 26:2H-12.8).

Carre-Lee, acting as the hospital's agent, directly denied this request, refused to facilitate communication with a qualified provider, and did not arrange for interpretation or an explanation at any time. This denial was a clear violation of Plaintiff's statutory and regulatory rights and left both Plaintiff and his wife without meaningful information about the commitment process or a chance to contest its basis.

Furthermore, during and after this visit, Carre-Lee took no action to advocate for Plaintiff, did not document the request for explanation or interpretation, and did not escalate the matter to hospital administration. Her conduct contributed to the escalation of the situation, which ultimately involved hospital security and law enforcement, resulting in additional emotional distress, intimidation, and further deprivation of rights for Plaintiff and his wife.


By failing to act on Plaintiff's repeated requests for discharge, failing to fulfill statutory and professional duties to provide or facilitate access to information in an understandable manner, failing to advocate for rights advisement, and directly denying requests for explanation during the October event, Carre-Lee breached her duties under federal and New Jersey law. Her acts and omissions directly contributed to Plaintiff's continued unlawful detention, deprivation of liberty, emotional harm, denial of due process, and the inability to access remedies, and further exemplify the coordinated pattern of procedural violations and institutional indifference thoroughly documented in Plaintiff's formal complaints and the complete case record.

**Robert Orro**

Plaintiffs allege that Robert Orro, acting in his capacity as a security officer and/or administrative agent at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Orro played a pivotal role during and after the October 2023 incident at CentraState, which occurred after Plaintiff and his wife, having exhausted internal grievance procedures and repeatedly been denied access to a physician's explanation or records, visited the facility in person to invoke their rights under the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1; N.J.S.A. 26:2H-12.8) and to request an in-person explanation from medical staff in language and terms they could understand.

Upon their peaceful arrival and explicit request for information and statutory rights, Orro, acting as the hospital's designated representative, engaged with Plaintiff and his wife but refused to facilitate any meaningful communication with a qualified provider or hospital administrator. Instead, Orro misrepresented the situation to law enforcement and hospital staff, falsely stating that Plaintiff was represented by counsel, was refusing to leave, or was causing a disturbance—none of which was true, as Plaintiff and his wife remained cooperative and clearly communicated their intention only to receive a lawful explanation. Orro's decision to call the police in response to these lawful, peaceful requests escalated the situation needlessly and resulted in further intimidation, emotional distress, and a chilling effect on Plaintiff's and his wife's willingness to exercise their rights and continue advocacy efforts.

Following this incident, Orro became the central conduit for all subsequent communications between the hospital and Plaintiff, in a clear attempt to isolate and control the flow of

information and further insulate medical and administrative staff from accountability. Plaintiff and his wife received a formal letter—authored or directed by Orro—explicitly instructing them to direct all future communications exclusively through him and warning against any further direct contact with hospital staff. This direction, issued under the guise of administrative protocol, served as a retaliatory measure designed to stifle Plaintiff's efforts to pursue grievances, obtain explanation, and seek redress for procedural and statutory violations. After receiving and honoring this letter and ceasing all direct contact as instructed, Plaintiff experienced a total lack of follow-up or facilitation of communication: Orro failed to arrange any conversation with a physician, did not provide any substantive response or clarification, and took no action to address the unresolved statutory violations or repeated requests for explanation.

Orro's acts and omissions—making materially false statements to law enforcement and staff, serving as the exclusive and obstructive channel for communication, retaliating against Plaintiff and his wife for protected activity, and failing to fulfill his duties under the New Jersey Patient Bill of Rights, N.J.A.C. 10:37-4.3, and hospital policy—constitute clear breaches of statutory, regulatory, and professional duties. His conduct resulted in the denial of due process, deprivation of liberty, emotional harm, intimidation, and furthered a coordinated institutional pattern of retaliation, obstruction, and disregard for patient and family rights. These actions are extensively documented throughout Plaintiff's formal complaints, the hospital record, and the written correspondence that followed the October 2023 event.

**Jodi Doe**

Plaintiffs allege that Jodi Doe, in her capacity as a social worker or patient care coordinator at Hampton Behavioral Health Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Jodi Doe was responsible for aspects of Plaintiff's care, case management, and the facilitation of patient advocacy during Plaintiff's involuntary commitment. Throughout Plaintiff's detention, Jodi Doe was directly involved in addressing (or failing to address) Plaintiff's concerns about missing medications, discrepancies in the medical chart, and requests for proper patient advocacy and incident reporting, as documented in Plaintiff's formal grievances (Formal Grievance , p. 2, 03/25/2023) and follow-up communications.

