**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BRADLEY CLONAN,<br>Plaintiff,<br>v.<br>CENTRASTATE HEALTHCARE SYSTEM;<br>HAMPTON BEHAVIORAL HEALTH CENTER;<br>MONMOUTH MEDICAL CENTER;<br>DR. CHRIS FABIAN, M.D.;<br>THEO F. KALOGRIDIS, R.N.;<br>DR. STEVEN GUILLEN, M.D.;<br>DR. STEPHEN VAN PELT, M.D.;<br>A. TABASKO, PA-C;<br>ANTONELLA SALONY, R.N.;<br>JORDAN WHITE, R.N.;<br>DR. MICHAEL HOUDART, D.O.;<br>DR. ATTA-UR REHMAN, M.D.;<br>ANITA GIUNTA, L.S.W.; and<br>“INTERN ASHLEY” (John/Jane Doe),<br>Defendants. | Civil Action No.<br>3:24-cv-11399-RK-RLS<br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiff Bradley Clonan, appearing pro se, alleges as follows:

## I. INTRODUCTION

1. This is a state-law civil action for damages arising from Plaintiff Bradley Clonan's emergency-department evaluation at CentraState Healthcare System on March 24–25, 2023, involuntary psychiatric screening and transfer, confinement and treatment at Hampton Behavioral Health Center from March 25–30, 2023, alleged nonconsensual administration of psychotropic medication, alleged defects in screening and transfer documentation, and alleged disclosure of confidential medical information.

2. Plaintiff asserts only state-law claims under diversity jurisdiction. Plaintiff does not replead any federal claims previously dismissed with prejudice, including claims under 42

U.S.C. § 1983, EMTALA, HIPAA, the ADA, the Rehabilitation Act, or the United States Constitution. References to federal or state transfer regulations, including the EMTALA transfer form, are pleaded only as facts supporting state-law negligence, lack of good faith, lack of objectively reasonable steps, causation, and damages.

3. Plaintiff alleges that each Defendant identified below caused harm through specific acts or omissions attributed to that Defendant. Plaintiff does not allege that every Defendant committed every act, and each Count below is asserted only against the Defendant or Defendants named in that Count.

## II. PARTIES

4. Plaintiff Bradley Clonan is a natural person and a domiciled citizen of Maryland. Plaintiff resides in Abingdon, Maryland, maintains his home in Maryland, intends to remain domiciled in Maryland, and was a Software Architect by profession.

5. Defendant CentraState Healthcare System is, upon information and belief, a New Jersey corporate or healthcare entity formed or incorporated in New Jersey with its principal place of business in Freehold, New Jersey, where it operates an emergency department. Upon information and belief, CentraState is not a citizen of Maryland. If CentraState is an unincorporated entity, Plaintiff alleges on information and belief that none of its members or owners is a Maryland citizen.

6. Defendant Hampton Behavioral Health Center is, upon information and belief, a New Jersey corporate or healthcare entity formed or incorporated in New Jersey with its principal place of business in Westampton, New Jersey, where it operates an inpatient psychiatric facility. Upon information and belief, Hampton is not a citizen of Maryland. If Hampton is an

Case 3:24-cv-11399-RK-RLS Document 83 Filed 06/18/25 Page 3 of 34 PageID: 2646

unincorporated entity, Plaintiff alleges on information and belief that none of its members or owners is a Maryland citizen.

7. Defendant Monmouth Medical Center is, upon information and belief, a New Jersey corporate or healthcare entity formed or incorporated in New Jersey with its principal place of business in Long Branch, New Jersey. Plaintiff alleges that Monmouth Medical Center operated, staffed, or was responsible for the Psychiatric Emergency Screening Service involved in Plaintiff's screening. Upon information and belief, Monmouth is not a citizen of Maryland. If Monmouth is an unincorporated entity, Plaintiff alleges on information and belief that none of its members or owners is a Maryland citizen.

8. Defendant Dr. Chris Fabian, M.D. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Dr. Fabian served as the Monmouth/PESS screening psychiatrist who evaluated Plaintiff remotely and issued the Clinical/Screening Certificate used to support involuntary commitment and transfer.

9. Defendant Theo F. Kalogridis, R.N. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Mr. Kalogridis served as a Monmouth/PESS screening evaluator or screener involved in the initial psychiatric screening records and dangerousness narrative.

10. Defendant Dr. Steven Guillen, M.D. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Dr. Guillen served as an attending provider at CentraState Healthcare System and participated in or ratified Plaintiff's medical clearance and transition to involuntary psychiatric screening or detention.

11. Defendant Dr. Stephen Van Pelt, M.D. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Dr. Van Pelt served as an attending provider at

CentraState Healthcare System during the late emergency-department and transfer period and signed or ratified chart entries, attestations, or transfer-related decisions.

12. Defendant A. Tabasko, PA-C is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that A. Tabasko served as a Physician Assistant at CentraState Healthcare System and signed the transfer certification and related transfer paperwork at issue.

13. Defendant Antonella Salony, R.N. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Ms. Salony served as a registered nurse at CentraState Healthcare System and provided nursing care, monitoring, and documentation during Plaintiff's emergency-department detention.

14. Defendant Jordan White, R.N. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Mr. White served as a registered nurse at CentraState Healthcare System and provided nursing assessment, monitoring, and documentation during Plaintiff's emergency-department detention.

15. Defendant Dr. Michael Houdart, D.O. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Dr. Houdart served as Plaintiff's attending physician at Hampton Behavioral Health Center during Plaintiff's admission.

16. Defendant Dr. Atta-ur Rehman, M.D. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Dr. Rehman served as a physician or evaluator at Hampton Behavioral Health Center and documented the "No Justification for Hospitalization documented" entry discussed below.

17. Defendant Anita Giunta, L.S.W. is, upon information and belief, a domiciled citizen of New Jersey. Plaintiff alleges that Ms. Giunta served as a licensed social worker at Hampton Behavioral Health Center and participated in treatment-plan, care-plan, or discharge-related

documentation, including records reflecting that care-plan interventions were "added by mistake."