Over a period of months, Plaintiff engaged in multiple phone and in-person exchanges with Jodi Doe concerning the whereabouts of his prescribed medications, which were missing from his property and not properly logged or administered. Initially, Jodi Doe informed Plaintiff that "you brought it in," referencing the standard protocol that all medications are checked in at intake. When Plaintiff pressed further, Jodi Doe changed her explanation, asserting that "your sister gave it to me and dropped it off," a claim that not only contradicted policy—prohibiting outside drop-off by family—but also never occurred. When challenged on these inconsistencies, Jodi Doe then insisted that Plaintiff "must have been confused that day," assuring him that her explanation was accurate and dismissing Plaintiff's concern without any investigation.

It was ultimately revealed that Jodi Doe had been reviewing the wrong patient's record with respect to the medication in question, leading to confusion and misinformation about Plaintiff's

actual medication status. Rather than acknowledging the error, initiating a formal incident report as Plaintiff had specifically requested, or following up with Plaintiff to resolve the matter, Jodi Doe summarily closed the issue without remedy or explanation. She did not provide any written response, did not escalate the matter to clinical leadership, and did not ensure Plaintiff received the required advisement of rights or timely access to legal or advocacy resources, as mandated by N.J.A.C. 10:37-4.3 and the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1).

Jodi Doe's actions and omissions—providing inconsistent, misleading, and incorrect explanations about missing medications; failing to verify, investigate, or escalate the complaint; refusing to initiate incident reporting; and closing the matter without resolution—reflect a serious breach of statutory and professional duties. Her conduct deprived Plaintiff of necessary medication, left critical health and safety concerns unresolved, and denied Plaintiff due process and statutory rights to transparency, patient involvement, and effective grievance redress. These failures contributed to Plaintiff's ongoing harm, emotional distress, and the inability to access meaningful remedies, and form part of a broader, coordinated pattern of indifference, neglect, and disregard for patient and family rights extensively documented in Plaintiff's formal complaints and the records of Hampton Behavioral Health Center.

**Eric Carney**

Plaintiffs allege that Eric Carney, as Chief Executive Officer and principal administrator of CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. In his executive role, Carney bore ultimate responsibility for the creation, oversight, and enforcement of all hospital policies, procedures, and statutory

obligations—including those mandated by the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1), N.J.A.C. 10:37-4.3, and hospital-specific patient grievance and rights protections. Carney was directly accountable for ensuring that all patients—including Plaintiff—received written advisement of rights, timely responses to formal grievances, transparent communication, and access to advocacy or legal resources as required by law.

During the course of Plaintiff's involuntary detention and in the aftermath, Plaintiff and his wife made multiple direct attempts to reach Carney's office, leaving detailed messages with his secretary regarding the ongoing failures of staff to provide a clear, lawful explanation for Plaintiff's commitment, to respond to formal grievances, or to produce the advisement of statutory rights. These messages explicitly notified Carney and his office of the continuing procedural violations, denials of access, and the failure of hospital staff and administrators to honor requests for review or provide a physician's explanation as guaranteed under the law.

Despite this direct notice, Carney failed to respond to Plaintiff's communications, did not initiate any meaningful follow-up by hospital leadership, and took no corrective or remedial action to address the well-documented failures occurring under his authority. Carney did not direct staff to review or resolve the procedural and statutory deficiencies raised in Plaintiff's formal complaints, nor did he implement any measures to enforce accountability, remedy the denial of rights, or prevent the continuation of harmful and unlawful practices by subordinate staff. As a result, the pattern of administrative neglect, lack of communication, and disregard for Plaintiff's rights persisted throughout the duration of Plaintiff's commitment and extended into the post-discharge period.