18. Defendant "Intern Ashley" is a John/Jane Doe placeholder named as a fictitious defendant pursuant to New Jersey fictitious-party practice until full identity is ascertained. Plaintiff alleges on information and belief that Intern Ashley was a staff member, intern, agent, employee, or apparent agent of CentraState Healthcare System working in New Jersey, is not a Maryland citizen, and placed the wrong-number voicemail described below. Plaintiff will promptly amend to substitute this Defendant's true name upon identification.

## III. JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a). Plaintiff is a citizen of Maryland, and, upon information and belief, all known Defendants are citizens of New Jersey or otherwise are not citizens of Maryland. Complete diversity exists.

20. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks damages for loss of liberty, physical and emotional injuries, nonconsensual medication, reputational harm, privacy harm, medical-record consequences, lost income or reduced earning capacity, and other consequential damages in an amount to be proven at trial.

21. Venue is proper in the District of New Jersey under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred at CentraState Healthcare System, Monmouth/PESS, and Hampton Behavioral Health Center in New Jersey.

## IV. FACTUAL ALLEGATIONS

### A. Pre-Admission Background and Objective Corroboration

22. On or about March 22, 2023, Plaintiff and his wife, Gabriela Clonan, reported a suspicious person recording or surveilling their Maryland residence to the Bel Air Police Department. Plaintiff alleges that a police report corroborates this event.

23. Before the CentraState encounter on or about March 23, 2023, Plaintiff and his family drove from Maryland to Philadelphia, Pennsylvania, to return a laptop to Plaintiff's prior employer following a data-breach-related employment dispute, before proceeding to New Jersey. Plaintiff alleges that EZ Pass records and related documentation corroborate this travel route and purpose, arriving at sisters house March 23,2024.

24. Plaintiff alleges that later medical records falsely or misleadingly characterized his travel as a direct drive from Maryland to New Jersey caused by delusional thinking or paranoia regarding his employer, even though objective travel records and the police report supported factual events that Plaintiff had reported.

**B. The Following Day - March 24, 2023: CentraState Emergency Department**

25. On March 24, 2023, at approximately 6:28 p.m., Plaintiff was voluntarily transported by ambulance to the CentraState Medical Center Emergency Department for a health assessment.

26. At approximately 6:30 p.m., a CentraState ED triage note recorded a chief complaint of “hallucinations” and “paranoia.” Plaintiff alleges that this initial triage framing was not borne out by the later psychiatric screening documentation stating “Perception: no hallucinations.”

27. At approximately 6:48 p.m., an initial ED psychosocial assessment described Plaintiff as expressing hallucinations and manic behavior. Plaintiff alleges that other contemporaneous assessments documented him as calm or resting, creating a material contradiction in the charted basis for psychiatric escalation.

28. At approximately 6:49 p.m., Defendant Jordan White, R.N. documented that Plaintiff denied pain, was resting comfortably, and was alert and oriented x3. Plaintiff alleges that these observations were relevant to whether there was an acute basis to prevent Plaintiff from leaving.

29. Between approximately March 24, 2023 at 7:14 p.m. and March 25, 2023 at 7:49 a.m., Defendant Antonella Salony, R.N. provided nursing care and monitoring. Plaintiff alleges that Ms. Salony documented calm, oriented, or cooperative behavior while Plaintiff remained in a secured or locked room after asking to leave.

30. Beginning at approximately 7:26 p.m. on March 24, 2023, Defendant Dr. Steven Guillen served as an attending provider at CentraState. Plaintiff alleges that Dr. Guillen participated in or ratified the transition from medical clearance and a requested discharge to involuntary psychiatric screening or detention without reconciling the objective toxicology results and calm or resting observations.

31. At approximately 8:50 p.m., CentraState performed blood and urine toxicology testing. Plaintiff alleges the results were negative for alcohol, benzodiazepines, and illicit drugs, and positive only for prescribed amphetamines, including Adderall, and authorized medical marijuana.

32. Plaintiff alleges that CentraState and Monmouth/PESS records later relied on a claim that Plaintiff was “overtaking” prescribed medications, even though the toxicology results did not show alcohol intoxication, benzodiazepines, illicit substances, or non-prescribed intoxicants, and instead reflected prescribed or authorized substances.

33. At approximately 9:54 p.m., Plaintiff was offered voluntary hospitalization. Plaintiff declined because he did not believe hospitalization was necessary and wanted to leave with his family.

Case 3:24-cv-11399-RK-RLS Document 310 Filed 01/16/26 Page 8 of 34 PageID: 2651

34. At approximately 9:57 p.m., after Plaintiff declined voluntary admission, the on-call psychiatrist recommended screening for involuntary admission, and the disposition was changed to involuntary inpatient psychiatric admission.

35. After Plaintiff was medically cleared and requested to leave, CentraState staff prevented Plaintiff from leaving, placed him in a secured or locked isolation room under continuous video monitoring, and initiated involuntary screening. Plaintiff alleges that CentraState did not provide a legally sufficient individualized explanation for preventing his departure and did not review the Screening Bill of Rights with him, as reflected by a facility flowsheet marking “No” for that item.

36. At approximately 11:31 p.m. on March 24, 2023, Defendant Dr. Stephen Van Pelt was assigned or identified as an attending provider at CentraState. Plaintiff alleges that Dr. Van Pelt signed or ratified chart entries, attestations, or transfer-related decisions without a documented in-person evaluation and without correcting objective discrepancies later appearing in transfer records.

**C. Late Night March 24 to March 25, 2023: PESS Screening and Certificate**

37. On March 25, 2023, at approximately 1:00 a.m., a Monmouth Medical Center PESS screener identified as “Theo” was called or assigned to evaluate Plaintiff.

38. Plaintiff alleges that Defendant Theo F. Kalogridis documented, repeated, or transmitted a screening narrative concerning Plaintiff's alleged medication overuse and travel from Maryland to New Jersey. Plaintiff alleges that this narrative was materially inconsistent with objective toxicology results and objective travel records.