Carney's failure to enforce or supervise compliance with all applicable statutory and regulatory mandates—despite being placed on clear, repeated, and direct notice of violations through Plaintiff's communications and records—constitutes a breach of his non-delegable professional and statutory duties as hospital CEO. This abdication of responsibility enabled continued administrative neglect, systemic deprivation of rights, and a lack of accountability for the failures of subordinate staff and administrators. Carney's omissions were a direct and proximate cause of Plaintiff's prolonged unlawful detention, severe emotional distress, inability to access due process and statutory protections, and the perpetuation of a systemic pattern of administrative and patient rights violations. These failures and their harmful impact are thoroughly documented in Plaintiff's formal complaints, records of communication, and the hospital's administrative files, and form a critical part of the coordinated pattern of indifference, procedural violation, and disregard for patient and family rights that has marked Plaintiff's experience at CentraState Medical Center.

**Marie Levasseur**

Plaintiffs allege that Marie Levasseur, in her capacity as an administrative staff member or patient relations officer at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. Levasseur was directly responsible for assisting with the administration of patient grievances, facilitating communication between patients, families, and the hospital, and ensuring compliance with patient rights policies as set forth in the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1) and N.J.A.C. 10:37-4.3.

Plaintiff and his wife made multiple formal and informal attempts to communicate with Levasseur—including by phone and in writing—specifically seeking clarification regarding Plaintiff's involuntary commitment, access to his medical records, a substantive explanation from a physician, and written advisement of rights, all of which are required by law and hospital policy.

Despite these repeated contacts and direct notice of Plaintiff's and his family's concerns, Levasseur failed to provide any meaningful response, did not follow up to facilitate a substantive explanation, and did not ensure Plaintiff received the statutory advisement of rights or access to legal or advocacy representation. Levasseur's inaction persisted even after Plaintiff's family submitted further oral and written requests and filed formal complaints about the hospital's failures to address the procedural and substantive deficiencies in Plaintiff's case (Formal Grievance , p. 2, 03/25/2023).

Levasseur also failed to escalate Plaintiff's concerns to hospital leadership, did not communicate with supervising medical staff to facilitate a physician's review, and did not intervene when it became clear that Plaintiff and his wife were being provided with incorrect or misleading information about their rights, the status of their grievances, or the process for contesting the basis of Plaintiff's detention. This persistent administrative neglect denied Plaintiff and his family a meaningful opportunity to obtain information, contest the underlying clinical and legal justifications for detention, and secure effective redress or review.

By failing to act on Plaintiff's repeated complaints, to communicate or coordinate with relevant staff, to facilitate access to statutory rights and protections, and to fulfill her administrative and professional obligations, Levasseur directly contributed to Plaintiff's continued deprivation of liberty, inability to access due process, emotional distress, and loss of statutory protections. Her conduct is further representative of the broader pattern of coordinated administrative neglect, procedural failure, and disregard for patient and family rights thoroughly documented in Plaintiff's formal complaints and throughout the CentraState administrative record.

**Cheryl Craig**

Plaintiffs allege that Cheryl Craig, in her capacity as Director of Patient Experience and a senior administrator at CentraState Medical Center, acted under color of state law and is liable under 42 U.S.C. § 1983 and New Jersey negligence law. As Director of Patient Experience, Craig bore direct supervisory authority over all hospital grievance and patient relations processes, and was responsible for ensuring that patient complaints, grievances, and rights violations were thoroughly received, investigated, and resolved in compliance with statutory mandates, including the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1) and N.J.A.C. 10:37-4.3.

Throughout the course of Plaintiff's involuntary detention in March 2023 and extending well beyond his discharge, Plaintiff and his wife made repeated, documented efforts to contact Craig—by phone, in writing, and through formal grievance submissions—raising urgent concerns about the ongoing failures of CentraState staff and administration to provide a lawful explanation for Plaintiff's detention, to supply the required advisement of rights, or to facilitate direct physician review and patient advocacy. Plaintiff's and his family's grievances explicitly

detailed issues such as being denied information, receiving inaccurate or misleading responses from other administrators and staff, being provided with incorrect contact numbers, and having their requests for follow-up repeatedly ignored (Formal Grievance , p. 2, 03/25/2023).

Craig was placed on direct notice of these persistent deficiencies and procedural violations through multiple channels, including direct phone calls, emails, internal reporting, and formal written complaints over an extended timeline. Despite this clear and repeated notice, Craig failed to respond substantively or to initiate or supervise corrective action by subordinate staff. She did not ensure that the complaints were properly investigated or resolved, did not enforce accountability for staff failures, and did not implement any policy changes or oversight to remedy the statutory and regulatory violations brought to her attention. Instead, Plaintiff's and his wife's complaints remained unresolved, their questions unanswered, and the pattern of administrative neglect, lack of transparency, and disregard for statutory rights continued unaddressed throughout and after Plaintiff's hospitalization.