39. At approximately 1:40 a.m., Defendant Dr. Chris Fabian, acting through Monmouth/PESS, conducted a remote telepsychiatry screening of Plaintiff. Plaintiff alleges that

Case 3:24-cv-11399-RK-RLS Document 139 Filed 01/22/26 Page 9 of 34 PageID: 2652

Dr. Fabian did not obtain Plaintiff's informed consent to a remote telepsychiatry evaluation and did not document a Division-approved telepsychiatry waiver.

40. At approximately 2:00 a.m., Dr. Fabian completed a Clinical/Screening Certificate certifying Plaintiff as a danger to self or others based on a delusional system, unspecified psychosis, and alleged medication overuse.

41. Dr. Fabian's same screening documentation allegedly stated “Perception: no hallucinations,” which directly contradicted the earlier triage framing that treated hallucinations as a basis for holding Plaintiff. Plaintiff alleges that the certificate also relied on alleged medication overuse despite toxicology results showing no alcohol intoxication, no benzodiazepines, and no illicit drugs.

42. Plaintiff alleges that Monmouth/PESS screening forms left critical fields blank or incomplete, including next-of-kin information, interpreter information, and specific histories of dangerous behavior, despite the screening certificate being used to support involuntary commitment and transfer.

**D. March 25, 2023: Transfer Paperwork and Hampton Admission**

43. At approximately 9:13 a.m. on March 25, 2023, Hampton Behavioral Health Center accepted Plaintiff for transfer.

44. Between approximately 11:43 a.m. and 11:52 a.m., CentraState completed an EMTALA Transfer Checklist and a Physician Certification Consent for Transfer to transfer Plaintiff to Hampton Behavioral Health Center.

45. At approximately 11:51 a.m., Defendant A. Tabasko, PA-C signed the Physician Certification Consent for Transfer. Plaintiff alleges that the certification lacked the signature or

countersignature of an attending physician, even though Plaintiff had been classified as dangerous or unstable for psychiatric purposes and was being involuntarily transferred.

46. The CentraState transfer checklist expressly marked “No” for whether the risks, benefits, and alternatives to transport were explained to Plaintiff.

47. Plaintiff alleges that CentraState treated him as dangerous or unstable for purposes of involuntary commitment, while simultaneously certifying him as stabilized for transfer to Hampton, creating a material contradiction in the transfer rationale.

48. CentraState transfer paperwork allegedly recorded Plaintiff's weight as 170 kg, approximately 374 pounds, and stated that dentures were sent with him. Plaintiff alleges that he actually weighed approximately 64.77 kg, approximately 142 pounds, and had natural teeth, not dentures. Plaintiff alleges that these errors required no medical judgment to avoid or detect.

49. At approximately 12:38 p.m., Plaintiff was involuntarily transported from CentraState to Hampton Behavioral Health Center.

50. Upon arrival at Hampton, Plaintiff was admitted under Defendant Dr. Michael Houdart and diagnosed with unspecified psychosis. Plaintiff alleges that Hampton paperwork included a handwritten notation indicating that Hampton did not independently evaluate Plaintiff, or otherwise relied on the flawed CentraState and Monmouth/PESS records, during the intake process.

51. Between March 25 and March 28, 2023, Dr. Houdart ordered, authorized, or caused Plaintiff to receive psychotropic medications, including Haldol, Risperdal, and Cogentin. Plaintiff alleges that these medications were administered against his will, without consent, and without a documented emergency that would justify nonconsensual administration.

**E. March 26–30, 2023: Hampton Records, Mistake Notations, and Discharge**

52. On March 26, 2023, Defendant Dr. Atta-ur Rehman evaluated Plaintiff at Hampton Behavioral Health Center. Under the "Justification for Hospitalization" section, Dr. Rehman allegedly wrote "No Justification for Hospitalization documented," while also entering or maintaining a psychiatric diagnosis.

53. Plaintiff alleges that after the "No Justification for Hospitalization documented" notation, Hampton, Dr. Houdart, and other treating personnel continued Plaintiff's confinement and treatment. Plaintiff further alleges that Dr. Rehman did not initiate or document a correction, discharge review, or other escalation to address the contradiction created by his own notation.

54. On March 27, 2023, a Temporary Order for Involuntary Commitment was entered by the Superior Court of New Jersey. By the time the order was entered, Plaintiff had already been confined after requesting discharge from CentraState and had been involuntarily transferred to Hampton.

55. On March 27, 2023, Licensed Social Worker Anita Giunta and Dr. Houdart inactivated Plaintiff's care plan in the medical records and noted that the care plan, goal, or intervention had been "added by mistake." Plaintiff alleges that Ms. Giunta did not initiate or document an immediate discharge review, correction, or escalation after recording the mistake notation.

56. On or about March 28, 2023, Plaintiff's wife communicated with Hampton social workers and physicians and provided information corroborating that Plaintiff's statements about a data breach, his prior employer, and related contacts were factual rather than delusional.

57. On or about March 28, 2023, Dr. Houdart allegedly admitted to Plaintiff that the initial commitment intervention was a "mistake." and "could not tell him why he was there".

58. Despite the “No Justification for Hospitalization documented” notation, the “added by mistake” care-plan notation, and the alleged admission of mistake, Hampton and Dr. Houdart continued to confine Plaintiff until March 30, 2023, and did not administratively discharge Plaintiff or initiate the discharge determination required when a treatment team determines a patient no longer needs involuntary commitment to treatment.

59. On March 30, 2023, Hampton Behavioral Health Center discharged Plaintiff.

**F. Confidentiality, Doe Identification, and Post-Discharge Record Issues**

60. On March 25, 2023, a CentraState staff member identified in available records as “Intern Ashley” left a voicemail at 732-762-9602 instead of the intended 732-672-9602 number. Plaintiff alleges that the voicemail disclosed Plaintiff's psychiatric location, psychiatric status, or other protected medical information.