Craig's failure to supervise, investigate, or enforce compliance with applicable statutes and hospital policies—despite being placed on repeated, detailed, and direct notice of ongoing violations—constitutes a breach of her statutory, regulatory, and professional duties as a senior hospital administrator. Her omissions enabled the continued deprivation of Plaintiff's rights, prolonged his inability to obtain information, denied him the opportunity to contest the basis of his detention, caused further emotional distress, and perpetuated a systemic pattern of administrative neglect and failure to protect patient and family rights. Craig's conduct is a critical component of the broader, coordinated breakdown of CentraState's administrative leadership in

safeguarding the due process and statutory protections of patients and families, as extensively documented in Plaintiff's formal grievances, records of communication, and the complete administrative file.

**Dr. Mohsen Rehim**

Plaintiffs allege that Dr. Mohsen Rehim, MD, in his capacity as Chairman of the Department of Psychiatry at Monmouth Medical Center and as the designated physician responsible for reviewing and resolving formal grievances, acted under color of state law and is liable under 42 U.S.C. § 1983, the ADA, the Rehabilitation Act, and New Jersey malpractice and negligence law. Dr. Rehim's central involvement arose after Plaintiff's involuntary commitment, when he was tasked with conducting formal grievance reviews and responding to Plaintiff's and his family's written and oral complaints regarding the legality, process, and accuracy of Plaintiff's detention and commitment records ([amended complaint, 29.pdf, p.3][37†29.pdf]; [01-2.pdf, jurisdiction and party sections][36†01-2.pdf]).

Plaintiffs and their family repeatedly sought Dr. Rehim's intervention and a meaningful, written explanation regarding the statutory and clinical basis for Plaintiff's continued commitment. Dr. Rehim was notified of substantial and obvious documentation errors, including the recording of a false transfer date, misstatements regarding Plaintiff's mental and physical health, and the unsupported narrative of prescription medication overuse—errors that were directly contradicted by laboratory results, clinical notes, and contemporaneous discharge summaries (Medical Charts).

Despite his explicit duty as the grievance-reviewing physician, and his direct notice of these specific concerns, Dr. Rehim failed to provide any substantive response or meaningful explanation. He did not return calls, failed to answer written questions, and did not ensure that Plaintiff or his family received the advisements of rights, written explanations, or information about legal remedies required by the New Jersey Patient Bill of Rights (N.J.A.C. 8:43G-4.1) and related regulations. Instead, Dr. Rehim formally signed off on the grievance investigation, affirming the validity of the original commitment process and clinical documentation despite being made aware of clear, material errors, including a grievance response letter that falsely reported Plaintiff's transfer date as 8/26/2023 instead of the actual date of 3/25/2023 ([01-2.pdf, grievance section][36†01-2.pdf]). This and other errors were never corrected, despite repeated and direct notice from Plaintiff's family and confirmation in the hospital's own clinical timeline. In addition to these procedural failures, Dr. Rehim demonstrated a lack of impartiality and failed to recognize or address clear evidence of mental health bias in the record—relying on unsubstantiated allegations, ignoring contradictory lab results, and failing to ensure Plaintiff was treated in accordance with objective clinical standards. His actions, omissions, and failure to follow hospital policies and statutory grievance procedures directly contravened the protections guaranteed under the Patient Bill of Rights and relevant federal and state law.

Dr. Rehim's persistent failure to intervene, non-responsiveness to the family's efforts to secure meaningful review, and formal endorsement of erroneous records contributed to a broader pattern of administrative neglect, lack of duty of care, and coordinated bad faith within Monmouth Medical Center. These omissions and procedural shortcuts discouraged Plaintiff and his family from further advocacy, created a chilling effect on their willingness to pursue statutory

remedies, and left Plaintiff without a legitimate avenue for redress, clarification, or correction of the record. As a direct and proximate result, Plaintiff suffered prolonged unlawful detention, continued emotional distress, denial of procedural due process, and was deprived of statutory rights to fair grievance review and access to legal remedies.

Respectfully submitted,

 Bradley Clonan

 /S/ Bradley Clonan

 Plaintiff, Pro Se

2604 W Rhododendron Drive, Abingdon Maryland 21009

732-476-9555

clonanxyz@gmail.com