61. Plaintiff alleges that 732-762-9602 was not Plaintiff's number, not his wife's number, and not an authorized recipient of Plaintiff's psychiatric or medical information. Plaintiff further alleges that the voicemail made highly sensitive information accessible to an unauthorized person or voicemail account, and that the disclosure is documented in CentraState's own records.

62. On or about August 9, 2024, Monmouth Medical Center, through Johanna Rosario, sent a grievance closure letter. Plaintiff alleges that the letter incorrectly stated that Plaintiff had been transferred to Hampton on August 26, 2023, instead of the actual transfer date of March 25, 2023, supporting Plaintiff's allegation that Monmouth failed to review the correct records in response to his grievance.

63. In or around September 2024, Plaintiff contacted Glenn A. Beveridge, counsel for Monmouth Medical Center/PESS, requesting physician explanations and the names of screeners

involved in Plaintiff's evaluation. Plaintiff alleges that counsel responded with a cease-and-desist communication instead of identifying all involved screeners.

64. On or about October 28, 2024, Robert Orro, Manager of Security at CentraState, sent Plaintiff a letter banning Plaintiff from the hospital campus and threatening to call authorities if Plaintiff attempted to contact team members. Plaintiff alleges that this further limited his ability to identify staff members by direct communication.

65. Plaintiff uses Doe designations only where the full legal identity of an actor has not yet been provided. Plaintiff alleges that he exercised diligence before and during this litigation by reviewing records, filing grievances, requesting names and explanations in writing, and attempting to identify the people involved, and that Defendants and their counsel declined to identify certain individuals despite those requests.

**G. Lack of Good Faith, Lack of Objectively Reasonable Steps, and Discharge Duty**

66. Plaintiff alleges that the commitment-related conduct described above was not taken in good faith and did not involve objectively reasonable steps within the meaning of N.J.S.A. 30:4-27.7. This allegation is based on documented contradictions and omissions, including: (a) a screening certificate documenting “no hallucinations” while certifying psychosis and dangerousness; (b) reliance on alleged medication overuse despite toxicology results showing no alcohol intoxication, no benzodiazepines, and no illicit drugs; (c) failure to provide the Screening Bill of Rights; (d) blank or incomplete PESS screening fields; (e) PA-only transfer certification without a physician signature or countersignature; (f) a transfer checklist marking “No” for risks, benefits, and alternatives explained; (g) transfer records stating an inaccurate 170 kg weight and dentures; (h) Hampton's alleged failure to conduct an independent intake evaluation; (i) the “No

Justification for Hospitalization documented" notation; and (j) the "added by mistake" care-plan notation and alleged admission of mistake.

67. Plaintiff does not plead these facts as a mere disagreement with medical judgment. Plaintiff alleges that they show ministerial, documentation, consent, transfer, screening, and confinement failures that a reasonable facility or clinician would have recognized before depriving Plaintiff of liberty, administering psychotropic medication, or transmitting Plaintiff to another facility.

68. Independently of any court order, N.J.S.A. 30:4-27.17(a) provides that the treatment team at a short-term care or psychiatric facility shall administratively discharge a patient from involuntary commitment status if the treatment team determines that the patient no longer needs involuntary commitment to treatment. Plaintiff alleges that, by March 27–28, 2023, Hampton's own records and Dr. Houdart's alleged admission of mistake reflected such a determination, or facts from which such a determination should have been made, yet no administrative discharge or discharge determination occurred until March 30, 2023.

69. Plaintiff further alleges that the conduct described above was, at minimum, grossly negligent and undertaken in willful or wanton disregard of Plaintiff's rights and safety. Plaintiff pleads gross negligence and willful or wanton misconduct in the alternative to ordinary negligence as to each negligence-based Count below.

## V. CLAIMS FOR RELIEF

### COUNT ONE

### Professional Negligence / Negligent Psychiatric Screening

### (Against Defendant Dr. Chris Fabian, M.D.)

70. Plaintiff incorporates only paragraphs 22 through 24, 31 through 42, and 66 through 69 as relevant to this Count.

71. Dr. Fabian owed Plaintiff a professional duty to conduct a careful, accurate, and legally compliant psychiatric screening before certifying Plaintiff for involuntary commitment or transfer.

72. Dr. Fabian breached that duty by conducting a remote telepsychiatry screening without documented consent or waiver, certifying Plaintiff for involuntary commitment despite documenting “Perception: no hallucinations,” relying on alleged medication overuse despite contrary toxicology results, and failing to reconcile material contradictions before issuing the Screening Certificate.

73. Plaintiff alleges that Dr. Fabian's conduct was not in good faith and did not constitute reasonable steps within the meaning of N.J.S.A. 30:4-27.7 because the certificate and supporting records contained internal contradictions and omitted critical information before authorizing involuntary confinement and transfer.

74. As a direct and proximate result of Dr. Fabian's conduct, Plaintiff was involuntarily transferred, confined, labeled with unsupported psychiatric diagnoses, exposed to later nonconsensual treatment, and suffered damages in an amount to be proven at trial.

**COUNT TWO**

**Professional Negligence / Negligent PESS Screening Narrative and Documentation**

**(Against Defendant Theo F. Kalogridis, R.N.)**

75. Plaintiff incorporates only paragraphs 22 through 24, 31 through 42, and 66 through 69 as relevant to this Count.

76. Theo F. Kalogridis owed Plaintiff a duty, as a PESS screening evaluator or screener, to gather, document, and transmit accurate information relevant to dangerousness, medication use, travel history, collateral contacts, and the factual basis for involuntary commitment.

77. Mr. Kalogridis breached that duty by documenting, repeating, or transmitting a screening narrative concerning medication overuse and travel that Plaintiff alleges was materially inconsistent with objective toxicology results and objective travel records, and by failing to ensure that critical screening fields and dangerousness history information were complete before the screening certificate was used.

78. Plaintiff alleges that Mr. Kalogridis's conduct was not in good faith and did not constitute reasonable steps because the screening narrative omitted or conflicted with objective information available before Plaintiff was deprived of liberty.

79. As a direct and proximate result of Mr. Kalogridis's conduct, Plaintiff was subjected to involuntary screening, transfer, confinement, and related damages in an amount to be proven at trial.

## COUNT THREE

**Vicarious Liability, Apparent Agency, and Institutional Negligence in PESS Screening**

**(Against Defendant Monmouth Medical Center)**

80. Plaintiff incorporates only paragraphs 37 through 42, 62 through 63, and 65 through 69 as relevant to this Count.

81. Monmouth Medical Center owed Plaintiff duties through its PESS screening function, its staff, its screeners, and its agents or apparent agents. Plaintiff did not choose or independently retain Dr. Fabian or Mr. Kalogridis, understood them to be acting through Monmouth/PESS,

reasonably relied on Monmouth/PESS as the provider of screening services, and had no practical ability to select a different screening provider.

82. Monmouth is liable for the conduct of Dr. Fabian and Mr. Kalogridis under agency, apparent agency, respondeat superior, and/or its own institutional duties as the entity responsible for the PESS screening process.

83. Monmouth breached its duties by failing to ensure that screening forms, dangerousness history fields, collateral information, and the factual basis for the certificate were complete, accurate, and reasonably supported before the certificate was used to deprive Plaintiff of liberty.

84. Plaintiff alleges that Monmouth's conduct was not in good faith and did not constitute reasonable steps within the meaning of N.J.S.A. 30:4-27.7 because the PESS records contained internal contradictions, omitted critical information, and failed to address objective records contradicting medication-overuse and hallucination narratives.

85. As a direct and proximate result of Monmouth's conduct, Plaintiff was involuntarily transferred, confined, labeled with unsupported psychiatric diagnoses, exposed to subsequent treatment, and suffered damages in an amount to be proven at trial.

**COUNT FOUR**

**Professional Negligence in Emergency-Department Clearance and Involuntary-Hold Transition**

**(Against Defendant Dr. Steven Guillen, M.D.)**

86. Plaintiff incorporates only paragraphs 25 through 35 and 66 through 69 as relevant to this Count.

87. Dr. Guillen owed Plaintiff a professional duty as an attending provider at CentraState to ensure that any transition from medical clearance and requested discharge to involuntary psychiatric detention was based on accurate, reconciled, and documented clinical information.

88. Dr. Guillen breached that duty by participating in or ratifying Plaintiff's transition to involuntary screening or detention without reconciling the objective toxicology results, the calm or resting nursing observations, Plaintiff's discharge request, and the absence of documented review of the Screening Bill of Rights.

89. Plaintiff alleges that Dr. Guillen's conduct was not in good faith and did not constitute reasonable steps because Plaintiff was held after requesting discharge based on records that were internally inconsistent and incompletely explained to Plaintiff.

90. As a direct and proximate result of Dr. Guillen's conduct, Plaintiff remained confined at CentraState, was escalated to involuntary screening, and suffered damages in an amount to be proven at trial.

**COUNT FIVE**

**Professional Negligence in Attestation, Oversight, and Transfer Authorization**

**(Against Defendant Dr. Stephen Van Pelt, M.D.)**

91. Plaintiff incorporates only paragraphs 25 through 36, 43 through 49, and 66 through 69 as relevant to this Count.

92. Dr. Van Pelt owed Plaintiff a professional duty as an attending provider at CentraState to ensure that attestations, transfer authorization, and chart ratification were accurate, documented, and reasonably supported before Plaintiff was involuntarily transferred.

93. Dr. Van Pelt breached that duty by signing or ratifying chart entries, attestations, or transfer-related decisions without a documented in-person evaluation and without correcting or

reconciling objective discrepancies, including toxicology, transfer-certification defects, and biometric or property errors appearing in transfer records.

94. Plaintiff alleges that Dr. Van Pelt's conduct was not in good faith and did not constitute reasonable steps because the transfer proceeded on records containing objective errors and incomplete transfer safeguards.

95. As a direct and proximate result of Dr. Van Pelt's conduct, Plaintiff was involuntarily transferred to Hampton on materially inaccurate and incomplete documentation and suffered damages in an amount to be proven at trial.

**COUNT SIX**

**Negligence / Professional Negligence in Transfer Certification**

**(Against Defendant A. Tabasko, PA-C)**

96. Plaintiff incorporates only paragraphs 43 through 49 and 66 through 69 as relevant to this Count.

97. A. Tabasko, PA-C owed Plaintiff a duty to execute transfer paperwork in a reasonably careful, accurate, and legally compliant manner and to ensure that risks, benefits, alternatives, physician certification, and transfer documentation were properly addressed before Plaintiff was involuntarily transported to another facility.

98. A. Tabasko breached those duties by signing the Physician Certification Consent for Transfer without a physician signature or countersignature and by executing transfer paperwork that marked “No” for whether risks, benefits, and alternatives to transport were explained to Plaintiff.

99. Plaintiff alleges that the PA-only transfer certification and the "No" entry for risks, benefits, and alternatives show a lack of good faith and failure to take reasonable steps, and are also state-law negligence facts rather than a separate EMTALA cause of action.

100. As a direct and proximate result of A. Tabasko's conduct, Plaintiff was transferred to Hampton on incomplete or defective transfer documentation and suffered damages in an amount to be proven at trial.

**COUNT SEVEN**

**Institutional Negligence in Emergency-Department Detention, Rights Notice, and Transfer Documentation**

**(Against Defendant CentraState Healthcare System)**

101. Plaintiff incorporates only paragraphs 25 through 36, 43 through 49, and 66 through 69 as relevant to this Count.

102. CentraState owed Plaintiff institutional duties to maintain accurate records, verify patient identity and objective patient information, provide required screening rights and transfer explanations, ensure appropriate transfer documentation, and refrain from transferring Plaintiff based on materially inaccurate or incomplete records.

103. CentraState breached its duties by preventing Plaintiff from leaving after he declined voluntary admission without reviewing the Screening Bill of Rights, documenting or transmitting incorrect objective information including a 170 kg weight and dentures, treating Plaintiff as dangerous or unstable for commitment purposes while certifying him as stabilized for transfer, and transmitting records that created or reinforced an inaccurate psychiatric narrative.

104. CentraState is also liable under agency, apparent agency, respondeat superior, and/or direct institutional negligence for the conduct of its employees or agents involved in Plaintiff's

emergency-department detention, nursing monitoring, transfer certification, and transfer documentation.

105. Plaintiff alleges that CentraState's conduct was not in good faith and did not constitute reasonable steps within the meaning of N.J.S.A. 30:4-27.7 because CentraState proceeded with detention and transfer despite objective contradictions, rights-notice failures, transfer-documentation defects, and biometric or property errors that required no medical judgment to recognize.

106. As a direct and proximate result of CentraState's conduct, Plaintiff was detained, screened, transferred, exposed to subsequent confinement and treatment, and suffered damages in an amount to be proven at trial.

## COUNT EIGHT

### Professional Nursing Negligence / Negligent Documentation and Escalation

### (Against Defendant Jordan White, R.N.)

107. Plaintiff incorporates only paragraphs 25 through 35 and 66 through 69 as relevant to this Count.

108. Jordan White, R.N. owed Plaintiff a nursing duty to document accurately, monitor Plaintiff carefully, communicate material observations, and escalate material inconsistencies between Plaintiff's observed condition and the basis for continued secured detention.

109. Mr. White breached that duty by documenting that Plaintiff denied pain, was resting comfortably, and was alert and oriented, while Plaintiff remained in secured detention after requesting discharge, without documenting or escalating the inconsistency between those observations and the continued involuntary hold.

110. Plaintiff alleges that Mr. White's conduct contributed to the continuation of Plaintiff's secured detention and to the failure of later actors to receive a complete and balanced record of Plaintiff's presentation.

111. As a direct and proximate result of Mr. White's conduct, Plaintiff remained detained, was escalated to involuntary screening, and suffered damages in an amount to be proven at trial.

**COUNT NINE**

**Professional Nursing Negligence / Negligent Documentation and Escalation**

**(Against Defendant Antonella Salony, R.N.)**

112. Plaintiff incorporates only paragraphs 25 through 35 and 66 through 69 as relevant to this Count.

113. Antonella Salony, R.N. owed Plaintiff a nursing duty to document accurately, monitor Plaintiff carefully, communicate material observations, and escalate material inconsistencies between Plaintiff's observed condition and the basis for continued secured detention.

114. Ms. Salony breached that duty by documenting calm, oriented, or cooperative behavior while Plaintiff remained in secured detention after requesting discharge, without documenting or escalating the inconsistency between those observations and the continued involuntary hold.

115. Plaintiff alleges that Ms. Salony's conduct contributed to the continuation of Plaintiff's secured detention and to the failure of later actors to receive a complete and balanced record of Plaintiff's presentation.

116. As a direct and proximate result of Ms. Salony's conduct, Plaintiff remained detained, was escalated to involuntary screening, and suffered damages in an amount to be proven at trial.

**COUNT TEN**

**Battery / Nonconsensual Administration of Psychotropic Medication**

**(Against Defendant Dr. Michael Houdart, D.O.)**

117. Plaintiff incorporates only paragraphs 50 through 59 and 66 through 69 as relevant to this Count.

118. Plaintiff did not consent to the administration of Haldol, Risperdal, Cogentin, or related psychotropic medication at Hampton. Plaintiff refused, objected, was not asked for meaningful consent, or was not given a meaningful opportunity to consent before the medications were administered.

119. Dr. Houdart ordered, authorized, directed, or caused the administration of those medications to Plaintiff without consent and without a documented emergency that would justify overriding Plaintiff's refusal or lack of consent.

120. The nonconsensual medication constituted intentional, harmful, or offensive physical contact and a battery under New Jersey law. This Count is pleaded as an intentional-tort claim distinct from any professional-negligence claim.

121. As a direct and proximate result of Dr. Houdart's conduct, Plaintiff suffered physical injury, emotional distress, loss of autonomy, fear, humiliation, and other damages in an amount to be proven at trial.

**COUNT ELEVEN**

**Battery / Vicarious Liability for Nonconsensual Medication**

**(Against Defendant Hampton Behavioral Health Center)**

122. Plaintiff incorporates only paragraphs 50 through 59 and 66 through 69 as relevant to this Count.

123. Hampton owed Plaintiff a duty not to administer psychotropic medication without consent or lawful justification and to ensure that any medication administered by its employees, nurses, agents, or apparent agents was authorized by valid consent or a documented emergency.

124. Hampton, through its staff, employees, nurses, agents, or apparent agents, administered Haldol, Risperdal, Cogentin, or related medication to Plaintiff pursuant to Dr. Houdart's orders or facility practice without Plaintiff's consent and without a documented emergency justification.

125. The nonconsensual medication constituted intentional, harmful, or offensive physical contact. Hampton is liable under respondeat superior, agency, apparent agency, and/or direct institutional duties for the resulting unauthorized bodily contact.

126. As a direct and proximate result of Hampton's conduct, Plaintiff suffered physical injury, emotional distress, loss of autonomy, fear, humiliation, and other damages in an amount to be proven at trial.

**COUNT TWELVE**

**Medical Malpractice / Professional Negligence in Hampton Evaluation, Treatment, and Continued Confinement — Pleaded in the Alternative**

**(Against Defendant Dr. Michael Houdart, D.O.)**

127. Plaintiff incorporates only paragraphs 50 through 59 and 66 through 69 as relevant to this Count.

128. Dr. Houdart owed Plaintiff a professional duty as Plaintiff's attending physician to evaluate Plaintiff independently, verify the factual basis for diagnosis and confinement, obtain informed consent where required, continuously reassess the need for inpatient psychiatric confinement, and initiate discharge when confinement was no longer clinically or legally justified.

129. Dr. Houdart breached his duties by relying on flawed CentraState and Monmouth/PESS records without adequate independent evaluation, diagnosing or treating Plaintiff based on unsupported or contradictory information, administering or causing psychotropic medication without informed consent, and continuing confinement after the record stated “No Justification for Hospitalization documented,” after the care plan was marked “added by mistake,” and after Dr. Houdart allegedly admitted the commitment intervention was a mistake.

130. Plaintiff alleges that Dr. Houdart's conduct was not in good faith and did not constitute reasonable steps, and that it was at minimum grossly negligent, because the continued confinement and treatment proceeded after records and communications reflected lack of justification or mistake.

131. As a direct and proximate result of Dr. Houdart's conduct, Plaintiff suffered unnecessary confinement, nonconsensual treatment, medical-record stigma, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

**COUNT THIRTEEN**

**Professional Negligence / Failure to Correct or Escalate Contradictory Hampton Evaluation**

**(Against Defendant Dr. Atta-ur Rehman, M.D.)**

132. Plaintiff incorporates only paragraphs 52 through 53, 58 through 59, and 66 through 69 as relevant to this Count.

133. Dr. Rehman owed Plaintiff a professional duty, as a Hampton physician or evaluator, to evaluate Plaintiff accurately, document hospitalization justification accurately, and take reasonable steps to correct, clarify, or escalate material contradictions in Plaintiff's confinement record.

134. Dr. Rehman breached that duty by entering or maintaining a psychiatric diagnosis while simultaneously writing "No Justification for Hospitalization documented," and by failing to initiate or document correction, discharge review, or escalation to address the contradiction in the record.

135. Plaintiff alleges that Dr. Rehman's conduct contributed to Hampton's continued confinement and treatment of Plaintiff after Hampton's own record failed to document a justification for hospitalization.

136. As a direct and proximate result of Dr. Rehman's conduct, Plaintiff suffered continued confinement, medical-record stigma, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

**COUNT FOURTEEN**

**Professional Negligence / Negligent Social-Work Documentation and Discharge Escalation**

**(Against Defendant Anita Giunta, L.S.W.)**

137. Plaintiff incorporates only paragraphs 54 through 59 and 66 through 69 as relevant to this Count.

138. Anita Giunta owed Plaintiff a professional duty, as a licensed social worker involved in Hampton's care-plan, treatment-plan, or discharge-related process, to document accurately,

communicate material information to the treatment team, and escalate facts showing that a care plan, goal, intervention, or commitment rationale was mistaken.

139. Ms. Giunta breached that duty by documenting or participating in the inactivation of Plaintiff's care plan, goal, or intervention as "added by mistake," while failing to initiate or document an immediate discharge review, correction, or escalation after recording that mistake.

140. Plaintiff alleges that Ms. Giunta's conduct contributed to Hampton's continued confinement of Plaintiff after the care-plan foundation for his involuntary status had been marked mistaken.

141. As a direct and proximate result of Ms. Giunta's conduct, Plaintiff suffered continued confinement, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

**COUNT FIFTEEN**

**Institutional Negligence / Professional Negligence in Hampton Evaluation, Treatment, and Continued Confinement**

**(Against Defendant Hampton Behavioral Health Center)**

142. Plaintiff incorporates only paragraphs 50 through 59 and 66 through 69 as relevant to this Count.

143. Hampton owed Plaintiff institutional duties to perform an independent intake assessment, verify sending-facility records before relying on them, ensure medication and confinement were clinically and legally justified, maintain accurate care-plan and discharge records, and release Plaintiff once continued confinement lacked justification.

144. Hampton breached those duties by admitting and treating Plaintiff based on flawed CentraState and Monmouth/PESS records without adequate independent evaluation,

administering or causing psychotropic medication without consent or adequate justification, and continuing confinement after the record stated "No Justification for Hospitalization documented," after the care plan was marked "added by mistake," and after Dr. Houdart allegedly admitted that the commitment intervention was a mistake.

145. Hampton is also liable under agency, apparent agency, respondeat superior, and/or direct institutional negligence for the conduct of Dr. Houdart, Dr. Rehman, Ms. Giunta, nurses, employees, agents, or apparent agents involved in Plaintiff's evaluation, medication, treatment planning, and continued confinement.

146. Plaintiff alleges that Hampton's conduct was not in good faith and did not constitute reasonable steps within the meaning of N.J.S.A. 30:4-27.7, and was at minimum grossly negligent, because Hampton continued confinement and treatment after its own records reflected absence of justification or mistake.

147. As a direct and proximate result of Hampton's conduct, Plaintiff suffered unnecessary confinement, nonconsensual treatment, medical-record stigma, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

**COUNT SIXTEEN**

**False Imprisonment Based on Pre-Certificate CentraState Detention**

**(Against Defendant CentraState Healthcare System)**

148. Plaintiff incorporates only paragraphs 25, 33 through 35, and 66 through 69 as relevant to this Count.

149. CentraState intentionally confined Plaintiff when, after he was medically cleared and requested discharge, CentraState prevented him from leaving, placed him in a secured or locked isolation room under continuous video monitoring, and initiated involuntary screening.

150. Plaintiff alleges that this confinement occurred before lawful process was completed and without providing Plaintiff the Screening Bill of Rights or a legally sufficient individualized explanation for continued detention.

151. Plaintiff alleges that CentraState's confinement was not in good faith and was not objectively reasonable because it rested on incomplete rights notice, contradictory records, and failure to explain the basis for detention after Plaintiff requested to leave.

152. As a direct and proximate result of CentraState's confinement, Plaintiff suffered loss of liberty, fear, humiliation, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

**COUNT SEVENTEEN**

**False Imprisonment Based on Continued Hampton Confinement**

**(Against Defendant Hampton Behavioral Health Center)**

153. Plaintiff incorporates only paragraphs 52 through 59 and 66 through 69 as relevant to this Count.

154. Hampton intentionally continued Plaintiff's confinement after the record stated “No Justification for Hospitalization documented,” after the care plan was marked “added by mistake,” and after Plaintiff alleges Hampton personnel were provided information corroborating that Plaintiff's statements were factual rather than delusional.

155. This Count does not seek to invalidate or review the facially valid state-court Temporary Order. Plaintiff alleges that Hampton's continued confinement became unlawful because Hampton's own records and communications reflected that continued involuntary treatment was no longer justified, and because N.J.S.A. 30:4-27.17(a) provides for administrative discharge upon such a determination.

156. Plaintiff alleges that Hampton's continued confinement was not in good faith and was not objectively reasonable within the meaning of N.J.S.A. 30:4-27.7 because it rested on materially contradictory records, lack of independent evaluation, and continued detention after internal records reflected mistake or absence of justification.

157. As a direct and proximate result of Hampton's continued confinement, Plaintiff suffered loss of liberty, fear, humiliation, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

**COUNT EIGHTEEN**

**False Imprisonment Based on Continued Confinement After Alleged Mistake Admission**

**(Against Defendant Dr. Michael Houdart, D.O.)**

158. Plaintiff incorporates only paragraphs 54 through 59 and 66 through 69 as relevant to this Count.

159. Dr. Houdart intentionally continued, authorized, or caused Plaintiff's confinement after the care plan was marked “added by mistake” and after Dr. Houdart allegedly admitted to Plaintiff that the initial commitment intervention was a mistake.

160. Plaintiff alleges that Dr. Houdart's continued confinement of Plaintiff after those events lacked lawful justification because Dr. Houdart knew or should have known that the factual and clinical basis for confinement had collapsed and that administrative discharge or discharge review was required.

161. Plaintiff alleges that Dr. Houdart's conduct was not in good faith and was not objectively reasonable because he continued confinement after records and communications reflected mistake or absence of justification.

162. As a direct and proximate result of Dr. Houdart's continued confinement of Plaintiff, Plaintiff suffered loss of liberty, fear, humiliation, emotional distress, reputational harm, and other damages in an amount to be proven at trial.

**COUNT NINETEEN**

**Breach of Confidentiality / Unauthorized Disclosure of Confidential Medical Information**

**(Against Defendant "Intern Ashley" (John/Jane Doe))**

163. Plaintiff incorporates only paragraphs 60 through 61 and 65 as relevant to this Count.

164. Plaintiff had a reasonable expectation of privacy and confidentiality in his psychiatric status, psychiatric location, medical information, and treatment-related communications.

165. Intern Ashley breached Plaintiff's privacy and confidentiality rights by dialing 732-762-9602 instead of the intended 732-672-9602 number and leaving a voicemail that disclosed Plaintiff's psychiatric location, psychiatric status, or other confidential medical information to an unauthorized number.

166. Plaintiff pleads this Count as a state-law breach-of-confidentiality and unauthorized-disclosure claim. Plaintiff does not assert a private HIPAA cause of action; statutory and regulatory confidentiality standards are referenced only as evidence of the applicable duty of care.

167. As a direct and proximate result of Intern Ashley's conduct, Plaintiff suffered invasion of privacy, embarrassment, emotional distress, fear of further dissemination, reputational harm, and other damages in an amount to be proven at trial.

**COUNT TWENTY**

**Institutional Liability for Breach of Confidentiality and Negligent Communication Procedures**

**(Against Defendant CentraState Healthcare System)**

168. Plaintiff incorporates only paragraphs 60 through 61 and 64 through 65 as relevant to this Count.

169. CentraState owed Plaintiff duties to maintain the confidentiality of his psychiatric and medical information, to train and supervise staff regarding confidential communications, and to require verification of a recipient's identity and telephone number before disclosing psychiatric information by voicemail.

170. CentraState is liable for Intern Ashley's conduct under agency, apparent agency, respondeat superior, and/or its own negligent training, supervision, and communication procedures concerning psychiatric patients and confidential medical information.

171. CentraState breached its duties when a staff member or apparent agent left a voicemail at an unauthorized phone number that disclosed Plaintiff's psychiatric location, psychiatric status, or other confidential medical information.

172. As a direct and proximate result of CentraState's conduct, Plaintiff suffered invasion of privacy, embarrassment, emotional distress, fear of further dissemination, reputational harm, and other damages in an amount to be proven at trial.

## VI. DAMAGES

173. As a result of the conduct alleged above, Plaintiff seeks compensatory damages in an amount to be proven at trial, including damages for loss of liberty, nonconsensual medication, physical and emotional injury, privacy harm, reputational harm, medical-record consequences, lost income or reduced earning capacity, and other consequential losses.

174. Plaintiff seeks punitive damages only against Defendants whose conduct is proven to have involved actual malice, wanton and willful disregard, bad faith, intentional misconduct, gross negligence, or reckless indifference under applicable New Jersey law, including the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9 et seq.

175. Plaintiff also seeks equitable relief, to the extent permitted by law, requiring correction or amendment of materially inaccurate medical records and preventing further dissemination of records that falsely attribute unsupported hallucinations, delusional travel, medication overuse, incorrect weight, dentures, or other inaccurate facts to Plaintiff.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bradley Clonan respectfully requests judgment against each Defendant only on the Count or Counts asserted against that Defendant, and requests:

176. Compensatory damages in an amount to be proven at trial;

177. Punitive damages where permitted by law and supported by proof;

178. Declaratory, injunctive, or equitable relief requiring correction or amendment of materially inaccurate medical records, where permitted by law;

179. Prejudgment and post-judgment interest where permitted by law;

180. Costs and any fees recoverable by law; and

181. Such other and further relief as the Court deems just and proper.

## VIII. EXHIBIT AND SEALED-RECORD NOTE

182. Plaintiff understands that the specific medical records supporting the factual allegations include sensitive psychiatric and medical information previously filed under seal. Plaintiff may submit a separate exhibit/source index for the Court's convenience. Any such index

is for source identification only and does not expand any Count beyond the paragraphs specifically incorporated into that Count.

## IX. JURY DEMAND

183. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

## X. SIGNATURE

Dated: June 11, 2026

Respectfully submitted,

Bradley Clonan
/s Bradley Clonan

Bradley Clonan, Plaintiff Pro Se
2604 W Rhododendron Drive
Abingdon, Maryland 21009
(732) 476-9555
clonanxyz@gmail.com